## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRAVIS GRANDISON,         ) | |
|             ) | |
|      Plaintiff,        ) | |
|             ) | |
|      v.              ) | Civil Action No. |
|             ) | |
| WACKENHUT SERVICES, INC., ) | |
|             ) | |
|      Defendant.      ) | |
| | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendant, Wackenhut Services, Inc. ("WSI"), reserving all defenses and objections, hereby removes the civil action styled *Travis Grandison v. Wackenhut Services, Incorporated*, Civil Action No. 2007- CA 002173B (the "State Court Action"), pursuant to 28 U.S.C. §§ 1441 *et seq.*, from the District of Columbia Superior Court. As grounds for removal, WSI states as follows:

1.      On or about March 23, 2007, Travis Grandison ("Plaintiff") commenced the State Court Action by filing a Complaint in the District of Columbia Superior Court.

2.      On April 2, 2007, WSI was served with the Complaint in the State Court Action through its registered agent in the District of Columbia, Prentice-Hall Corporation.

3.      WSI is filing herewith a copy of all process, pleadings, and orders served upon it in the State Court Action. Those documents are attached hereto as **Exhibit 1**.

4.      WSI is filing this Notice of Removal within thirty days from the date on which WSI received, through service or otherwise, a copy of the Complaint in the State Court Action.

5.      Travis Grandison, the sole plaintiff in the State Court Action, is a citizen of the District of Columbia.  Cmplt. ¶ 3.[1]

6.      WSI, the sole defendant in the State Court Action, is incorporated under the laws of the State of Florida, *see* **Exhibit 2** (Certificate), which also is its principal place of business.  Thus, for the purposes of federal diversity, WSI is a citizen of Florida. 28 U.S.C. § 1332(c)(1).

7.      The amount in controversy in the State Court Action exceeds $75,000, exclusive of interest and costs.  Indeed, Plaintiff demands over $500,000 in punitive damages alone.  Cmplt. Remedies section ¶ b.  Plaintiff also seeks $75,000 in compensatory damages.  Cmplt. Remedies section ¶ a.  Plus he seeks, among other relief, attorneys' fees, and back wages and benefits resulting from his alleged retaliatory discharge approximately a year ago, in May 2006.  Cmplt. ¶ 32, Cmplt. Remedies section ¶ d.  Thus, he seeks over $75,000 in back wages.

8.      This Court has original jurisdiction over this action, under 28 U.S.C. § 1332(a), because (a) this action is between citizens of different states; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.  Accordingly, removal is appropriate under 28 U.S.C. § 1441(a).

---

[1] Citations to the Complaint in the State Action are denominated "Cmplt. ¶___."

9.      The State Court Action purports to allege claims under the District of Columbia Human Rights Act, slander/defamation, intentional infliction of emotional distress, breach of contract, breach of the covenant of good faith and fair dealing, interference with contract and violation of due process.  Plaintiff's claims relate, in substantial part, to the manner in which WSI, as Plaintiff's employer, administered the Collective Bargaining Agreement by and between WSI and Plaintiff's Labor Organization, the United Union of Security Guards at the Government Accountability Office Headquarters.  Resolution of Plaintiff's tort claims requires consideration and analysis of that Collective Bargaining Agreement.  Accordingly, those claims are preempted under Section 301 of the Labor Management Relations Act ("LMRA").  29 U.S.C. § 185.  *See International Brotherhood of Teamsters v. Hechler*, 481 U.S. 855, 862 (1987); *Allis-Chambers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)("[A] plaintiff may not evade the preemptive force of § 301 of the LMRA by casting the suit as a state law claim.").

10.     Under Section 301 of the LMRA and 28 U.S.C. § 1331, this Court also has original jurisdiction over Plaintiff's claims that require consideration and analysis of the Collective Bargaining Agreement.  Thus, removal of those claims is appropriate under 28 U.S.C. § 1441(a).  Removal of Plaintiff's remaining state claims, including his contract claims, is permitted under 28 U.S.C. § 1441(c).  Accordingly, pursuant to 28 U.S.C. § 1441(b), WSI may remove this entire action.

11.     To the extent that Plaintiff's procedural due process claim (Count VIII) envisions a claim under the U.S. Constitution, this Court has original jurisdiction over the claim, under 28 U.S.C. 1331.  Thus, removal of the due process claim is appropriate

under 28 U.S.C. § 1441(a). Removal of Plaintiff's remaining claims is permitted under 28 U.S.C. § 1441(c). Accordingly, pursuant to 28 U.S.C. § 1441(b), WSI may remove this entire action.

      12.    WSI is filing a copy of this Notice of Removal with the District of Columbia Superior Court in accordance with 28 U.S.C. § 1446(d).

      13.    WSI is sending a copy of this Notice of Removal to Plaintiff, through his attorney, Jay Schiffres.

      14.    WSI expressly reserves all rights and defenses relating to Plaintiff's claims.

      WHEREFORE WSI respectfully removes the State Court Action to this Court for all purposes pursuant to 28 U.S.C. § 1441.

Respectfully submitted,

ARENT FOX PLLC

By: _____
Henry Morris, Jr. (Bar No. 375894)
Richard Webber (Bar No. 193995)
Kristine J. Dunne (Bar No. 471348)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
(202) 857-6000/Telephone
(202) 857-6395/Facsimile

*Counsel for Wackenhut Services, Inc.*

Dated:   April 23, 2007

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of April 2007, I caused a copy of the foregoing

Notice of Removal to be served, by first class mail, postage pre-paid, upon the following:

> Jay Schiffres, Esq.
> 700 E Street, S.E.
> Washington, D.C. 20003

Kristine J. Dunne

**EXHIBIT 1**

# Agreement

between

# Wackenhut Services Inc.

and

# United Union of Security Guards

at the

# General Accounting Office Headquarters

## July 1, 2000 - September 30, 2004

00 SEP 26 PM 2:27
ACQUISITION MANAGEMENT
RECEIVED

# AGREEMENT

## PREAMBLE

This Agreement is entered into as of this 1st day of September 2000, by and between Wackenhut Services Inc. hereinafter referred to as the "Employer" and the United Union of Security Guards hereinafter referred to as the "Union." The Agreement is effective July 1, 2000, and continues to September 30, 2004.

## ARTICLE 1: SCOPE OF AGREEMENT

### Section 1: Recognition

The Employer recognizes and acknowledges the Union as the exclusive bargaining agent with respect to rates of pay, hours of work, and other conditions of employment, for all full-time and regular part-time security officers and corporals employed by the Employer at the General Accounting Office Headquarters (GAO), Washington, DC; and excluding all other employees, clerical, lead receptionist, access control receptionists, managerial and administrative employees and supervisors as defined in the National Labor Relations Act, as amended.

### Section 2: Probationary Employees

All employees newly hired, or rehired after termination of their seniority, shall be classified as probationary employees for a cumulative period of ninety (90) days worked on the site for full-time and forty-five (45) cumulative days worked for all part-time employees. After an employee has worked such period, the employee shall gain seniority status and his/her seniority date shall revert to the first day the employee earned wages from the Employer for employment at this site. During the probationary period, the employee may be discharged

without recourse to the grievance and arbitration procedures; however, no employee shall be discharged in violation of any federal and/or state law. The employee's probation may be extended by the Employer for the same number of day(s) missed during said period.

An Employee promoted to a higher job classification covered by this Agreement shall be on probationary status in that job for ninety (90) days. If within the ninety (90) days said employee fails to satisfactorily fulfill the requirements of the higher classification position as determined by the Employer, the employee shall be transferred back to the original or similar position. Except as provided in this paragraph or elsewhere all other provisions of this Agreement are applicable to probationary employees.

Section 3: Temporary Employees

The Employer shall have the right to hire temporary employees when requested to do so by the government in writing and when the employees are so informed at the time of hire, who shall be excluded from the seniority provisions of Article 16 of this Agreement, for a period not to exceed in the aggregate three (3) months. The said three (3) month period referred to in the preceding sentence may be extended for up to an additional three (3) month period at the written request of the government.

## ARTICLE 2: UNION SECURITY AND CHECK - OFF

All covered employees have the right to become and remain members of the Union or not to do so. As a condition of employment, all employees covered by this Agreement shall, on or before their 31st day following the actual beginning of such employment with the Employer or the effective date of this Agreement, whichever is later, either:

a.    Join the Union and remit to the Union on a monthly basis Union dues as duly established by the Union, or

b.    Remit to the Union on a monthly basis a representation fee, which is eighty percent (80%), of Union dues as duly established by the Union and represented by the Union as the appropriate fee for representational activities.

If any employee shall fail to remit such union dues or representation fees when due as provided herein, the Employer shall discharge such employee upon the Union's written request and representation of such failure to remit dues or fees and proof that the employee has been put on notice of such arrears. The Union will hold the Employer harmless and indemnify the Employer for the discharge of any employee who has been discharged pursuant to the Union's request.

The Union agrees to furnish the Employer with a memorandum verifying the amount of dues payable as members of the Union by each of the employees covered by this Agreement. Upon receipt of such memoranda and upon receipt of a signed authorization card from the employee, the Employer agrees to deduct such union dues or representation fees from covered employees' wages as required by the Union on a form mutually agreed to and subject to the provision of Section 302(c) of the Labor Management Relations Act of 1947. The check-off authorization card to be executed and furnished to the Employer by the Union and the employees shall be the official Union authorization for check-off of dues/fees, a copy of which shall be attached and made a part of this Agreement as Appendix A. Union dues or representation fees based upon all payrolls paid during a month and a supporting remittance report shall be delivered by the

Employer to the Union on or before the 15th day following the month for which said dues or fees are due.

c.  The Union accepts full responsibility for the authenticity for each authorization card submitted by it to the Company, and any authorization which is incomplete or in error shall be disregarded by the Company, and shall be returned to the Union for correction. The Union agrees that, upon receipt of proper proof, it will refund to the employees any deduction erroneously or illegally withheld from an employee's earnings by the Company, which has been transmitted to the Union by the Company. The Union further agrees to indemnify the Company and hold it harmless against any and all claims, suits or other forms of liability which may be made against it by any party for amounts deducted from wages as herein provided.

d.  No deduction of Union dues or representation fees will be made from the wages of any employee who has executed an authorization and who has been transferred to a job not covered by this Agreement, or who is not in pay status. Upon return to work within a classification covered by this Agreement, deductions from future wages shall be automatically resumed, provided it is in accordance with the other appropriate provisions of this Agreement and of the National Labor Relations Act, as amended.

e.  Collections of any back dues or representation fees owed at the time of starting deductions for any employee, and collection of dues or representation fees missed because the employee's earnings were not sufficient to cover payment of dues for

5

a particular pay period, will be the responsibility of the union, and will not be the subject of payroll deductions.

f.     Deduction of membership dues or representation fees shall be made in a flat sum provided there is a balance in the paycheck sufficient to cover the amount after all other deductions authorized by the employee, or required by law, have been satisfied.  In the event of termination of employment, the obligation of the Employer to collect dues shall not extend beyond the pay period in which the employee's last day of work occurs.

## ARTICLE 3: NONDISCRMINATION

The Employer and the Union agree that there shall be no discrimination by the Employer or the Union against employees because of race, color, creed, religion, national origin, sex, age, marital status, non job-related physical or mental handicap, or because of their involvement in, or refraining from, participating in Union activities except as required by Article 2 or this Agreement.

## ARTICLE 4: MANAGEMENT RIGHTS

Subject only to such limitations as may be specifically imposed by this Agreement, the Union recognizes that the management of the business and direction of the working force is vested exclusively in the Employer, including but not limited to, the right to schedule work, to assign work and working hours to employees, to decide the work amount and location at its facility to determine the type of services performed, to establish reasonable quality and performance standards, and the most efficient means of providing service, to require from every

employee compliance with normal operating rules and procedures, to formulate and enforce appropriate Employer rules and regulations, including the drug and alcohol policy set out in Article 28 of this Agreement, now in effect, or hereinafter enacted, if not covered by the provisions of this Agreement, to hire, suspend, promote, demote, transfer, discharge or discipline for cause, or relieve employees from duty because of lack of work, government's request or for other legitimate reasons, to maintain discipline and efficiency of employees, to judge skill, ability, and physical fitness, and to create, eliminate, or consolidate job classifications, to control and regulate the use of all equipment and other property of the Employer and to subcontract. work which would otherwise be performed by the employees subject to this Agreement at the convenience of the Government all shall be vested exclusively in the Employer.   The above mentioned rights reserved to management are not intended to deny or limit the Employer in other managerial rights which are not covered by this Agreement or which it previously exercised.

## ARTICLE 5: EMPLOYEE CLASSIFICATIONS

### Section 1

An employee shall be classified as "full-time" as soon as the Employer, in its opinion reasonably exercised, determines that the non-probationary employee is reasonably expected to work 1,768 hours or more during a twelve-month period.

### Section 2

An employee shall be classified as "part-time" if the Employer, in its opinion reasonably exercised, determines that the non-probationary employee is not reasonably expected to work 1,768 hours or more during a twelve-month period.

## ARTICLE 6: WORK WEEK AND HOURS OF WORK

<u>Section 1</u>

The work week shall be from 0001 hours Monday until 2400 hours Sunday.  Wages shall be paid bi-weekly on Friday in the next week following the end of the pay period.

<u>Section 2</u>

The Employer shall schedule the hours of work of employees at least two (2) weeks in advance except in circumstances beyond the Employer's control (including requirements of GAO).  Where the agency contract requirements permit, the Employer shall schedule employees for eight (8) hour shifts whenever possible.

<u>Section 3</u>

Through the duration of this Agreement, covered employees working shifts of six consecutive hours shall receive a fifteen (15) minute paid break during their shift.  Employees who work shifts of eight hours or more shall receive two fifteen (15) minutes paid break periods during their shift and a one half hour paid lunch break.  In addition, employees shall be provided with breaks for emergency purposes as reasonably required.

<u>Section 4</u>

Overtime is to be paid at the rate of one and one-half (1 ½) times the basic hourly straight time rate.  Overtime shall be paid to employees for work performed in excess of forty (40) hours in a work week.  A workday shall be defined as from 0001 hours until 2400 hours.  There will not be any pyramiding or duplicating of hours worked for any purpose whatsoever. The payment

8

of overtime or premium pay for any hour excludes that hour from consideration of overtime payment on any other basis.  Only hours actually worked shall be recognized in determining overtime eligibility.  Paid vacation or holiday time shall not be counted as hours worked in the calculation of overtime.  The Employer shall have the right to hold over employees until relieved and/or to require an available employee to provide coverage of the post.

## Section 5

An employee called in outside his regular work schedule shall be guaranteed a minimum of four (4) consecutive hours of work or pay in lieu thereof.  In the event, a GAO post is closed because of an order from the government (i.e., Snow Closure) after an employee has reported to work, the employee shall receive pay for such shift as scheduled to work.  It is the responsibility of the Employer to make timely notification to employees in the event of changes to posted schedules, as well as, temporary additional services and emergency services.  The employee will maintain effective communications and provide telephone/pager numbers and updates of changes to the Employer.  In the event the Employer is paid by the government for posts not covered on snow days, any employee who is normally scheduled to work such post and who was excused from reporting shall be compensated to the same degree as the Employer is compensated.

## Section 6

Nothing in this Article shall be construed as a guarantee of work, work opportunities, or hours, except as otherwise expressly provided.

## ARTICLE 7: DISCIPLINE

### Section 1

The Employer has the right to determine the level and degree of discipline. Disciplinary action shall not be taken without just cause. The Parties agree to follow the disciplinary provisions contained in its Standard Operating Procedures Number 358, *Administration of Discipline*, as revised July 2000 (Appendix B). Under normal circumstances, corrective progressive disciplinary action is taken following a thorough review of the incident, to include an oral warning, written warning, suspension, and eventual discharge. After an employee receives a written warning, the use of a final written warning, rather than suspension, may be more appropriate as the next step in the disciplinary sequence. A suspension, however, remains the more appropriate option when in the discretion of the supervisor, it is in the best interest of all parties that the employee be removed from the work area immediately.

The above steps would not necessarily apply in all cases. A suspension or discharge may be warranted on the first occasion of an extremely serious offense. However, an oral warning may not be warranted on a first occasion where personal counseling may eliminate future problems. In addition, it may be proper to give an employee one or more written warnings in some cases before giving a disciplinary suspension. In such situations requiring discipline, the circumstances must be known and each action taken on the merits of the case.

### Section 2: Representation by Shop Stewards or Union Officers

Any conference between an employee and an Employer representative during which discipline is expected to be imposed or from which discipline may flow, if the employee so

requests, must be conducted in the presence of an authorized Union Officer or shop steward. Employees must be advised in advance if a conference may lead to disciplinary action.

## ARTICLE 8: GRIEVANCE, ARBITRATION PROCEDURE

Any grievance or dispute which may arise following the effective date of this Agreement concerning the application, meaning, interpretation, implementation of an/or adherence to this Agreement, limited thereto, shall be settled in the following manner:

Step 1:       The employee and/or his or her Union representative shall present the grievance or dispute orally to the Employer's Project Manager/company representative within five (5) business days of its occurrence or when the employee knew, or by reasonable diligence should have known, of its occurrence.  The Project Manager/company representative shall orally respond to the grievance within five (5) business days.

Step 2:       If the grievance is not settled at Step 1, the employee an/or his or her Union representative shall, within five (5) business days of the date the Project Manager responded or should have responded, whichever is sooner, submit the grievance in writing to the Employer's Vice President/General Manager.  The Employer's Vice President/General Manager shall respond to the grievance within five (5) business days of receipt of the grievance.

Step 3:       If the grievance is not settled at Step 2, the Union shall, within five (5) business days of receipt of the Vice President/General Manager's response in Step 2, or the date when the Vice President/General Manager's response was due, present the grievance in writing to the Employer's President or his/her designee.  The Employer's President or his/her designee shall respond in writing to the grievance within five (5) business days.  Grievances affecting a class or classes of employees may be initiated by the Union at Step 3.  The Employer shall have

the right to involve senior management in the grievance process at an earlier stage, in its discretion.

Step 4:        If the grievance is not settled at Step 3, the Union may, within seven (7) business days after the receipt of the Employer's President's response (or that of his designee) in Step 3, proceed to binding arbitration. Notice that arbitration is desired shall be served upon the Employer within (7) business days after the Union receives the Employer's Step 3 answer. Such notice shall identify the provisions of the Agreement allegedly violated and shall set forth such facts and circumstances as will provide the Employer with reasonable notice of the nature of the grievance. If the Parties are unable to agree on an arbitrator within ten (10) business days of the date of service, they shall choose an Arbitrator from a panel provided by the Federal Mediation and Conciliation Service by alternately striking the names on the list. The Employer shall have the first strike.

In addition, if the Employer has a dispute with the Union concerning the application, meaning, interpretation, implementation of and/or adherence to this Agreement, the Employer shall notify the Union in writing of such dispute within seven (7) business days of the date on which the dispute arose or, if later, on the date it first became aware (or reasonably should have become aware) of the existence of such dispute. If the Parties are unable to resolve such dispute within a period of thirty (30) days from the date of notice to the Union, the Employer may proceed to binding arbitration. Such arbitration proceeding must be demanded within ten (10) Business days following the aforementioned thirty (30) day period unless the Parties mutually agree in writing to extend such time period. Notice that the Employer requests arbitration shall be served upon the Union. If the Parties are unable to agree on an arbitrator within ten (10) business days of the date of service of the demand for arbitration, they shall choose an Arbitrator

from a panel provided by the Federal Mediation and Conciliation Service by alternately striking the names on the list. The Union shall have the first strike.

The Arbitrator shall conduct a hearing on the grievance. The Arbitrator shall render a decision within thirty (30) days of the close of the hearing or receipt of briefs. Any back pay award shall be reduced by any sums received as unemployment compensation or from interim employment.

The Arbitrator shall have no authority to alter, amend, or add to this Agreement, nor shall the Arbitrator alter, reduce or modify the penalty assessed by the Employer unless the Employer has failed to follow the progressive discipline steps. All of the time limits contained in this Article may be extended by mutual agreement of the Parties in writing.

All fees and expenses of the Arbitrator shall be shared by the Parties, except where one of the Parties to the Agreement requests a postponement of a previously scheduled arbitration hearing which results in a postponement charge and in that case the postponing Party shall pay such charge.

An employee shall be permitted to have a Union representative at each step of the grievance and arbitration procedure. Similarly, the Employer shall be permitted to have a representative at each step of the grievance and arbitration procedure.

The president of the Union or his/her designee shall have access to all relevant personnel records necessary to the Union's administration of this Agreement but must otherwise maintain the confidentiality of all information contained therein.

Both the Union and Employer shall utilize the grievance and arbitration procedure prior to initiating claims or litigation before any other administrative body or court whenever a dispute arises regarding the application, meaning, interpretation, implementation of an/or adherence to

this Agreement. Seeking relief from a government agency or a federal or state court before using the grievance and arbitration provisions herein shall constitute a violation of this Agreement. However, nothing in this Agreement shall be construed to be a waiver of any statutory rights of any employee. In the event of any arbitration involving an issue which involves rights of employees or the Union which are secured by federal or state statute, the Parties agree that any period of limitations shall be deemed to be tolled during the arbitration proceeding. An employee shall not be entitled to recover more than once for the grievance or dispute with the Employer.

## ARTICLE 9: NO STRIKE AND NO LOCKOUT

The Employer agrees not to cause, permit or engage in any lockout of its employees during the term of this Agreement. The Union agrees that neither it nor the employees it represents covered by this Agreement will, during the term of this Agreement, cause, permit, or take part in any strike, including sympathy or secondary strike, picketing, or work action. It shall be a violation of this Agreement, and it shall be cause for discharge or suspension in the event an employee refuses to enter upon any property involved in a labor dispute involving other employee organizations or refuses to go through or work behind any picket lines involving other employee organizations at the Employer's place or places of business. The Union and the Employer agree to take all steps possible to ensure that Government property is properly secured and protected in the event of labor disputes involving other employee organizations at the GAO Headquarters.

## ARTICLE 10: BULLETIN BOARDS

The Union may furnish a 2' by 3' bulletin board for the exclusive use of the Union at the GAO Headquarters in the break room. There shall be no posting of literature on these bulletin boards except official Union notices or events authorized by an official designated by the Union.

## ARTICLE 11: STEWARDS

### Section 1

The Union shall designate no more than one (1) Steward per shift. An Alternate Steward may be designated if the Steward is not available. The Union shall notify the Employer of the selection of Stewards within ten (10) days of such selection. Stewards will be limited in the aggregate to a maximum two (2) hours per pay period of the Employer's paid time to conduct their on-site duties concerning the investigatory interviews which may result in discipline and grievances arising therefrom. This time will be coordinated with the shift supervisor. Stewards shall keep a log of time expended on matters of Union representation and related business. The Employer may examine the log in the event a request for compensation under this section is questioned.

### Section 2

Stewards have no authority to call or direct strikes or authorize other economic action against the Employer. Stewards and Union officers shall not interfere with the management of the business or direct the work of any employee, but may advise the Employer of any violations of the Agreement. The authority of Stewards shall be strictly limited to the investigation and representation of grievances in accordance with the provisions of this Agreement and the

transmission of such messages and information which shall originate with and are authorized by the Union or its officers.

## Section 3

In the absence or unavailability of the Steward designated as representing employees on a specific shift or in a specific location, any other Union-designated Steward may represent unit employees.

## ARTICLE 12: COURT APPEARANCES

Court or administrative appearances necessitated by job-related occurrences or incidents shall be compensated for fully at the rates specified in this Agreement. However, other court, administrative or grievance procedure and/or arbitration appearances shall not be Employer-paid.

## ARTICLE 13: JURY DUTY

The Employer agrees to pay employees called for jury duty their normal full regular pay for a period up to ten (10) work days, less any fees or sums received from the Court, when an employee has met the following conditions:

a.  The employee must notify the Employer within seventy-two (72) hours after he or she receives a jury duty questionnaire or notice that he or she is subject to a jury duty call;

b.  No compensation shall be paid by the Employer for jury duty on Saturday, Sundays and holidays, unless such Saturday, Sunday or holiday was the employee's normal work day or for any other day on which the employee is not

16

normally scheduled to work. The employee must provide the Employer with written evidence or notice from the court that he/she performed jury service, for what period of time and the amount that the employee was compensated for such service.

## ARTICLE 14: LEAVES OF ABSENCE

### Section 1: Family & Medical Leave

All provisions of this Article shall be applied in accordance with the Family and Medical Leave Act as amended (FMLA). Eligible non-probationary employees will be granted up to twelve (12) weeks of unpaid leave for their own serious illness, for the birth or adoption of a child, or the care of a seriously ill child, spouse, or parent as defined by FMLA. An employee who takes FMLA leave will use as much sick leave and vacation leave that he/she has accrued.

### Section 2: Extended Family & Medical Leave

An employee who is ineligible for or has exhausted available Family & Medical leave or accrued sick leave, may, at the Employer's sole discretion, be granted unpaid leave on such terms and conditions the Employer deems appropriate. During such leave, the employee shall not continue to accrue seniority, although all seniority attained before the granting of extended leave shall be retained.

### Section 3: Personal Leave Without Pay

An employee may request personal leave without pay for personal reasons for a period of up to ninety (90) days. It is within the Employer's sole discretion whether such requests, which

must be in writing and state the reason for and length of the desired leave, will be granted. Neither seniority nor benefits shall accrue during such personal leave. Employees on leaves of absence for personal reasons who accept other employment during such leave shall be considered as having resigned. Upon giving two (2) weeks notice of intent to return to work, an employee shall be scheduled to report to his or her former job, or an equal job within two (2) weeks of the Employer's receipt of such notice if a job is available. If no job is available on the employee's former shift, he or she may be put on any available shift, consistent with the Employer's scheduling needs.

## Section 4: Bereavement Leave

In the event of the death of a member of a non-probationary unit employee's immediate family, the employee will not lose any wages which he or she would other wise have earned for the day before the burial, the day of the burial and the day after the burial. For the purpose of this provision, members of the employee's immediate family include: husband, wife, child, parent (including step parent), foster parent (*i.e.* an adult who reared the employee), grandparent, brother or sister. Appropriate documentation of the death, attendance at the funeral, memorial service, family grieving process and family relationship may be required. Such documentation may include letters or death certificates from the funeral home, clergy or community leaders. Leave for the death of a foster parent will be granted in the case of death in only one foster family.

## Section 5: Military Service

Employees enlisting or entering the military service of the United States pursuant to the provisions of the Uniformed Services Employment and Reemployment Rights Act and amendments thereto shall be granted all rights and privileges provided by that Act.

## ARTICLE 15: WEAPONS

The Employer agrees to implement a regular maintenance program for all Employer-owned weapons. Pursuant to this program, all weapons shall be checked, cleaned, and if necessary, repaired or replaced at least once every thirteen (13) weeks. Employees have the obligation to ensure that their weapons are at all times in proper working order. If an employee has knowledge that his or her weapon is not in proper condition, the employee shall immediately report this to his or her supervisor for replacement.

## ARTICLE 16: SENIORITY

### Section 1: Seniority Lists

The Employer shall maintain a seniority list for all regular full-time and part-time employees employed by the Employer at the GAO Headquarters. The Employer shall furnish the Union with copies of such lists every six (6) months if requested in writing.

### Section 2: Scheduled Overtime

a.    The Employer reserves the right to offer overtime to employees at its discretion and without regard to seniority in the event that such overtime (i.e., work over 40 hours per week) is required for reasons including but not limited to, an employee

19

has failed to report for work, an employee has called in sick, or for other unanticipated reasons or special circumstances.

b.    The Employer will in good faith attempt to distribute overtime work as equitably as practical among the employees the Employer reasonably deems qualified to perform the work, giving due regard to seniority where all other factors are equal. In the event the Employer has advance knowledge of 48 hours or more that overtime will be required, such work will be offered consistent with seniority whenever possible. Opportunity to work overtime shall be provided consistent with the Employer's business needs and circumstances and must be authorized in advance by the Employer. When the Employer has an unanticipated or exigent need to provide coverage, the Employer shall have the right to require an employee who normally performs the work to remain on duty until relieved and/or to require an available employee to provide such coverage, as conditions warrant.

Section 3: Permanent Position Openings

A permanent position is defined, for the purposes of this Section, as a position on a specific shift. The parties understand that the Employer may rotate employees among posts on a specific shift. As permanent positions open, notice shall be posted. Employees shall have seven (7) days within which to bid. First preference shall be given to the employee, meeting site requirements, with the most seniority, skill, ability and professional work performance. Skill, ability, and work performance will be measured by job knowledge, punctuality, and responsiveness to schedules. All qualified candidates may then bid the successful bidder's prior

position. The remaining opening(s), if any, may then be assigned by the Employer at its discretion without challenge.

Section 4: Promotions

The Employer reserves the right to promote personnel who, in the Employer's sole judgment, will best serve and fulfill its requirements and standards. If within ninety (90) days, an employee who has been promoted fails to satisfactorily fulfill the requirements of the new position, as determined by the Employer, the employee may be transferred to the original or similar position. Time spent, as a supervisor shall not count towards the employee's seniority.

Section 5: Reduction in Force/Lay Off

In the event that the work force at the GAO Headquarters shall be reduced for any reason, the employees with the least seniority shall be laid off first. Shift reassignments shall be by bidding. Full-time employees may bid to return to a part-time position and be transferred to a full-time position when one becomes available, consistent with the Employer's scheduling needs and the provisions of this Agreement. A full-time employee may decline recall to a part-time position and remain on the recall list.

Section 6: Recall

a.    As jobs become available at the GAO Headquarters employees shall be recalled in order of their seniority at the site, where reasonably deemed qualified by the Employer. Laid off full-time employees shall be recalled to full-time

employment as positions become available. Probationary employees who have

been laid off have no recall privileges.

b.    In the event of a layoff, seniority does not continue to accrue. An employee shall

retain the seniority, which he or she possessed at the time of the layoff except as

provided below.

## Section 7: Loss of Seniority

In the event the Employer loses its contract to provide services at the GAO Headquarters,

the Employer will have no obligation with regard to this Section after the termination of its

contract.

An employee's seniority with the Employer shall be terminated if the employee:

(a)    Voluntarily quits;

(b)    retires;

(c)    is discharged for cause;

(d)    is absent from work for two (2) consecutive working days without notifying the
       Employer of the reason for his absence before the close of the two (2) day period,
       unless there was an emergency which prevented the employee from properly
       notifying the Employer;

(e)    fails to return to work from layoff within five (5) working days after the mailing
       of notice of recall by the Employer, unless there was an emergency which
       prevented the employee from properly notifying the Employer; or

(f)    fails to return from a scheduled vacation or leave of absence without having given
       proper notice to the Employer, unless there was an emergency that prevented the
       employee from properly notifying the Employer.

(g)    is laid off for a period of twelve (12) months or length of employment whichever
       is less.

In the event that an employee is laid off for reasons other than the Employer's loss of contract, the Employer shall, within thirty (30) days of the layoff, determine if the employee is qualified for work at another job site, and, if so, offer the employee the opportunity for a transfer if a position is available.

An employee's seniority shall not be terminated by a lay off due to an employee's efforts at requalification pursuant to Article 18.

A laid off employee who is recalled shall be sent notice of recall by certified mail to the employee's last known home address.  It shall be the obligation of the employee to keep the Employer informed of his/her address or changes thereto.  If such employee does not respond within five (5) business days of the date on which the Employer's notice was sent, or the employee refuses such offer, the employee will be deemed to have  voluntarily quit, even if the notice is returned as undeliverable.  An employee who has voluntarily quits or otherwise been terminated has no right to recall.

## Section 8: Shift and Post Reassignments

In the event the Employer determines it is necessary to rotate employees among posts, every reasonable effort, consistent with the Employer's business needs,  shall be made to assign employees during the same shift in which they previously worked.  The Employer will make every reasonable effort, consistent with the Employer's business needs, to assign employees in such a manner as will not disrupt established child care arrangements, established work obligations as well as family obligations.  Assignments are to be made in an unbiased manner and, where the Employer reasonably deems qualifications to be equal, in accordance with seniority to the extent possible.

23

## ARTICLE 17: VOLUNTARY QUITS

An employee shall be deemed to have voluntarily quit employment with the Employer if:

a.  A full-time employee accepts full-time employment with a competitor of the Employer at the same time while he or she is employed by the Employer, or otherwise fails to report for duty as scheduled by the Employer, while simultaneously remaining an employee of a competitor of the Employer.

b.  The employee fails to report for work within forty-eight (48) hours of the beginning of his/her scheduled shift after the expiration of a leave of absence without a telephone call or other explanation, unless there was an emergency which reasonably prevented the employee from properly notifying the Employer.

c.  The employee fails to report for work for two (2) consecutive days without telephoning or otherwise notifying the Employer, unless there was an emergency, which reasonably prevented the employee from properly notifying the Employer.

d.  The employee fails to respond within five (5) days of the Employer sending a notice of recall, unless there was an emergency, which prevented the employee from properly notifying the Employer.

e.  An employee who takes medical leave fails to notify the Employer that he/she is able to return to work within two (2) days after he/she receives a medical release to work.

# ARTICLE 18: TRAINING AND RE-QUALIFICATION

<u>Section 1</u>

Effective October 1, 2000, the Employer agrees to pay employees who are required to requalify with a weapon on a firing range for up to four (4) hours at the employee's normal hourly rate of pay and one-half (½) hour for travel to and from the range facility at the employee's normal rate of pay for the first attempt only. The Employer further agrees to pay employees who are required to take government mandated training and retraining courses at the regular rates of pay provided by this Agreement. Notwithstanding the foregoing, in the event that an employee is required to take a repeat training course or is required to make a second attempt to qualify with a weapon because the employee failed to attain a sufficiently high score to be requalified, the Employer shall not be obligated to pay the employee for such courses or additional weapons range time.

<u>Section 2</u>

The Employer shall schedule employees to be re-qualified at least one (1) month prior to the expiration of their weapons permit. The Employer shall afford to employees the opportunity to have at least one (1) practice sessions prior to any formal requalification test. All qualification and requalification procedures shall be conducted in accordance with GSA guidelines and procedures. Subject to GSA guidelines and procedures, the employee shall be given two (2) opportunities to qualify prior to the expiration date of his/her weapons permit. If the employee is unable to re-qualify prior to the expiration of his/her weapons permit or fails to pass a range qualification test twice before such time, the employee shall be laid off without pay for a maximum of forty-five (45) days. Such employee shall be reinstated after re-qualifying.

An employee laid off pursuant to this provision shall not accrue seniority or fringe benefits during his/her period of layoff. If the person does not re-qualify after the forty-five (45) day lay off period, such action will be considered as a voluntary quit.

## Section 3

The Employer shall schedule, in a timely manner, full-time and part-time employees to obtain any annual government required physical examination at no expense to the employee (only for one examination). If an employee does not appear for or obtain his or her government-required physical examination prior to the time by which it must be obtained, the employee shall be suspended as in Section 2 above. If the employee does not satisfactorily pass his/her physical within the period of time specified above, the employee shall be considered as having voluntarily quit.

Subject to GSA requirements and rules, the employee shall have two opportunities to pass the physical examination. If the employee fails to do so or fails to report for a scheduled examination (unless such failure to report is the result of a documented emergency circumstance), the employee shall be terminated. Failure to maintain physical fitness standards, as established by the Employer, shall also result in employee termination. Failure to pass or refusal to take an alcohol or drug test shall be treated in accordance with Article 28.

## Section 4

If an employee does not successfully complete and pass his or her government-required GSA, first aid and/or CPR examination prior to the time by which such examination must be taken and passed, the employee shall be laid off as in Section 2 above. If the employee does not

satisfactorily pass his/her first aid and/or CPR examination within the period of time specified above, the employee shall be placed on lay-off status until such time as the employee is administered the examination(s) and passes same. The employee shall have two opportunities to pass the first aid and/or CPR examination. If the employee fails to do so or fails to report for a scheduled examination (unless such failure to report is the result of a documented emergency circumstance), the employee shall be terminated.

Section 5

The Employer shall provide employees, at least 90 days prior to expiration of their General Services Administration (GSA) handgun permit, such forms as are required by the GSA for the renewal of such permit. Employees are expected to return such forms, including the range qualification form, completed together with any necessary photographs and fingerprint specimens within ten (10) days thereafter. The Employer shall promptly submit the completed forms, photographs, and fingerprint specimens to the GSA. If the employee does not submit to the Employer the completed forms, photographs, and fingerprint specimens within the aforementioned period and, as a result of the employee's delay, the employee's permit lapses, the employee shall be suspended without pay until the permit is received. Notwithstanding the foregoing, if the employee fails to provide the completed forms, photographs, and fingerprint specimens within 30 days of his/her receipt of the forms from the Employer, the employee shall be deemed to have quit voluntarily. In the event the Employer does not timely submit completed forms, photographs, and fingerprint specimens to the appropriate state agency and the employee permit lapses because of such delay, the employee may be suspended until a permit is issued.

## ARTICLE 19: UNIFORMS

<u>Section 1</u>

The Employer shall provide at no cost to all employees those items listed in the Employer's GAO Headquarters guard service contract.  Upon termination of employment, the clothing and equipment issued to the employee shall be returned to the Employer in good condition.  Returned clothing shall be cleaned, pressed and returned on hangers.

The Employer agrees to pay eleven ($0.11) cents per hour worked up to forty (40) hours a week to each employee for uniform cleaning allowance.

The Employer shall replace any parts of the uniform that are damaged in the line of duty, provided it has been reported to the Shift Supervisor within the shift period when the incident occurred and for uniforms that become unserviceable due to normal wear and tear. Employees may purchase replacement items that are not covered above from the Employer at cost.  Such articles shall be paid for by deductions from the employees' pay.

<u>Section 2</u>

Upon termination of employment, the issued clothing and equipment shall be returned to the Employer.  The Union agrees that all employees, at the time of hire, shall give written authorization allowing the Employer to deduct from the employees' final paycheck the cost of all unreturned issued clothing and equipment and/or the cost of cleaning clothing not returned in a clean condition.  The deduction for such missing items or cost of cleaning shall be the actual cost to the Employer.

## ARTICLE 20: SUCCESSORS

The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee of the operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to the Union at the time the seller, transferee, or lessee executes a contract or transaction as herein described.

## ARTICLE 21: SUBCONTRACTING

For the purposes of preserving work and job opportunities for the employees covered by this Agreement, the Employer agrees to provide the Union with at least seven (7) days notice prior to subcontracting or transferring to non-bargaining unit employees, any of the work or services of the kind, nature or type presently or hereafter performed or provided by the Employer. Supervisory personnel may, without prior notice, be temporarily assigned to cover unit work in an emergency situation. In no event shall such temporary assignment(s) exceed sixty (60) days in any year.

## ARTICLE 22: HOLIDAYS

Section 1

The Employer shall grant to all full-time employees the following holidays off with pay (or pay in lieu thereof, if normally scheduled to work that week day) at their straight time rate. Holiday benefits shall be paid provided that the employee shall work his or her regularly scheduled workday prior to the holiday and after the holiday:

> New Year's Day
> Martin Luther King's Birthday
> President's Day
> Memorial Day

Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day
Employee's Birthday (Effective 10/1/00)

The Employer reserves the right to limit the number of employees who take their birthday holiday on the same date.  A birthday holiday may be taken by the employee up to seven (7) days prior to or after the employee's birthday.  Holiday pay will not be granted to employees when a holiday falls within a period of leave of absence and/or layoff.  A regularly scheduled part-time employee will receive a prorated portion of the above holidays not worked based upon their average hours worked in the four (4) weeks preceding the holiday.

## ARTICLE 23: VACATION

### Section 1

During the term of this Agreement, the Employer will provide paid vacation for full-time employees as follows:

After one (1) year of continuous service          eighty (80) hours

After five (5) years of continuous service        one hundred twenty (120) hours

After ten (10) years of continuous service        one hundred sixty (160) hours

### Section 2

Employees are eligible to take vacation after their anniversary date of employment each year.  Vacations must be taken in the twelve (12) month period following each anniversary date of employment and cannot be carried over from one anniversary year to another.

Section 3

Pro-rata vacation shall not be paid during the first year of employment. However, after the first year of employment an employee who has earned a full vacation or accrued a portion thereof and whose employment is terminated shall be entitled to vacation pay, unless the employee has been discharged for cause involving monetary or material loss by the Employer.

Section 4

If a holiday named in Article 22 falls during an employee's vacation period, such employee shall be entitled to receive pay for such holiday (8 hours at employee's straight time hourly rate).

Section 5

Vacation preferences shall be submitted to the Employer for approval, and although the most senior employee's vacation preference will be given weight where possible, the time when each employee takes his/her vacation shall be determined by the Employer.  No more than five percent (5%) of the work force may be on vacation at any time. All vacation pay will be at employee's straight time hourly rate.

Section 6

Part-time employees, after their anniversary date of employment, shall receive pro-rata vacation at their straight time hourly rate based on hours worked in the preceding anniversary year of employment.  Should a holiday fall during the part-time employee's vacation period such employee shall be entitled to receive pro-rata holiday pay pursuant to Article 22.

## ARTICLE 24: SICK LEAVE

### Section 1

Effective October 1, 2000, full-time employees shall earn sick leave benefits on the basis of four (4) hours per month to a maximum of forty-eight (48) hours per year. No more than a total of forty (40) hours may be carried over or banked in the aggregate. Part-time employees will earn a prorated sick pay benefit. Said benefit will be calculated based upon their average hours worked in the preceding six (6) month period not to exceed eight (8) hours per sick day used (up to forty-eight (48) hours a year). The earning and accrual of sick leave is based upon sick leave earned by the employee, without break in service, for the Employer at the GAO Headquarters. Unused sick leave shall not be paid upon termination of employment. Full-time employees with perfect attendance during the calendar year will receive an attendance bonus of $100.00. Perfect attendance is defined as no lateness or unexcused absences from work. This will be issued in a separate check after verification by the Employer during the first month following the end of the calendar year for which attendance bonus was earned.

### Section 2

In order to receive compensation for sick days, an employee must notify his/her supervisor or designee at least three (3) hours prior to the commencement of his/her shift or as soon as possible after the onset of the illness that he/she will be unable to work due to sickness.

### Section 3

An employee who is absent due to illness or injury for more than three (3) consecutive work days shall be required to provide to the Employer, a physician's statement supporting and

certifying the employee's absence and ability to return to work on the day of returning to work. Where an employee fails to provide medical certification as required by this Article, or where medical certification does not support the employee's absence, the employee will not be entitled to sick pay, and will be subject to disciplinary action. An employee who does not provide medical certification that he/she is able to return to work if required or reasonably requested under this Article will not be permitted to return to work until such documentation is provided. The employer may require a doctor's certificate in cases of suspected abuse of sick leave of any length.

Section 4

Where an employee takes leave pursuant to the Employer's Family and Medical Leave Policy, the provisions of that policy will supersede any provision of this Article which is inconsistent with that policy.

ARTICLE 25: HEALTH AND WELFARE

Section 1

During the term of this Agreement, the Employer shall offer to eligible full-time employees a cafeteria type health and welfare plan. This Section 125 qualified plan offered to employees and their eligible dependents includes health insurance, dental insurance, vision, life insurance, accidental death and dismemberment insurance. Employees may select all, part or none according to individual requirements using dollars provided by the Employer in Section 2 below. Part-time employees are not eligible to participate in this plan. If an employee elects not to participate in any benefit provided by the plan or elects benefits the cost(s) of which are less

than the benefit contributions set out below, the employee shall receive an amount equal to the benefit amount, or the difference between the cost of the benefit(s) elected and the amounts set out below, as additional wages.

Section 2

Upon the effective date of this Agreement, it is mutually agreed that the Health and Welfare Benefits or the money in lieu thereof (to full or part-time employees) shall be established at $1.63 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2000, such rate shall be $2.03 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2001, such rate shall be $2.18 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2002, such rate shall be $2.30 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2003 such rate shall be $2.30 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year.

Section 3

Upon the next open enrollment period of the Company or upon an employee's date of hire, each covered employee shall elect in writing one of two options: (1) Participation in the Company's Sponsored Plan outlined in Section 1 or (2) the Security Worker's Health and Welfare Fund. Failure to select an option shall be deemed to be an election of option (1).

## Section 4

Consistent with the election of each employee, the Company will contribute the amounts set forth in Section 1 in accordance with employee's election.   In the event cash amounts are to be paid to the employee, the Company will pay those amounts in each biweekly payroll.

## Section 5

Employees  who elect the Security Worker's Fund must remain a participant for at least one full year. Employees who do not select this Fund may thereafter elect it only once each subsequent year during the thirty (30) day period that begins on the first day of the month in which this agreement was executed. An employee may terminate his/her participation in the Security Worker's at any time following the anniversary of his/her initial participation. However, an employee who voluntarily terminates such participation may not again participate in the Fund for a minimum of twelve (12) months. The parties also understand and agree that regardless of the date(s) on which the Company makes contributions on behalf of specific employees, eligibility for benefits under any of the Plans or Funds referred to herein is determined in accordance with the respective plan or fund rules.

## Section 6

The parties agree that an employee's initial or subsequent choice of options as listed herein shall be voluntary and free of any influence of either party or their representatives. The Company retains the right to make available or choose another insurance carrier(s) provided that the employee's level of coverage is not substantially decreased.

In the event that the contribution rate required by the Security Workers Health and Welfare Fund for a level of coverage desired by an employee is greater than the Employer contributions provided for in Section 5 above, the Employer agrees to deduct from the employee's wages an amount sufficient to meet the contribution requirement. Such deduction shall only be made upon authority of a written authorization signed by the employee.

## ARTICLE 26: 401(k) RETIREMENT PLAN

Upon the effective date of this Agreement all full and regular scheduled part-time employees may participate on a voluntary basis in the Employer's 401(k) Plan. Effective October 1, 2000, whether they elect to contribute or not, the Employer will contribute on behalf of each employee the sum $0.25 an hour to a maximum of forty (40) hours worked per week (2,080 hours/year). The employee will be entitled to a vesting of these Employer contributions after a period of one (1) year of continuous employment. Employees will be vested in said Plan based upon the terms and conditions of said Plan. No provision of said Plan is subject to the provision of Article 8 of this Agreement.

The Employer will provide information to the employees to advise them about the 401(k) program including roll over opportunities as provided by law.

## ARTICLE 27: WAGES

During the term of this Agreement, employees shall receive the following hourly rates of pay on the dates indicated:

| Classification | 7/1/00 | 10/1/00 | 10/1/01 | 4/1/02 | 10/1/02 | 4/1/03 | 10/1/03 | 4/1/04 |
|---|---|---|---|---|---|---|---|---|
| CPL | $11.50 | $12.20 | $12.56 | $12.68 | $13.05 | $13.18 | $13.56 | $13.69 |
| SO | $11.20 | $11.90 | $12.26 | $12.38 | $12.75 | $12.88 | $13.26 | $13.39 |

## ARTICLE 28: DRUG AND ALCOHOL POLICY

The Parties recognize that in the security business, the use of controlled substances or alcohol, which cause intoxication or impairment on-the-job poses risks to the Employer, the affected employee, his or her co-workers, and the public. An employee cannot perform his or her work adequately if he or she is under the influence of illegal drugs or alcohol which also presents a danger to himself or herself and to others. Unlawful use of drugs and the abuse of alcohol when not on duty raise serious questions concerning the employee's competency to perform security work and is grounds for revocation of his or her firearms permit. It is the Employer's policy to maintain a drug-free work place. The Employer and the Union agree to the Drug and Alcohol Policy attached hereto (Appendix C) and incorporated in this Agreement.

## ARTICLE 29: MISCELLANEOUS

Section 1

The Union agrees to cooperate with the Employer in all matters required by the Government. The Union recognizes that the terms and conditions of this Agreement are subject to certain priorities which the Government may exercise. The Union agrees that any action taken

37

by the Employer pursuant to a requirement imposed by the Government shall not constitute a breach of this Agreement. Any action which the Government directs or requires the Employer to take immediately may be taken without prior notice to or discussion with the Union. Otherwise, actions which affect terms or conditions of employment will be discussed with the Union.

## Section 2

It is recognized and acknowledged by the Union that the Employer is in the business of providing a service, through its employees, to the government. It is therefore essential and expected that all employees will act in a highly professional, courteous manner and will be held responsible and accountable for their duties, functions and job requirements. Deviation from or failure to meet this standard will result in disciplinary action pursuant to the provisions of Article 7.

## Section 3

The parties acknowledge that during negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements reached by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this Agreement even though such subjects or matters may

not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

## ARTICLE 30: SEPARABILITY AND SAVINGS CLAUSE

If any Article or Section of this Agreement or any appendix or attachments thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement and of any appendix thereto, or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.  In the event that any Article or Section is held invalid or enforcement of or compliance with has been restrained as above set forth, the Employer and the Union agree to enter into immediate collective bargaining negotiations, upon the request of either Party, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint.

## ARTICLE 31: DURATION OF AGREEMENT

Except as otherwise provided in this Article, this Agreement shall be in full force and effect from July 1, 2000, and shall remain in effect until (and including) September 30, 2004.

IN WITNESS WHEREOF, the Parties hereto have set their hands and seals to this
Agreement, this _22_th day of _September_, 2000.


UNITED UNION OF SECURITY GUARDS

By: _[signature]_                    Dated _September 5, 2000_


WACKENHUT SERVICES, INC.

By: _[signature]_                    Dated: _September 22, 2000_


I:\S30\Wackenhut_Areawide\2000cbaGAO4.wpd

40

AMENDMENT #2
TO
AGREEMENT BETWEEN
WACKENHUT SERVICES, INC.
AND
UNITED UNION OF SECURITY GUARDS
AT
GENERAL ACCOUNTABILITY OFFICE (GAO)

Subject Agreement is revised as follows:

**A. ARTICLE 1: Section 1: RECOGNITION**  New language to read:

Effective August 4, 2004 the GAO requires the security force to be staffed with Metropolitan Police Department Security Officers Management Branch (SOMB) Special Police Officers (SPO).  All references throughout this contract to "Security Officer" shall mean SPO.

The Employer recognizes and acknowledges the Union as the exclusive bargaining agent with respect to rates of pay, hours of work, and other conditions of employment, for all full-time and regular part-time **special police officers, and alarm monitor dispatch operators,** employed by the Employer at the U.S. **Government Accountability Office** (GAO), Washington, D.C; and excluding all other employees, clerical, lead receptionist, access control receptionists, managerial and administrative employees and supervisors as defined in the National Labor Relations Act, as amended.

**B. ARTICLE 18: QUALIFICATIONS, TRAINING AND RE-QUALIFICATION.**  Add the following Introduction  paragraph above Section I to read:

"Introduction: **Effective August 4, 2004** personnel must meet the following qualifications.

Special Police Officers must:
1.      Obtain and maintain a Metropolitan Police Department SOMB Armed SPO License.
2.      Obtain a DOD Secret Clearance within 6 months of assignment to GAO.  DOD Interim Secret Clearance is required before entry on duty.
3.      Successfully complete and receive certification for the use of expandable batons.

4.    Pass a physical fitness requirement. Consisting of a forty yard sprint or run starting from the prone position in under 7 seconds; and run or walk a half mile in under 7 minutes.

Alarm Monitor Dispatch Operators must have 5 years experience in the following:

1.    Proficiency in using Microsoft windows based programs such as Excel, Word, and Access based programs.
2.    Proficiency and knowledge in using e-mail.
3.    An ability to maintain poise and self-control under stress.
4.    An ability to construct and write clear, concise, accurate and detailed reports.
5.    An ability to comprehend rules, detailed orders, instructions, and training materials.
6.    The ability to obtain a DOD Secret Clearance with 6 months of assignment to GAO.  DOD Interim Secret Clearance is required before entry on duty.
7.    An ability to perform and function as a dispatcher in a security or law enforcement environment.
8.    Proficiency and knowledge in security systems operation and functions.
9.    An ability to comprehend floor plans
10.   Proficiency in operating a digital CCTV system.
11.   Proficiency in operating fire alarm system for program monitoring.
12.   Proficiency in operating an access control program.
13.   Proficiency in capturing and recording video MPEG or JPEG for CD burning or e-mailing attachments.
14.   Ability to effectively communicate orally with all management levels, up to and including executive staff.
15.   Proficiency and knowledge in key control and accountability."

C. ARTICLE 18: QUALIFICATIONS, TRAINING AND RE-QUALIFICATION.  References to "GSA" in Section 2 and 5 shall be change to "SOMB".  References to "GSA" in Section 3 and 4 shall be changed to "GAO".

D. ARTICLE 19:  UNIFORMS.  Add Section III as follows:

"Section III.
        Personnel assigned as Alarm Monitor Dispatch Operators do not have the requirement to wear uniforms but will wear business casual attire.  These personnel will not receive either a uniform or shoe allowance. "

ARTICLE 27: WAGES are changed to read as follows:

| Classification | 10/01/04 | 10/01/05 |
|---|---|---|
| CPL** | $17.38 | n/a |
| Alarm Monitor Dispatch Operator * | $21.00 | $21.63 |
| Security Officer (SO) ** | $17.00 | n/a |
| Special Police Officer (SPO)* | $20.00 | $20.60 |

\* Current employees, in order to be considered for these positions, must meet the new requirements for these positions
\*\* These positions will be phased out as employees meet the new qualifications

E. ARTICLE 25: HEALTH & WELFARE Section II. At end of Section II add the following sentence.

"Effective 10/1/2004, such rate shall be $3.10 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year."

IN WITNESS WHEREOF, the Parties hereto have set their hands and seals to this Agreement, this 11th day of October, 2004.

UNITED UNION OF SECURITY GUARDS

By: _____    Dated: _____

WACKENHUT SERVICES, INC.

By: _____    Dated: Oct 11, 2004

**AMENDMENT #1**
**TO**
**AGREEMENT BETWEEN**
**WACKENHUT SERVICES, INC.**
**AND**
**UNITED UNION OF SECURITY GUARDS**
**AT**
**GAO**
**JULY 1, 2000-SEPTEMBER 30, 2004**
**(Effective November 1, 2003)**

Subject Agreement is revised as follows:

A.      **PREAMBLE** is changed to read as follows:

This Agreement is entered into as of this 1st day of September 2000, by and between Wackenhut Services, Inc. hereinafter referred to as the "Employer" and the United Union of Security Guards hereinafter referred to as the "Union". The Agreement is effective July 1, 2000, and continues to September 30, 2006.

B.      **ARTICLE 19: UNIFORMS** is changed to read as follows:

<u>Section 1</u>

The Employer shall provide at no cost to all employees those items listed in the Employer's GAO Headquarters guard service contract with the exception of shoes. Upon termination of employment, the clothing and equipment issued to the employee shall be returned to the Employer in good condition. Returned clothing shall be cleaned, pressed and returned on hangers.

The Employer agrees to pay eleven ($0.11) cents per hour worked up to forty (40) hours a week to each employee for uniform cleaning allowance. A shoe allowance of $65.00 per contract year will be paid as reimbursement for work shoe expenses each October 1 and will conform to uniform standards as described in the GAO Headquarters guard service contract. Shoe receipts shall not be required.

The Employer shall replace any parts of the uniform that are damaged in the line of duty, provided it has been reported to the Shift Supervisor within the shift period when the incident c\occurred and for uniforms that become unserviceable due to normal wear and tear. Employees may purchase replacement items that are not covered above from the Employer at cost. Such articles shall be paid for by deductions from the employees' pay.

C.    **ARTICLE 25:  HEALTH & WELFARE** is changed to read as follows:

**Section 1**

Effective November 1, 2003 Employees will be enrolled in the Security Workers Health and Welfare Fund where the Employer makes periodic payments on behalf of the Employee.  The Fund provides health and welfare benefits to employees and their beneficiaries.  Regardless of the date(s) on which the Company makes contributions on behalf of specific employees, eligibility for benefits under any of the Plans or Funds referred to herein is determined in accordance with the respective plan or fund rules.

**Section 2**

Upon the effective date of this Agreement, it is mutually agreed that the Health and Welfare Benefits or the money in lieu thereof (to full or part-time employees) shall be established at $1.63 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year.  Effective October 1, 2000, such rate shall be $2.03 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year.  Effective October 1, 2001, such rate shall be $2.18 per compensated hour to a maximum of forty- (40) hours per week or two thousand and eighty (2,080) hours per year.  Effective October 1, 2002, such rate shall be $2.30 per compensated hour to a maximum of forty- (40) hours per week or two thousand and eighty (2,080) hours per year.  This portion of the CBA may be opened each July for the purpose of negotiating future H&W rates to be effective October 1 of that year.

**Section 3**

In the event that the contribution rate required by the Security Workers Health and Welfare Fund for a level of coverage desired by an employee is greater than the Employer contributions provided for in Section 2 above, the Employer agrees to deduct from the employee's wages an amount sufficient to meet the contribution requirement.  Such deduction shall only be made upon authority of a written authorization signed by the employee.

D.    **ARTICLE 26:  401(K) RETIREMENT PLAN** is changed to read as follows:

Effective November 1, 2003, the Employer will contribute to the Security Workers Severance and Retirement Plan the sum of $0.25 an hour to a maximum of forty- (40) hours per week or 2,080 hours per year.  The purpose of this Plan is to provide retirement and other related benefits for Participants and Beneficiaries under the terms and conditions of the Plan.

**E. ARTICLE 27: WAGES** is changed to read as follows:

During the term of this Agreement, employees shall receive the following hourly rates of pay on the dates indicated:

| Classification | 7/1/00 | 10/1/00 | 10/1/01 | 4/1/02 | 10/1/02 | 4/1/03 | 11/1/03 | 10/1/04 | 10/1/05 |
|---|---|---|---|---|---|---|---|---|---|
| CPL | $11.50 | $12.20 | $12.56 | $12.68 | $13.05 | $13.18 | $16.87 | $17.38 | $17.90 |
| SO | $11.20 | $11.90 | $12.26 | $12.38 | $12.75 | $12.88 | $16.50 | $17.00 | $17.50 |

**F.    ARTICLE 31: DURATION OF AGREEMENT** is changed to read as follows:

Except as otherwise provided in this Article, this Agreement shall be in full force and effect from July 1, 2000, and shall remain in effect until (and including) September 30, 2006.

**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals to this Agreement, this ___ day of _September_, 2003.

**UNITED UNION OF SECURITY GUARDS**

By: _Ruthie Rome_                    Dated: _9/1/03_

**WACKENHUT SERVICES, INC.**

By: _Gail Bange_

200002842.txt

| REGISTER OF WAGE DETERMINATIONS UNDER<br>THE SERVICE CONTRACT ACT<br>By direction of the Secretary of Labor | U.S. DEPARTMENT OF LABOR<br>EMPLOYMENT STANDARDS ADMINISTRATION<br>WAGE AND HOUR DIVISION<br>WASHINGTON D.C.   20210 |
|---|---|
| William W.Gross          Division of<br>Director          Wage Determinations | Wage Determination No.: 2000-0284<br>Revision No.: 2<br>Date Of Last Revision: 11/13/2003 |

State:   District of Columbia
Area:    District of Columbia Statewide

Employed on U.S. General Accounting Office contract(s) for security services at U. S. General Accounting Office Headquarters in the above localiy.

Collective Bargaining Agreement between Wackenhut Services Inc. and United Union of Security Guards effective July 1, 2000 through September 30, 2006.

In accordance with Sections 2(a) and 4(c) of the Service Contract Act, as amended, employees employed by the contractor(s) in performing services covered by the Collective Bargaining Agreement(s) are to be paid wage rates and fringe benefits set

forth in the current collective bargaining agreement and modified extension agreement(s).

Page 1

**EXHIBIT 2**

# State of Florida
## Department of State

I certify from the records of this office that WACKENHUT SERVICES, INCORPORATED is a corporation organized under the laws of the State of Florida, filed on July 25, 1960.

The document number of this corporation is 238799.

I further certify that said corporation has paid all fees due this office through December 31, 2006, that its most recent annual report was filed on May 10, 2006, and its status is active.

I further certify that said corporation has not filed Articles of Dissolution.

*Given under my hand and the Great Seal of Florida, at Tallahassee, the Capital, this the Twenty Third day of April, 2007*



## Secretary of State

Authentication ID: **900098055419-042307-238799**

To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed.
**www.sunbiz.org/auth.html**



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

TRAVIS GRANDISON
    Vs.                                C.A. No.      2007 CA 002173 B

WACKENHUT SERVICES INCORPORATED

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued by the judge to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to: Judge JENNIFER M ANDERSON
Date:  March 23, 2007
Initial Conference: 9:30 am, Friday, June 22, 2007
Location:  Courtroom A-50
              515 5th Street N.W.
              WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

| Travis Grandison |
| --- |
| _Plaintiff_ |

**VS.**

| Wackenhut Services Incorporated |
| --- |
| _Defendant_ |

0002173-07

Civil Action No. [                    ]

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below**. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue. N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

_Clerk of the Court_

| Jay Schiffres |
| --- |
| Name of Plaintiff's Attorney |
| 700 E Street, SE |
| Address |
| Washington, DC 20003 |
| (703) 383-3991 |
| Telephone |

By _____
Deputy Clerk

Date MAR 23 2007

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(6)-456/Mar. 78    **NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1 161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

Travis Grandison
705 4ᵗʰ Street NW
#303
Washington, DC 20001          :
                              :
     Plaintiff                :        0002173-07
                              :        Civil Action No._____
v.                            :
                              :
Wackenhut Services Incorporated :
Serve:  Prentice-Hall Corporation :
System                        :
1090 Vermont Avenue NW        :
Washington, DC 20005          :

RECEIVED
Civil Clerk's Office
MAR 2 3 2007
Superior Court of the
District of Columbia
Washington, D.C.

**COMPLAINT**

(Race and Sex, Discrimination, Retaliation, Breach of Contract, Defamation,
Violation of Procedural Due Process, Breach of Covenant of Good Faith and
Dealing, and Interference with Contract )

A. **JURISDICTION AND VENUE**

1. The Court has jurisdiction the case under the District of Columbia
   Human Rights ACT(DCHRA ), District of Columbia Code 1981, 1-2556,
   DC Code 11-921).

2. Venue properly lies in the District of Columbia since plaintiff is a resident
   of the District of Columbia and worked for Defendant Wackenhut
   Services Incorporated (WHS) in the District of Columbia and since the
   causes of action arose against Defendant here.

1

B. <u>THE PARTIES</u>

3.  Plaintiff Travis Grandison (hereafter "Plaintiff") is an African American male: he is a resident of the District of Columbia and a former employee of Defendant (WHS).  He is a college graduate with a marketing degree from James Madison University)

4.  Defendant (WHS) is a corporation, incorporated in the District of Columbia and, as pertinent, provides security services for private businesses and government agencies.

B. <u>FACTS</u>

5.  Plaintiff was hired by the Defendant in April 2005.

6.  At the time of his hire, Plaintiff was twenty nine (29) years old.

7.  Plaintiff was hired as a Special Police Officer.

8.  At the time of his hire there was in force employment manuals and policies covering, as here pertinent, Plaintiff's obligations and consideration.

9.  At all times pertinent herein, Plaintiff was assigned to the General Accounting Office in Washington, D.C.

10. From 2005 through February of 2006,  Plaintiff experienced  harassment from an African American supervisor and other officers and officials of Defendant which included but was not limited to improper and false allegations about the Plaintiff's dress, overlooking acts of female officers

2

which should have resulted in discipline, making up rules that applied only to Plaintiff, intentionally interfering with Plaintiff's right to leave work, being sent home without pay for trumped up reasons including not being properly dressed in uniform, allegedly sleeping on the job, intentionally not taking authorized breaks, attempts to have other officers write disparaging remarks concerning Plaintiff, being deprived of taking necessary courses which resulted in one of his required certifications, unfounded threats of discipline, lies concerning Plaintiff being argumentative or verbal with his supervisor, intentional provocation by supervisor and others in order to terminate Plaintiff and different treatment based on his education.

11. This harassment continued and Plaintiff complained to his Project Manager Chuck Carrol , a male Caucasian.

12. Despite Defendant's management being aware of the above noted actions, no measures were taken to rectify the situation-moreover Management retaliated against Plaintiff because of his complaints.

13. By memorandum dated March 1, 2006, Plaintiff was informed by Chuck Carrol/Project Manager, GAO that Plaintiff's allegations of harassment and disparate treatment were not supported by the record.

14. On the same day, March 1, 2006, Plaintiff was physically assaulted on the premises of Defendant by his former supervisor.

15. On March 10, 2006, Plaintiff was issued two (2) disciplinary reports which were intentionally tailored by management to make it appear that

3

they were second and third offenses. The reasons given for said discipline were contradictory and misleading, including a disciplinary report for requesting leave and discipline for his physician having faxed Plaintiff a document. Plaintiff was threatened with termination.

16. That the above history shows that Defendant was attempting to force Plaintiff to quit his position.

17. Plaintiff filed an EEOC Complaint on March 13, 2006 alleging discrimination based on race.

18. By letter dated March 16, 2006, K.A. Conry, male Caucasian, The Vice President and General Manager of Defendant, suspended Plaintiff from March 22, 2006 through March 26, 2006 for alleged violation of security procedures and regulations. It was stated that Plaintiff's return date would be March 29, 2006.

19. By letter dated March 17, 2006, K.A. Conry, again suspended Complainant for three(3) days from April 5, 2006 through April 7, 2006 for alleged tardiness or failure to observe assigned work hours. It was stated that his return date would be April 8, 2006.

20. On March 30, 2006 the Equal Employment Opportunity Commission (EEOC) informed Plaintiff of his right to sue in federal court.

21. On April 2, 2006, Plaintiff was injured at work when a Freight Elevator crashed on his head causing injuries to his head, neck, back and shoulders.

22. Plaintiff's physician cleared him to return to work on April 30, 2006 however Defendant was told to come back to work on May 2, 2002 by Chuck Carroll.

23. On April 30, 2006, Plaintiff started a part time position with Startech Security Company at the National Building museum located in Washington, D.C.

24. Plaintiff arrived at work on May 2, 2002 but was not on the schedule.

25. On information and belief during May of 2006 inappropriate inquires were made about the status of Plaintiff's part time work status at Startech Security.  In specific, his supervisor at Startech reported to Plaintiff that representatives of the General Accounting Office harassed her and two other employees on at  least three occasions, including inferences of Defendant performing illegal  acts; that they and threatened to bring  legal action against Plaintiff as well  as his supervisor at Startech.. On information and belief, these actions were approved and instigated by Defendant. During May of 2006

26. On May 3, 2006, Plaintiff was informed by Mr. Carrol that Plaintiff would be  suspended for five (5) days for willful insubordination and another 3-5 days  for not wearing his hat and tie on  April 2, 2006. Plaintiff was informed that  dismissal was recommended because of the May 3, 2006 suspension.

5

27. Subsequently, Plaintiff was informed that he was suppose to resume
    work on May 10, 2006.

28. That on or about May 4, 2006, Plaintiff was informed by management
    that they allegedly had proof that he wasn't wearing a hat and his tie was
    not properly attached to his uniform-allegedly this information was
    obtained by viewing film of his work accident on April 2, 2006.

29. Subsequently, Plaintiff was informed that his suspension would continue
    through May 14, 2006

30. On or about May 11, 2006, Plaintiff filed a reprisal complaint with the
    EEOC alleging retaliation.

31. By letter dated May 22, 2006 Plaintiff was informed that he would be
    terminated effective May 25, 2006, for not being in compliance with
    established uniform policies characterized as willful insubordination.

32. Plaintiff was terminated on May 25, 2006 on the basis of willful
    insubordination- a charge which was manufactured in order to end his
    employment.

### D STATEMENT OF CLAIMS

### COUNT I:

### Racial Discrimination

33. Plaintiff adopts and incorporates by reference paragraphs 1-32 above.

34. The individuals responsible for Plaintiff's termination were all

Caucasian.

35. Plaintiff was treated differently from similarly situated employees.

36. Defendant, intentionally discriminated against Plaintiff.

37. Plaintiff was protected by the DCHRA from race discrimination in his

employment.

38. Defendant's wrongful and malicious actions in terminating Plaintiff

caused him financial injury and mental distress.

## COUNT II

### Sex Discrimination/Reverse Discrimination

39. Plaintiff incorporates by reference paragraphs 1-38 above. \

40. Plaintiff was discipline for acts that similarly situated females were not

disciplined.

41. That said acts of Defendant constitute discrimination based on sex.

## COUNT III

### Retaliation

42. Plaintiff incorporates by reference paragraphs 1- 41 above.

43. That the actions taken by Defendant subsequent to Plaintiff

filing his discrimination complaint constitutes illegal retaliation

which is protected under the District Of Columbia Human Rights Act.

44. That the aforementioned acts of discrimination constitute retaliation

inasmuch a reasonable worker would be discouraged from filing a

discrimination complaint due to said actions.

## COUNT III

### (Intentional Infliction of Emotional Distress)

45 Plaintiff incorporates by reference paragraphs 1-44 above.

46. That the actions of Defendant in terminating Plaintiff were intentional; that Defendant knew that Plaintiff's termination was illegal and the manner in which Plaintiff was so terminated was taken maliciously, was extreme and outrageous and willfully performed which caused severe emotional distress to Plaintiff.

## COUNT IV

### (Breach of Contract )

47. Plaintiff incorporates by reference paragraphs 1-46 above.

48. Defendant's Personnel Policy and Procedures including any involved manuals  constitute a contract of employment.

49.  On information and belief, Plaintiff received the documentation noted in 48 above  and signified his acceptance of the contract, and provided consideration for it by continuing to work for Defendant.

50. Plaintiff  satisfactorily performed his part of the bargain under the contract.

51. That said policies and procedures noted above dealt with terminations, disciplinary actions and grievances.

52.  By terminating Plaintiff, Defendant violated the terms of its own Personnel Policies and Procedures; that this included the intentional falsification of alleged acts taken by Plaintiff, retaliating against Plaintiff for following procedure, that there was no cause to terminate Plaintiff based on his performance and in any event the required process was not followed due to discrimination as noted above.

53. That as a result of Defendant's beaches of contract, Plaintiff suffered financial damages and emotional distress.

## COUNT V

### (Slander/Defamation- Per Se)

54. Plaintiff adopts and incorporates by reference paragraphs 1-53 above.

55. The actions of Defendant in casting aspersions upon Plaintiff's character and alleged legal problems to his part time supervisor and others at Startech Corporation were false, defamed Plaintiff and place him in a false light.

56. That, like all the adverse actions noted above, said defamation was ratified by Defendant.

57. The aforementioned statements were made without privilege and with malice, since Defendant's knew the statements to be false or acted with reckless disregard for whether they were false.

58. That these statements which were ratified by Defendant, were wrongful

and malicious actions, as a matter of law constitute slander per se and have

caused him damages, including emotional distress.

## COUNT VI

### (Breach of Covenant of Good Faith and Fair dealing)

59. Plaintiff adopts and incorporates by reference paragraphs 1-58 above.

60. By discharging Plaintiff, Defendant breached the covenant of good faith
    and fair dealing which was inherent in the parties employment contract.

61. That as a result of Defendant's breaches of the convenant of good faith
    and fair dealing Plaintiff suffered and is suffering financial damages
    and emotional distress.

## COUNT VII

### (Discriminatory Discharge)

62. Plaintiff adopts and incorporates by reference paragraphs 1-61 above.

63. Defendant discharged Plaintiff wholly or partially on the basis of his race,
    sex, status as a college graduate and in retaliation for exercising his
    constitutionally protected rights, and therefore discriminated against him,
    in violation of DCHRA. D.C. Code 1981 1-2512.

64. Defendant's wrongful and malicious actions in discharging Plaintiff
    caused him financial injury and mental distress.

10

## COUNT VIII

65. Plaintiff adopts and incorporates by reference paragraphs 1-64 above.

66. The actions taken by Defendant violated the procedural due process of Plaintiff.

67. That these wrongful and malicious acts caused financial injury and mental distress to Plaintiff.

## COUNT IX

### (Interference with Contract)

68. Plaintiff adopts and incorporates by reference paragraphs 1-67 above.

69. When Defendant approached Startech Corporation as noted above there existed a contract between Startech and Plaintiff; that Defendant had knowledge of said contract, and intentionally attempted to procure its breach and damages resulted from their actions and that Defendant's conduct was not legally justified or privileged.

## E: REMEDIES

WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting him the following relief against Defendants:

a. Compensatory damages of $ 75,000.00

11

b   Punitive damages of  $500,000.00

c.  Reinstatement in the position he was terminated from .

d.  Back Pay (including overtime) and Front Pay.

e.  Reasonable attorney fees and costs incurred.

f.  Such other and further relief as the Court deems just.

F:  **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

Plaintiff has the right under the District of Columbia Human Rights

Law, District of Columbia Code 1981, Section 1-2556, to bring a private cause of

action for alleged violations of said law, without the necessity of exhausting any

particular administrative remedies which may be available to him.

Respectfully submitted,

Jay Schiffres, Esq.
Bar # 185488
700 E Street, SE
Washington, DC 20003
(703) 383-3991

12

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Travis Grandison

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___ D.C. ___
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jay Schiffres, Esq.
700 E Street, S.E.
Washington, D.C. 20003

## DEFENDANTS

Wackenhut Services, Inc.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

ATTORNEYS (IF KNOWN)

Henry Morris, Jr.
Richard Webber
Kristine J. Dunne
Arent Fox LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
● 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ● 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ● 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. Antitrust
☐ 410 Antitrust

○ B. Personal Injury/ Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ E. General Civil (Other)     OR     ○ F. Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus* 2255 | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ⊙ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☒ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

○ 1 Original Proceeding   ⊙ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Removal pursuant to 28 U.S.C. sec. 1441(a) based on diversity and federal question (Labor Management Relations Act, 29 USC sec. 185).

| VII. REQUESTED IN COMPLAINT | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 575,000.00 | Check YES only if demanded in compl... |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐   NO ☐ |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐   NO ☒   If yes, please complete related case form.

DATE   4/23/07    SIGNATURE OF ATTORNEY OF RECORD

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.