**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TRAVIS GRANDISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-00754 (RMC) |
| | ) | |
| WACKENHUT SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OR,
IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

Wackenhut Services, Inc. ("WSI"), by and through its undersigned counsel, hereby moves this Court to issue an order dismissing Plaintiff's breach of contract, good faith and fair dealing, intentional infliction, and due process claims, or in the alternative, entering partial summary judgment as to those claims in WSI's favor. In support of its Motion, WSI commends the Court to the attached Memorandum of Points and Authorities.

Wherefore, WSI submits that the Court should grant WSI's motion.

Respectfully submitted,

ARENT FOX PLLC

By: _____/s/ Kristine J. Dunne_____
Henry Morris, Jr. (Bar No. 375894)
Kristine J. Dunne (Bar No. 471348)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
(202) 857-6000/Telephone
(202) 857-6395/Facsimile

Dated: April 30, 2007     *Counsel for Wackenhut Services, Inc.*

LDR/199493.9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TRAVIS GRANDISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-00754 |
| (RMC) | | |
| | ) | |
| WACKENHUT SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OR,**
**IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

## I.    Introduction

This action arises from a dispute between Plaintiff and his former employer,
Wackenhut Services, Inc. ("WSI" or the "Company").  His Complaint contains ten
counts:

- In Count I, Plaintiff contends that WSI violated the District of
  Columbia Human Rights Act (the "DCHRA"), by discriminating
  against him due to his race.

- In Count II, he contends that WSI violated the DCHRA by
  discriminating against him due to his gender.

- In Count IIIa, he contends that WSI unlawfully retaliated against him
  because he engaged in activities that DCHRA protects.[1]

---

[1]     The Complaint contains 2 counts denominated captioned "Count III."  References herein to
the first – Plaintiff's retaliation claim – are denominated "Count IIIa."  References herein to the
second – Plaintiff's intentional infliction claim are denominated "Count IIIb."

- In Count IIIb, Plaintiff contends that WSI intentionally caused him to suffer severe emotional distress.

- In Count IV, he contends that WSI breached his contract with the Company, as embodied in employee handbook.

- In Count V, he contends that WSI defamed him.

- In Count VI, he contends that WSI breached an alleged covenant of good faith and fair dealing.

- In Count VII, he contends that WSI fired him (1) due to his race, sex, and graduate student status; and (2) because he engaged in activities that the DCHRA protects.

- In Count VIII, he contends that the Company trammeled his due process rights.

- And, in Count IX, he contends that WSI interfered with his contract with another employer.

Plaintiff's breach of contract, good faith and fair dealing, intentional infliction, and due process Counts, however, fail to state a claim upon which relief can be granted. Accordingly, WSI submits that the Court should dismiss them as a matter of law or, in the alternative, enter a judgment in WSI's favor as to those claims.

## II.    Fact[2]

WSI provides security services for government agencies and private

companies. Cmplt. ¶ 4.[3]  It employed Plaintiff as a special police officer, Cmplt. ¶

7, assigned to work at the General Accounting Office.  Cmplt. ¶ 9.

Plaintiff contends that WSI's personnel policies and procedures, "including

any involved manuals, constitute a contract of employment, which WSI breached."

Cmplt. ¶ 48.  Evidently, he is referring to WSI's Security Officer Handbook.  *See*

Conry Dec. ¶¶ 5,6; Conry Dec. Exhibit 3 (the "Handbook").[4]  The Handbook,

however, specifically disclaims that it is a contract.

> THIS HANDBOOK IS INTENDED AS A GUIDE FOR EFFICIENT
> AND PROFESSIONAL PERFORMANCE OF YOUR JOB.
> NOTHING HEREIN CONTAINED SHALL BE CONSTRUED TO
> BE A CONTRACT BETWEEN THE EMPLOYER AND THE
> EMPLOYEE.  ADDITIONALLY, THIS HANDBOOK IS NOT TO
> BE CONSTRUED BY ANY EMPLOYEE AS CONTAINING
> BINDING TERMS AND CONDITIONS OF EMPLOYMENT.
> MANAGEMENT RETAINS THE ABSOLUTE RIGHT TO
> TERMINATE ANY EMPLOYEE, AT ANY TIME, WITH OR
> WITHOUT CAUSE.  MANAGEMENT RETAINS THE RIGHT TO
> CHANGE THE CONTENTS OF THIS HANDBOOK AS IT DEEMS
> NECESSARY, WITH OR WITHOUT NOTICE.

Handbook, Introduction (emphasis in original).

Plaintiff was a member of a collective bargaining unit represented by the

Union of Security Guards at the Government Accounting Office Headquarters (the

"Union").  *See* Conry Dec. ¶ 4.  The Union and WSI are parties to a collective

---

[2]      To the extent that WSI relies upon facts that Plaintiff alleges in his Complaint, it does so for the purposes of this Motion only.
[3]      Citations to Plaintiff's Complaint are denominated "Cmplt. ¶ __."
[4]      Citations to the Declaration of Kevin Conry are denominated "Conry Dec. ¶ ___."
Citations to exhibits to Mr. Conry's Declaration are denominated "Conry Dec. Exhibit ___." A copy of Mr. Conry's Declaration is attached as Exhibit 1 to WSI's Statement of Material Facts as to which there is No Genuine Issue.

bargaining agreement covering members of Plaintiff's bargaining unit. *See* Conry
Dec. ¶ 3; Conry Dec. Exhibit 1 (the "Agreement"). And that Agreement contains
several provisions that are relevant to Plaintiff's claims.

- Article 1, Section 1 recognizes the Union "as the exclusive
  bargaining agent with respect to rates of pay, hours of work, and
  other conditions of employment, for all full-time and regular part-
  time security officers and corporals employed by the Employer [--
  WSI --] at the General Accounting Office Headquarters (GAO)."

- Article 4 acknowledges that the "management of the business and
  direction of the working force is vested exclusively in [WSI],"
  including the "exclusive" right to "assign work and working hours to
  employees," "require from every employee compliance with normal
  operating rules and procedures," "formulate and enforce appropriate
  Employer rules and regulations," "hire, suspend, promote, demote,
  transfer, discharge, or discipline for cause," and "maintain discipline
  and efficiency of employees."

- Article 7, Section 1 affirms WSI's right to "determine the level and
  degree of discipline, describes the normal disciplinary procedure,
  and incorporates by reference WSI Standard Operating Procedure
  358.

- Standard Operating Procedure 358, in turn, describes WSI's
  disciplinary procedure and the sanctions that WSI imposes for

various infractions.  See Conry Dec. ¶ 3; Conry Dec. Exhibit 2 (the "Agreement").

- Article 8 sets forth a detailed grievance-arbitration procedure for resolving employment disputes.

- Article 29, Section 2 acknowledges that (1) it is "essential and expected that all employees will act in a highly professional, courteous manner and will be held responsible and accountable for their duties, functions and job requirements; and (2) "deviation from or failure to meet this standard will result in disciplinary."

Plaintiff pins his intentional infliction and good faith and fair dealing claims, in large measure, on WSI's exercise of its right, under the Collective Bargaining Agreement to discipline Plaintiff for various infractions.  Specifically, its decision under the Agreement to (1) suspend Plaintiff, on March 16, 2006 for violating security procedures and regulations, Cmplt. ¶ 18; Conry Dec. ¶ 7; Conry Dec. Exhibit 4 (Letter from K.A. Conry to Plaintiff, dated March 16, 2006); (2) suspend him on March 17, 2006 for tardiness or failure to observe his assigned work hours, Cmplt. ¶ 19; Conry Dec. ¶ 8 Conry Dec. Exhibit 5 (Letter from K.A. Conry to Plaintiff, dated March 17, 2006); (3) suspend him on May 3, 2006, for insubordination, Cmplt. ¶ 26; Conry Dec. ¶ 9; Conry Dec. Exhibit 5 (Letter from K.A. Conry to Plaintiff, dated May 3, 2006); and (4) dismiss him on May 22, 2006 for insubordination.  Cmplt. ¶ 31; Conry Dec. ¶ 10; Conry Dec. Exhibit 7 (Letter from K.A. Conry to Plaintiff, dated May 22, 2006).

## III.   Argument

### A.   Standard of Review

Granting a motion to dismiss is appropriate where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 210 (D.C. 1997), *cert. denied*, 525 U.S. 912 (1998), *reh. denied*, 525 U.S. 1036 (1998). That is precisely the case here.

### B.   Section 301(a) of the Labor Management Relations Act Preempts Plaintiff's Contract, Intentional Infliction, and Good Faith and Fair Dealing and Intentional Infliction Claims.

The United States Constitution authorizes Congress to preempt state law. And Congress exercised that power when it enacted Section 301(a) of the Labor Management Relations Act, *Loewen Group Int'l, Inc. v. Haberichter,* 65 F.3d 1417, 1421 (7th Cir. 1995), which provides as follows:

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of parties.

29 U.S.C. § 185(a).

The Supreme Court has long recognized that federal courts must fashion and apply federal common law when resolving Section 301 actions. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403 (1988); *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 104 (1962); *Textile Workers v. Lincoln Mills,* 353 U.S. 448 (1957). Preemption advances that end by "ensuring uniform interpretation of collective-bargaining agreements," "promot[ing] the peaceable, consistent resolution of labor-

management disputes," and preserving the central role of arbitration established in collective bargaining contracts. *White v. National Steel Corp.*, 938 F.2d 474, 481 (4th Cir.), *cert. denied*, 502 U.S. 974 (1991).

Plaintiffs may not evade Section 301's preemptive force by casting their suit as a state law action. *IBEW v. Hechler*, 481 U.S. 851, 859 (1987) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209-13 (1985)). The key to determining whether Section 301 applies is not how a plaintiff frames his complaint, but whether the fact finder must consider and analyze the collective bargaining agreement to resolve the dispute. If so, federal law governs and the state claim is preempted. *See, e.g.*, *Hechler*, 481 U.S. at 852-53; *Allis-Chalmers,* 471 U.S. at 209-13; *Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1146 (9th Cir. 1988); *Cephas v. MVM, Inc.*, 403 F. Supp. 2d 17, 23 (D.D.C. 2005). That is true, regardless of whether the claim sounds in contract, *Lucas Flour*, 369 U.S. at 104; *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 657 (1965), or in tort. *Allis-Chalmers*, 471 U.S. at 211; *Hechler*, 481 U.S. at 362; *McCormick v. AT&T Techn.*, 934 F.2d 531 (4th Cir. 1991), *cert. denied*, 502 U.S. 1048 (1992) (intentional infliction, negligent infliction, conversion and negligence claims preempted); *Willis v. Reynolds Metals Co.*, 840 F.2d 254 (4th Cir. 1988) (invasion of privacy, slander and intentional infliction of emotional distress claims preempted).

Here, Plaintiff contends that WSI breached an alleged individual employment contract with the Company. But any such contract is subject to WSI's agreement with the Union, Plaintiff's *exclusive* bargaining agent. Accordingly, Plaintiff's contract claim is not "wholly independent" from the Collective

Bargaining Agreement.  Thus, his claim is doomed under Section 301.  *See Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 801 (6th Cir. 1990)("[T]he collective bargaining process prohibits [a bargaining unit employee] from engaging in separate negotiations with the company and precludes any actions to enforce such an agreement." ); *Chmiel v. Beverly Wilshire Hotel Co.*, 873 F.2d 1283, 1286 (9th Cir. 1989)("Since Chmiel's independent contract claim concerns a job position governed by the collective bargaining agreement, it is completely preempted by section 301."); *Young*, 830 F.2d at 1001 (Section 301 preempts any individual labor contract inconsistent with a collective bargaining agreement); *Darden v. U.S. Steel Corp.*, 830 F.2d 1116, 1120 (11th Cir. 1987)(individual oral contracts of bargaining unit members preempted by Section 301); *Eitmann v. New Orleans Pub. Serv. Inc.*, 730 F.2d 359, 364 (5th Cir. 1984), *reh. denied*, 738 F.2d 437 (5th Cir. 1984), *cert. denied*, 469 U.S. 1018 (1984) (Section 301 preempts alleged oral agreement to keep bargaining unit employee on the payroll at full compensation in the event of a disabling work-related injury).  Because any "'independent agreement of employment [concerning that job position] could be effective only as part of the collective bargaining agreement,' the [collective bargaining agreement] controls and the contract claim is preempted." *Young v. Anthony's Fish Grottos, Inc.,* 830 F.2d 993, 997 (9th Cir. 1987).  "To hold otherwise in such a case would frustrate the policy of the federal labor laws." *Eitmann*, 730 F.2d at 362.

Plaintiff's intentional infliction and good faith and fair dealing claims fare no better.  To the contrary, his Complaint makes clear that he grounds those claims in the manner in which WSI exercised its right to discipline him under the

governing Collective Bargaining Agreement.  Plainly, resolving those claims will require the fact finder to consider and analyze that Agreement.  Accordingly, Section 301 preempts them as well.

**C.    Plaintiff has Failed to State a Claim for Intentional Infliction of Emotional Distress Claim.**

Plaintiff's intentional infliction claim would fail as a matter of law, even if Plaintiff could overcome Section 301.

An intentional infliction plaintiff must prove:  (1) "extreme and outrageous" conduct on the part of the defendant; which (2) intentionally or recklessly; (3) causes the plaintiff to suffer "severe" emotional distress.  *Sere v. Group Hosp., Inc.,* 443 A.2d 33, 37 (D.C. 1982); *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C. 1980).

The tort's parameters are exceedingly narrow, applying *only* when the defendant's conduct goes "beyond all possible bounds of decency and (is) regarded as atrocious . . .  and utterly intolerable in a civilized community."  *Waldon,* 415 A.2d at 1076 (quoting Restatement (2d) Torts § 46, comment d (1965)).  This is an extremely demanding standard that is rarely met.  *Dale v. Thomason,* 962 F. Supp. 181, 184 (D.D.C. 1997); *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C. 1994).

It is for the Court to determine in the first instance whether a defendant's alleged conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.  *Sere,* 443 A.2d at 37.

The tort is especially limited as a theory of employer liability in the District of Columbia.  *Shewmaker v. Minchew,* 504 F. Supp. 156, 163 (D.D.C. 1980), *aff'd,* 666 F.2d 616 (D.C. Cir. 1981) ("[H]arassment in a professional context . . . is not

the type of conduct that gives rise to [an intentional infliction claim].”); *see Duncan*, 702 A.2d at 211-12 (“[O]ur cases show that, generally, employer-employee conflicts do not rise to the level of outrageous conduct.”).

The Court of Appeals’ decision in *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624 (D.C. 1997), is instructive.

Kerrigan sued Britches for intentional infliction of emotional distress. He alleged that

> Britches targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him. . . to promote a woman in his position.

*Id.* at 628.

The District of Columbia Superior Court granted Britches’ motion for summary judgment. And the Court of Appeals affirmed, stressing that the alleged conduct did not “‘as a matter of law, rise to the level of outrageous conduct.’” *Id., quoting, Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984).

The Court of Appeals’ decision in *Duncan*, 702 A.2d 207, is to the same effect.

Children’s National Medical Center attempted to transfer Duncan to a position that would have exposed her unborn child to radiation. When Duncan resisted the transfer, the Center fired her. Thereafter she sued the Center for intentional infliction of emotional distress.

The Superior Court granted the Center's motion to dismiss. And the Court of Appeals affirmed, holding that the Center's alleged conduct was not sufficiently outrageous to support a claim.

> The facts alleged in the complaint are insufficient to impute reckless or outrageousness to [the Center] in implementing its internal staffing changes. Nor can [the Center's] actions be said to go well beyond the bounds of established community standards in the employment relationship. Because the alleged conduct of [the Center] underlying Duncan's claim for intentional infliction of emotional distress is not sufficiently 'outrageous' as a matter of law to sustain the cause of action, we affirm the trial court's dismissal of Duncan's claim for intentional infliction of emotional distress.

*Id.* at 212. *Accord Crowley v. North Am. Telecomm. Ass'n,* 691 A.2d 1169, 1171 (D.C. 1997) (plaintiff failed to state an intentional infliction claim despite allegations that his employer had (1) thwarted plaintiff's effort to do his job; (2) refused to meet with him; (3) refused to include him in board meetings; (4) ignored him; (5) evaluated his performance unfairly; (6) treated him in a hostile and unprofessional manner; and (7) unjustly terminated his employment).

This case warrants the same result. Plaintiff pins his intentional infliction claim upon WSI's decision to terminate him. Cmplt. ¶ 46. But an employment termination, even if unlawful, is not so beyond the pale as to support an intentional infliction of emotional distress action.

Thus Plaintiff's intentional infliction claim fails as a matter of law.

### D.    Plaintiff's Contract Claim Fails on the Merits

Plaintiff's contract claim also must fail on the merits, even if he could overcome Section 301.

Plaintiff evidently pins that claim on WSI's Security Guard Handbook.  But the Handbook makes clear that it is not a contract.

> THIS HANDBOOK IS INTENDED AS A GUIDE . . . .  NOTHING HEREIN CONTAINED SHALL BE CONSTRUED TO BE A CONTRACT BETWEEN THE EMPLOYER AND THE EMPLOYEE.  ADDITIONALLY, THIS HANDBOOK IS NOT TO BE CONSTRUED BY ANY EMPLOYEE AS CONTAINING BINDING TERMS AND CONDITIONS OF EMPLOYMENT.  MANAGEMENT RETAINS THE ABSOLUTE RIGHT TO TERMINATE ANY EMPLOYEE, AT ANY TIME, WITH OR WITHOUT CAUSE. . . .

Handbook, Introduction (emphasis in original).

In view of that disclaimer, Plaintiff's contract claim cannot survive.  *See Sokos v. Hilton Hotels Corp.*, 283 F. Supp. 2d 42, 49 (D.D.C. 2003); *Futrell v. Department of Labor Federal Credit Union*, 816 A.2d 793, 806 (D.C. 2003).

### E.    Plaintiff's Procedural Due Process Claim

Plaintiff's due process claims also must fail.

It is axiomatic that constitutional due process claims do not lie against private parties.  *See, e.g., Public Util. Comm'n v. Pollak,* 343 U.S. 451, 462 (1952).  Plaintiff does not, and cannot in good faith, allege that WSI is a governmental entity.  Accordingly, as a matter of law, his due process claim fails.

## III.    Conclusion

For the foregoing reasons, WSI submit that the Court should dismiss, with prejudice, Plaintiff's contract, good faith and fair dealing, intentional infliction, and due process claims.  In the alternative, WSI submits that the Court should enter a judgment in WSI's favor as to those claims as a matter of law.

Respectfully submitted,

ARENT FOX PLLC


By:    _____/s/ Kristine J. Dunne_____
        Henry Morris, Jr. (Bar No. 375894)
        Kristine J. Dunne (Bar No. 471348)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
(202) 857-6000/Telephone
(202) 857-6395/Facsimile

*Counsel for Wackenhut Services, Inc.*

Dated:    April 30, 2007

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TRAVIS GRANDISON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-00754 (RMC) |
| | ) | |
| WACKENHUT SERVICES, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## STATEMENT OF MATERIAL FACT AS TO WHICH THERE IS NO GENUINE ISSUE

Wackenhut Services, Inc. ("Wackenhut" or the "Company") hereby submits its Statement of Material Fact as to which No Genuine Issue Exists.[1]

1.      WSI provides security services for government agencies and private companies. Cmplt. ¶ 4.[2]

2.      It employed Plaintiff as a special police officer, Cmplt. ¶ 7, assigned to work at the General Accounting Office.  Cmplt. ¶ 9.

3.      Plaintiff contends that WSI's personnel policies and procedures, "including any involved manuals, constitute a contract of employment, which WSI breached." Cmplt. ¶ 48.

4.      Evidently, he is referring to WSI's Security Officer Handbook. *See* Conry Dec. ¶ 5; Conry Dec. Exhibit 3 (the "Handbook").[3]

5.      The Handbook, however, specifically disclaims that it is a contract.

---

[1]      To the extent that Wackenhut relies upon Plaintiff's rendition of the facts, it does so solely for the purposes of its Summary Judgment Motion.

[2]      Citations to Plaintiff's Complaint in this case are denominated "Cmplt. ¶ __."

[3]      Citations to the Declaration of Kevin Conry are denominated "Conry Dec. ¶ ___." A copy of Mr. Conry's Declaration is attached hereto as Exhibit 1.

THIS HANDBOOK IS INTENDED AS A GUIDE FOR EFFICIENT AND
PROFESSIONAL PERFORMANCE OF YOUR JOB.  NOTHING HEREIN
CONTAINED SHALL BE CONSTRUED TO BE A CONTRACT BETWEEN THE
EMPLOYER AND THE EMPLOYEE.  ADDITIONALLY, THIS HANDBOOK IS
NOT TO BE CONSTRUED BY ANY EMPLOYEE AS CONTAINING BINDING
TERMS AND CONDITIONS OF EMPLOYMENT.  MANAGEMENT RETAINS THE
ABSOLUTE RIGHT TO TERMINATE ANY EMPLOYEE, AT ANY TIME, WITH OR
WITHOUT CAUSE.  MANAGEMENT RETAINS THE RIGHT TO CHANGE THE
CONTENTS OF THIS HANDBOOK AS IT DEEMS NECESSARY, WITH OR
WITHOUT NOTICE.

Handbook, Introduction (emphasis in original).

6.      Plaintiff was a member of a collective bargaining unit represented by the Union of

Security Guards at the Government Accountability Government Office Headquarters (the

"Union").  *See* Conry Dec. ¶ 4.

7.      The Union and WSI are parties to a collective bargaining agreement covering

members of Plaintiff's bargaining unit (the "CBA" or the "Agreement").  *See* Conry Dec. ¶ 3;

Conry Dec. Exhibit 1 (the "Agreement").

8.      And the Agreement contains several provisions that are relevant to Plaintiff's

claims.  Conry Dec. Exhibit 1.

9.      Article 1, Section 1 recognizes the Union "as the exclusive bargaining agent with

respect to rates of pay, hours of work, and other conditions of employment, for all full-time and

regular part-time security officers and corporals employed by the Employer [--WSI --] at the

General Accounting Office Headquarters (GAO)." Conry Dec. Exhibit 1.

10.      Article 4 acknowledges that the "management of the business and direction of the

working force is vested exclusively in [WSI]," including the "exclusive" right to "assign work

and working hours to employees," "require from every employee compliance with normal

operating rules and procedures," "formulate and enforce appropriate Employer rules and

regulations," "hire, suspend, promote, demote, transfer, discharge, or discipline for cause," and

"maintain discipline and efficiency of employees."  Conry Dec. Exhibit 1.

11.    Article 7, Section 1 affirms WSI's right to "determine the level and degree of

discipline, describes the normal disciplinary procedure, and incorporates by reference WSI

Standard Operating Procedure 358.  Conry Dec. Exhibit 1.

12.    Standard Operating Procedure 358, in turn, describes WSI's disciplinary

procedure and the sanctions that WSI imposes for various infractions.  S*ee* Conry Dec. ¶ 3;

Conry Dec. Exhibit 2.

13.    Article 8 sets forth a detailed grievance-arbitration procedure for resolving

employment disputes.  Conry Dec. Exhibit 1.

14.    Article 29, Section 2 acknowledges that (1) it is "essential and expected that all

employees will act in a highly professional, courteous manner and will be held responsible and

accountable for their duties, functions and job requirements; and (2) "deviation from or failure to

meet this standard will result in disciplinary."  Conry Dec. Exhibit 1.

15.    Plaintiff pins his intentional infliction and good faith and fair dealing claims, in

large measure, on WSI's exercise of its right, under the Collective Bargaining Agreement to

discipline Plaintiff for various infractions.  Specifically, WSI's decision under the Agreement to

(1) suspend Plaintiff, on March 16, 2006 for violating security procedures and regulations,

Cmplt. ¶ 18; Conry Dec. ¶ 7; Conry Dec. Exhibit 4  (Letter from K.A. Conry to Plaintiff, dated

March 16, 2006); (2) suspend him on March 17, 2006 for tardiness or failure to observe his

assigned work hours, Cmplt. ¶ 19; Conry Dec. ¶ 8; Conry Dec. Exhibit 5 (Letter from K.A.

Conry to Plaintiff, dated March 17, 2006); (3) suspend him on May 3, 2006, for insubordination,

Cmplt. ¶ 26; Conry Dec. ¶ 9; Conry Dec. Exhibit 6 (Letter from K.A. Conry to Plaintiff, dated

May 3, 2006); and (4) dismiss him on May 22, 2006 for insubordination.  Cmplt. ¶ 31; Conry

Dec. ¶ 7; Conry Dec. Exhibit 7 (Letter from K.A. Conry to Plaintiff, dated May 22, 2006).

Respectfully submitted,

ARENT FOX PLLC


By:       /s/ Kristine J. Dunne       
          Henry Morris, Jr. (Bar No. 375894)
          Kristine J. Dunne (Bar No. 471348)
     1050 Connecticut Avenue, N.W.
     Washington, D.C. 20036-5339
     (202) 857-6000/Telephone
     (202) 857-6395/Facsimile

     *Counsel for Wackenhut Services, Inc.*

Dated:    April 30, 2007

-4-

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TRAVIS GRANDISON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:07-cv-00754 (RMC)** |
| ) | |
| **WACKENHUT SERVICES, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

**UPON CONSIDERATION** of Defendant Wackenhut Services, Inc.'s Motion for

Partial Dismissal or, in the Alternative, for Partial Summary Judgment, the Memorandum

of Points and Authorities in Support, the opposition thereto, and the argument of counsel,

it is this ___ day of _____, 2007,

**ORDERED** that Defendant Wackenhut Services, Inc.'s Motion be, and hereby is

**GRANTED** in its entirety, and it is further

**ORDERED** that Plaintiff's breach of contract, good faith and fair dealing, and

due process claims be, and hereby are, dismissed, with prejudice.


_____
Judge Rosemary M. Collyer


LDR/199493.9

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TRAVIS GRANDISON,       ) | |
|       ) | |
|     **Plaintiff,**   ) | |
|       ) | |
| **v.**       ) | Civil Action No. 1:07-cv-00754 (RMC) |
|       ) | |
| WACKENHUT SERVICES, INC.,) | |
|       ) | |
|     **Defendant.**   ) | |

**DECLARATION OF KEVIN A. CONRY**

I, Kevin A. Conry, do herby depose and state as follows:

1.      I am Vice President and General Manager of Wackenhut Services, Inc.'s ("WSI") National Capital Region, which is a Division of WSI.

2.      WSI provides security services at the General Accounting Office Headquarters.

3.      WSI and the United Union of Security Guards at the General Accounting Office Headquarters entered into a Collective Bargaining Agreement effective July 1, 2000 through September 30, 2004.  In September 2003, the parties agreed to extend the Agreement to September 30, 2006.  A true and correct copy of that Agreement, with its first and second amendments, is attached hereto as **Exhibit 1**.  A true and correct copy of WSI Standard Operating Procedure No. 358, which the Agreement references in Article 7, is attached hereto as **Exhibit 2**.

4.      Travis Grandison was a member of the collective bargaining unit that the Agreement covers.

5.    WSI has distributed to its security officers a Security Officer Handbook, a true and correct copy of which is attached hereto as **Exhibit 3**.

6.    I have read Travis Grandison's Complaint against WSI. And I understand that the Security Officers Handbook is the manual that he references in Paragraph No. 48.

7.    On March 16, 2006, WSI suspended Mr. Grandison for violating security procedures and regulations. A true and correct copy of the March 16th suspension letter is attached hereto as **Exhibit 4**.

8.    On March 17, 2006, WSI suspended Mr. Grandison for tardiness or failure to observe his assigned work orders. A true and correct copy of the March 17th suspension letter is attached hereto as **Exhibit 5**.

9.    On May 3, 2006, WSI suspended Mr. Grandison for insubordination. A true and correct copy of the May 3rd suspension letter is attached hereto as **Exhibit 6**.

10.    On May 22, 2006, WSI dismissed Mr. Grandison for insubordination. A true and correct copy of the May 22nd dismissal letter is attached hereto as **Exhibit 7**.

11.    I am a custodian of the documents attached hereto, which WSI prepared and maintained in the regular course of its business.

I have read the forgoing Declaration, consisting of eleven (11) numbered paragraphs, and declare, under penalty of perjury, that it is true and correct to the best of my knowledge, information, and belief.

Kevin A. Conry                                        Date: April 30, 2007

# EXHIBIT 1

# Agreement

between

# Wackenhut Services Inc.

and

# United Union of Security Guards

at the

# General Accounting Office Headquarters

## July 1, 2000 - September 30, 2004

00 SEP 26 PM 2:27

RECEIVED
ACQUISITION MANAGEMENT

# AGREEMENT

## PREAMBLE

This Agreement is entered into as of this 1st day of September 2000, by and between Wackenhut Services Inc. hereinafter referred to as the "Employer" and the United Union of Security Guards hereinafter referred to as the "Union." The Agreement is effective July 1, 2000, and continues to September 30, 2004.

## ARTICLE 1: SCOPE OF AGREEMENT

### Section 1: Recognition

The Employer recognizes and acknowledges the Union as the exclusive bargaining agent with respect to rates of pay, hours of work, and other conditions of employment, for all full-time and regular part-time security officers and corporals employed by the Employer at the General Accounting Office Headquarters (GAO), Washington, DC; and excluding all other employees, clerical, lead receptionist, access control receptionists, managerial and administrative employees and supervisors as defined in the National Labor Relations Act, as amended.

### Section 2: Probationary Employees

All employees newly hired, or rehired after termination of their seniority, shall be classified as probationary employees for a cumulative period of ninety (90) days worked on the site for full-time and forty-five (45) cumulative days worked for all part-time employees. After an employee has worked such period, the employee shall gain seniority status and his/her seniority date shall revert to the first day the employee earned wages from the Employer for employment at this site. During the probationary period, the employee may be discharged

without recourse to the grievance and arbitration procedures; however, no employee shall be discharged in violation of any federal and/or state law. The employee's probation may be extended by the Employer for the same number of day(s) missed during said period.

An Employee promoted to a higher job classification covered by this Agreement shall be on probationary status in that job for ninety (90) days. If within the ninety (90) days said employee fails to satisfactorily fulfill the requirements of the higher classification position as determined by the Employer, the employee shall be transferred back to the original or similar position. Except as provided in this paragraph or elsewhere all other provisions of this Agreement are applicable to probationary employees.

## Section 3: Temporary Employees

The Employer shall have the right to hire temporary employees when requested to do so by the government in writing and when the employees are so informed at the time of hire, who shall be excluded from the seniority provisions of Article 16 of this Agreement, for a period not to exceed in the aggregate three (3) months. The said three (3) month period referred to in the preceding sentence may be extended for up to an additional three (3) month period at the written request of the government.

## ARTICLE 2: UNION SECURITY AND CHECK - OFF

All covered employees have the right to become and remain members of the Union or not to do so. As a condition of employment, all employees covered by this Agreement shall, on or before their 31st day following the actual beginning of such employment with the Employer or the effective date of this Agreement, whichever is later, either:

a.    Join the Union and remit to the Union on a monthly basis Union dues as duly established by the Union, or

b.    Remit to the Union on a monthly basis a representation fee, which is eighty percent (80%), of Union dues as duly established by the Union and represented by the Union as the appropriate fee for representational activities.

If any employee shall fail to remit such union dues or representation fees when due as provided herein, the Employer shall discharge such employee upon the Union's written request and representation of such failure to remit dues or fees and proof that the employee has been put on notice of such arrears. The Union will hold the Employer harmless and indemnify the Employer for the discharge of any employee who has been discharged pursuant to the Union's request.

The Union agrees to furnish the Employer with a memorandum verifying the amount of dues payable as members of the Union by each of the employees covered by this Agreement. Upon receipt of such memoranda and upon receipt of a signed authorization card from the employee, the Employer agrees to deduct such union dues or representation fees from covered employees' wages as required by the Union on a form mutually agreed to and subject to the provision of Section 302(c) of the Labor Management Relations Act of 1947. The check-off authorization card to be executed and furnished to the Employer by the Union and the employees shall be the official Union authorization for check-off of dues/fees, a copy of which shall be attached and made a part of this Agreement as Appendix A. Union dues or representation fees based upon all payrolls paid during a month and a supporting remittance report shall be delivered by the

4

Employer to the Union on or before the 15th day following the month for which said dues or fees are due.

c.    The Union accepts full responsibility for the authenticity for each authorization card submitted by it to the Company, and any authorization which is incomplete or in error shall be disregarded by the Company, and shall be returned to the Union for correction. The Union agrees that, upon receipt of proper proof, it will refund to the employees any deduction erroneously or illegally withheld from an employee's earnings by the Company, which has been transmitted to the Union by the Company. The Union further agrees to indemnify the Company and hold it harmless against any and all claims, suits or other forms of liability which may be made against it by any party for amounts deducted from wages as herein provided.

d.    No deduction of Union dues or representation fees will be made from the wages of any employee who has executed an authorization and who has been transferred to a job not covered by this Agreement, or who is not in pay status. Upon return to work within a classification covered by this Agreement, deductions from future wages shall be automatically resumed, provided it is in accordance with the other appropriate provisions of this Agreement and of the National Labor Relations Act, as amended.

e.    Collections of any back dues or representation fees owed at the time of starting deductions for any employee, and collection of dues or representation fees missed because the employee's earnings were not sufficient to cover payment of dues for

5

a particular pay period, will be the responsibility of the union, and will not be the subject of payroll deductions.

f.     Deduction of membership dues or representation fees shall be made in a flat sum provided there is a balance in the paycheck sufficient to cover the amount after all other deductions authorized by the employee, or required by law, have been satisfied.   In the event of termination of employment, the obligation of the Employer to collect dues shall not extend beyond the pay period in which the employee's last day of work occurs.

### ARTICLE 3: NONDISCRMINATION

The Employer and the Union agree that there shall be no discrimination by the Employer or the Union against employees because of race, color, creed, religion, national origin, sex, age, marital status, non job-related physical or mental handicap, or because of their involvement in, or refraining from, participating in Union activities except as required by Article 2 or this Agreement.

### ARTICLE 4: MANAGEMENT RIGHTS

Subject only to such limitations as may be specifically imposed by this Agreement, the Union recognizes that the management of the business and direction of the working force is vested exclusively in the Employer, including but not limited to, the right to schedule work, to assign work and working hours to employees, to decide the work amount and location at its facility to determine the type of services performed, to establish reasonable quality and performance standards, and the most efficient means of providing service, to require from every

employee compliance with normal operating rules and procedures, to formulate and enforce appropriate Employer rules and regulations, including the drug and alcohol policy set out in Article 28 of this Agreement, now in effect, or hereinafter enacted, if not covered by the provisions of this Agreement, to hire, suspend, promote, demote, transfer, discharge or discipline for cause, or relieve employees from duty because of lack of work, government's request or for other legitimate reasons, to maintain discipline and efficiency of employees, to judge skill, ability, and physical fitness, and to create, eliminate, or consolidate job classifications, to control and regulate the use of all equipment and other property of the Employer and to subcontract. work which would otherwise be performed by the employees subject to this Agreement at the convenience of the Government all shall be vested exclusively in the Employer.   The above mentioned rights reserved to management are not intended to deny or limit the Employer in other managerial rights which are not covered by this Agreement or which it previously exercised.

## ARTICLE 5: EMPLOYEE CLASSIFICATIONS

Section 1

  An employee shall be classified as "full-time" as soon as the Employer, in its opinion reasonably exercised, determines that the non-probationary employee is reasonably expected to work 1,768 hours or more during a twelve-month period.


Section 2

  An employee shall be classified as "part-time" if the Employer, in its opinion reasonably exercised, determines that the non-probationary employee is not reasonably expected to work 1,768 hours or more during a twelve-month period.

## ARTICLE 6: WORK WEEK AND HOURS OF WORK

### Section 1

The work week shall be from 0001 hours Monday until 2400 hours Sunday. Wages shall be paid bi-weekly on Friday in the next week following the end of the pay period.

### Section 2

The Employer shall schedule the hours of work of employees at least two (2) weeks in advance except in circumstances beyond the Employer's control (including requirements of GAO). Where the agency contract requirements permit, the Employer shall schedule employees for eight (8) hour shifts whenever possible.

### Section 3

Through the duration of this Agreement, covered employees working shifts of six consecutive hours shall receive a fifteen (15) minute paid break during their shift. Employees who work shifts of eight hours or more shall receive two fifteen (15) minutes paid break periods during their shift and a one half hour paid lunch break. In addition, employees shall be provided with breaks for emergency purposes as reasonably required.

### Section 4

Overtime is to be paid at the rate of one and one-half (1 ½) times the basic hourly straight time rate. Overtime shall be paid to employees for work performed in excess of forty (40) hours in a work week. A workday shall be defined as from 0001 hours until 2400 hours. There will not be any pyramiding or duplicating of hours worked for any purpose whatsoever. The payment

of overtime or premium pay for any hour excludes that hour from consideration of overtime payment on any other basis. Only hours actually worked shall be recognized in determining overtime eligibility. Paid vacation or holiday time shall not be counted as hours worked in the calculation of overtime. The Employer shall have the right to hold over employees until relieved and/or to require an available employee to provide coverage of the post.

## Section 5

An employee called in outside his regular work schedule shall be guaranteed a minimum of four (4) consecutive hours of work or pay in lieu thereof. In the event, a GAO post is closed because of an order from the government (i.e., Snow Closure) after an employee has reported to work, the employee shall receive pay for such shift as scheduled to work. It is the responsibility of the Employer to make timely notification to employees in the event of changes to posted schedules, as well as, temporary additional services and emergency services. The employee will maintain effective communications and provide telephone/pager numbers and updates of changes to the Employer. In the event the Employer is paid by the government for posts not covered on snow days, any employee who is normally scheduled to work such post and who was excused from reporting shall be compensated to the same degree as the Employer is compensated.

## Section 6

Nothing in this Article shall be construed as a guarantee of work, work opportunities, or hours, except as otherwise expressly provided.

## ARTICLE 7: DISCIPLINE

### Section 1

The Employer has the right to determine the level and degree of discipline. Disciplinary action shall not be taken without just cause. The Parties agree to follow the disciplinary provisions contained in its Standard Operating Procedures Number 358, *Administration of Discipline*, as revised July 2000 (Appendix B). Under normal circumstances, corrective progressive disciplinary action is taken following a thorough review of the incident, to include an oral warning, written warning, suspension, and eventual discharge. After an employee receives a written warning, the use of a final written warning, rather than suspension, may be more appropriate as the next step in the disciplinary sequence. A suspension, however, remains the more appropriate option when in the discretion of the supervisor, it is in the best interest of all parties that the employee be removed from the work area immediately.

The above steps would not necessarily apply in all cases. A suspension or discharge may be warranted on the first occasion of an extremely serious offense. However, an oral warning may not be warranted on a first occasion where personal counseling may eliminate future problems. In addition, it may be proper to give an employee one or more written warnings in some cases before giving a disciplinary suspension. In such situations requiring discipline, the circumstances must be known and each action taken on the merits of the case.

### Section 2: Representation by Shop Stewards or Union Officers

Any conference between an employee and an Employer representative during which discipline is expected to be imposed or from which discipline may flow, if the employee so

requests, must be conducted in the presence of an authorized Union Officer or shop steward. Employees must be advised in advance if a conference may lead to disciplinary action.

## ARTICLE 8: GRIEVANCE, ARBITRATION PROCEDURE

Any grievance or dispute which may arise following the effective date of this Agreement concerning the application, meaning, interpretation, implementation of an/or adherence to this Agreement, limited thereto, shall be settled in the following manner:

Step 1:       The employee and/or his or her Union representative shall present the grievance or dispute orally to the Employer's Project Manager/company representative within five (5) business days of its occurrence or when the employee knew, or by reasonable diligence should have known, of its occurrence. The Project Manager/company representative shall orally respond to the grievance within five (5) business days.

Step 2:       If the grievance is not settled at Step 1, the employee an/or his or her Union representative shall, within five (5) business days of the date the Project Manager responded or should have responded, whichever is sooner, submit the grievance in writing to the Employer's Vice President/General Manager. The Employer's Vice President/General Manager shall respond to the grievance within five (5) business days of receipt of the grievance.

Step 3:       If the grievance is not settled at Step 2, the Union shall, within five (5) business days of receipt of the Vice President/General Manager's response in Step 2, or the date when the Vice President/General Manager's response was due, present the grievance in writing to the Employer's President or his/her designee. The Employer's President or his/her designee shall respond in writing to the grievance within five (5) business days. Grievances affecting a class or classes of employees may be initiated by the Union at Step 3. The Employer shall have

the right to involve senior management in the grievance process at an earlier stage, in its discretion.

Step 4:    If the grievance is not settled at Step 3, the Union may, within seven (7) business days after the receipt of the Employer's President's response (or that of his designee) in Step 3, proceed to binding arbitration. Notice that arbitration is desired shall be served upon the Employer within seven (7) business days after the Union receives the Employer's Step 3 answer. Such notice shall identify the provisions of the Agreement allegedly violated and shall set forth such facts and circumstances as will provide the Employer with reasonable notice of the nature of the grievance. If the Parties are unable to agree on an arbitrator within ten (10) business days of the date of service, they shall choose an Arbitrator from a panel provided by the Federal Mediation and Conciliation Service by alternately striking the names on the list. The Employer shall have the first strike.

In addition, if the Employer has a dispute with the Union concerning the application, meaning, interpretation, implementation of and/or adherence to this Agreement, the Employer shall notify the Union in writing of such dispute within seven (7) business days of the date on which the dispute arose or, if later, on the date it first became aware (or reasonably should have become aware) of the existence of such dispute. If the Parties are unable to resolve such dispute within a period of thirty (30) days from the date of notice to the Union, the Employer may proceed to binding arbitration. Such arbitration proceeding must be demanded within ten (10) Business days following the aforementioned thirty (30) day period unless the Parties mutually agree in writing to extend such time period. Notice that the Employer requests arbitration shall be served upon the Union. If the Parties are unable to agree on an arbitrator within ten (10) business days of the date of service of the demand for arbitration, they shall choose an Arbitrator

from a panel provided by the Federal Mediation and Conciliation Service by alternately striking the names on the list. The Union shall have the first strike.

The Arbitrator shall conduct a hearing on the grievance. The Arbitrator shall render a decision within thirty (30) days of the close of the hearing or receipt of briefs. Any back pay award shall be reduced by any sums received as unemployment compensation or from interim employment.

The Arbitrator shall have no authority to alter, amend, or add to this Agreement, nor shall the Arbitrator alter, reduce or modify the penalty assessed by the Employer unless the Employer has failed to follow the progressive discipline steps. All of the time limits contained in this Article may be extended by mutual agreement of the Parties in writing.

All fees and expenses of the Arbitrator shall be shared by the Parties, except where one of the Parties to the Agreement requests a postponement of a previously scheduled arbitration hearing which results in a postponement charge and in that case the postponing Party shall pay such charge.

An employee shall be permitted to have a Union representative at each step of the grievance and arbitration procedure. Similarly, the Employer shall be permitted to have a representative at each step of the grievance and arbitration procedure.

The president of the Union or his/her designee shall have access to all relevant personnel records necessary to the Union's administration of this Agreement but must otherwise maintain the confidentiality of all information contained therein.

Both the Union and Employer shall utilize the grievance and arbitration procedure prior to initiating claims or litigation before any other administrative body or court whenever a dispute arises regarding the application, meaning, interpretation, implementation of an/or adherence to

this Agreement. Seeking relief from a government agency or a federal or state court before using the grievance and arbitration provisions herein shall constitute a violation of this Agreement. However, nothing in this Agreement shall be construed to be a waiver of any statutory rights of any employee. In the event of any arbitration involving an issue which involves rights of employees or the Union which are secured by federal or state statute, the Parties agree that any period of limitations shall be deemed to be tolled during the arbitration proceeding. An employee shall not be entitled to recover more than once for the grievance or dispute with the Employer.

## ARTICLE 9: NO STRIKE AND NO LOCKOUT

The Employer agrees not to cause, permit or engage in any lockout of its employees during the term of this Agreement. The Union agrees that neither it nor the employees it represents covered by this Agreement will, during the term of this Agreement, cause, permit, or take part in any strike, including sympathy or secondary strike, picketing, or work action. It shall be a violation of this Agreement, and it shall be cause for discharge or suspension in the event an employee refuses to enter upon any property involved in a labor dispute involving other employee organizations or refuses to go through or work behind any picket lines involving other employee organizations at the Employer's place or places of business. The Union and the Employer agree to take all steps possible to ensure that Government property is properly secured and protected in the event of labor disputes involving other employee organizations at the GAO Headquarters.

## ARTICLE 10: BULLETIN BOARDS

The Union may furnish a 2' by 3' bulletin board for the exclusive use of the Union at the GAO Headquarters in the break room. There shall be no posting of literature on these bulletin boards except official Union notices or events authorized by an official designated by the Union.

## ARTICLE 11: STEWARDS

Section 1

The Union shall designate no more than one (1) Steward per shift. An Alternate Steward may be designated if the Steward is not available. The Union shall notify the Employer of the selection of Stewards within ten (10) days of such selection. Stewards will be limited in the aggregate to a maximum two (2) hours per pay period of the Employer's paid time to conduct their on-site duties concerning the investigatory interviews which may result in discipline and grievances arising therefrom. This time will be coordinated with the shift supervisor. Stewards shall keep a log of time expended on matters of Union representation and related business. The Employer may examine the log in the event a request for compensation under this section is questioned.

Section 2

Stewards have no authority to call or direct strikes or authorize other economic action against the Employer. Stewards and Union officers shall not interfere with the management of the business or direct the work of any employee, but may advise the Employer of any violations of the Agreement. The authority of Stewards shall be strictly limited to the investigation and representation of grievances in accordance with the provisions of this Agreement and the

transmission of such messages and information which shall originate with and are authorized by the Union or its officers.

## Section 3

In the absence or unavailability of the Steward designated as representing employees on a specific shift or in a specific location, any other Union-designated Steward may represent unit employees.

## ARTICLE 12: COURT APPEARANCES

Court or administrative appearances necessitated by job-related occurrences or incidents shall be compensated for fully at the rates specified in this Agreement. However, other court, administrative or grievance procedure and/or arbitration appearances shall not be Employer-paid.

## ARTICLE 13: JURY DUTY

The Employer agrees to pay employees called for jury duty their normal full regular pay for a period up to ten (10) work days, less any fees or sums received from the Court, when an employee has met the following conditions:

a.   The employee must notify the Employer within seventy-two (72) hours after he or she receives a jury duty questionnaire or notice that he or she is subject to a jury duty call;

b.   No compensation shall be paid by the Employer for jury duty on Saturday, Sundays and holidays, unless such Saturday, Sunday or holiday was the employee's normal work day or for any other day on which the employee is not

normally scheduled to work. The employee must provide the Employer with written evidence or notice from the court that he/she performed jury service, for what period of time and the amount that the employee was compensated for such service.

## ARTICLE 14: LEAVES OF ABSENCE

### Section 1: Family & Medical Leave

All provisions of this Article shall be applied in accordance with the Family and Medical Leave Act as amended (FMLA). Eligible non-probationary employees will be granted up to twelve (12) weeks of unpaid leave for their own serious illness, for the birth or adoption of a child, or the care of a seriously ill child, spouse, or parent as defined by FMLA. An employee who takes FMLA leave will use as much sick leave and vacation leave that he/she has accrued.

### Section 2: Extended Family & Medical Leave

An employee who is ineligible for or has exhausted available Family & Medical leave or accrued sick leave, may, at the Employer's sole discretion, be granted unpaid leave on such terms and conditions the Employer deems appropriate. During such leave, the employee shall not continue to accrue seniority, although all seniority attained before the granting of extended leave shall be retained.

### Section 3: Personal Leave Without Pay

An employee may request personal leave without pay for personal reasons for a period of up to ninety (90) days. It is within the Employer's sole discretion whether such requests, which

must be in writing and state the reason for and length of the desired leave, will be granted. Neither seniority nor benefits shall accrue during such personal leave. Employees on leaves of absence for personal reasons who accept other employment during such leave shall be considered as having resigned. Upon giving two (2) weeks notice of intent to return to work, an employee shall be scheduled to report to his or her former job, or an equal job within two (2) weeks of the Employer's receipt of such notice if a job is available. If no job is available on the employee's former shift, he or she may be put on any available shift, consistent with the Employer's scheduling needs.

## Section 4: Bereavement Leave

In the event of the death of a member of a non-probationary unit employee's immediate family, the employee will not lose any wages which he or she would other wise have earned for the day before the burial, the day of the burial and the day after the burial. For the purpose of this provision, members of the employee's immediate family include: husband, wife, child, parent (including step parent), foster parent (*i.e.* an adult who reared the employee), grandparent, brother or sister. Appropriate documentation of the death, attendance at the funeral, memorial service, family grieving process and family relationship may be required. Such documentation may include letters or death certificates from the funeral home, clergy or community leaders. Leave for the death of a foster parent will be granted in the case of death in only one foster family.

### Section 5: Military Service

Employees enlisting or entering the military service of the United States pursuant to the provisions of the Uniformed Services Employment and Reemployment Rights Act and amendments thereto shall be granted all rights and privileges provided by that Act.

## ARTICLE 15: WEAPONS

The Employer agrees to implement a regular maintenance program for all Employer-owned weapons. Pursuant to this program, all weapons shall be checked, cleaned, and if necessary, repaired or replaced at least once every thirteen (13) weeks. Employees have the obligation to ensure that their weapons are at all times in proper working order. If an employee has knowledge that his or her weapon is not in proper condition, the employee shall immediately report this to his or her supervisor for replacement.

## ARTICLE 16: SENIORITY

### Section 1: Seniority Lists

The Employer shall maintain a seniority list for all regular full-time and part-time employees employed by the Employer at the GAO Headquarters. The Employer shall furnish the Union with copies of such lists every six (6) months if requested in writing.

### Section 2: Scheduled Overtime

a.  The Employer reserves the right to offer overtime to employees at its discretion and without regard to seniority in the event that such overtime (i.e., work over 40 hours per week) is required for reasons including but not limited to, an employee

has failed to report for work, an employee has called in sick, or for other unanticipated reasons or special circumstances.

b.      The Employer will in good faith attempt to distribute overtime work as equitably as practical among the employees the Employer reasonably deems qualified to perform the work, giving due regard to seniority where all other factors are equal. In the event the Employer has advance knowledge of 48 hours or more that overtime will be required, such work will be offered consistent with seniority whenever possible. Opportunity to work overtime shall be provided consistent with the Employer's business needs and circumstances and must be authorized in advance by the Employer. When the Employer has an unanticipated or exigent need to provide coverage, the Employer shall have the right to require an employee who normally performs the work to remain on duty until relieved and/or to require an available employee to provide such coverage, as conditions warrant.

## Section 3: Permanent Position Openings

A permanent position is defined, for the purposes of this Section, as a position on a specific shift. The parties understand that the Employer may rotate employees among posts on a specific shift. As permanent positions open, notice shall be posted. Employees shall have seven (7) days within which to bid. First preference shall be given to the employee, meeting site requirements, with the most seniority, skill, ability and professional work performance. Skill, ability, and work performance will be measured by job knowledge, punctuality, and responsiveness to schedules. All qualified candidates may then bid the successful bidder's prior

position. The remaining opening(s), if any, may then be assigned by the Employer at its discretion without challenge.

## Section 4: Promotions

The Employer reserves the right to promote personnel who, in the Employer's sole judgment, will best serve and fulfill its requirements and standards. If within ninety (90) days, an employee who has been promoted fails to satisfactorily fulfill the requirements of the new position, as determined by the Employer, the employee may be transferred to the original or similar position. Time spent, as a supervisor shall not count towards the employee's seniority.

## Section 5: Reduction in Force/Lay Off

In the event that the work force at the GAO Headquarters shall be reduced for any reason, the employees with the least seniority shall be laid off first. Shift reassignments shall be by bidding. Full-time employees may bid to return to a part-time position and be transferred to a full-time position when one becomes available, consistent with the Employer's scheduling needs and the provisions of this Agreement. A full-time employee may decline recall to a part-time position and remain on the recall list.

## Section 6: Recall

a.    As jobs become available at the GAO Headquarters employees shall be recalled in order of their seniority at the site, where reasonably deemed qualified by the Employer. Laid off full-time employees shall be recalled to full-time

21

employment as positions become available.  Probationary employees who have been laid off have no recall privileges.

b.      In the event of a layoff, seniority does not continue to accrue.  An employee shall retain the seniority, which he or she possessed at the time of the layoff except as provided below.

## Section 7: Loss of Seniority

In the event the Employer loses its contract to provide services at the GAO Headquarters, the Employer will have no obligation with regard to this Section after the termination of its contract.

An employee's seniority with the Employer shall be terminated if the employee:

(a)      Voluntarily quits;

(b)      retires;

(c)      is discharged for cause;

(d)      is absent from work for two (2) consecutive working days without notifying the Employer of the reason for his absence before the close of the two (2) day period, unless there was an emergency which prevented the employee from properly notifying the Employer;

(e)      fails to return to work from layoff within five (5) working days after the mailing of notice of recall by the Employer, unless there was an emergency which prevented the employee from properly notifying the Employer; or

(f)      fails to return from a scheduled vacation or leave of absence without having given proper notice to the Employer, unless there was an emergency that prevented the employee from properly notifying the Employer.

(g)      is laid off for a period of twelve (12) months or length of employment whichever is less.

In the event that an employee is laid off for reasons other than the Employer's loss of contract, the Employer shall, within thirty (30) days of the layoff, determine if the employee is qualified for work at another job site, and, if so, offer the employee the opportunity for a transfer if a position is available.

An employee's seniority shall not be terminated by a lay off due to an employee's efforts at requalification pursuant to Article 18.

A laid off employee who is recalled shall be sent notice of recall by certified mail to the employee's last known home address. It shall be the obligation of the employee to keep the Employer informed of his/her address or changes thereto. If such employee does not respond within five (5) business days of the date on which the Employer's notice was sent, or the employee refuses such offer, the employee will be deemed to have voluntarily quit, even if the notice is returned as undeliverable. An employee who has voluntarily quits or otherwise been terminated has no right to recall.

Section 8: Shift and Post Reassignments

In the event the Employer determines it is necessary to rotate employees among posts, every reasonable effort, consistent with the Employer's business needs, shall be made to assign employees during the same shift in which they previously worked. The Employer will make every reasonable effort, consistent with the Employer's business needs, to assign employees in such a manner as will not disrupt established child care arrangements, established work obligations as well as family obligations. Assignments are to be made in an unbiased manner and, where the Employer reasonably deems qualifications to be equal, in accordance with seniority to the extent possible.

## ARTICLE 17: VOLUNTARY QUITS

An employee shall be deemed to have voluntarily quit employment with the Employer if:

a.   A full-time employee accepts full-time employment with a competitor of the Employer at the same time while he or she is employed by the Employer, or otherwise fails to report for duty as scheduled by the Employer, while simultaneously remaining an employee of a competitor of the Employer.

b.   The employee fails to report for work within forty-eight (48) hours of the beginning of his/her scheduled shift after the expiration of a leave of absence without a telephone call or other explanation, unless there was an emergency which reasonably prevented the employee from properly notifying the Employer.

c.   The employee fails to report for work for two (2) consecutive days without telephoning or otherwise notifying the Employer, unless there was an emergency, which reasonably prevented the employee from properly notifying the Employer.

d.   The employee fails to respond within five (5) days of the Employer sending a notice of recall, unless there was an emergency, which prevented the employee from properly notifying the Employer.

e.   An employee who takes medical leave fails to notify the Employer that he/she is able to return to work within two (2) days after he/she receives a medical release to work.

# ARTICLE 18: TRAINING AND RE-QUALIFICATION

## Section 1

Effective October 1, 2000, the Employer agrees to pay employees who are required to requalify with a weapon on a firing range for up to four (4) hours at the employee's normal hourly rate of pay and one-half (½) hour for travel to and from the range facility at the employee's normal rate of pay for the first attempt only. The Employer further agrees to pay employees who are required to take government mandated training and retraining courses at the regular rates of pay provided by this Agreement. Notwithstanding the foregoing, in the event that an employee is required to take a repeat training course or is required to make a second attempt to qualify with a weapon because the employee failed to attain a sufficiently high score to be requalified, the Employer shall not be obligated to pay the employee for such courses or additional weapons range time.

## Section 2

The Employer shall schedule employees to be re-qualified at least one (1) month prior to the expiration of their weapons permit. The Employer shall afford to employees the opportunity to have at least one (1) practice sessions prior to any formal requalification test. All qualification and requalification procedures shall be conducted in accordance with GSA guidelines and procedures. Subject to GSA guidelines and procedures, the employee shall be given two (2) opportunities to qualify prior to the expiration date of his/her weapons permit. If the employee is unable to re-qualify prior to the expiration of his/her weapons permit or fails to pass a range qualification test twice before such time, the employee shall be laid off without pay for a maximum of forty-five (45) days. Such employee shall be reinstated after re-qualifying.

An employee laid off pursuant to this provision shall not accrue seniority or fringe benefits during his/her period of layoff. If the person does not re-qualify after the forty-five (45) day lay off period, such action will be considered as a voluntary quit.

Section 3

The Employer shall schedule, in a timely manner, full-time and part-time employees to obtain any annual government required physical examination at no expense to the employee (only for one examination). If an employee does not appear for or obtain his or her government-required physical examination prior to the time by which it must be obtained, the employee shall be suspended as in Section 2 above. If the employee does not satisfactorily pass his/her physical within the period of time specified above, the employee shall be considered as having voluntarily quit.

Subject to GSA requirements and rules, the employee shall have two opportunities to pass the physical examination. If the employee fails to do so or fails to report for a scheduled examination (unless such failure to report is the result of a documented emergency circumstance), the employee shall be terminated. Failure to maintain physical fitness standards, as established by the Employer, shall also result in employee termination. Failure to pass or refusal to take an alcohol or drug test shall be treated in accordance with Article 28.

Section 4

If an employee does not successfully complete and pass his or her government-required GSA, first aid and/or CPR examination prior to the time by which such examination must be taken and passed, the employee shall be laid off as in Section 2 above. If the employee does not

satisfactorily pass his/her first aid and/or CPR examination within the period of time specified above, the employee shall be placed on lay-off status until such time as the employee is administered the examination(s) and passes same. The employee shall have two opportunities to pass the first aid and/or CPR examination. If the employee fails to do so or fails to report for a scheduled examination (unless such failure to report is the result of a documented emergency circumstance), the employee shall be terminated.


Section 5

The Employer shall provide employees, at least 90 days prior to expiration of their General Services Administration (GSA) handgun permit, such forms as are required by the GSA for the renewal of such permit. Employees are expected to return such forms, including the range qualification form, completed together with any necessary photographs and fingerprint specimens within ten (10) days thereafter. The Employer shall promptly submit the completed forms, photographs, and fingerprint specimens to the GSA. If the employee does not submit to the Employer the completed forms, photographs, and fingerprint specimens within the aforementioned period and, as a result of the employee's delay, the employee's permit lapses, the employee shall be suspended without pay until the permit is received. Notwithstanding the foregoing, if the employee fails to provide the completed forms, photographs, and fingerprint specimens within 30 days of his/her receipt of the forms from the Employer, the employee shall be deemed to have quit voluntarily. In the event the Employer does not timely submit completed forms, photographs, and fingerprint specimens to the appropriate state agency and the employee permit lapses because of such delay, the employee may be suspended until a permit is issued.

## ARTICLE 19: UNIFORMS

### Section 1

The Employer shall provide at no cost to all employees those items listed in the Employer's GAO Headquarters guard service contract. Upon termination of employment, the clothing and equipment issued to the employee shall be returned to the Employer in good condition. Returned clothing shall be cleaned, pressed and returned on hangers.

The Employer agrees to pay eleven ($0.11) cents per hour worked up to forty (40) hours a week to each employee for uniform cleaning allowance.

The Employer shall replace any parts of the uniform that are damaged in the line of duty, provided it has been reported to the Shift Supervisor within the shift period when the incident occurred and for uniforms that become unserviceable due to normal wear and tear. Employees may purchase replacement items that are not covered above from the Employer at cost. Such articles shall be paid for by deductions from the employees' pay.

### Section 2

Upon termination of employment, the issued clothing and equipment shall be returned to the Employer. The Union agrees that all employees, at the time of hire, shall give written authorization allowing the Employer to deduct from the employees' final paycheck the cost of all unreturned issued clothing and equipment and/or the cost of cleaning clothing not returned in a clean condition. The deduction for such missing items or cost of cleaning shall be the actual cost to the Employer.

## ARTICLE 20: SUCCESSORS

The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee of the operation covered by this Agreement or any part thereof. Such notice shall be in writing with a copy to the Union at the time the seller, transferee, or lessee executes a contract or transaction as herein described.

## ARTICLE 21: SUBCONTRACTING

For the purposes of preserving work and job opportunities for the employees covered by this Agreement, the Employer agrees to provide the Union with at least seven (7) days notice prior to subcontracting or transferring to non-bargaining unit employees, any of the work or services of the kind, nature or type presently or hereafter performed or provided by the Employer. Supervisory personnel may, without prior notice, be temporarily assigned to cover unit work in an emergency situation. In no event shall such temporary assignment(s) exceed sixty (60) days in any year.

## ARTICLE 22: HOLIDAYS

Section 1

The Employer shall grant to all full-time employees the following holidays off with pay (or pay in lieu thereof, if normally scheduled to work that week day) at their straight time rate. Holiday benefits shall be paid provided that the employee shall work his or her regularly scheduled workday prior to the holiday and after the holiday:

New Year's Day
Martin Luther King's Birthday
President's Day
Memorial Day

Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day
Employee's Birthday (Effective 10/1/00)

The Employer reserves the right to limit the number of employees who take their birthday holiday on the same date. A birthday holiday may be taken by the employee up to seven (7) days prior to or after the employee's birthday. Holiday pay will not be granted to employees when a holiday falls within a period of leave of absence and/or layoff. A regularly scheduled part-time employee will receive a prorated portion of the above holidays not worked based upon their average hours worked in the four (4) weeks preceding the holiday.

## ARTICLE 23: VACATION

### Section 1

During the term of this Agreement, the Employer will provide paid vacation for full-time employees as follows:

| | |
|---|---|
| After one (1) year of continuous service | eighty (80) hours |
| After five (5) years of continuous service | one hundred twenty (120) hours |
| After ten (10) years of continuous service | one hundred sixty (160) hours |

### Section 2

Employees are eligible to take vacation after their anniversary date of employment each year. Vacations must be taken in the twelve (12) month period following each anniversary date of employment and cannot be carried over from one anniversary year to another.

## Section 3

Pro-rata vacation shall not be paid during the first year of employment. However, after the first year of employment an employee who has earned a full vacation or accrued a portion thereof and whose employment is terminated shall be entitled to vacation pay, unless the employee has been discharged for cause involving monetary or material loss by the Employer.

## Section 4

If a holiday named in Article 22 falls during an employee's vacation period, such employee shall be entitled to receive pay for such holiday (8 hours at employee's straight time hourly rate).

## Section 5

Vacation preferences shall be submitted to the Employer for approval, and although the most senior employee's vacation preference will be given weight where possible, the time when each employee takes his/her vacation shall be determined by the Employer. No more than five percent (5%) of the work force may be on vacation at any time. All vacation pay will be at employee's straight time hourly rate.

## Section 6

Part-time employees, after their anniversary date of employment, shall receive pro-rata vacation at their straight time hourly rate based on hours worked in the preceding anniversary year of employment. Should a holiday fall during the part-time employee's vacation period such employee shall be entitled to receive pro-rata holiday pay pursuant to Article 22.

## ARTICLE 24: SICK LEAVE

### Section 1

Effective October 1, 2000, full-time employees shall earn sick leave benefits on the basis of four (4) hours per month to a maximum of forty-eight (48) hours per year. No more than a total of forty (40) hours may be carried over or banked in the aggregate. Part-time employees will earn a prorated sick pay benefit. Said benefit will be calculated based upon their average hours worked in the preceding six (6) month period not to exceed eight (8) hours per sick day used (up to forty-eight (48) hours a year). The earning and accrual of sick leave is based upon sick leave earned by the employee, without break in service, for the Employer at the GAO Headquarters. Unused sick leave shall not be paid upon termination of employment. Full-time employees with perfect attendance during the calendar year will receive an attendance bonus of $100.00. Perfect attendance is defined as no lateness or unexcused absences from work. This will be issued in a separate check after verification by the Employer during the first month following the end of the calendar year for which attendance bonus was earned.

### Section 2

In order to receive compensation for sick days, an employee must notify his/her supervisor or designee at least three (3) hours prior to the commencement of his/her shift or as soon as possible after the onset of the illness that he/she will be unable to work due to sickness.

### Section 3

An employee who is absent due to illness or injury for more than three (3) consecutive work days shall be required to provide to the Employer, a physician's statement supporting and

certifying the employee's absence and ability to return to work on the day of returning to work. Where an employee fails to provide medical certification as required by this Article, or where medical certification does not support the employee's absence, the employee will not be entitled to sick pay, and will be subject to disciplinary action. An employee who does not provide medical certification that he/she is able to return to work if required or reasonably requested under this Article will not be permitted to return to work until such documentation is provided. The employer may require a doctor's certificate in cases of suspected abuse of sick leave of any length.

Section 4

Where an employee takes leave pursuant to the Employer's Family and Medical Leave Policy, the provisions of that policy will supersede any provision of this Article which is inconsistent with that policy.

ARTICLE 25: HEALTH AND WELFARE

Section 1

During the term of this Agreement, the Employer shall offer to eligible full-time employees a cafeteria type health and welfare plan. This Section 125 qualified plan offered to employees and their eligible dependents includes health insurance, dental insurance, vision, life insurance, accidental death and dismemberment insurance. Employees may select all, part or none according to individual requirements using dollars provided by the Employer in Section 2 below. Part-time employees are not eligible to participate in this plan. If an employee elects not to participate in any benefit provided by the plan or elects benefits the cost(s) of which are less

than the benefit contributions set out below, the employee shall receive an amount equal to the benefit amount, or the difference between the cost of the benefit(s) elected and the amounts set out below, as additional wages.

Section 2

Upon the effective date of this Agreement, it is mutually agreed that the Health and Welfare Benefits or the money in lieu thereof (to full or part-time employees) shall be established at $1.63 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2000, such rate shall be $2.03 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2001, such rate shall be $2.18 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2002, such rate shall be $2.30 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2003 such rate shall be $2.30 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year.

Section 3

Upon the next open enrollment period of the Company or upon an employee's date of hire, each covered employee shall elect in writing one of two options: (1) Participation in the Company's Sponsored Plan outlined in Section 1 or (2) the Security Worker's Health and Welfare Fund. Failure to select an option shall be deemed to be an election of option (1).

## Section 4

Consistent with the election of each employee, the Company will contribute the amounts set forth in Section 1 in accordance with employee's election. In the event cash amounts are to be paid to the employee, the Company will pay those amounts in each biweekly payroll.

## Section 5

Employees who elect the Security Worker's Fund must remain a participant for at least one full year. Employees who do not select this Fund may thereafter elect it only once each subsequent year during the thirty (30) day period that begins on the first day of the month in which this agreement was executed. An employee may terminate his/her participation in the Security Worker's at any time following the anniversary of his/her initial participation. However, an employee who voluntarily terminates such participation may not again participate in the Fund for a minimum of twelve (12) months. The parties also understand and agree that regardless of the date(s) on which the Company makes contributions on behalf of specific employees, eligibility for benefits under any of the Plans or Funds referred to herein is determined in accordance with the respective plan or fund rules.

## Section 6

The parties agree that an employee's initial or subsequent choice of options as listed herein shall be voluntary and free of any influence of either party or their representatives. The Company retains the right to make available or choose another insurance carrier(s) provided that the employee's level of coverage is not substantially decreased.

In the event that the contribution rate required by the Security Workers Health and Welfare Fund for a level of coverage desired by an employee is greater than the Employer contributions provided for in Section 5 above, the Employer agrees to deduct from the employee's wages an amount sufficient to meet the contribution requirement. Such deduction shall only be made upon authority of a written authorization signed by the employee.

## ARTICLE 26: 401(k) RETIREMENT PLAN

Upon the effective date of this Agreement all full and regular scheduled part-time employees may participate on a voluntary basis in the Employer's 401(k) Plan. Effective October 1, 2000, whether they elect to contribute or not, the Employer will contribute on behalf of each employee the sum $0.25 an hour to a maximum of forty (40) hours worked per week (2,080 hours/year). The employee will be entitled to a vesting of these Employer contributions after a period of one (1) year of continuous employment. Employees will be vested in said Plan based upon the terms and conditions of said Plan. No provision of said Plan is subject to the provision of Article 8 of this Agreement.

The Employer will provide information to the employees to advise them about the 401(k) program including roll over opportunities as provided by law.

## ARTICLE 27: WAGES

During the term of this Agreement, employees shall receive the following hourly rates of pay on the dates indicated:

| Classification | 7/1/00 | 10/1/00 | 10/1/01 | 4/1/02 | 10/1/02 | 4/1/03 | 10/1/03 | 4/1/04 |
|---|---|---|---|---|---|---|---|---|
| CPL | $11.50 | $12.20 | $12.56 | $12.68 | $13.05 | $13.18 | $13.56 | $13.69 |
| SO | $11.20 | $11.90 | $12.26 | $12.38 | $12.75 | $12.88 | $13.26 | $13.39 |

## ARTICLE 28: DRUG AND ALCOHOL POLICY

The Parties recognize that in the security business, the use of controlled substances or alcohol, which cause intoxication or impairment on-the-job poses risks to the Employer, the affected employee, his or her co-workers, and the public. An employee cannot perform his or her work adequately if he or she is under the influence of illegal drugs or alcohol which also presents a danger to himself or herself and to others. Unlawful use of drugs and the abuse of alcohol when not on duty raise serious questions concerning the employee's competency to perform security work and is grounds for revocation of his or her firearms permit. It is the Employer's policy to maintain a drug-free work place. The Employer and the Union agree to the Drug and Alcohol Policy attached hereto (Appendix C) and incorporated in this Agreement.

## ARTICLE 29: MISCELLANEOUS

Section 1

The Union agrees to cooperate with the Employer in all matters required by the Government. The Union recognizes that the terms and conditions of this Agreement are subject to certain priorities which the Government may exercise. The Union agrees that any action taken

by the Employer pursuant to a requirement imposed by the Government shall not constitute a breach of this Agreement. Any action which the Government directs or requires the Employer to take immediately may be taken without prior notice to or discussion with the Union. Otherwise, actions which affect terms or conditions of employment will be discussed with the Union.

Section 2

It is recognized and acknowledged by the Union that the Employer is in the business of providing a service, through its employees, to the government. It is therefore essential and expected that all employees will act in a highly professional, courteous manner and will be held responsible and accountable for their duties, functions and job requirements. Deviation from or failure to meet this standard will result in disciplinary action pursuant to the provisions of Article 7.

Section 3

The parties acknowledge that during negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements reached by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this Agreement even though such subjects or matters may

not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

## ARTICLE 30: SEPARABILITY AND SAVINGS CLAUSE

If any Article or Section of this Agreement or any appendix or attachments thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement and of any appendix thereto, or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby. In the event that any Article or Section is held invalid or enforcement of or compliance with has been restrained as above set forth, the Employer and the Union agree to enter into immediate collective bargaining negotiations, upon the request of either Party, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint.

## ARTICLE 31: DURATION OF AGREEMENT

Except as otherwise provided in this Article, this Agreement shall be in full force and effect from July 1, 2000, and shall remain in effect until (and including) September 30, 2004.

IN WITNESS WHEREOF, the Parties hereto have set their hands and seals to this Agreement, this _22_th day of _September_, 2000.

UNITED UNION OF SECURITY GUARDS

By: _Ruthie Rouse_                    Dated _September 5, 2000_

WACKENHUT SERVICES, INC.

By: _Larry K_____                    Dated: _September 22, 2000_

I:\530\Wackenhut_Areawide\2000cbaGAO4.wpd

AMENDMENT #1
TO
AGREEMENT BETWEEN
WACKENHUT SERVICES, INC.
AND
UNITED UNION OF SECURITY GUARDS
AT
GAO
JULY 1, 2000–SEPTEMBER 30, 2004
(Effective November 1, 2003)

Subject Agreement is revised as follows:

A.     **PREAMBLE** is changed to read as follows:

This Agreement is entered into as of this 1st day of September 2000, by and between Wackenhut Services, Inc. hereinafter referred to as the "Employer" and the United Union of Security Guards hereinafter referred to as the "Union". The Agreement is effective July 1, 2000, and continues to September 30, 2006.

B.     **ARTICLE 19: UNIFORMS** is changed to read as follows:

<u>Section 1</u>

The Employer shall provide at no cost to all employees those items listed in the Employer's GAO Headquarters guard service contract with the exception of shoes. Upon termination of employment, the clothing and equipment issued to the employee shall be returned to the Employer in good condition. Returned clothing shall be cleaned, pressed and returned on hangers.

The Employer agrees to pay eleven ($0.11) cents per hour worked up to forty (40) hours a week to each employee for uniform cleaning allowance. A shoe allowance of $65.00 per contract year will be paid as reimbursement for work shoe expenses each October 1 and will conform to uniform standards as described in the GAO Headquarters guard service contract. Shoe receipts shall not be required.

The Employer shall replace any parts of the uniform that are damaged in the line of duty, provided it has been reported to the Shift Supervisor within the shift period when the incident c\occurred and for uniforms that become unserviceable due to normal wear and tear. Employees may purchase replacement items that are not covered above from the Employer at cost. Such articles shall be paid for by deductions from the employees' pay.

C.    **ARTICLE 25: HEALTH & WELFARE** is changed to read as follows:

**Section 1**

Effective November 1, 2003 Employees will be enrolled in the Security Workers Health and Welfare Fund where the Employer makes periodic payments on behalf of the Employee. The Fund provides health and welfare benefits to employees and their beneficiaries. Regardless of the date(s) on which the Company makes contributions on behalf of specific employees, eligibility for benefits under any of the Plans or Funds referred to herein is determined in accordance with the respective plan or fund rules.

**Section 2**

Upon the effective date of this Agreement, it is mutually agreed that the Health and Welfare Benefits or the money in lieu thereof (to full or part-time employees) shall be established at $1.63 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2000, such rate shall be $2.03 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2001, such rate shall be $2.18 per compensated hour to a maximum of forty- (40) hours per week or two thousand and eighty (2,080) hours per year. Effective October 1, 2002, such rate shall be $2.30 per compensated hour to a maximum of forty- (40) hours per week or two thousand and eighty (2,080) hours per year. This portion of the CBA may be opened each July for the purpose of negotiating future H&W rates to be effective October 1 of that year.

**Section 3**

In the event that the contribution rate required by the Security Workers Health and Welfare Fund for a level of coverage desired by an employee is greater than the Employer contributions provided for in Section 2 above, the Employer agrees to deduct from the employee's wages an amount sufficient to meet the contribution requirement. Such deduction shall only be made upon authority of a written authorization signed by the employee.

D.    **ARTICLE 26: 401(K) RETIREMENT PLAN** is changed to read as follows:

Effective November 1, 2003, the Employer will contribute to the Security Workers Severance and Retirement Plan the sum of $0.25 an hour to a maximum of forty- (40) hours per week or 2,080 hours per year. The purpose of this Plan is to provide retirement and other related benefits for Participants and Beneficiaries under the terms and conditions of the Plan.

**E. ARTICLE 27: WAGES** is changed to read as follows:

During the term of this Agreement, employees shall receive the following hourly rates of pay on the dates indicated:

| Classification | 7/1/00 | 10/1/00 | 10/1/01 | 4/1/02 | 10/1/02 | 4/1/03 | 11/1/03 | 10/1/04 | 10/1/0 |
|---|---|---|---|---|---|---|---|---|---|
| CPL | $11.50 | $12.20 | $12.56 | $12.68 | $13.05 | $13.18 | $16.87 | $17.38 | $17.9( |
| SO | $11.20 | $11.90 | $12.26 | $12.38 | $12.75 | $12.88 | $16.50 | $17.00 | $17.5( |

**F.     ARTICLE 31: DURATION OF AGREEMENT** is changed to read as follows:

Except as otherwise provided in this Article, this Agreement shall be in full force and effect from July 1, 2000, and shall remain in effect until (and including) September 30, 2006.

IN WITNESS WHEREOF, the Parties hereto have set their hands and seals to this Agreement, this ___ day of _September_, 2003.

UNITED UNION OF SECURITY GUARDS

By: _____    Dated: 9/1/03

WACKENHUT SERVICES, INC.

By: _____

200002842.txt

| | |
|---|---|
| REGISTER OF WAGE DETERMINATIONS UNDER<br>THE SERVICE CONTRACT ACT<br>By direction of the Secretary of Labor | U.S. DEPARTMENT OF LABOR<br>EMPLOYMENT STANDARDS ADMINISTRATION<br>WAGE AND HOUR DIVISION<br>WASHINGTON D.C.   20210 |
| William W.Gross          Division of<br>Director          Wage Determinations | Wage Determination No.: 2000-0284<br>Revision No.: 2<br>Date Of Last Revision: 11/13/2003 |

State:   District of Columbia
Area:    District of Columbia Statewide

Employed on U.S. General Accounting Office contract(s) for security services at U.
S. General Accounting Office Headquarters in the above localiy.

Collective Bargaining Agreement between Wackenhut Services Inc. and United Union of
Security Guards effective July 1, 2000 through September 30, 2006.

In accordance with Sections 2(a) and 4(c) of the Service Contract Act, as amended,
employees employed by the contractor(s) in performing services covered by the
Collective Bargaining Agreement(s) are to be paid wage rates and fringe benefits set

forth in the current collective bargaining agreement and modified extension
agreement(s).

AMENDMENT #2
TO
AGREEMENT BETWEEN
WACKENHUT SERVICES, INC.
AND
UNITED UNION OF SECURITY GUARDS
AT
GENERAL ACCOUNTABILITY OFFICE (GAO)

Subject Agreement is revised as follows:

**A. ARTICLE 1: Section 1: RECOGNITION** New language to read:

Effective August 4, 2004 the GAO requires the security force to be staffed with Metropolitan Police Department Security Officers Management Branch (SOMB) Special Police Officers (SPO). All references throughout this contract to "Security Officer" shall mean SPO.

The Employer recognizes and acknowledges the Union as the exclusive bargaining agent with respect to rates of pay, hours of work, and other conditions of employment, for all full-time and regular part-time **special police officers, and alarm monitor dispatch operators**, employed by the Employer at the **U.S. Government Accountability Office** (GAO), Washington, D.C; and excluding all other employees, clerical, lead receptionist, access control receptionists, managerial and administrative employees and supervisors as defined in the National Labor Relations Act, as amended.

**B. ARTICLE 18: QUALIFICATIONS, TRAINING AND RE-QUALIFICATION.** Add the following Introduction paragraph above Section I to read:

"Introduction: Effective August 4, 2004 personnel must meet the following qualifications.

Special Police Officers must:
1.     Obtain and maintain a Metropolitan Police Department SOMB Armed SPO License.
2.     Obtain a DOD Secret Clearance within 6 months of assignment to GAO. DOD Interim Secret Clearance is required before entry on duty.
3.     Successfully complete and receive certification for the use of expandable batons.

4.    Pass a physical fitness requirement. Consisting of a forty yard sprint or run starting from the prone position in under 7 seconds; and run or walk a half mile in under 7 minutes.

Alarm Monitor Dispatch Operators must have 5 years experience in the following:

1.    Proficiency in using Microsoft windows based programs such as Excel, Word, and Access based programs.
2.    Proficiency and knowledge in using e-mail.
3.    An ability to maintain poise and self-control under stress.
4.    An ability to construct and write clear, concise, accurate and detailed reports.
5.    An ability to comprehend rules, detailed orders, instructions, and training materials.
6.    The ability to obtain a DOD Secret Clearance with 6 months of assignment to GAO.  DOD Interim Secret Clearance is required before entry on duty.
7.    An ability to perform and function as a dispatcher in a security or law enforcement environment.
8.    Proficiency and knowledge in security systems operation and functions.
9.    An ability to comprehend floor plans
10.    Proficiency in operating a digital CCTV system.
11.    Proficiency in operating fire alarm system for program monitoring.
12.    Proficiency in operating an access control program.
13.    Proficiency in capturing and recording video MPEG or JPEG for CD burning or e-mailing attachments.
14.    Ability to effectively communicate orally with all management levels, up to and including executive staff.
15.    Proficiency and knowledge in key control and accountability."

C. ARTICLE 18: QUALIFICATIONS, TRAINING AND RE-QUALIFICATION.  References to "GSA" in Section 2 and 5 shall be change to "SOMB".  References to "GSA" in Section 3 and 4 shall be changed to "GAO".

D. ARTICLE 19: UNIFORMS.  Add Section III as follows:

"Section III.
       Personnel assigned as Alarm Monitor Dispatch Operators do not have the requirement to wear uniforms but will wear business casual attire.  These personnel will not receive either a uniform or shoe allowance. "

ARTICLE 27: WAGES are changed to read as follows:

| Classification | 10/01/04 | 10/01/05 |
|---|---|---|
| CPL** | $17.38 | n/a |
| Alarm Monitor Dispatch Operator * | $21.00 | $21.63 |
| Security Officer (SO) ** | $17.00 | n/a |
| Special Police Officer (SPO)* | $20.00 | $20.60 |

* Current employees, in order to be considered for these positions, must meet the new requirements for these positions
** These positions will be phased out as employees meet the new qualifications

E. ARTICLE 25: HEALTH & WELFARE Section II. At end of Section II add the following sentence.

"Effective 10/1/2004, such rate shall be $3.10 per compensated hour to a maximum of forty (40) hours per week or two thousand and eighty (2,080) hours per year."

IN WITNESS WHEREOF, the Parties hereto have set their hands and seals to this Agreement, this 11th day of October, 2004.

UNITED UNION OF SECURITY GUARDS

By: _____    Dated: _____

WACKENHUT SERVICES, INC.

By: _____    Dated: Oct 11, 2004

# EXHIBIT 2

| WACKENHUT SERVICES, INC. (NCR) | STANDARD OPERATING PROCEDURES<br>TITLE/SUBJECT:<br><br>ADMINISTRATION OF DISCIPLINE | NUMBER:<br>358<br><br>EFFECTIVE DATE:<br>October 1, 2006<br>Supersedes Jan 1, 2001 version |
| --- | --- | --- |

**PURPOSE**   To establish a standard policy and procedures for the administration of discipline for all Wackenhut Services, Inc. (NCR) employees.

It is the policy of Wackenhut Services, Inc. (NCR) to maintain an effective and consistent disciplinary program to ensure optimum safety and efficiency in meeting all contractual requirements. It is also our policy to supervise and monitor the actions of each employee to assist them in correcting noted shortcomings before these shortcomings reach a level where disciplinary action is required.

Employee discipline is to be accomplished in accordance with the guidance contained herein for offenses or job deficiencies and as listed in the Wackenhut Services, Inc. (NCR) Disciplinary Actions (Attachment 1). However, disciplinary actions are not automatic as each must be considered in light of any mitigating circumstances that may apply. Furthermore, disciplinary actions must not be based on bias and/or personal likes and dislikes.

**RESPONSIBILITY**   The Wackenhut Services, Inc. (NCR) Vice President/General Manager is the approval authority for all formal discipline and any exceptions to the Administration of Discipline procedure. The Wackenhut Services, Inc. (NCR) Vice President/General Manager is the review authority for all appeals of disciplinary actions.

The Deputy General Manager for Operations is responsible for providing oversight for all disciplinary actions involving WSI employees assigned to NCR.

The Field Operations Manager is responsible for insuring that the proposed disciplinary action is appropriate and warranted. The Field Operations Manager will coordinate the preparation of disciplinary reports involving operational personnel.

The Project Managers and Site Supervisors are responsible for investigating and providing accurate and complete documentation of all disciplinary actions, along with their recommendations for actions to be taken.

The Contract Support Manager is responsible for the processing of disciplinary action correspondence e.g. letters of reprimand, suspensions and terminations.

The Deputy General Manager for Operations is also responsible for conducting, and/or coordinating inquiries/investigations of any offense committed when directed to do so by the Wackenhut Services, Inc. (NCR) Vice President/General Manager. The VP/GM-NCR may also direct the NCR Quality Assurance Manager's office to conduct independent inquiries or investigations in support of certain disciplinary cases where deemed useful to the process.

All Wackenhut Services, Inc. (NCR) employees are responsible for thoroughly reading, understanding and complying with this policy and procedure.

**PROCEDURE**    Discipline will be administered in accordance with the published list of Wackenhut Services, Inc. (NCR) Disciplinary Actions. This will help assure that consistency is maintained and that employees are treated in a fair and equitable manner.

All requests for formal disciplinary action will be submitted on the Wackenhut Services, Inc. (NCR) Disciplinary Report form (Attachment 2). The individual requesting the discipline action is responsible for the proper completion of the Disciplinary Report Form.

The Project Manager or Site Supervisor is responsible for reviewing the request for completeness, either approving or disapproving the request, making a recommendation, and acknowledging this review by signing in the appropriate space. The request will then be forwarded to the Field Operations Manager.

The Field Operations Manager will review the request and either approve the request and forward it to Contract Support Manager for action or disapprove and return the request to the originator with a written explanation for the disapproval. Copies of all disapproved disciplinary actions will be provided to the Deputy General Manager for Operations.

Upon receipt of an approved disciplinary action request, the Contract Support Manager will prepare the appropriate memorandum or letter as required. Sample formats for a Memorandum For Record (MFR), Letter of Reprimand, Letter of Suspension and Letter of Termination are provided as (Attachment 3). The completed memorandum or letter, with

supporting documentation will be routed to the Deputy General Manager for Operations for final review, and then forwarded to the VP/GM for signature. The signed memorandum or letter will be returned to the Contract Support Manager for copying, filing and distribution. A copy of the document will be faxed to the PM for immediate counseling use before the original is mailed to the employees. It is WSI(NCR) policy for supervisors to conduct all disciplinary actions in person, most especially those related to suspensions and terminations.

Archiving disciplinary actions after a specified period of time will establish the time period that a particular disciplinary action can be counted against the employee in relation to subsequent occurrences of the same offense. Archived disciplinary actions and related documentation will be maintained in the employee's permanent file; however once archived, the disciplinary actions will no longer be counted against the employee for following occurrences of the same offense.

For all offenses that list a Memorandum For Record (MFR) as the disciplinary action approved for a FIRST OFFENSE, that disciplinary action will be archived after 60 days. For all offenses that list a Letter of Reprimand as the disciplinary action approved for a FIRST OFFENSE, that disciplinary action will be archived after 90 days. For all offenses that list a Suspension as the disciplinary action approved for a FIRST OFFENSE, that disciplinary action will be archived after 180 days. The archiving of one type of offense does not affect another type of offense. Each offense category stands alone. An Offense File Cover Sheet (Attachment 4) will be attached to each disciplinary action. The Administration department is responsible for filling out the Offense File Cover Sheet and ensuring that disciplinary actions are properly archived.

Individuals who believe that they were wrongly disciplined may appeal the action to the Wackenhut Services, Inc. (NCR) Vice President/General Manager. This appeal must be in writing and received at the Wackenhut Services, Inc. (NCR) office within seven (7) calendar days after the disciplinary action is received by the individual being disciplined. The letter of appeal should contain all pertinent information to include witnesses when appropriate, and any mitigating circumstances. The Wackenhut Services, Inc. (NCR) Vice President/General Manager will review the appeal and render a decision.

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.01 Failure to be properly groomed. (See appropriate SOP's and contract requirements) | Verbal counseling with MFR in personnel file | Written reprimand | Two (2) days suspension to DISMISSAL | DISMISSAL |
| 404.02 Smoking in prohibited areas while on duty. | Verbal counseling with MFR in personnel file | Written reprimand | Five (5) days suspension to DISMISSAL | DISMISSAL |
| 404.03 Improper conduct. | Verbal counseling with MFR in personnel file | Written reprimand | Two (2) days suspension to DISMISSAL | DISMISSAL |
| 404.04 Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties. | Verbal counseling with MFR in personnel file | Written reprimand | One (1) day suspension | DISMISSAL |
| 404.05 Reading unauthorized material and/or using an unauthorized radio, tape payer, CD, television, computer equipment, etc. while on duty. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.06 Failure to take proper action to insure the safety of client or company personnel and/or property. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.7 Failure to properly submit any required report within two (2) work days. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.08 Non-willful failure to carry out assigned task. | Written reprimand | Two (2) days suspension | DISMISSAL | |

01/01

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.09  Losing Property or Equipment in your charge. | Written reprimand and reimbursement | One (1) day suspension and reimbursement | DISMISSAL | |
| 404.10  Tardiness or failure to observe assigned work hours. | Verbal counseling with MFR in personnel file | Written reprimand | Five (5) days suspension* (*Action may be postponed/shortened) | DISMISSAL |
| 404.11  Unauthorized solicitation and/or distribution of written or printed material of any kind for any purpose during working hours. | Written reprimand | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.12  Participating in games of chance, lotteries, sports pools or gambling while on duty. | Written reprimand to Five (5) days suspension | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.13  Two or more unexcused Call-offs from scheduled duty within a two week period. | Written reprimand to Five (5) days suspension | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.14  Unauthorized use of equipment (Client or Company property). | Written reprimand to five (5) days suspension and reimbursement | Five (5) days suspension to DISMISSAL and reimbursement | DISMISSAL and reimbursement | |
| 404.15  Violation of security procedures or regulations. | Written reprimand to DISMISSAL. | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.16 Being inattentive to duty but not asleep. | Two (2) days suspension | Five (5) days suspension | DISMISSAL | |

01/01

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.17  Failure to complete forms 139, 139R and/or 4072. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.18  Permitting or engaging in destruction or damage to customer or company property or equipment through carelessness or inattention to duty. | Five (5) days suspension and reimbursement to termination and reimbursement. | DISMISSAL and reimbursement | | |
| 404.19  Willful insubordination. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.20  Leaving work station without Supervisor's authorization. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.21  Disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.22  Deliberately allowing unauthorized persons on post or client property. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.23  Fighting on the job. (Aggressor(s)) | DISMISSAL | | | |
| 404.24  Horseplay or any other activity with potentially serious consequences such as personal injury or property damage. | DISMISSAL | | | |

01/01

## WACKENHUT SERVICES, INC. (NCR)
### DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.25  Sleeping on duty. | DISMISSAL | | | |
| 404.26  Harassment (including sexual or racial) of fellow employees, client employees or members of the public. | DISMISSAL | | | |
| 404.27  Unexcused No Call, No Show absence(s). | DISMISSAL | | | |
| 404.28  Unauthorized or careless use, handling or display of firearms or other weapons including pepper spray. | DISMISSAL | | | |
| 404.29  Possession of privately owned weapon(s) on client owned or leased property. | DISMISSAL | | | |
| 404.30  Wearing or bearing a firearm, baton (night stick) or other weapon, or equipment not specifically issued and/or required by the company. | DISMISSAL | | | |
| 404.31  Unauthorized removal of discarded or obsolete client property. | DISMISSAL | | | |
| 404.32  Giving verbal or written reports of any activity or incident to an unauthorized person without company approval. | DISMISSAL | | | |

01/01

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.33  Aiding a competitor without obtaining Company approval by providing Proprietary information and/or confidential data without obtaining Company approval. | DISMISSAL | | | |
| 404.34  Failure to report in writing offers, bribes or gratuities. | DISMISSAL | | | |
| 404.35  Proven theft, dishonesty, fraud or bribery. | DISMISSAL | | | |
| 404.36  Possession of alcoholic beverages or illegal drugs, either on the person, in a company or customer vehicle or on any company or client property. | DISMISSAL | | | |
| 404.37  Under the influence or reporting to work in an impaired state (this applies to alcohol, drugs, and/or narcotics). | DISMISSAL | | | |
| 404.38  Refusing to assist or cooperate in administrative investigations or inquiries. | DISMISSAL | | | |

01/01

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.39  Falsification or unlawful concealment, removal, mutilation, or destruction of any official documents or records or concealment of material facts by willful omissions from official documents, records, or statements (written or verbal). | DISMISSAL | | | |
| 404.40  Falsification or fraudulent alteration of any company document or record. | DISMISSAL | | | |
| 404.41  Unethical or improper use of official authority or credentials. | DISMISSAL | | | |
| 404.42  Conviction or pleading guilty to any felony. | DISMISSAL | | | |
| 404.43  Arrest for felony violations or indications of felony violations of Federal, State, or Municipal laws. | Suspension and removal from the contract pending results of an investigation to DISMISSAL | | | |

01/01

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| | DISMISSAL | | |
|---|---|---|---|
| 404.44  Any other act, which by its nature and impact, severely limits the employee's ability to perform the essential elements of the job or is injurious to the interest of the Company and/or the Client. * | | | |

* 404.44    *These may be acts such as, but not limited to, the following:*

- *Concealing or failing to report the onset of a serious health condition that severely limits the employee's hearing, vision, motor skills or other potentially disqualifying physical conditions.*
- *Concealing or failing to report the suspension and/or revocation of job required certifications, licenses or permits.*
- *Concealing or failing to report the expiration of job required certifications, licenses or permits.*

NOTE:    **Where applicable, offense/job deficiency definitions or requirements are set forth in the appropriate provision(s) of the SOP's and/or contractual agreements.**

01/01

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY REPORT

TO: _____          DATE OF REPORT:_____

FROM: _____          SITE: _____

The following disciplinary report was issued this date and is to be included in the employee's personnel file.  Provide the appropriate letter as required.

NAME: _____

DATE OF VIOLATION:_____          TIME DISCOVERED:_____

LOCATION OF VIOLATION:_____

The above-named employee was found to be in violation of the Wackenhut Services, Inc. (NCR) Disciplinary Actions:

Article_____          _____

_____

The infraction/offense is described as follows:

_____

_____

_____

use reverse side if more space is needed

(1)     Immediate action taken:_____

(2)     Formal disciplinary action recommended:_____

_____

Requestor:_____          Title:_____
          Printed Name and Signature of Supervisor or Manager

□ I agree with the contents of the above report          □ I do not agree with the contents of the above report

_____          Date:_____          □ Statement attached
          Employee Signature

Project Manager:_____          Project Manager: □ Approve  □ Disapprove
                Signature of Project Manager

Comment:_____

Field Operations Manager:□ Approve          □ Modify          □ Disapprove

Comments:_____

Signature:_____          Date:_____

01/01

# WACKENHUT SERVICES, INC. (NCR)
## MEMORANDUM FOR RECORD
## (FORMAT)

Date:

To:        File

From: Individual conducting the counseling session

This is a Memorandum for Record concerning *state the Name of the Individual* committing the violation of the disciplinary actions section of the Wackenhut Services, Inc. (NCR) Administration of Discipline policy and procedures and *state the specific offense committed as stated in the Disciplinary Actions section.*

*Explain the facts and circumstances surrounding the offense. The information provided should answer the questions: Who? What? When? Where? and How?*

*During your counseling session with the individual who committed the offense, inform the individual of the potential consequences of a repeat violation as specified in the Disciplinary Actions section and advise the individual of the actions that must be taken to improve or prevent a recurrence, and, if necessary, where or how assistance can be obtained.*

*Summarize the results of the verbal counseling session and any comments made by the individual who committed the violation.*

Completed Memorandums for Record must be forwarded through the Field Operations Manager to the Contract Support Manager for inclusion in the individual's personnel file. A copy should remain in the Project Manager's file.

01/01

# WACKENHUT SERVICES, INC. (NCR)
## LETTER OF REPRIMAND
## (FORMAT)

This is an official letter of reprimand concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. (NCR) Administration of Discipline policy and procedures: *State the specific offense committed as stated in the Disciplinary Actions section.*

*Explain the facts and circumstances surrounding the offense. The information provided should answer the questions: Who? What? When? Where? and How?*

*Inform the individual of the potential consequences of a repeat violation as specified in the Disciplinary Actions section.*

*Advise the individual of the actions that must be taken to improve or prevent a recurrence, and, if necessary, where or how assistance can be obtained.*

Appropriate signature block

01/01

# WACKENHUT SERVICES, INC. (NCR)
## LETTER OF SUSPENSION and TERMINATION
## (FORMAT)

This is an official letter of suspension concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. (NCR) Administration of Discipline policy and procedures: *State the specific offense committed as stated in the Disciplinary Actions section.*

*Explain the facts and circumstances surrounding the offense. The information provided should answer the questions: Who? What? When? Where? and How?*

*Inform the individual of the inclusive dates of the suspension and the date and time that the individual is scheduled to return to work.*

*Inform the individual of the potential consequences of a repeat violation as specified in the Disciplinary Actions section.*

*Advise the individual of the actions that must be taken to improve or prevent a recurrence, and, if necessary, where or how assistance can be obtained.*

Appropriate signature block

**Note:** A letter of termination contains the same heading and elements of the offense(s) spelled out; It will also give the date termination is effective and instructions for turning in credentials, and company-provided equipment and uniform items.

01/01

# WACKENHUT SERVICES, INC. (NCR)
## OFFENSE FILE COVER SHEET

Name of Employee:_____

Location:_____

Date of Offense:_____

Category of Offense:_____

Initial (First) offense of this category _____

Second _____ Third_____ offense of this category within _____
of the initial offense.

Type of Disciplinary Action taken for this offense:

_____MOR    _____Letter of Reprimand    _____Suspension

Is the offense still current?    Yes_____  No_____

Remarks:_____

_____

_____

Date of Archiving:_____

Name and Title of Reviewer:_____

Date of Review:_____

01/01

**EXHIBIT 3**

# G4S
# Wackenhut

## Security Officer Handbook

A World of Security Solutions

# WACKENHUT
## SECURITY OFFICER HANDBOOK

THIS HANDBOOK IS INTENDED AS A GUIDE FOR THE EFFICIENT AND PROFESSIONAL PER- FORMANCE OF YOUR JOB. NOTHING HEREIN CONTAINED SHALL BE CONSTRUED TO BE A CONTRACT BETWEEN THE EMPLOYER AND THE EMPLOYEE. ADDITIONALLY, THIS HAND- BOOK IS NOT TO BE CONSTRUED BY ANY EMPLOYEE AS CONTAINING BINDING TERMS AND CONDITIONS OF EMPLOYMENT. THE COMPANY RETAINS THE ABSOLUTE RIGHT TO TERMINATE ANY EMPLOYEE, AT ANY TIME, WITH OR WITHOUT GOOD CAUSE. MANAGEMENT RETAINS THE RIGHT TO CHANGE THE CONTENTS OF THIS HAND- BOOK AS IT DEEMS NECESSARY, WITH OR WITHOUT NOTICE.

THIS HANDBOOK IS THE PROPERTY OF THE WACKENHUT CORPORATION AND SHALL BE TREATED BY THE EMPLOYEE AS CONFIDENTIAL. THE CONTENTS HEREIN SUPERSEDE ALL PREVIOUS EDITIONS OF THE WACKENHUT CORPORATION SECURITY OFFICER HANDBOOKS/MANUALS.
© COPYRIGHT 1986

## A MESSAGE FROM OUR CHAIRMAN AND CHIEF EXECUTIVE OFFICER

*Your job as a Security Officer is of utmost importance because of the great responsibility it carries. Our clients depend upon you to endeavor to protect their property from burglary, fire and many other dangers and, in many instances, you are required to preserve and maintain the security of the United States through prevention of improper disclosure of classified information, sabotage or any other act detrimental to the security of the United States.*

*In order that we may continue to provide a high degree of protection and safety for business and industry, we have prepared this Security Officer Handbook which contains information and suggestions to help you do a better job. Through a careful reading of this Handbook, members of our Security Officer forces will become better acquainted with their duties and responsibilities. You should follow diligently the rules and regulations listed and make full use of the suggestions provided. Alertness and security consciousness serve the best interests of you, your Company and your country.*

*I'm sure that all Security Officers will cooperate to the fullest extent in our efforts to provide the best service possible for our clients.*

*Gary A. Sanders*
*Chairman and Chief Executive Officer*

# CONTENTS

## SECTION I.
## GENERAL INFORMATION

1. **The Wackenhut Story** ................................. 7
2. **Services of the Wackenhut Corporation and Subsidiaries**
   - List of Wackenhut Subsidiaries ... 10
3. **Employment Facts**
   - Wages and Hours .......................... 12
   - Paydays ........................................ 12
   - Payroll Deductions ...................... 12
   - FICA Tax (Social Security) .......... 13
   - Workers' Compensation .............. 13
   - Equal Opportunity Employer ...... 14
   - Duties ........................................... 14
   - Transfers ...................................... 14
   - Training ........................................ 14
   - TWC Drug and Alcohol Policy .... 15
   - Drug and Alcohol Policy for Federal Contracts or Grant Recipients ..... 16
   - Leaves of Absence ........................ 16
   - Sexual Harassment ....................... 20
4. **Advancement and Incentive Awards**
   - Promotions .................................... 22
   - Self Improvement ......................... 22
   - Employee Suggestion Program ... 22
   - Incentive Award Certificates ....... 23
     - Security Officer of the Quarter .................................. 23
     - Security Officer of the Year . 23
     - Certificate of Achievement . 23
     - Certificate of Appreciation.. 23
     - Certificate of Recognition .... 23
     - Certificate of Distinction ..... 23
   - W-Valor ........................................ 23
   - Service Awards ............................. 23

iii

## SECTION II.
## THE ROLE OF THE SECURITY OFFICER
## - TO EACH SECURITY OFFICER -

1. **Requirements of a Security Officer**
   - 1.1 What is Expected of a Security Officer .......................................... 24
   - 1.2 Our Mission ................................... 26
   - 1.3 We Endeavor to Protect .............. 26
   - 1.4 We Inspect ................................... 26
   - 1.5 We Enforce .................................. 27
   - 1.6 Production Security ..................... 28
   - 1.7 Remember .................................... 28
2. **Rules and Regulations**
   - 2.1 Attention to Duty ......................... 29
   - 2.2 Obey Laws ................................... 29
   - 2.3 Appearance .................................. 29
   - 2.4 Courtesy to the Public ................. 30
   - 2.5 Punctuality .................................. 30
   - 2.6 Orders ......................................... 30
   - 2.7 Conduct While on Duty ............... 31
   - 2.8 Prohibited Activities ................... 31
   - 2.9 Reports......................................... 32
   - 2.10 Court Cases ................................. 32
   - 2.11 Confidential Material ................... 33
   - 2.12 Debts ........................................... 33
   - 2.13 Visiting ........................................ 33
   - 2.14 Solicitation .................................. 33
   - 2.15 Discipline .................................... 34
3. **Sabotage**
   - 3.1 Definition ..................................... 36
   - 3.2 Types of Sabotage ....................... 36
   - 3.3 Reasons for Committing Sabotage ..................................... 38
   - 3.4 What Can Be Done to Prevent Sabotage ..................................... 38
4. **Legal Aspects of Industrial Security and Plant Protection**
   - 4.1 General Information ..................... 39
   - 4.2 Duties of Industrial Security Officers ......................................... 39
   - 4.3 Arrests .......................................... 40
   - 4.4 Crimes Which May Occur on Client Property ......................... 41

iv

5.    **Procedures**
      5.1    Theft Control Procedures ............ 42
      5.2    Pass and Badge Control ................ 44
      5.3    Lock and Key Suggestions .......... 44
      5.4    Patrolling ......................................... 45
      5.5    Flag Instructions ........................... 46
      5.6    Riot Duty ......................................... 46
      5.7    Protection of a Crime Scene ........ 47
6.    **Fire Protection and Prevention**
      6.1    General Information ...................... 48
      6.2    Primary Responsibilty of Plant
             Security ........................................... 48
      6.3    What Is Fire ..................................... 49
      6.4    Effective Fire Control ................... 49
      6.5    Fire Prevention .............................. 49
      6.6    Fire-Extinguishing ......................... 50
      6.7    Use of Extinguishing Agents ....... 50
      6.8    Extinguisher Identification .......... 51
      6.9    Fire-Extinguishers ......................... 52
      6.10   Sodium Fires ................................... 53
      6.11   Acids ................................................. 53
7.    **First Aid**
      7.1    General Information ...................... 57
      7.2    Security Officer Procedures in a
             Medical Emergency ...................... 57
8.    **Report-Writing**
      8.1    Importance of Reports ................. 58
      8.2    Basic Elements of a Report ........... 58
      8.3    Essential Considerations in
             Report-Writing .............................. 58
      8.4    What Should Be Reported ........... 59
9.    **Firearms**
      9.1    General Instructions ..................... 60
      9.2    Safety Precautions - Pistol and
             Revolver .......................................... 61
10.   **Espionage and Ways to Combat It**
      10.1   General Information ...................... 63
      10.2   What Does an Espionage Agent
             Want to Know? .............................. 63

      10.3   How Does an Espionage Agent
             Obtain Information? ...................... 64
      10.4   How to Fight Espionage? ............. 64
11.   **Traffic**
      11.1   Intersection Control ...................... 65
      11.2   Your Position in the Intersection  66
      11.3   General Rules for
             Smooth Operation ......................... 66
      11.4   Signals and Gestures ..................... 67

v

vi

# SECTION I
## GENERAL INFORMATION

### 1. THE WACKENHUT STORY

The history of The Wackenhut Corporation goes back to 1954.

In December of that year George R. Wackenhut and three other former Special Agents of the Federal Bureau of Investigation established their own company in Miami, Florida to provide investigative services to business and industry.

The new company was called Special Agent Investigators, Inc. Professionalism and quality were the hallmarks of the Wackenhut philosophy from the beginning and the fledgling firm quickly earned a solid reputation.

As its clientele expanded, a second company was formed in 1955 to apply this same philosophy to physical security problems. It was called Special Agent Security Guards, Inc. and it also quickly prospered.

In December 1958, Special Agent Security Guards, Inc. became Security Services Corp. with Mr. Wackenhut as President and Chief Executive Officer. The name of this firm was changed to The Wackenhut Corporation in September 1959 and Special Agent Investigators, Inc. was merged into it in 1960.

By 1960 business exceeded the million-dollar mark and TWC was embarked on a growth path that would sweep across the United States and around the world.

In 1960, the headquarters were moved to Coral Gables, Florida. All operations, domestic and foreign, are directed from there.

7

As the demand for Wackenhut's security expanded, the Company gradually added a number of wholly-owned subsidiaries. Today it provides a wide range of highly specialized services including electronic security systems and products.

The Wackenhut Corporation is now one of the world's largest international security and investigative organizations and is listed on the New York Stock Exchange.

Its operations extend across the United States, from Hawaii and Alaska to Puerto Rico and into Canada, the United Kingdom, the Orient, Central and South America, the Caribbean and a representative stationed in Europe. In addition, electronic products and systems are marketed throughout the world.

Despite the growth and diversity of its services, Wackenhut's uniformed security personnel still constitute the backbone of the Corporation and best symbolize the professionalism and quality performance which propelled TWC into the forefront of the security industry.

Strong management and dedicated employees have steadily reinforced the Wackenhut reputation, making the Company one of the most respected in the world. Proud of its past accomplishments, The Wackenhut Corporation looks to the future with confidence.

8

## 2. SERVICES OF THE WACKENHUT CORPORATION AND SUBSIDIARIES

Each person in the Wackenhut organization contributes to the total security services the Company provides its clients. Together, our thousands of employees, with their individual talents and professional training, comprise the strength of The Wackenhut Corporation.

There is a great and growing demand for security. Business, industry and the professions recognize the need to prevent losses, to safeguard physical assets, and to provide numerous other services a modern security force can be called upon to perform. Increasingly, this demand is accompanied by management preference for the Wackenhut Systems Approach to security problems.

Through this approach, Wackenhut people first evaluate the client's security requirements in terms of a plan for total security. Though a client may be considering just one aspect of Wackenhut services as the apparent answer to security needs, the Wackenhut Approach is to first completely analyze the security situation. When this analysis is accomplished a plan for total security is developed and presented to the client.

Wackenhut is able to provide all the services which a complete plan for total security may require. The plan might call for guard service supplemented by electronic security equipment. Investigative or pre-employment screening work could be involved. The inclusion of Wackenhut electronics for building management and security might be indicated in new client building plans. Training in employee security awareness could well be a part of the plan. And, if international operations were a client's consideration, this, too, could be part of the plan, utilizing Wackenhut's international capabilities.

9

Wackenhut is a large and growing Company. It has the personnel and the complete range of services required by today's sophisticated security client. The future of the security business, and particularly the Wackenhut Systems Approach to total security, is bright. Each individual among the thousands of Wackenhut employees contributes in his or her own way to the growth of the Company and the attainment of The Wackenhut Corporation's position as the industry leader.

## WACKENHUT SUBSIDIARIES

*WACKENHUT SERVICES, INC. (WSI)* - provides security services, fire protection, training and other security related services to agencies at municipal, state and federal levels.

*WACKENHUT PUERTO RICO, INC.* - provides security and security related services to business and industries in the U.S. territory of Puerto Rico.

*WACKENHUT OF ALASKA, INC.* (WAI) - provides Wackenhut security services for the Eastern half of Prudhoe Bay Oil Field and the Western section of Kuparuk River Oil Fields.

*AMERICAN GUARD AND ALERT, INC.* - provides Wackenhut security services for the TransAlaska Pipeline System, in addition to the Anchorage, Alaska business community.

*WACKENHUT APPLIED TECHNOLOGIES CENTER (WATCI)* - applies advanced technologies in a variety of ways to assure the fullest extent of security enhancement.

*WACKENHUT INTERNATIONAL, INC. (WII)* - provides Wackenhut security services to forty (40) countries on six (6) continents; and security to U.S. Embassies in over a dozen countries.

*WACKENHUT AIRLINE SERVICES, INC.* - provides security and security related services to the major airline companies at locations throughout the country.

10

*WACKENHUT CORRECTIONS CORP. (WCC)* - provides design, construction, financing and management services to detention/correction facilities for municipal, state, and federal agencies.

*SECURE TRAVEL SERVICES, INC. (STS)* - provides corporations as well as individual travelers with advice and service.

*WACKENHUT SPORTS SECURITY, INC.* - provides Wackenhut security services at sports facilities and arenas throughout the country.

*WACKENHUT HEALTH SERVICES, INC. (WHS)* - provides health care and health services at detention/correction facilities through out the country.

*WACKENHUT MONITORING SYSTEMS, INC.* - Electronic monitoring of parolees, detainees, and persons under house-arrest or similar restraint.

11

## 3. EMPLOYMENT FACTS

**WAGES AND HOURS** - One of your main concerns will be the wages or salary you receive for the hours you work. At Wackenhut our pay rates are fair, equitable and compare favorably with rates for similar work in the industry. We comply with all applicable Federal and State Wage and Hour laws.

Since our business is built on serving clients and is subject to the client's convenience, those of you hired as security personnel will work hours that conform to the demands of the client. You will be advised of your work schedule by your Supervisor.

**PAYDAYS** - With the exception of a few states in which pay periods are weekly, we pay bi-weekly. The payday will depend on the area you are in. Any questions regarding pay should be directed to your immediate Supervisor.

**PAYROLL DEDUCTIONS** - Each pay period the Payroll Department is required by law to make certain deductions from your earnings. These include FICA (Social Security), Federal Withholding Tax, and State or local withholding tax, or disability payments, as may be required in your particular area. The amounts of the deductions are subject to change for various reasons: change in wage rate, tax legislation, and changes in the number of your dependents. Each check stub will itemize all deductions. Upon being hired you prepared a W-4 (Federal) withholding exemption form. From the information you provide on this form your income tax deductions are computed. At the end of each year you will be given a W-2 withholding statement itemizing the income tax and FICA (Social Security) deductions withheld from your salary.

12

**FICA TAX (Social Security)** - Each employee pays tax on his or her salary for Social Security purposes through payroll deductions. The amount deducted is matched equally by a contribution from Wackenhut, thereby sharing with you the cost of paying for Social Security benefits. These benefits are in the form of retirement pension, Medicare insurance, death benefits to dependents and disability benefits. In addition, in the event of your death, either before or after retirement, your dependents may receive benefits in accordance with the terms of the Social Security Act.

In order to receive proper credit for FICA (Social Security) deductions, you must have a Social Security account card. Report changes in name immediately to your local Social Security office or to the Wackenhut office to which you are assigned so that your earnings will not be reported under two different names.

**WORKERS' COMPENSATION** - According to the laws of the state in which we operate, our Company carries Workers' Compensation Insurance, which applies to all accidental injuries to an employee while at work. The cost is paid entirely by Wackenhut. Workers' Compensation is carried to cover expenses and earnings lost due to injury while you are on the job. The individual laws of your state regulate the amount you are entitled to receive to cover medical expenses and to make up part of any loss in earnings. You must immediately report any work-related injury to your Supervisor.

**UNEMPLOYMENT COMPENSATION** - In accordance with the provisions of your State Unemployment Act, if you become unemployed, due to lack of work, you will be eligible for weekly benefits, provided you meet the requirements of the Act. Wackenhut pays the entire tax in the majority of states.

13

**EQUAL OPPORTUNITY EMPLOYER** - The Wackenhut Corporation is an Equal Opportunity/ Affirmative Action Employer. All personnel actions are effected without regard to race, sex, age, religion, national origin, disability, medical condition, veteran status, ancestry or marital status. As a responsible organization, we resolutely support the concept and practice of Affirmative Action and Equal Employment Opportunity. Each year we prepare an Affirmative Action Plan which reasserts our continuing commitment to equal treatment for all. We uphold federal and state civil rights laws and ensure that all of our personnel actions and policies are in compliance. Additionally, we recognize and value the importance and diversity of our work force and support its various cultures. The Wackenhut Corporation is dedicated to fostering an environment which respects the dignity, rights and contributions of its employees.

**DUTIES** - You have been selected and placed in your present assignment after having met certain requirements necessary to perform your duties. Your Supervisor will instruct you as to what your work and responsibilities are. You should diligently follow your duties and look to your Supervisor for guidance. He or she will answer any questions concerning your job.

**TRANSFERS** - Due to the nature of the contract security industry, no employee shall have a vested interest in any specific assignment, shift, post, or location and may be removed/transferred for any reason including but not limited to a client-directed request. To effect continuity of employment, it may be necessary for you to transfer from your particular location to another site where the Company is in need of employees. If you wish to be considered for a transfer within your present work unit, discuss the matter with your Supervisor.

**TRAINING** - According to your position with the Company, various training programs will be provided. After basic training, your Supervisor will

14

conduct an on-the-job training program in which procedures and forms applicable to your job will be discussed. It is the policy of Wackenhut to encourage and assist you in broadening your knowledge and to prepare you for increasing responsibility within the Company. To meet this obligation, manuals, monthly training bulletins and other materials for your self-improvement are available. You are urged to learn as much as you can about your present job and to qualify yourself for other important positions with the Company.

**TWC DRUG AND ALCOHOL POLICY** - Except when undergoing prescribed medical treatment as stated below, any use, sale, or possession of narcotics, drugs, controlled substances or alcohol while on duty or on Company property is an offense subject to termination of employment.

Off-the-job use of alcohol which adversely affects an employee's job performance or which jeopardizes the safety of other employees, the public or Company equipment is proper cause for administrative or disciplinary action up to and including termination of employment. Illegal use, sale or possession of narcotics, drugs, or controlled substances, at any time, shall be proper cause for severe disciplinary action up to and including termination of employment.

Employees undergoing prescribed medical treatment with a controlled substance should immediately report this treatment to their Supervisor. Although not grounds for disciplinary action, the use of controlled substances as part of a prescribed medical treatment program requires a medical certificate from the prescribing physician stating that job performance will not be impaired by the treatment. If job performance could be impaired, a medical leave of absence will be required.

15

**DRUG AND ALCOHOL POLICY FOR FEDERAL CONTRACTS OR GRANT RECIPIENTS** - Except when undergoing prescribed medical treatment, as previously stated, any unlawful use, sale, distribution, manufacture, or possession of narcotics, drugs, controlled substances or alcohol, while on duty, or on Corporate property, is an offense subject to termination of employment.

Off-the-job use of substances or alcohol which adversely affects an employee's job performance, or which jeopardizes the safety of other employees, the public or Corporate equipment, is proper cause for administrative or disciplinary action up to, and including, termination of employment.

The illegal use, sale or possession of narcotics, drugs or controlled substances, at any time, shall be proper cause for severe disciplinary action up to, and including, termination of employment.

Employees undergoing prescribed medical treatment with a controlled substance should immediately report this treatment to their Supervisor. Although not grounds for disciplinary action, the use of controlled substances, as part of a prescribed medical treatment program, requires a medical certificate from the prescribing physician stating that job performance will not be impaired by treatment. If job performance could be impaired, a medical leave of absence is required.

**LEAVES OF ABSENCE** - Personal, military and disability leaves are available for employees who qualify. These leaves of absence are always without pay.

1. Personal leave will normally not be granted for a period exceeding sixty (60) days and where applicable, will be applied against Family & Medical Leave Act.

16

2. Military leave as required to fulfill military obligations.

3. Disability leave (will be in accordance with the Family & Medical Leave Act (FMLA) of 1993 and any applicable state law).

4. **Family & Medical Leave**
TWC policy complies with the FMLA (Family & Medical Leave Act) of 1993.

**General**
Employees who have been employed for at least one (1) year, *and* for at least 1,250 hours during the preceding 12-month period are eligible for family and medical leave. Except for those employees who are considered as "key employees" or "highly compensated employees," employees will be returned to the same or to an equivalent position upon their return from leave.

Family and medical leave will be unpaid leave. If leave is requested for an employee's own serious health condition, the employee must use all of his/her accrued sick leave (if available). If leave is for any of the reasons listed below, the employee has the option of using vacation time.

**Reasons for Leave**
All employees who meet the time-of-service requirements may be granted a total of twelve (12) weeks of unpaid family leave during any 12-month period for the following reasons:
1. the birth of the employee's child and in order to care for the child;
2. the placement of a child with the employee for adoption or foster care;
3. to care for a spouse, child, or parent who has a serious health condition; or,
4. a serious health condition that renders the employee incapable of performing the functions of his or her job.

17

The entitlement to leave for the birth or placement of a child for adoption or foster care will expire twelve (12) months from the date of the birth or placement.

Spouses employed by the same employer are permitted to take only a combined total of 12 weeks of leave during any 12 month period if the leave is taken for the birth or placement of a son or daughter or to care for a parent with a serious health condition. For their own serious health condition, or to care for their spouse or son or daughter, each spouse would be entitled to 12 weeks of leave during any 12 month period.

### FMLA-The Twelve Month Period
Eligible employees may take up to twelve weeks of leave during a twelve month period under FMLA. This "twelve month period" is considered as beginning on the first day of the employee's leave.

### Intermittent Leave
An employee may take leave on an intermittent basis when medically necessary to care for a spouse, child, or parent or because of the employee's own serious health condition.

### Procedure for Requesting Leave
In all cases, an employee requesting leave must complete an Application for Family & Medical Leave and return it to his/her Supervisor. The completed application must state the reason for the leave, the duration of the leave, and the starting and ending dates of the leave. An employee intending to take family or medical leave because of an expected birth or placement, or because of a planned medical treatment, must submit an application for leave at least thirty (30) days before the leave is to begin. If leave is to begin within thirty (30) days, an employee must give notice to his/her Supervisor as soon as the necessity for the leave arises.

18

### Medical Certification
An application for leave based on the serious health condition of the employee or the employee's spouse, child or parent must also be accompanied by a "Medical Certification Statement" completed by a health care provider. The certification must state the date on which the health condition commenced, the probable duration of the condition, and the appropriate medical facts regarding the condition. If the employee has a serious health condition, the certification must state that the employee cannot perform the functions of his or her job. TWC has the option of requesting a second opinion.

If the employee is needed to care for a spouse, child or parent, the certification must so state, along with an estimate of the amount of time the employee will be needed.

### Subsequent Medical Re-Certifications
TWC has the option of requesting periodical medical re-certifications.

### Fitness for Duty Certificate
Employees who request leave because of a health condition will be required to submit certification from the health care provider that the employee is able to resume work.

### Benefits Coverage During Leave
During a period of family or medical leave, an employee may be retained on his/her health plan under the same conditions that applied before leave commenced. To continue health coverage, the employee must continue to make any contributions that he/she made to the plan before taking leave. If the employee chooses to not continue coverage during the leave, he/she may elect to reinstate coverage (without a waiting period) upon return from leave. An employee continues to accrue seniority and vacation while on family or medical leave.

19

An employee does not continue to accrue sick days while on family or medical leave unless the employee is using sick or vacation days. An employee who takes family or medical leave will not lose any employment benefits that accrued before the date leave began.

**Restoration to Employment Following Leave**
An employee eligible for family and medical leave - with the exception of those employees designated as "highly compensated employees" - will be restored to his or her old position or to a position with equivalent pay, benefits, and other terms and conditions of employment. TWC cannot guarantee that an employee will be returned to his or her original job.

All applicable leaves will be applied against FMLA leave.

FMLA does not supersede any state or local law or collective bargaining agreement which provides greater family or medical leave rights.

5. In accordance with the Pregnancy Discrimination Act of 1978, employers are required to treat pregnancy and pregnancy related medical disabilities the same as any other medical disability with respect to all terms and conditions of employment. There are states that have additional laws with respect to maternity leave. Management at each location should ensure compliance with any applicable state laws and FMLA.

For further details regarding leaves of absence, please see your Supervisor.

**SEXUAL HARASSMENT** - Sexual harassment, whether it occurs between a Supervisor and a subordinate or between co-workers, can not and will not be tolerated by The Wackenhut Corporation.

20

Sexual harassment is a violation of Title VII of the Civil Rights Act of 1964 and it is against our policy for any employee, male or female, to sexually harass other employees by: (1) Making unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature a condition of an employee's employment, or (2) Making submission to or rejection of such conduct the basis for employment decisions affecting the employee, or (3) Creating an intimidating, hostile or offensive working environment by such conduct.

Sexual harassment may take different forms. Examples of several types of forms are: **Verbal:** Sexual innuendoes, suggestive comments, jokes of sexual nature, sexual propositions or sexual threats. **Nonverbal:** Sexually suggestive objects or pictures, graphic commentaries, suggestive or insulting sounds, leering, whistling or obscene gestures. **Physical:** Unwanted physical contact, including touching, pinching, brushing the body, coerced sexual intercourse or assault.

If an investigation into a sexual harassment complaint concludes that an employee violated this policy by sexually harassing another employee, the violator will be subjected to discipline which may include termination of employment, regardless of his/her level. Supervisors in particular will be held to the highest of standards with respect to their conduct.

Employees who believe they are the victims of sexual harassment are to immediately contact their Supervisor, or the Corporate Human Resources Department for appropriate action. For the comfort of the complaining employee, upon request, a management representative who is the same gender as the employee may be made available to discuss the issue.

21

## 4. ADVANCEMENT AND INCENTIVE AWARDS

**PROMOTIONS** - We want you to advance within our Company, You are encouraged to develop and improve skills and abilities in order that you may qualify for promotion. We are proud of the many employees who have risen within the ranks to positions of additional responsibility. Your ability to learn and your attitude toward your work are factors that will help you make progress. The ongoing training Wackenhut provides gives you the incentive to broaden your horizons with us and may prepare you to accept new challenges and responsibilities.

**SELF IMPROVEMENT** - Your Company encourages you to improve your qualifications, not only for your present position but for promotion. Any courses or special training completed should be reported to your Supervisor for inclusion in your permanent personnel file, so that we may, at all times, know your qualifications and accomplishments.

**EMPLOYEE SUGGESTION PROGRAM** - We are always interested in suggestions that will improve the efficiency and operations of the Corporation. There is a formalized method for Wackenhut employees to submit suggestions for Management review.

Employees can submit their suggestions directly to the Human Resources Department at Headquarters or use a Suggestion Box, at locations where provided. Suggestions should be submitted on an 8.5 x 11 sheet of paper and be brief and concise. Information on which areas of the Corporation would be affected and what benefit would be derived are essential. The signature of the employee making the suggestion, location and date must be entered below the suggestion.

22

## INCENTIVE AWARD CERTIFICATES

### SECURITY OFFICER OF THE QUARTER
### SECURITY OFFICER OF THE YEAR
The Security Officer of the Quarter and Security Officer of the Year awards have been established to recognize outstanding performance by Field Office Security Officer personnel. Area Office recipients will be eligible for the Corporate Security Officer of the Year Award.

### CERTIFICATE OF ACHIEVEMENT
The Certificate of Achievement is awarded for the successful completion of a Wackenhut Training Institute Program.

### CERTIFICATE OF APPRECIATION
The Certificate of Appreciation is presented in response to a letter of commendation for a job well done or for performance of a valued act of service for the client or Corporation.

### CERTIFICATE OF RECOGNITION
The Certificate of Recognition is presented in recognition of unusual and outstanding service, and for courage and initiative.

### CERTIFICATE OF DISTINCTION
The Certificate of Distinction is presented for the performance of an act of valor above and beyond the call of duty, an act that reflects great credit on the individual, the client, and the Corporation.

### W-VALOR AWARD
The W-Valor Award may be awarded to employees who have received a Certificate of Distinction and are eligible for this prestigious award.

### SERVICE AWARDS
To reward longevity with the Company, Wackenhut service pins are given for each 5 year period of continuous service with the Company. Each year, on a monthly basis, service pins are issued to those employees who are eligible in recognition of longevity with Wackenhut.

23

## SECTION II
### THE ROLE OF THE
### SECURITY OFFICER

#### TO EACH SECURITY OFFICER

In your position as a Security Office, you will be called on to perform many different assignments. This Handbook has been prepared to serve as a guide in performing these tasks. Even though the procedures will vary from place to place, the basic purpose behind your work is the same.

It is impossible to cover all of the duties that you will be called on to perform, but this Handbook provides you with general information on accepted techniques. As new techniques are developed, they will be furnished in the form of revisions to the present sections or as additional chapters. You will be expected to keep this book available for ready reference.

#### 1. REQUIREMENTS OF A SECURITY OFFICER

**1.1 WHAT IS EXPECTED OF A SECURITY OFFICER:**
**ABILITY:** To be able to handle any normal situation which a Security Officer may encounter and know how and where to get help if it is needed.

**ALERTNESS:** To be alert at all times while on-duty, to be always on the watch for activities, conditions or hazards which could result in injury or damage to property and equipment.

**ATTITUDE:** The Security Officer is frequently the first contact a visitor has with the client. The way in which the visitor is greeted and the visitor's questions are answered will play a significant part on the visitor's ap-

24

praisal of the client's company. Human and employee relations depend a great deal upon the Security Officer's attitude.

**COURTESY:** Security Officers must be courteous at all times. An Officer need not be belligerent to be firm. An Officer can be courteous and well-mannered and still be effective.

**DISCIPLINE:** Personal likes and dislikes should not swerve a Security Officer from his or her duty. Prompt obedience and proper execution of all orders given by superiors is expected from all Security Officers. Discipline does not mean punishment. True discipline is indicated by proper conduct under all conditions - by individuals away from the presence of their Supervisors.

**EXEMPLARY CONDUCT:** To conduct ourselves at all times in a manner which will reflect credit on ourselves and The Wackenhut Corporation.

**IMAGINATION:** Security Officers should develop the ability to: Imagine what might happen under a given set of circumstances.

Determine the correct action to be taken if a given emergency should arise.

**JOB INTEREST:** Security Officers should take pride in their duties and maintain a keen interest in their jobs. This will show in the manner in which they perform their duties and will be recognized by all who come in contact with them.

**LOYALTY:** A Security Officer must be loyal to the Company. Learn to ask yourself, "Is this best for the Company?" Loyalty also means that supervisors are able to trust a Security Officer with confidential information.

25

*TACT:* A Security Officer should act without haste or undue emotion. Do not argue with people, and avoid force unless absolutely necessary. Present a calm, dignified bearing.

## 1.2 OUR MISSION:

To endeavor to protect all property within the limits of the client's property boundaries and to endeavor to protect employees and other persons on the client's property:

By the prevention of fire, disorderly conduct, vandalism, espionage or spying, stealing and carelessness.

By the promotion of safety, public relations, order in the plant, good will, discipline and respect for and confidence in ourselves and others. By enforcement of rules of conduct, rules of safety and client policy and procedures.

## 1.3 WE ENDEAVOR TO PROTECT BY:

Observing irregular or unusual conditions and activities. Correcting or reporting irregular or unusual conditions. Permitting only authorized materials into or out of the client's premises. Permitting only authorized persons into or out of the client's premises. Enforcing rules and laws. Rendering service to management and employees. Planning against potential harm. Acquiring the respect and good will of employees.

## 1.4 WE INSPECT FOR:

Fire and safety hazards.
Evidence of sabotage.
Waste of materials.
Theft of client materials or employee's property.
Incendiary or explosive materials carried into the client's premises.

26

Proper badge identification, passes and material releases.
Carrying or use of intoxicants or non-prescription narcotic drugs.
Possession of firearms or other weapons.
Lights out of order or burning needlessly.
Exposed classified or important documents.
Good housekeeping.
Unlocked doors and rooms.
Misconduct on client property.
Loitering.
Disturbances that interfere with production.
Smoking where not permitted.
Unlocked file cabinets in security areas.
All other violations of the client's policies or rules.

## 1.5 WE ENFORCE AGAINST:

Tampering with fire equipment, utilities, or machinery.
Sabotage or espionage and subversive activities.
Violation of safety rules.
Theft of client's and employees' property.
Possession or use of intoxicants and/or non-prescription narcotic drugs on the client's premises.
Possession of weapons.
Misconduct or indecent behavior.
Rowdiness or vandalism.
Gambling or soliciting on the client's premises.
Use of profane or indecent language.
Abuse or destruction of property, tools, machines or equipment.
Smoking where not permitted.
Unauthorized demonstrations or disturbances on the client's premises.
Creating unsanitary conditions.
Unauthorized distribution of literature on the client's premises.
Loitering.
Unauthorized peddling on the client's premises.

27

## 1.6 PRODUCTION SECURITY:

We endeavor to protect and thereby permit uninter-rupted production. We screen out the unwanted and let in those needed to make the product.

We preserve the buildings, machines, tools, materi-als and utilities for production.

We endeavor to protect the property of the client and of the employees involved in production against theft or misuse and to report all such occurrances.

We report and assist in the investigation of all in-stances of suspected production sabotage or subversive activity.

We inspect safety devices and enforce safety rules.

We preserve order and enforce rules of conduct.

We do everything except make the product with our hands - and we produce secure conditions under which the client's product may be made.

## REMEMBER:

*COURTESY* - Earns Respect.
*KNOWLEDGE* - Gets Results.
*PATIENCE* - Receives Cooperation.
*SERVICE* - Increases Good Will.

The *APPLICATION* of all of the above gets the job done well. To properly enforce client rules, a Secu-rity Officer must, at all times, abide by these rules as well as abide by our Company's regulations. This is of the utmost importance.

Authority is easily abused and nothing creates re-sentment so quickly as its misapplication. Keep in mind, each person is an individual very similar to yourself and should be treated as such. Seeking re-venge for an offense against you lowers you to the level of the offender. Patience and tact are needed under all circumstances.

28

## 2. RULES AND REGULATIONS

### 2.1 ATTENTION TO DUTY:

Security Officers shall demonstrate interest in their work by alertness and attention to duty.

### 2.2 OBEY LAWS:

No Security Officer shall knowingly and intention-ally violate the laws of the United States, a state, county or municipality.

### 2.3 APPEARANCE OF SECURITY OFFICERS:

Security Officers shall be neat and clean in appear-ance on duty, and shall wear only the complete uniform as prescribed by their Supervisor.

Leather and brass will be polished.

Due to the public nature of our business, and the busi-ness necessity that uniformed personnel represent a figure of authority, a code relative to hair length and facial hair is hereby prescribed:

Hair is to be neatly combed and appropriately cut to accommodate the wearing of the Security Officer cap. The cap is part of the official uniform and is required to be worn by male personnel. Female Security Of-ficers will not wear a uniform cap except when client-requested, and then they are limited to the of-ficial cap or a hard hat. Men's hair length should not extend beyond the shirt collar. Female Officers should wear their hair in a neat fashion.

Regarding male facial hair, a neatly trimmed mus-tache which does not extend beyond the width of the mouth and the lower lip is permitted; neatly trimmed side-burns that do not extend beyond the lower part of the ear lobe are also permitted.

Uniforms will be clean and presentable at all times.

29

Badges will be worn at times while on duty. If lockers are provided, the badge and uniform maybe kept on the client's premises.

It is the responsibility of the Security Officer to maintain the post to which he/she is assigned in a clean and orderly manner.

No insignias, emblems, buttons, or items other than those issued by the Company will be worn on the uniform without the expressed permission of the Company.

Shoes will be black leather or comparable material, and polishable. The shoe style must not inhibit safe, agile, and free movement as determined by the Supervisor.

## 2.4 COURTESY TO THE PUBLIC:
Security Officers will at all times be courteous, kind, patient, and respectful in their dealings with the public and will, by an impartial discharge of their duties, bring credit to themselves, TWC, and the client they represent.

## 2.5 PUNCTUALITY:
Security Officers will be prompt and punctual in all assignments. If a Security Officer, for any reason, is unable to report for duty at the specified time, he/she will notify his/her Supervisor at least 4 hours before shift change. A Security Officer will not leave an assigned post unless properly relieved. Absence without notification will be cause for disciplinary action.

## 2.6 ORDERS:
A Security Officer will obey all order promptly and inform his or her relief of all new orders issued. Willful disregard of orders and instructions will be cause for disciplinary action.

30

## 2.7 CONDUCT WHILE ON DUTY:
A Security Officer:
Will remain awake and alert at all times during his or her tour of duty.
Will not read while on duty except material furnished for instructions and in connection with the performance of his or her job.
Will carry on no unnecessary conversations.
Will not argue controversial subjects.
Will not conduct outside business at the employment location or while in Company uniform.
Will not accept gifts or gratuities from anyone for any reason.
Will not attempt to borrow money from fellow employees or employees of the firm where assigned.
Will not use the telephone for personal calls.
Will answer the telephone by saying, "Security Officer (Name)." Will write all messages.
Unless authorized, will not open drawers in cabinets, desks or other storage places. Will not remove, rearrange or read material left on desks or cabinets or allow any unauthorized person to do so.
Will not smoke in prohibited areas or in view of the public. The general client rules in regard to smoking will be adhered to.
Will not use threatening, abusive or insulting language or behave in a disrespectful manner to the public or fellow employees.

## 2.8 PROHIBITED ACTIVITIES:
A Security Officer:
Will not knowingly associate or have any dealings with any person or organization advocating or fostering hatred or prejudice against any racial or religious group.
Will at no time knowingly associate with any persons engaged in unlawful activities.
Will not drink intoxicants immediately prior to or while on duty, or at any time to the extent of becoming unfit for duty. Will not at any time use narcotic or habit-forming drugs unless prescribed by a licensed physician.

31

Will not enter premises where intoxicants are sold while in an identifiable Wackenhut uniform.

Will not report for duty with the odor of any alcoholic beverage on his/her breath.

Will not play cards or games of chance on the client's premises.

Will not authorize his or her name and title on photographs in uniform for an advertisement, endorsement or subscription for any company without the written permission of The Wackenhut Corporation.

## 2.9 REPORTS:

A Security Officer:

Will be alert and observe everything that takes place within sight and hearing of assigned post.

Will in an emergency not covered by Post Orders immediately report by telephone to his/her Supervisor.

Will make written reports on all observed violations of laws, client or Post Orders.

Will provide information in reports covering who, when, where, what and how.

Will report facts, not opinions. False statements will be cause for severe disciplinary action. Will, if a Security Officer meets with an accident in the line of duty, however slight, complete a written report covering details with the names of witnesses. This report will be furnished to his/her Supervisor.

Will immediately report to his/her Supervisor in writing any change of home address or telephone number.

Will complete a written report in any case where a weapon has been discharged either by citizens, employees or Security Officers.

Will accurately report all hours worked on the prescribed sign in form.

## 2.10 COURT CASES:

A Security Officer will immediately report to his/her Supervisor on being summoned to appear in court as a defendant or a witness in either civil or criminal proceedings.

32

## 2.1 CONFIDENTIAL MATERIAL:

Security Officers will regard as confidential all material and information that come to their attention in the line of duty. Security Officers will not give interviews or make public statements concerning the activities or policies of Wackenhut or the client to which they are assigned without the written permission of The Wackenhut Corporation.

## 2.12 DEBTS:

All Security Officers are expected to support their families and pay their debts.

## 2.13 VISITING:

Security Officers: Are prohibited from entering a working area of a client more than ten (10) minutes before the start of their work shift and from remaining more than ten (10) minutes after their shift has ended. Security Officers will not be permitted to enter any work area of a client for any purpose during their off-duty hours except as may be expressly authorized by appropriate authorities. This prohibition does not apply to off-duty employees entering a client's premises as a member of the general public for purposes for which the client's business is held open to the general public.

Will not permit individuals to visit with them for the purpose of discussing personal or other unofficial matters while on duty at a client's premises.

## 2.14 SOLICITATION:

Solicitation for any purpose by a Security Officer is prohibited while either the person soliciting or the person being solicited should be performing job duties. Distribution of any materials for any purpose by a Security Officer is prohibited at all times in a client's working areas. Distribution of any materials for any purpose by a Security Officer is prohibited in a client's non-working areas while the person

33

distributing materials or the person receiving them should be performing job duties.

Solicitation or distribution of any materials for any purpose by non-employees is prohibited at all times on the premises of TWC and prohibited on clients' property where prohibited by the client.
Even though Security Officers are paid for the entire time they are working at a client's premises, this rule does not prohibit Security Officers from engaging in solicitation during no more than the one-half-hour period while Security Officers are properly engaged in eating their meals and during periods, if any, when Security Officers are properly not engaged in performing their work tasks.

**2.15 DISCIPLINE: The following are not binding terms and conditions of employment. The Company retains the absolute right to terminate any employee at any time with or without good cause.**

Violations of any Rules and Regulations under Chapter 2 may result in disciplinary action to include:

*1. ORAL REPRIMAND:* when unintentional carelessness results in a problem. The employee will be counseled regarding the problem and proper action to correct the problem.

*2. WRITTEN REPRIMAND:* when a second reprimand is necessary for the same offense which originally carried an oral reprimand. However, in certain circumstances, it may be appropriate to bypass the oral reprimand and progress immediately to the written reprimand should the nature of the infraction warrant this. The written reprimand is to be entered into the employees file.

*3. SUSPENSION:* a temporary disciplinary layoff for serious misconduct or repeated offenses. The employee doesn't lose his/her job or seniority rights, but loses his/her pay for the designated period of suspension.

34

*4. DISMISSAL:* a result of a serious breach of a rule, standard, practice, policy or procedure. Additionally, dismissal may result from repeated disciplinary problems of a less serious nature.

**GROUNDS FOR IMMEDIATE DISMISSAL:**
The disciplinary process referenced above will be followed in most instances of employee non-compliance, with the exception of the following violations of prescribed standards which will result in immediate dismissal:
1. Refusal to work.
2. Extreme insubordination.
3. Fighting on the job.
4. Intoxication on the job or reporting to work in an impaired state (this applies to alcohol, drugs, narcotics or any substance which alters perception, awareness and which inhibits normal human response).
5. Theft, dishonesty, fraud or bribery.
6. Willful or reckless destruction of client or TWC property.
7. Unauthorized or careless use of firearms or other weapons.
8. Malicious harassment (including sexual or racial) of fellow employees, client employees or members of the public.
9. "Horseplay" or any other activity with potentially serious consequences such as personal injury or property damage.
10. Unexcused "No call, No show" absence(s).
11. Job performance that is unacceptable.
12. Conviction or pleading guilty to any criminal act.
13. Falsification or fraudulent alteration of any company document or record.
14. Sleeping on duty.
15. Failure to report to your Supervisor your arrest or conviction.
16. Aiding a competitor or any other act which intends to inflict injury upon TWC or its clients.
17. Any other acts which, by their nature and impact, severely limit the employee's ability to perform the essential elements of the job.

35

## 3. SABOTAGE

### 3.1 DEFINITION:

Sabotage is the intentional act of destroying, damaging or otherwise interfering with the production process.

### 3.2 TYPES OF SABOTAGE:

#### MECHANICAL SABOTAGE

Damaging machines or equipment by breakage or manipulation. Damaging power stations, transmission lines, transfer stations, switchboards or other key points of the power system. Placing abrasives or chemicals in motors or foreign objects in machinery to cause rapid, excessive wear. Tampering with a lubrication system; for example, draining motors and pouring molasses into crankcases to burn out bearings. Damaging electrical equipment or controls, causing overload of motors. Damaging telephone and communication systems. Damaging or stealing precision tools or technical mechanisms. Damaging materials either used or being manufactured at the client's premises. Damaging or delaying finished products both at the client's premises and in transit. Damaging, stealing, or tampering with blueprints, formulae, working models or other confidential data.

#### FIRE OR BOMB

Delayed-action incendiary or explosive action. Damaging by arson or by existing fire hazards. Damaging vital machinery, equipment or buildings by time bombs, gas explosions, incendiary bombs and devices or the use of other explosives. Placing holes in intake manifolds on motors to cause fires.

36

#### GERMS AND POISONS - ACTION AGAINST FOODSTUFFS

Bacterial infection or other pollution of water and foodstuffs for employee consumption. Injury to personnel, including the introduction of contagious disease .

Sabotage of refrigeration machinery to ruin food. Addition of moisture or other agents to ruin food.

#### LABOR SABOTAGE

Deliberate attempts to create unrest. Using "stink bombs" or other nuisances to damage morale, disrupt normal routine and keep employees away from work. Spreading rumors to undermine employee loyalty and morale, and thus create dissension and friction. Fomenting strikes, unrest, personal antagonism, spoilage of work and "slow-down" operations; provoking fear and work stoppages through false alarm. Saboteurs can be expected to work themselves into positions of some responsibility in order to act as strike provokers.

The most popular technique used in industrial sabotage is called *WORKING TO RULE*: The employee does nothing incorrectly or with evident malice, but works with extreme caution, paying attention to each detail, and asking instructions prior to every move. This slows down the employee's production and the production of all others whose work depends upon him/her.

#### POLITICAL MEANS

Provoking antagonism to government policies. Encouraging certain elements of the population to react against the government's course of action.

#### PSYCHOLOGICAL SABOTAGE

Systematic undermining of morale. Use of lies, rumors and deception to instill fear and weaken the will of the people to resist a hostile attack. Issuing false orders and communications.

37

## 3.3 REASONS FOR COMMITTING SABOTAGE:

For money.

Patriotic Extremism - Any sacrifice for country.

Political Extremism - Any sacrifice to extend political philosophy.

Threats - Of force or exposure of an indiscreet act in past life.

Revenge - Deep-seated grievance against government, an employer or fellow employee.

## 3.4 WHAT CAN BE DONE TO PREVENT SABOTAGE:

Watch for individuals who appear to be loyal, industrious workers who show interest in the work of others, an unusual interest in the layout of the client's premises, unguarded vulnerable spots, and patterns of plant activity and office personnel.

Watch for individuals who disrupt production by making fractional errors on precision work.

Watch for individuals who create small bottlenecks that delay major projects.

Carefully inspect all equipment and frequently check physical safeguards.

Constantly guard valuable equipment and documents.

Deny admittance of unauthorized persons or persons with no "need to know" to restricted areas.

Report all unidentified persons and challenge suspicious activities.

Report defects immediately to the proper authority.

38

## 4. LEGAL ASPECTS OF INDUSTRIAL SECURITY AND PLANT PROTECTION

### 4.1 GENERAL INFORMATION:

A Security Officer is not engaged in law enforcement as such. Therefore, an industrial Security Officer is not a Law Enforcement Officer like a Police Officer or Sheriff.

Security Officers endeavor to protect the production of goods and services and the client management makes rules and regulations regarding the conduct of persons engaged in production. The result is a smooth flow of production - not law enforcement.

Most rules and regulations do not have the force of law. An employee cannot be deprived of his/her freedom because he/she has broken a rule or regulation to help production. The most that can be done is dismissal of the employee.

Violation of law by someone working on the client's premises presents the same situation as someone breaking the law elsewhere - the case is under the jurisdiction of law enforcement agencies; local, state or federal.

Work performed by a Security Officer is not related to police work. Execution of the job and training are different. Leave law enforcement to the responsible agencies.

### 4.2 DUTIES OF INDUSTRIAL SECURITY OFFICERS:

To endeavor to prevent unlawful entry.

To endeavor to prevent theft.

To endeavor to prevent violation of client rules and regulations.

To endeavor to prevent violations of local, state and federal laws.

To endeavor to prevent fires, and in the event of a fire to give the alarm immediately and take other action that is necessary.

39

To know the location of the nearest telephone and how to report fire, emergency or conditions of disorder.

To be alert for and report safety hazards.

To know the location of the nearest first aid, firefighting and medical equipment.

To familiarize yourself with the installation geography and be able to direct people.

To enforce all security, traffic and parking regulations.

To keep roadways clear in case of an emergency.

To take charge of your post and to endeavor to protect all government and client property in view as well as personal property of client employees.

To familiarize yourself with the latest issue of the special and General Orders of the guard post.

To report immediately any unusual happenings to your immediate Supervisor.

To call your immediate Supervisor in any case not covered by orders.

To immediately call your Supervisor if you receive an order from a recognized client or government official, inform the Supervisor of the instructions received, and request official orders.

**4.3 ARRESTS:**

A Security Officer has no greater authority than a private citizen. As a general rule, a Security Officer or any private citizen may arrest an offender without a warrant when the offense is committed in his or her presence, within his/her view, if the offense is a felony or an offense against public peace. However, arrest laws vary from state to state and this rule does not apply in every state.

A felony is ordinarily any offense punishable by death or confinement in a penitentiary for a period of more than one year.

Arrests should be made only with the consent of a superior and only on client or Company property, except in an emergency situation.

False arrests and searches can result in civil and criminal lawsuits.

40

Before making an arrest the Security Officer should know:

That the violation committed is a crime.

That he/she has information in his/her possession to prove, beyond a reasonable doubt, that the suspect committed the crime.

No person may be arrested on a charge of suspicion.

No arrest is legal until AFTER the actual violation of a law.

Arrest is made by restraint of the suspect or by the Security Officer saying, "You are under arrest." Actual touching of a person is unnecessary - it is enough if the person submits to your custody.

No person is to be transported as a prisoner off the client's premises by a Security Officer. Notify the local law enforcement agency and turn the prisoner over to police on the client premises.

**4.4 CRIMES WHICH MAY OCCUR ON CLIENT PREMISES:**

Murder
Arson
Assault
Burglary
Larceny
Intoxication
Violation of sabotage and espionage laws

41

## 5. PROCEDURES

### 5.1 THEFT CONTROL PROCEDURES:
*SUGGESTIONS FOR REDUCING PILFERAGE:*

Look for careless storage and handling of valuable metals, such as nickel anodes, copper, brass, lead, etc. Give special attention to carelessness or suspicious activities in areas where valuable items may be stored or used: batteries, tires, clocks, radios, etc. Make recommendations for more secure control of property which may be particularly subject to misappropriation.

Report areas or jobs where tools may be carelessly left lying around at the end of a shift. It may be advisable to bring some of these tools to the client premises protection headquarters for safekeeping. Report tools and supplies which are left on receiving docks at the end of a shift, when there are no receiving room employees on the job.

Check tool cribs and stock rooms for the presence of unauthorized or suspiciously-acting employees. Check into rubbish piles or other possible places of concealment near the property's edge.

Check questionable employees who may be moving motors or other equipment in machinery or equipment-storage areas.

Check on questionable persons in finished-products storage areas. Look in tool cribs or rooms for property which apparently should not be there.

Check persons who are suspiciously loitering near client fences or building windows.

Immediately report the presence of property which is out of its proper area or appears to be placed for misappropriation.

### WHERE TO WATCH FOR STOLEN PROPERTY:
Carried under the coat.

Wrapped around the body (wire, valuable cloth goods, etc.)

42

Tied to a rope suspended from the waist under a coat.
Hung over the shoulders under a shirt or coat.
Suspended in pants legs.
Placed in a cap or hat.
Placed in stockings so that it fits next to the shin bone or calf of the leg.
Taped to the leg.
In clothing carried over the arm.
In sleeves of clothing.
Under the armpits.
In an unopened umbrella.

### ACTIONS OF AN EMPLOYEE TO AROUSE A SECURITY OFFICER'S SUSPICIONS:
Approaches gate too nonchalantly.
Approaches gate too fast or too slow.
Approaches gate and waves at someone.
Approaches gate and turns back.
Starts useless conversations with the Security Officer on patrol.
Too eager to show lunch box or parcel.
Overdressed.
Not dressed for the weather.
Picks position in screening line.
Sidles away from the Security Officer on patrol as he/she nears gate.
Says he/she forgot something and starts back into the client's premises.
Walks lame or stiff-legged - not natural.
Walks too erect to be natural.
Walks too stooped to be natural.
Carries arms or arm rigidly, not naturally.
Goes into client premises before signing or checking in.
Loiters in areas other than own department.
Goes to car during working hours.
Has a marked or sudden change of actions toward a Security Officer on patrol, or in general behavior, such as a change from a friendly attitude to one of hostility or indifference, or from being quiet to talkative.

43

## 5.2 PASS AND BADGE CONTROL, WHEN USED:

See that badges are worn on employee's outer garment in such a manner as to be visible at all times.
See that all persons wear a badge within the confines of the client's premises.
See that all visitors have a special pass when entering the client's premises.
See that all official and administrative personnel wear badges at all times when they are on the client's premises, other than in the main office.
There are to be no exceptions to these rules. Any person observed on the client's premises without proper identification, irrespective of official rank, should be immediately reported to the Officer in charge of your shift.
Employees reporting for work without their badges are to report to the Security Officer's post for a gate pass.

## 5.3 LOCK AND KEY SUGGESTIONS:

Report all defective locks.
Report misuse of locks or keys, or destruction and abuse of locks.
Make sure that all locks which should be locked are fastened, and report failure of persons to lock them.
If padlocks are found hanging unlocked, lock them and notify your Supervisor for corrective action. An Incident Report will be required.
In opening locks for admittance of a person be sure that person has the right to enter. Report the occurrence, giving the name of the person admitted and other necessary information.
Do not leave departmental, post or patrol keys where they may be picked up by unauthorized persons.
Look for night latches which can be opened by inserting a knife blade or similar device. A baffle may be necessary.
Closely check all exterior door and gate locks.
Recommend installation of locks where it is believed to be necessary.

44

## 5.4 PATROLLING:

Be alert and careful.
Have a known purpose for going into each department and area.
Use the five senses: hearing, seeing, smelling, feeling and tasting.

Don't patrol with clock-like regularity, either by time or route covered, unless otherwise instructed. It is not desirable to have persons know when you will come and go.
Look at things searchingly.
Be alert to the additional dangers confronting you at night.
Day or night, have a good workable flashlight available.
Thoroughly check all restricted areas on each patrol.
Inspect all fences to determine whether attempts have been made either to penetrate or tunnel underneath.
Check on foreign objects placed near fences, inside or outside, that may be used for climbing over the fences or to commit an act of sabotage.
From time to time stop on patrol rounds, step back into the shadows and observe for any suspicious activity.
Know the employees and the shifts they work. Check on any persons, including employees, who do not seem to have a reason to be in the area.
Check on drivers and passengers who look out of place.
Know regularly parked cars.
Look above and about you as you patrol.
Look for signs that would indicate a burglary has been attempted. If you suspect a person may be hiding in a building, push doors fully open on entering a room and keep your flashlight away from your body.
When you patrol suspecting a problem, be prepared to handle any situation.

45

## 5.5 FLAG INSTRUCTIONS:

The flag should be displayed from SUNRISE TO SUNSET. It is a universal custom to display the flag only from sunrise to sunset on buildings and on stationary flag staffs in the open.

The flag should NOT be DISPLAYED IN INCLEMENT WEATHER. Unless there is some special reason for doing so, the flag should not be flown in rainy or stormy weather.

The flag should always be raised briskly and lowered slowly and ceremoniously.

The flag should NEVER TOUCH THE GROUND while being lowered or raised.

HALF-STAFF: When the flag is to be flown at half-staff it shall be first raised to full staff and then slowly lowered to half-staff. When taken down from half-staff, the flag must again be raised to full staff and then lowered.

## 5.6 RIOT DUTY:

Remain calm and strictly neutral. Riots thrive on lawless leadership. This is fundamental in riots.

Pick the leaders and make a mental record of distinctive marks, so that you can positively swear to their presence at the scene of the riot. Note what particular action they took, what weapons they had in their possession, what oral threats were uttered, and what threatening action there was.

Remember, the Security Officers are an organized force versus a disorganized force, or mob. Every act of the Security Officers must be according to law and legal procedure.

Only those who are unquestionably violating the law should be arrested. Names, addresses, occupations, and identification marks of witnesses should be recorded in a memorandum book. Evidence must be secured and safeguarded. (*See Chapter 4.3*)

Don't make idle threats. Announce what you intend to do in a clear voice, then do it.

46

When it is advisable to use tear gas, the gas canister should be thrown on the edge of the crowd and on the windward side. The smoke and gas should be released on a sufficiently wide front so that the crowd is entirely covered.

Never draw firearms to threaten. Never shoot over the heads of people. Firearms should be used properly and only in a life-threatening situation.

(*See Chapter 9.1*)

## 5.7 PROTECTION OF A CRIME SCENE:

When a crime is committed on client property, it is imperative that the Security Officer on duty take prompt measures to protect the crime scene.

In the event of a serious crime, Security Officers will NOT investigate the area.

The Security Officer should refrain from touching any evidence in the crime scene area and should prevent unauthorized persons from handling such evidence. The nature of the crime and the type of evidence in the area require that the Security Officer be extremely careful in moving about so as not to obliterate or otherwise destroy crime evidence.

Security Officers will rope off or isolate the area and all possible avenues of entry or escape. No one should be allowed to enter or leave the area pending the arrival of representatives of the law enforcement agency bearing primary investigative jurisdiction.

Obtain the names and addresses of any possible witnesses to be furnished to the law enforcement agency.

47

## 6. FIRE PROTECTION AND PREVENTION

### 6.1 GENERAL INFORMATION:

Fire is an old enemy as well as friend of mankind. Fire out of control can destroy people, homes, all we hold dear. Fire under control supplies heat, power, energy to manufacture necessities of life. Fire is common. Strike a match to light a cigarette (a half-million matches are struck every minute) and you have fire under control. Throw the match away still burning, let it fall among combustible materials such as leaves, paper, flammable liquids, and in a very few minutes you have fire out of control.

Carelessness is the cause of great loss of life and enormous property damage from fire. The carelessly thrown cigarette or burning match, the paper-littered area, the poorly lubricated machine or improperly disposed flammable in the factory are careless causes of fire which may start as flickering flame and quickly spread out into an uncontrollable inferno.

A Security Officer's main job is to endeavor to protect life and property. It is extremely important that an Officer know exactly what to do in the event a fire occurs. Properly placed and maintained equipment and frequent inspections, knowledge of fire protective equipment, its operation and application, if needed, are MUSTS for good fire security.

### 6.2 PRIMARY RESPONSIBILITY OF PLANT SECURITY:

As Plant Security Officers we are - 24 hours a day, 365 days a year - PLANT INSPECTORS.

Endeavoring to protect the property from fire is a primary duty of Security Department members. **Fire protection involves four activities:**

*FIRE PREVENTION* - Consists of minimizing every cause of fire. It embraces the prevention of careless, ignorant or malicious acts by employees or others which may cause a fire or create a fire hazard.

*SAFEGUARDING EMPLOYEES* - Consists of evacuating and excluding all unnecessary persons from areas which may become dangerous, and giving first aid to any injured.

*FIRE EXTINGUISHING* - Can be done quickly and with a minimum loss only through a thorough knowledge of the fire equipment at hand and its operation.

*SALVAGE WORK* - Action taken during and following a fire. The object is to prevent excessive loss by fire, water, smoke, falling stock, walls, or roofs and other causes.

### 6.3 WHAT IS FIRE?

*FIRE IS* - Rapid combustion in air at attended by heat and flame.

*COMBUSTION IS* - A chemical reaction involving the union of oxygen with another element. When it occurs at such a rate as to produce appreciable heat it becomes a fire hazard.

> *FUEL + OXYGEN + HEAT = FIRE*
> *REMOVE ANY ONE TO PREVENT FIRE.*

### 6.4 FOR EFFECTIVE FIRE CONTROL:

The Security Officer should know the location of: Alarm Boxes (and how to activate). Telephones (and whom to call). Extinguishers (and how to use). Aisles (and where they go). All exits (including usable windows).

### 6.5 FIRE PREVENTION:

The time to stop a fire is before it starts.

Good housekeeping is an important factor in the prevention of fires.

See that rags soaked with flammable liquids or greases are disposed of in approved containers.

Make sure NO SMOKING rules are enforced where they are in effect.

See that flammable liquids are always in closed, approved containers.

See that all welding and burning jobs have a welding and burning permit prominently displayed, if a permit system is used in the plant.

48

49

Remember that any source of heat is a potential fire hazard. Care must be exercised in preventing any nearby materials from reaching dangerous temperatures.

## 6.6 FIRE EXTINGUISHING:

*COOLING:* Using water or water solution to lower the temperature of substances below burning point.
*SMOTHER OR BLANKETING:* Oxygen content of air is reduced below 15% (from normal 21%) in volume by using chemicals, water, fog, sand, blankets, etc.
*STARVING:* Supply of fuel is cut off, as in a gas jet.

## 6.7 USE OF EXTINGUISHING AGENTS:

*FIRE EXTINGUISHERS AND CLASSES OF FIRES:*
The following table gives the various kinds of fires and types of extinguishers to be used.

## CLASSES    EXTINGUISHING AGENT

| | CO₂ | Foam | Dry Chemical | Water | Metal X Powder |
|---|---|---|---|---|---|
| Class "A" Wood, Rubbish, Textiles, | NO | YES | YES if rated A,B,C | YES | NO |
| Class "B" Oils, Solvents, Greases, etc. | YES | YES | YES | NO | NO |
| Class "C" Electrical Machinery, Automobiles | YES | NO | YES | NO | NO |
| Class "D" Magnesium Alloy, Titanium' | NO | NO | NO | NO | YES |

50

Five (5) extinguishing agents are generally provided throughout the plant: **CO₂., Foam, Dry Chemical, Water and Metal X Powder.**

Electrical fires require CO, or Dry Chemical. Metal X Powder for magnesium and titanium alloy fires is provided for use in areas where these metals are being worked. This powder should be distributed carefully over the top of the blaze to form a smothering blanket. CO₂ Dry Chemical, and Foam are provided for oil and other flammable-liquid fires. Care must be exercised in extinguishing oil fires, particularly where a quantity of oil is confined in a bucket or other container, to avoid spreading the burning oil by the pressure of the extinguisher. In such cases, the extinguishing agent should be applied to the fire gently. Water hoses will not be placed in service except on authority of a Fireman or an Officer of the Security Department.

## 6.8 EXTINGUISHER IDENTIFICATION:


1. Extinguishers suitable for "Class A" fires should be identified by a triangle containing the letter "A." The triangle may be colored green.

2. Extinguishers suitable for Class B" fires should be identified by a square containing the letter "B". The square may be colored red.

3. Extinguishers suitable for "Class C" fires should be identified by a circle containing the letter "C". The circle may be colored blue.

4. Extinguishers suitable for fires in volving metals should be identified by a five-pointed star containing the letter D". The star may be colored yellow.

Extinguishers suitable for more than one class of fire should be identified by multiple symbols placed in a horizontal sequence.

51

... there are different kinds of
# FIRE EXTINGUISHERS
Find out WHERE THEY ARE and HOW THEY WORK
... NOW, *before* a fire starts



**WATER**
- TYPES: PUMP TANK; stored pressure; cartridge
- Works by COOLING fire
- Use for Class **A** Fires

**CHEMICAL FOAM**
- Works by SMOTHERING fire with foam
- Use for class **A** and **B** fires

**COMPRESSED GAS**
- TYPES: CO₂ Bromotrifluoromethane Halon
- Works by SMOTHERING fire with gas
- Use for class **B** and **C** fires

**DRY CHEMICAL**
- TYPES: stored pressure· cartridge operated.
- Works by SMOTHERING fire with a blanket of powder
- Use for class **B** and **C** fires

**MULTIPURPOSE DRY CHEMICAL**
- Works by SMOTHERING fire with a blanket of powder
- Use for class **A** **B** and **C** fires

**DRY POWDER**
- TYPES: special ones for the different combustible metals
- Use for class ★ fires

---

**KNOW THE LOCATION** of emergency equipment in your work area.

 

**FIRST AID KIT**
Fast action can save a life. Know where to find stretcher, rolled blanket, too.

**PLUS**
Ladder, ax, breathing , equipment, etc.

52

**6.10 SODIUM FIRES:**
Small amounts of sodium can be allowed to burn up completely. The only agents for extinguishing sodium fires are fine, dry soda - ash or Metal X Extinguisher. Sodium fires are promptly put out by throwing liberal quantities of these agents over the burning surface. In air these agents absorb water and containers for them must be kept covered. Covered containers of one or the other of these agents must always be at hand where sodium is being used. If sodium should burn in a drum, the fire can be extinguished by closing the cover. Wait until the drum is cool before removing the cover again. None of the standard fire extinguishers or water should be used on burning sodium. USE SODA-ASH or Metal X Extinguisher only.

**6. 1 ACIDS:**
*ACETIC ACID.*
Usual shipping containers are glass carboys and barrels. Dangerous in contact with chromic acid, sodium peroxide or nitric acid; yields moderately flammable vapors above Flash Point-104 degrees Fahrenheit. May cause painful burns on skin. Safeguard in storage against physical damages. Isolate from oxidizing material . Extinguishing agent - water. Expands on solidification and may burst container unless kept at a temperature above 61 degrees Fahrenheit.

*HYDROCHLORIC ACID (MURIATIC ACID).* Usual shipping containers are tank cars (rubber-lined), carboys and glass bottles. Not combustible (in air), but if allowed to come in contact with common metals hydrogen is produced, which may form explosive mixtures with air. Mixed with water it is corrosive and irritating to mucous membranes. Safeguard containers against damage. Keep away from oxidizing agents, particularly nitric acid and chlorates. Avoid contact by leakage or otherwise with all common metals. Use water or chemically basic substances such as soda-ash or slaked lime as extinguishing agents.

53

*HYDROFLUORIC ACID.* Usual shipping containers, water solution in lead carboys and wax or gutta-percha bottles. Colorless, volatile liquid. Not combustible but reacts with glass and most substances, platinum being an exception. Water solution also attacks glass and several metals. Acid and its vapor are highly toxic and irritating to skin, eyes and respiratory tract. Fumes produced by contact with ammonia and many metals are poisonous. May be neutralized with chalk. Bicarbonate of soda solution may be immediately applied to burns as first aid and used as a gargle. Isolate. Ventilate. Use water in case of fires involving hydrofluoric acid vapors. Use oxygen helmet on entering atmospheres known to contain hydrofluoric acid vapors. Vapors have been known to cause serious corrosion of sprinkler piping and heads.

*NITRIC ACID.* Usual shipping containers are carboys and glass bottles. May cause ignition when in contact with combustible materials; corrodes iron or steel; may cause explosion when in contact with hydrogen sulphide and certain other chemicals. Corrosive; causes severe burns by contact; deadly if inhaled. Safeguard against damage to containers; isolate from turpentine, combustible materials, carbides, metallic powders, fulminates, picrates or chlorates. In event of fire use large volumes of water. Use gas mask.

*PHOSPHORIC ACID.* Usual shipping containers are carboys and glass bottles. May cause burns on skin. In event of fire, use water. Not readily combustible in air. Avoid damage to containers.

*SULPHURIC ACID.* Usual shipping containers are carboys, iron drums, glass bottles and tankcars. May cause ignition by contact with combustible materials. Corrodes metal. Corrosive; dangerous fumes under fire conditions. Safeguard containers against damage; isolate from saltpeter, metallic powders, carbides, picrates, fulminates, chlorates and combustible materials. In case of fire, smother with sand, ashes, or rock dust, but avoid water.

54

*SULPHUROUS ACID.* Usual shipping containers are carboys and glass bottles. Not readily combustible in air. Avoid damage to containers. Has a suffocating sulphurous odor. In case of a fire, use water.

**CAUTION:** Use self-contained breathing apparatus or approved gas masks when combatting any of the above-listed materials, fire or other toxic vapor-emitting fires.

55





56

## 7. FIRST AID

### 7.1 GENERAL INFORMATION:

First aid is the immediate, temporary care of an injured or ill person before a physician arrives or regular medical aid can be obtained, or the patient is taken to a physician.

A Security Officer should respond immediately to a medical problem or emergency by seeking proper assistance.

### 7.2 SECURITY OFFICER PROCEDURES IN A MEDICAL EMERGENCY:

Remain calm.

Call for emergency aid.

Keep a crowd away from the injured person.

Assist law enforcement personnel and/or emergency medical personnel as directed.

ALWAYS keep emergency telephone numbers conveniently available.

57

# 8. REPORT-WRITING

## 8.1 THE IMPORTANCE OF REPORTS:

Written reports by Security Officers are essential in providing protection and safety for business and industry. Reports inform supervisory personnel and management of conditions that need correcting, are used for reference purposes and general record keeping, and as an aid in conducting investigations. Reports may concern present conditions or past occurrences, but in either case they are frequently kept as a permanent record and often are shown to top management officials.

## 8.2 BASIC ELEMENTS OF A REPORT:

What?
When?
Where?
Who?
How?

## 8.3 ESSENTIAL CONSIDERATIONS IN REPORT-WRITING:

*OBSERVATION*- notice details, train yourself to see in detail what you are looking at.

*ACCURACY*- state the facts as you have seen them and keep personal opinions out of the report.

*DETAILS* - do not overlook date, correct time, subject, exact location, what action, if any, was taken, whether the action taken achieved results, and who wrote the report. Do not exaggerate.

*SEQUENCE* - set forth the details in the report in the order in which they took place.

*BREVITY* - be brief, but tell the story completely.

*LEGIBILITY*- print or write neatly and distinctly.

*NEATNESS* - correct mistakes and avoid a dirty, finger-marked report.

*SPELLING AND PUNCTUATION* - be careful to use correct spelling and punctuation.

58

## 8.4 WHAT SHOULD BE REPORTED:

Fire or safety hazards.

Gas or steam leaks.

Water or liquid overflows.

Power and lights left on unnecessarily.

Theft, accident or property damage.

Defective electrical equipment.

Poor housekeeping and improperly stored materials.

Violations of Company or client rules and regulations.

Punching of another employee's time card.

Evidence of sabotage.

Unauthorized distribution of literature on client property.

Difficulties encountered with employees or visitors requested to comply with client rules and regulations.

Deviations during patrol which require additional time.

Any other unusual occurrences noted by the Security Officer during a tour of duty.

Record of Detex clock tours.

Client, Wackenhut Supervisor or Manager visit to the post.

59

## 9. FIREARMS

### 9.1 GENERAL INSTRUCTIONS:

The authority to carry firearms gives only the right to use them in self-defense or in defense of an imminent threat to another human life.

A Security Officer will be held accountable for the un-warranted use of firearms and is personally liable for the WRONGFUL or NEGLIGENT use of firearms.

This does not mean that undue risk should be taken when danger threatens, but it does mean that judgment must be used in resorting to the use of firearms. Security Officers must avoid all reference to firearms in ordinary circumstances, but so train themselves that they may, in an emergency, make quick and accurate use of them. Firearms will be issued by either the on-site or Area Supervisor and shall be inspected by that individual for loads and cleanliness at the time of issue.

Upon being issued a firearm preparatory to assuming a post of duty, each Security Officer will examine his/her weapon, verify loads and immediately holster the firearm before going on duty, and will not again remove it during the tour of duty except to use in an emergency. In no situation are weapons to be cleaned on post. Supervisors will issue necessary instructions to provide that all weapons be cleaned and oiled in appropriate areas, when available.

Treat all firearms as though they are loaded. The accidental discharge of firearms will be regarded as negligence.

Weapons will never be laid on desks or furniture during exchanges, or kept in desk drawers.

Any damage to a weapon shall immediately be made the subject of a written report.

Firearms shall not be altered, filed, fitted with new parts, or changed in any way, except when such changes shall have been previously approved by the Supervisor. Company firearms, when not in use, will normally be placed in a secure area.

60

A Security Officer will use the utmost care in handling firearms.

No weapon will be removed from the facility where the Security Officer is assigned without the express permission of the Supervisor.

Transportation of all weapons will be in accordance with all state, county and municipal laws.

A Security Officer will never use warning shots in an effort to apprehend a violator.

A Security Officer will not carry a personal weapon of any kind, unless mandated by state or local law, while on duty. This includes, but is not limited to, firearms, mace, batons, knives, and handcuffs. The use of personal holsters, belts and other associated equipment is also prohibited.

All weapons, including firearms, batons, mace, etc., should be used only at specified posts and only by qualified and licensed personnel and worn in the prescribed manner.

### 9.2 SAFETY PRECAUTIONS
### PISTOL AND REVOLVER:

The following rules will be strictly enforced on the range:

When picking up a weapon, make a safety check to see that it is not loaded. When handing a weapon to another person, make certain the cylinder is open, and the weapon unloaded.

Never handle, point, or look over the sights of any firearm handed to you without first opening it to be sure it is NOT loaded. Look a SECOND time to make sure. Never glance hurriedly into a revolver or pistol and "decide that it is not loaded. That is the mark of an amateur. LOOK again to be SURE you have not made a mistake.

If a revolver or pistol is handed to you (or if you pick one up) ALWAYS look to see that it is NOT loaded. Then LOOK AGAIN to be sure you have not made a mistake.

61

NEVER draw a weapon unless commanded to do so by the Range Instructor.

ALWAYS be sure that there is no obstruction in the barrel (foreign matter, heavy oil or grease, or cleaning patch, etc.)

Weapons are only loaded on command by the Range Instructor.

NEVER load (or cock) any firearm until you are actually at the firing point.

Weapons will be pointed down-range at all times. No talking on the firing line. No talking to shooters on the firing line except by the Range Instructor.

Never point a firearm at any part of your body.

In case of misfire (failure to "go off"), do not open the revolver for at least 15 seconds (count 20), and keep the muzzle pointed toward the target.

Never leave the firing point without first unloading your firearm.

NEVER unload behind the firing line. If you have a loaded firearm which you wish to unload, step to the firing point, unload and show the firearm to the Range Instructor.

In presenting a firearm for inspection, first open the cylinder and insure that it is unloaded.

**REMEMBER** - There is no such thing as an UN-LOADED firearm. Treat ALL firearms as LOADED until you have looked, then look AGAIN to be sure that you have not made a mistake.

Disregard of any of the provisions in 9.1 - FIREARMS, GENERAL INSTRUCTIONS - and 9.2 - SAFETY PRE-CAUTIONS - will be cause for immediate disciplinary action which could include discharge if the infraction was of such magnitude that it placed in jeopardy the life of an innocent person.

62

# 10. ESPIONAGE AND WAYS TO COMBAT IT

## 10.1 GENERAL INFORMATION:

Espionage is not a new concept. The earliest recorded reports of spying occur in the Bible, when God spoke to Moses and told him to send men to search the land. The art of spying or espionage is a very important factor in the cold war and in modern warfare when production capacity, raw material stockpiles, technological developments and scientific discoveries play a top role in deciding who will win.

American history is filled with references to spies, for example: Benedict Arnold, Klaus Fuchs, the Rosenbergs, David Greenglass and Myron Soble. The best plan of action is useless if the enemy is prepared for it. That is what causes our enemies to train and use espionage agents. If the espionage agent is successful, espionage helps the enemy not only to know how far advanced we are, but also allows the enemy to duplicate our products and anticipate how we will wage a war based on our current degree of technological development.

## 10.2 WHAT DOES AN ESPIONAGE AGENT WANT TO KNOW?

Plans and specifications of missiles, weapons, systems and other items of national defense.

Test records of new equipment.

Sources of components.

Destination of finished products and routes followed.

Production methods data.

Rates of production, capacity, schedules of production and orders on hand.

Critical points and possible ways of effective sabotage.

Security measures in force and measures for sabotage prevention.

Dependability of Security Officers and frequency of inspection. Dissatisfied labor elements in critical jobs.

63

## 10.3 HOW DOES AN ESPIONAGE AGENT OBTAIN INFORMATION?

Loose talk.

Carelessness.

Infiltration onto client property as employees, visitors, inspectors or by other means.

Stealing or buying information from employees.

Stealing data from records or other sources and reporting personal observations and studies of material.

Reproducing documents through various measures.

Using fronts, such as commercial concerns, to obtain confidential information or pertinent statistics which can be translated to strategic data.

## 10.4 HOW TO FIGHT ESPIONAGE:

Use good judgment and common sense:

Be careful about what you say.

Don't be too friendly - and become a bad security risk.

Don't write what you wouldn't say.

Report anyone whom you suspect of being a possible espionage agent.

## 11. TRAFFIC

## 11.1 INTERSECTION CONTROL:

Sometimes there isn't room enough in the street for all the drivers who want to use it. Left to themselves, they quickly get in each other's way and can cause a traffic jam. This can lead to accidents caused by impatient drivers. To keep traffic congestion from becoming a traffic jam somebody must act as an umpire to decide how cars shall move so that the delay to all will be as short as possible.

You are the umpire when you are assigned to direct vehicle movements. If you are on the job, drivers will usually be glad to wait until you tell them it is their turn to move because they know you are trying to make the best possible use out of the street and that you can prevent the delays they dread.

You become responsible for the smooth flow of traffic and for preventing or breaking jams at your post or intersection the minute you take your station. Here is what you are expected to do:

*Regulate cross-flow*, that is, direct whether east and west or north and south traffic will move and for how long a time. Control turning movements, especially left turns.

*Coordinate vehicle movement* at your intersection with that in adjacent blocks and at neighboring intersections.

*Detour traffic* in emergencies. Supervise traffic signal obedience, if necessary directing traffic to disregard signal indications.

*Protect pedestrians* crossing streets.

*Restrain pedestrians* from jaywalking and illegal crossings.

*Prevent illegal parking*, double parking or standing of vehicles near your post, especially if it interferes with traffic movement.

*Provide for the safe passage of emergency vehicles. Assist people seeking information.*

64

65

*Handle accidents* at your intersection or within your area of control, at least until accident investigation squads can take over.

## 11.2 YOUR POSITION IN THE INTERSECTION:

Stop and think about each of these points before taking your position to direct traffic: Can you see and be seen by all approaching lines of traffic and by pedestrians? Will you interfere with the free movement of traffic and thus be forced continually to shift positions? Can you handle all turning movement from that point? Can you direct pedestrian movement from that point? Are you safe there? This is highly important to you, naturally, and to your Company.

## 11.3 GENERAL RULES FOR SMOOTH OPERATION:

After you have taken your position and have coordinated traffic-directing with the adjacent intersection, try to improve smoothness and continuity of flow by applying the rules set forth below. It may take time to become proficient in all of these, but experience will show you how valuable they are:

Use uniform signals and gestures.

Try to break traffic at natural gaps whenever possible. This will give following vehicles an opportunity to stop smoothly to allow cross traffic to flow.

When no normal break appears in the line of traffic you wish to halt, try to break the line behind a slow-moving vehicle such as a large truck. If you do this, re-starting traffic in that lane will not be hampered by the slow vehicle.

Keep stragglers and "day-dreamers" alert and rolling, and in their proper lanes. Three sharp blasts on your whistle will usually bring the day-dreamer back to the wheel.

Remain calm. If a jam starts forming in your intersection, look for the trouble spot immediately. Do not lose your temper. Make your decision as to what must be done and do it systematically.

66

If you have to leave your position when the intersection is crowded, tell drivers not to move into the intersection until they can move clear across, otherwise your corner may become jammed. Do not leave your position just to "bawl out" a driver.

Use the parking control officer to relay information to Security Officers on adjoining posts, or to your Supervisor, regarding change which might improve the situation at your intersection. Look cheerful. Be cheerful, but firm. Do not argue with drivers. You will be surprised at the extra cooperation you will get!

## 11.4 SIGNALS AND GESTURES:

*TO STOP TRAFFIC*, two motions are used. First, point with your arm and finger and look straight at the driver you want to stop. Watch the driver and hold this point until he/she sees you, or at least has had plenty of time to do so. Then, raise your pointing hand (but not your whole arm) so that the palm is toward the driver. Hold this until the driver stops. You have to stop traffic from both directions to allow traffic on the cross-street to move. Because you cannot look both ways at once, stop the traffic coming from one side first, then the traffic From the other. After you have halted traffic with one hand, hold that hand in the stop position and turn to the other side and repeat the process. Do not lower either arm until cars coming from both ways are halted.

*TO START TRAFFIC*, place yourself so that your side is toward traffic to be started. Point with your arm and finger toward the car you want to start and hold this position until you get attention. And then, with your palm up, swing your hand up and over to your chin. Bend your arm only at the elbow. If you get the attention of the driver first by pointing you will not have to make the signal a second time. After traffic has been started from one side, drop that arm and start traffic from the other side in the same way.

67

Use the same signals to give the go-ahead to slow and timid drivers.

*RIGHT TURN.* Signals for a right turn movement are not usually required at an intersection. When it is necessary, the arm you signal with will be determined by the car's direction. If it approaches from the right, point toward the driver with your right arm. Give the driver time to see your gesture and then swing your arm to point in the direction the driver is turning. Keep pointing in that direction until the driver begins to turn.

If the car approaches you from the left, point with your left arm. When the driver sees you point, swing your arm in the direction he/she is to go. Because of your position you will not be able to make a complete swing with your arm. If you prefer and find it more comfortable, bend your left arm at the elbow and with your thumb and forearm indicate the direction the driver is to take.

*LEFT TURN.* In helping a driver make a left turn, you may first have to halt traffic in the lane or lanes the turning car must cross. If the car is approaching from your left, give the stop signal with your right arm to stop traffic in the lane through which the turning driver is to pass. Hold the stop signal with your right arm and then give the turning gesture with your left arm. If the car approaches from your right, turn around so that you face toward the direction the car making the turn is to go. Halt traffic with your right arm and give the turning gesture with your left.

*USE OF WHISTLE.* The whistle is used to get the attention of drivers and pedestrians. It is used as follows:

One long blast with a STOP signal. Two short blasts with the GO signal.

Several short blasts to get the attention of a driver or pedestrian who does not respond to a given signal. Be judicious in the use of your whistle at all times. Whistle blasts directed at pedestrians usually need not be as shrill as those used to command the attention of motorists.

68

## THE CHALLENGE

We hope this Handbook assists you in better understanding the goals, policies, and employment benefits of your new organization.

You play an important role in a Company which is in a rapidly growing service field. We at Wackenhut firmly believe that we have the skill, the determination, and the zeal to push our Company to the top of the field.

To continue this growth, the devotion and effort of every employee in the organization will be needed. The future is our challenge.

Let's go to work!

**G4S Wackenhut**

56088 (6/30/94)

**NOTES**





# EXHIBIT 4

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

March 16, 2006

Officer Travis Grandison
1715 Shady River Ct., #914
Woodbridge, VA 22192

Dear Mr. Grandison:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

| | |
|---|---|
| Violation: | **Article 404.15 – (1st Offense) Violation of security procedures and regulations.** |
| Disciplinary Action: | **Based on Article 404.15, 5-Day Suspension is warranted from the contract.** **Days of Suspension: 3/22/06 – 3/26/06; returning on 3/29/06.** |

*On 27 February, 2006 at approximately 1400 hours a personal fax addressed to Ofc. Grandison arrived on a Government Fax machine. Mr. Trumpet the Contract Officers Technical Representative has requested disciplinary action for the unauthorized use of government equipment. Ofc. Grandison signed a form stating that he was aware that the misuse of government property or service would result in disciplinary action up to and including dismissal. Ofc. Grandison's actions violated GAO security procedures and regulations and Wackenhut Article 404.15.*

You are to give your full attention to this action.  Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

# EXHIBIT 5

# WACKENHUT
## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

March 17, 2006

Officer Travis Grandison
1715 Shady River Ct., #914
Woodbridge, VA 22192

Dear Mr. Grandison:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

| | |
|---|---|
| Violation: | **Article 404.10 – (3rd Offense) Tardiness or failure to observe assigned work hours.** |
| Disciplinary Action: | **Based on Article 404.10, 3-Day Suspension is warranted from the contract.** **Days of Suspension: 4/05/06 – 4/07/06; returning on 4/08/06.** |

*Ofc. Travis Grandison was scheduled to work Post 11 on 1 March, which required Ofc. Grandison to attend Roll Call at 2145 hours and report for Post 11 at 2200 hours on 28 February 2006. Ofc. Grandison entered the GAO Command Center at approximately 2240 hours on 28 February. Sgt. Collins notified SPO Grandison that he was not needed. Sgt. Collins had already called a replacement officer and he was enroute and the relief officer was covering the post pending his arrival. Ofc. Grandison stated that Mr. Carroll had told him his hours were from 2300 through 0700. Ofc. Grandison's tardiness and failure to observe assigned work hours was in direct violation of GAO Post orders and Wackenhut Article 404.10.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

# EXHIBIT 6

# WACKENHUT

## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

May 3, 2006

Officer Travis Grandison
705 4th St., NW
Apt. 303
Washington, DC 20001

Dear Mr. Grandison:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

| | |
|---|---|
| Violation: | **Article 404.19 – (1st Offense) Willful Insubordination.** |
| Disciplinary Action: | **Based on Article 404.19, 5-Day Suspension is warranted from the contract.**<br>**Days of Suspension: 5/10/06 – 5/14/06; returning on 5/16/06.** |

*At approximately 2230 hours Sgt. Collins delivered paperwork to Post 5, 10, and 11. When Sgt. Collins approached Sgt. Grandison on Post 11 he observed that Ofc. Grandison still did not have his tie on and that Ofc. Grandison had also unbuttoned and raised his sleeves. Sgt. Collins notified Ofc. Grandison about proper uniform requirements and that a disciplinary report would be generated. Ofc. Grandison's failure to follow Sgt. Collins instructions shows a complete disregard to Sgt. Collins authority to enforce GAO and Wackenhut policies. Ofc. Grandison's willful insubornation is in violation of Wackenhut Article 404.19.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:   Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

# EXHIBIT 7

# WACKENHUT
## SERVICES INCORPORATED

May 22, 2006

Travis Grandison
705 4th St., NW, # 303
Washington, DC 20001

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

Dear Mr. Grandison:

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

This letter is officially informing you that your employment with Wackenhut Services, Inc. is terminated effective May 25, 2006, based on the following disciplinary action:

**To Wit:**    *Violation of Section 404.19 (2nd Offense), Willful Insubordination.*

*On 7 April while reviewing security tapes of 2 April, 2006 Mr. Carroll observed Ofc. Grandison on Post 16 conducting his Morse Watchman tour. Ofc. Grandison was again not in compliance with established uniform policies. Specifically his shirt collar was open, his tie was to one side and he was not wearing his hat. On March 29th both Mr. Carroll and Ofc. McNeil were present when Mr. Carroll presented Ofc.Grandison with a disciplinary report for the same offense of not properly wearing his tie after being told by the supervisor to put his tie on and to be in full uniform before assuming post. Ofc. Grandison's continued failure to follow policies, after being briefed four days earlier, shows a complete disregard of authority and Wackenhut policies. Ofc. Grandison's willful insubordination is in violation of Wackenhut Article 404.19.*

**Disciplinary Action:  Based on Article 404.19, DISMISSAL**

Your termination is based on the above referenced event along with the other behavior previously discussed and documented in your personnel file.

All equipment and credentials must be returned, to include your Company ID.  Your complete uniform as issued to you at the start of your employment must be returned after being professionally laundered or dry-cleaned.

If you have any questions, please contact us.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC:kpp

cc:  Personnel File
     Project Manager/GAO

*Professionalism With Integrity®*