## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRAVIS GRANDISON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:07-cv-00754 (RMC)** |
| ) | |
| **WACKENHUT SERVICES, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## WACKENHUT SERVICES, INC.'S SUMMARY JUDGMENT MOTION

Wackenhut Services Inc., by and through its undersigned counsel, hereby moves this Court to enter a judgment in Wackenhut's favor in the above-captioned action.  In support of this Motion, Wackenhut commends the Court's attention to Wackenhut's Statement of Material Facts as to which No Genuine Issue Exists and Wackenhut's Memorandum of Points and Authorities, which Wackenhut has filed with its Motion.

Wherefore, Wackenhut submits that the Court should grant Wackenhut's Motion and enter a judgment in Wackenhut's favor as to Travis Grandison's entire Complaint.

Respectfully submitted,

ARENT FOX PLLC


By:    /s/  Henry Morris, Jr._____
       Henry Morris, Jr., (#375894)
       Kristine J. Dunne (#471348)
       1050 Connecticut Avenue, N.W.
       Washington, D.C. 20036-5339
       (202) 857-6000/Telephone
       (202) 857-6395/Facsimile

       *Counsel for Wackenhut Services, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                              )
**TRAVIS GRANDISON,**          )
                              )
          **Plaintiff,**       )
                              )
     **v.**                    )        **Civil Action No. 1:07-cv-00754 (RMC)**
                              )
**WACKENHUT SERVICES, INC.,**  )
                              )
          **Defendant.**       )
_____)

**WACKENHUT SERVICES, INC.'S STATEMENT OF MATERIAL FACTS AS TO
WHICH NO GENUINE ISSUE EXISTS**

Henry Morris, Jr., (#375894)
Kristine J. Dunne (#471348)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
(202) 857-6000/Telephone
(202) 857-6395/Facsimile

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**TRAVIS GRANDISON,**                   )
                                        )
          **Plaintiff,**                )
                                        )
     **v.**                             )          **Civil Action No. 1:07-cv-00754 (RMC)**
                                        )
**WACKENHUT SERVICES, INC.,**           )
                                        )
          **Defendant.**                )
_____)

**WACKENHUT SERVICES, INC.'S STATEMENT OF MATERIAL FACTS AS TO**
**WHICH NO GENUINE ISSUE EXISTS**[1]

1.      Wackenhut supplies high-end armed and unarmed security personnel, paramilitary

protective forces, law enforcement officers, fire and rescue services, aviation operations and

support, base operations, facility management, entry level training, and cleared personnel to

government and select commercial customers.  S.J. Ex. 1 [Conry Decl. ¶ 2].[2]

2.      Through its National Capital Region (the "NCR"), the Company provides security

services and personnel for the Government Accountability Office headquarters, in Washington,

D.C.  S.J. Ex. 1 [Conry Decl. ¶ 3].

3.      The security guards there are members of a collective bargaining unit.  S.J. Ex. 1 [Conry

Decl. ¶ 4].

4.      Wackenhut is an equal opportunity employer, which strictly prohibits unlawful

discrimination, harassment, and retaliation.  S.J. Ex. 1 [Conry Decl. ¶ 5; Conry Decl. Ex. A

(Sexual Harassment/Workplace Harassment Policy, HR 520 (Sept. 1, 1999)); Sexual Harassment

Workplace Harassment Statement W-211 (HR 520) (Rev. 9/01/99)); Conry Decl. ¶ 6; Conry

---

[1]      To the extent that Wackenhut relies upon Grandison's rendition of the facts, it does so for the purposes of
this Motion only.

[2]      Citations to the Declaration of Kevin A. Conry, are denominated "Conry Decl. ¶ ___."

Decl. Ex. B (G4S Wackenhut Security Officer's Handbook, at 14, 20-21); Conry Decl. ¶ 7, Ex. C

(Human Resources Manual: Equal Employment Opportunity, HR 515 (June 1, 2000))].

5.      To promote equal treatment, the NCR has promulgated a standard operating procedure

for administration of discipline.  It prescribes the appropriate disciplinary measure for each

contemplated offense.  Also, it provides that offenses are archived after 60 days.  S.J. Ex. 1

[Conry Decl. ¶ 8; Conry Decl. Ex. D (Standard Operating Procedure: Administration of

Discipline, No. 358 (Jan. 1, 2001) ("SOP 358")) at 3].

6.      Grandison was a special police officer at the GAO site.  He lasted for just over a year,

from April 5, 2005 until May 25, 2006, when Wackenhut terminated him for willful

insubordination.  S.J. Ex. 3 [Grandison Tr. 30:11-13; Grandison Tr. 425:15-22; Grandison Tr.

Ex. 3 (Letter from K.A. Conry to Grandison, dated March 30, 2005); Grandison Tr. Ex. 67

(Letter from K.A. Conry to Grandison (May 22, 2006))][3] .

7.      Of the 87 WSI employees who worked at the GAO during Grandison's tenure, 78 --

nearly 90% -- are black, like Grandison.  Also like Grandison, 60 -- nearly 70% -- are men.

Compl. ¶ 3; S.J. Ex. 1 [Conry Decl. ¶ 9]; S.J. Ex. 2 [Carroll Tr. 9:15-19];[4] S.J. Ex. 3 [Grandison

Tr. 152:2-5].

8.      On June 5, 2005, Grandison opened his post late.  The shift supervisor, Sgt. Derrick

Richardson, issued a disciplinary report, citing Grandison for tardiness or failure to observe

assigned work hours -- first offense.  S.J. Ex. 3 [Grandison Tr. 171:3 - 172:21; Grandison Tr. Ex.

25 (Disciplinary Report (June 1, 2005)); Grandison Tr. Ex. 26 (Letter from K.A. Conry to

Grandison (June 6, 2005)).

---

[3]        Citations to Grandison's disposition transcript are denominated "Grandison Tr. ___. " Citations to exhibits
to his transcript are denominated "Grandison Tr. Ex. __."
[4]        Citations to Charles Carroll's deposition transcript are denominated "Carroll Tr. __."

9.      Grandison agreed with the report's contents.  And, the Company followed-up by counseling Grandison and issuing a memorandum for the record, the prescribed disciplinary measure under the NCR's standard operating procedure.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001230)]; S.J. Ex. 3 [Grandison Tr. 171:3 - 172:21; Grandison Tr. Ex. 25 (Disciplinary Report (June 1, 2005)); Grandison Tr. Ex. 26 (Letter from K.A. Conry to Grandison (June 6, 2005)); S.J. Ex. 4 [Carroll Decl. ¶¶ 15, 16].[5]

10.     Grandison takes no issue with the Company's action:

> Q      And you are not saying in this lawsuit that there was anything inappropriate with respect to the memorandum for the record or the disciplinary report that are Grandison Deposition Exhibit Number 26 [-- Letter from K.A. Conry to Grandison (June 6, 2005) --] and Grandison Deposition Exhibit Number 25 [ -- Disciplinary Report (June 1, 2005)]?
>
> A      Yes.
>
> Q      You're not challenging those; is that correct?
>
> A      Yes.

S.J. Ex. 3 [Grandison Tr. 173:4-12].

11.     Wackenhut evaluated Grandison's performance a few months later, noting that he needed to improve in several areas:

- Quality of Work: Correctness, completeness and accuracy.
- Attitude: Enthusiasm for the job and willingness to accept orders, changes, *etc*.
- Initiative: Self motivation, ability to work with minimal supervision.
- Dependability: Follows through without constant supervision, reliable.
- Appearance: Well-groomed, uniform is clean, pressed, and complete.
- Regulations: Adherence to regulations established by the Company.

S.J. Ex. 3 [Grandison Tr. 173:17 – Tr. 175:11; Grandison Tr. Ex. 27 (Performance Appraisal (Sept. 9, 2005))].

---

[5]      Citations to Charles Carroll's Declaration are denominated "Carroll Decl. __.  "Citations to exhibits to his Declaration transcript are denominated "Carroll Decl. Ex. ___."

12.    The Company observed that Grandison has the ability to be an exceptional officer.   But, it continued, "[h]e needs to focus more on following rules and procedures of the Company." S.J. Ex. 3 [Grandison Tr. Ex. 27 (Performance Appraisal (Sept. 9, 2005))].

13.    Grandison does not contend that there is anything inappropriate about the Company's assessment:

> Q    Sir, the question was:  You are not contending in this lawsuit that there was anything inappropriate with respect to Grandison Deposition Exhibit Number 27 [-- (Performance Appraisal (Sept. 9, 2005)) --]; is that correct?
>
> A    That's correct.

S.J. Ex. 3 [Grandison Tr. 177:6-10].

14.    On October 15, 2006, Richardson issued another disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- first offense.  Richardson said this about the precipitating incident:

> Officer Grandison was schedule[d] to report to work and assume duty on Post 12 at 0600 hours [-- 6:00 a.m. --].  Ofc. Grandison called off and gave no reason for his call off. When questioned by shift supervisor as to his call off on Sunday 10/16/05, Ofc. Grandison stated that he called off to attend CPR/AED Training at the corporate office. Ofc. Grandison was given explicit instructions by Sgt. Richardson on Wednesday 10/12/05 that the PM [-- Project Manager --] had scheduled Grandison for a later training date.  He was instructed that his call off would effect manpower.  Ofc. Grandison chose not to follow explicit instruction.

S.J. Ex. 3 [Grandison Tr. 178:7-13; Grandison Tr. Ex. 28 (Disciplinary Report (Oct. 15, 2005))].

15.    Grandison agreed with the report's contents.  S.J. Ex. 3 [Grandison Tr. 180:17 – Tr. 181:3]; S.J. Ex. 4 [Carroll Decl. ¶ 15].

16.    And, he can point to no evidence that his race, gender, or education prompted Richardson to issue it:

> Q.    Did -- do you have any evidence or information that causes you to believe that Derrick Richardson prepared Grandison Deposition Exhibit Number 28 [ -- Disciplinary Report (Oct. 15, 2005) -- ] as he did because of your race?

A.      No.

Q.      Do you have any evidence or information that causes you to believe that Derrick
Richardson prepared Grandison Deposition Exhibit Number 28 as he did because
of your gender?

A.      No.

Q.       Do you have any evidence or information that causes you to believe that Derrick
Richardson prepared Grandison Deposition Exhibit Number 28 because of your
educational attainment?

A.      Maybe.

Q.      What is the evidence or information that causes you to believe that?

A.      Just the information that -- that -- it different.  That, you know, that -- that they're
going to single you out for -- for that.

You know, I think -- you know, I don't know why he held to this when he knew --
you know, I don't know why he would do that.  I mean, I don't -- you compare this
disciplinary report with all the others and it's not even -- it doesn't even compare,
you know, to -- to what I'm being disciplined for.

You know, I called off to work beforehand.  It's -- it's -- you know --

MR. SCHIFFRES:

Okay.

THE WITNESS:

-- I can call off for whatever reason and -- and -- you know, the question is why -

BY MR. MORRIS:

Q.      Did Sergeant -- did Sergeant Richardson tell you that he disciplined -- pardon me
-- that he prepared Grandison Deposition Exhibit Number 28 the way he did
because of your educational attainment?

A.      No.

Q.      Have you seen anything in writing that supports a conclusion that Sergeant
Richardson prepared Grandison Deposition Exhibit Number 28 as he did because
of your educational attainment?

A.      No.

Q.    Are you speculating, then, that he prepared Grandison Deposition Exhibit Number 28 as he did because of your educational attainment?

A.    Yes.

S.J. Ex. 3 [Grandison Tr. 184: 12 – Tr. 186: 15].

17.    In keeping with the standard operating procedure, Wackenhut counseled Grandison and issued a memorandum for the record.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 183:9-16; Grandison Tr. Ex. 29 (Letter from K.A. Conry to Grandison (Nov. 10, 2005))]; S.J. Ex. 4 [Carroll Decl. ¶¶ 15, 16].

18.    On October 29, 2005, Grandison was due at work at 5:45 a.m.  Nearly 30, minutes later, however, he neither had arrived nor called.  So, Richardson telephoned Grandison to determine his whereabouts.   S.J. Ex. 3 [Grandison Tr. 186:20 - Tr. 188:6; Grandison Tr. Ex. 30 (Disciplinary Report (Oct. 29, 2005))].

19.    When reached, Grandison explained that he had overslept and that he would report to work immediately.  But, although he lived less than 100 yards away, Grandison did not show up for almost another 2 hours.  S.J. Ex. 3; [Grandison Tr. Ex. 30 (Disciplinary Report (Oct. 29, 2005))].

20.    Richardson issued another disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- second offense.  Grandison agreed with the report's contents. S.J. Ex. 3 [Grandison Tr. 186:20 – Tr. 188:6; Grandison Tr. Ex. 30 (Disciplinary Report (Oct. 29, 2005))]; S.J. Ex. 4 [Carroll Decl. ¶ 15].

21.    And, WSI issued a letter of reprimand, the disciplinary measure that the standard operating procedure prescribes.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 189:3-15; Grandison Tr. Ex. 31 (Letter from K.A. Conry to Grandison (Nov. 10, 2005))].

22.     Grandison complains about neither document:

> Q.     You did not file a grievance in connection with Grandison Deposition Exhibit Number 31 [ -- Letter from K.A. Conry to Grandison  (Nov. 10, 2005) --] or 30 [-- Disciplinary Report (October 29, 2005) --], correct?

> A.     Yeah, I would say that's correct.

> Q.     And you are not contending in this litigation that there was anything inappropriate about Grandison Deposition Exhibit Number 30 or 31, correct?

> A.     Correct.  Except for the check.  I typically -- I typically didn't check whether I agreed or didn't agree.

> Q.     Well, a moment ago, sir, I thought I heard you say you weren't sure whether you checked I agree.

> A.     That's what I'm saying is typically I didn't check whether I agree or didn't agree.  I probably would definitely check whether I didn't agree, but we were forced to sign.  That's what I'm telling you.  And, you know, a lot of the write-ups that they gave in terms tardiness, you know, it was just more or less procedures.

> Q.     I want to make sure I understand.  Are you -- is it your testimony that you don't know whether you checked the I agree box?

> A.     Right.

S.J. Ex. 3 [Grandison Tr. 189:16 – 190:16; Grandison Tr. Ex. 31].

23.     On November 21, 2005, Shift Supervisor Sgt. Felton Foster found Grandison in a guard booth with his feet propped up on the desk and his head laying on the window.  Foster issued a disciplinary report, citing Grandison for being inattentive to duty but not asleep -- first offense. S.J. Ex. 3 [Grandison Tr. 192:1-7; Grandison Tr. Ex. 32 (Disciplinary Report (Nov. 21, 2005))].

24.     Grandison agreed with the report's contents.  S.J. Ex. 3 [Grandison Tr. 192:8-15]; S.J. Ex. 4 [Carroll Decl. ¶ 15].

25.     And, in keeping with the standard operating procedure, Wackenhut suspended him for 2 days.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 204:18 – 205:3; Grandison Tr. Ext. 33 (Letter from K.A. Conry to Grandison (Nov. 30, 2005))].

26.    Grandison can point to no evidence that his race, gender, or education played a role in the

Company's decision-making:

> Q.    You didn't file a grievance with respect to Grandison Deposition Exhibit Number
>        33 [ -- Letter from K.A. Conry to Grandison (Nov. 30, 2005) --], did you?
>
> A.    Nope.
>
> Q.    And am I correct, sir, that you're not contending that Grand -- that Wackenhut
>        issued Grandison Deposition Exhibit Number 33 because of your race?
>
> A.    No.
>
> Q.    Let me say that differently.  Did Grand -- did Wackenhut issue Grandison
>        Deposition Exhibit Number 33 because of your race?
>
> A.    I don't -- I don't know.
>
> Q.    Did Grandison -- pardon me -- did Wackenhut issue Grandison Deposition
>        Exhibit Number 33 because of your gender?
>
> A.    I don't know.  I really don't know.
>
> Q.    Did Wackenhut issue Grandison Deposition Exhibit Number 33 because of your
>        educational attainment?
>
> A.    No, I doubt it.

S.J. Ex. 3 [Grandison Tr. 205:4 – 206:1].

27.    On January 13, 2006, Grandison was scheduled to open his post at 5:00 a.m.  But, he did

not appear until 20 minutes later.  S.J. Ex. 3 [Grandison Tr. 206:6-17; Grandison Tr. Ex. 34

(Disciplinary Report (Jan. 13, 2006))].

28.    Again, Richardson issued a disciplinary report, citing Grandison for tardiness or failure to

observe assigned work hours -- third offense.  The NCR standard operating procedure allows for

up to a 5-day suspension for that infraction.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD

001230].

29.    But, the Project Manager, Charles Carroll, reduced the level to first offense, since Grandison's earlier offenses were archived.  S.J. Ex. 3 [Grandison Tr. 206:6-17; Grandison Tr. Ex. 34 (Disciplinary Report (Jan. 13, 2006))].

30.    Grandison agreed with the report's contents.  S.J. Ex. 3 [Grandison Tr. 206:14-22; Grandison Tr. Ex. 34 (Disciplinary Report (Jan. 13, 2006))]; S.J. Ex. 4 [Carroll Decl. ¶ 15].

31.    And, he does not contend that his race, gender, or education motivated it:

> Q.    Do you contend that Wackenhut issued a disciplinary report -- the disciplinary report which is Grandison Exhibit Number 34 [-- Disciplinary Report (Jan. 13, 2006) --] because of your race?
>
> A.    No.
>
> Q.    Because of your gender?
>
> A.    No.
>
> Q.    Or because of your educational attainment?
>
> A.    No.

S.J. Ex. 3 [Grandison Tr. 207:4-11].

32.    Wackenhut counseled Grandison and issued a memorandum for the record, the prescribed disciplinary measure for his infraction.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 211:13-19; Grandison Tr. Ex. 35 (Letter from K.A. Conry to Grandison (Feb. 1, 2006));  S.J. Ex. 4 [Carroll Decl. ¶ 16].

33.    On February 26, 2006, Grandison asked to take the next day off so that he could tend to issues that he was having with Foster.  Grandison received no response to the request.  But, he took the day off anyway.  Indeed, he had decided that he would not report to work no matter what management said:

> Q.    Do you recall that after Foster sent you home one day, you were upset and you decided to take the following day off in order to write up the incident?

A.     Oh, I remember the situation where I did take the day off to address the issues with Foster.

Q.     And you completed -- as I understand it, you completed a leave request form; is that correct?

A.     I may have done that, yeah.  I don't remember.

Q.     You don't know one way or another?

A.     I don't remember.

Q.     Well, what's the protocol for requesting leave at the GAO at the time?

A.     From what I remember, you just put in the request.  They probably have a form. You fill out the form and they -- and that's it.

Q.     What is the protocol for responding to those leave requests?

A.     I don't know.

Q.     Are all requests granted?

A.     I'm sure they're not.

Q.     Was your leave request granted?

A.     I think I may have submitted that the day before, and I probably didn't get a response back on it.

Q.     Did you take that day -- the day off that you requested to take off?

A.     I may have.  I think so.  I don't know.

Q.     If you didn't receive a response allowing you to take the day off, why did you take the day off?

A.     I was going to take the day off anyway, and I put that in to let them know I was taking the day off.  Me not receiving a response from whoever, you know, I was letting them know that I would be off.

Q.     Regardless of what they said; is that correct?

A.     Right.  It's -- it's tantamount to calling off work.  You know, you can pick up the phone -- one of the major policies or procedures, if you call off, they have certain times that they like to state that if you call off within a certain amount of hours, then I guess it would be approved.

However, like any other job, you know, if you let them know you're not coming to work, you let them know you're not coming to work.  People call off every day.

Q.     You weren't ill; is that correct?

A.     No.

Q.     You weren't taking off because of illness; is that correct?

A.     No.  And people call off for reasons other than illness.

Q.     That's not my question.  Were you ill –

A.     I answered that.

Q.     Were you ill?

A.     I answered that.

Q.     Were you ill on February 27th?

A.     I answered that question.

Q.     Well, answer it again, please.

A.     And the answer is no.

S.J. Ex. 3 [Grandison Tr. 380:16 – Tr. 383:11; Grandison Tr. 386:15 – Tr. 387:8; Grandison Tr. 387:20 - Tr. 388:8; Grandison Tr. Ex. 55 (Disciplinary Report, dated Feb. 27, 2006))].

34.     Wackenhut incurred overtime due to Grandison's unscheduled absence.  S.J. Ex. 3 [Grandison Tr. 386:15 – 387:8; Grandison Tr. 387:20 - Tr. 388:8; Grandison Tr. Ex. 55 (Disciplinary Report, dated Feb. 27, 2006))].

35.     The Project Manager -- Charles Carroll -- issued a disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- second offense.  Consistent with the standard operating procedure, Wackenhut issued a letter of reprimand.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001230]; S.J. Ex. PROD 001230 [Carroll Tr. 13:9 – 14:5]; S.J. Ex. 3 [Grandison Tr. 388:10-21; Grandison Tr. Ex. 56 (Letter from K.A. Conry to Grandison, dated Mar. 9, 2006)].

36.     Grandison can point to no evidence that his race, gender, or education was a factor, with

either document:

> Q.     Are you aware of any evidence or information that causes you to believe that
> Wackenhut issued the disciplinary report, Number 55, or the letter of reprimand
> because of your race?
>
> A.     No.  I don't know.
>
> Q.     Are you aware --
>
> A.     I do not know.
>
> Q.     Are you aware of any evidence or information that supports a belief that
> Wackenhut issued Grandison Deposition Exhibit Number 55 or Grandison
> Deposition Exhibit Number 56 [ -- Letter from K.A. Conry to Grandison (March
> 9, 2006) --]  because of your gender?
>
> A.     Nothing specific, no.

S.J. Ex. 3 [Grandison Tr. 389:7-19]

> Q.     Are you aware of any female employee at the GAO who failed to report to work
> as scheduled, completely failed to report to work as scheduled who was not
> disciplined for that failure?
>
> A.     Not specifically, but I'm sure there's proof.

S.J. Ex. 3 [Grandison Tr. 391:22 – Tr. 392:5].

> Q.     Is it your contention that Grandison -- that Wackenhut issued Grandison Number
> 55 or Grandison Number 56 because of your educational attainment?
>
> A.     Yes.
>
> Q.     On what do you base that?
>
> A.     On my last statement.
>
> Q.     That you think that there was some animosity; is that what you said?
>
> A.     Right.
>
> Q.     On what do you base that conclusion, that there was animosity because of your
> educational attainment?

A.     My daily treatment and things that I have heard mentioned about, you know, who I think I am, what I think I am and all of this writing and because of, you know, my level of education, I think that I -- you know, I'm going to write my way into a certain situation, that that kind of talk and that kind of -- that type of dialogue leads me to believe.

Q.     Who made those comments?

A.     Officers.  I don't know which ones, but officers.

Q.     Did Mr. Carroll make the comment?

A.     I don't recall that.

Q.     Did Mr. Conry make such a comment?

A.     No.  Mr. Conry's was -- I can only think that he was referring to the documentation that I wrote when he stated that if I continue to do what I did, he would kick me out of the building or have me rolled out of the building. . . .

Q.     Have you ever heard Mr. Carroll make any comment at all that supports a conclusion that he had some animus, harbored an animus toward you because of your educational attainment?

MR. SCHIFFRES:

     Do you understand the question?

THE WITNESS:

     Yeah.

     No, I never heard it.

BY MR. MORRIS:

Q.     Are you aware of any evidence or information that causes you to believe that Mr. Conry [- - a Wackenhut Vice President and General Manager of NCR --] harbored any animus toward you because of your educational attainment?

A.     I think the -- I think the actions.  I think the actions.  I don't think it's anything they said.  Of course, they wouldn't say but so much to me. I've never spoken to Conry at all, but I think it's their actions.

Q.     I don't think I heard an answer to my question, sir.  The question is this:  Are you aware of any evidence –

A.    I said their actions.  That is the evidence.  Their actions that I remember.  And then whether you can prove those actions, you probably will have to get a number of people to come in and say that, you know, they treated Grandison this way and I heard them say that, but -- because you -- you said evidence.  I mean, action would be evidence, right, if something occurred?

Q.    I said evidence or information.  So my question is:  What did Mr. Conry do that supports a conclusion that he harbored an animus against you because of your educational attainment?

A.    I don't know.

S.J. Ex. 3 [Grandison Tr. 392:16 – Tr. 395:14]; S.J. Ex. 1 [Conry Decl. ¶ 1].

37.    On February 27th, at Grandison's request, someone sent a personal facsimile to him at a GAO facsimile machine.  Receiving it violated WSI's policies and GAO security procedures, which preclude unauthorized WSI employees from using government equipment.  Indeed, consistent with those policies and procedures, Wackenhut had informed personnel that they could not use government equipment except when performing their assigned duties.  S.J. Ex. 2 [Carroll Tr. 84:11 – Tr. 89:17]; S.J. Ex. 3 [Grandison Tr. 238:12 – Tr. 241:6; Grandison Tr. 255:19 – Tr. 256:4].

38.    Craig Trumpet, the GAO contracting officer's technical representative, asked WSI to discipline Grandison appropriately for the same offense for which it had disciplined another employee -- Omer Gilliam -- who had engaged in similar conduct.   S.J. Ex. 1 [Conry Decl. ¶ 10; S.J. Ex. 2 [Carroll Tr. 85:22 – Tr. 86:19]; S.J. Ex. 3 [Grandison Tr. 238:12 – Tr. 241:6; Grandison Tr. 244:12 – Tr. 245:21; Grandison Tr. 249:5-11; Grandison Tr. 261:22 – Tr. 262:14; Grandison Tr. Ex. 41 (Electronic Mail Memorandum from Craig Trumpet to Charles Carroll, dated Mar. 9, 2006)); Grandison Tr. Ex. 44 (Letter from K.A. Conry to Omer Gilliam (Jan. 31, 2006))].

39.    Grandison can point to no evidence that Trumpet requested the discipline due to Grandison's race, gender, or education.  S.J. Ex. 3 [Grandison Tr. 249:12 – Tr. 250:4].

-14-

40.     Carroll issued a disciplinary report, citing Grandison for violating security procedures and regulations -- first offense.  S.J. Ex. 3 [Grandison Tr. 255:4-18; Grandison Tr. Ex. 42 (Disciplinary Report, dated Mar.13, 2006)].

41.     And, Wackenhut suspended him for 5 days, the prescribed disciplinary measure. S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 260:3-9; Grandison Tr. Ex. 43 (Letter from K.A. Conry to Grandison (March 16, 2006))].

42.     Grandison can point to no evidence that his race, gender, or education played a role in that decision:

> Q.     Do you have any evidence or information -- are you aware of any evidence or information that Wackenhut suspended you for use of the fax machine because of your race?
>
> A.     I don't know.
>
> Q.     Are you aware of any evidence or information that Wackenhut suspended you because of your -- because of the fax -- use of the fax, receipt of the fax, because of your gender?
>
> A.     I don't know.
>
> Q.     Are you aware of any evidence or information that Wackenhut suspended you for a receipt of the fax because you had filed a charge of discrimination with the Equal Employment Opportunity Commission?
>
> A.     I think it was in response to the documentation that was sent to the union and my persistence to resolve write-ups and disciplinary actions that they've taken against me.  That's what I think it was in retaliation for.
>
> Q.     All right.  Let's stick to my question, though.
>
>         Do you have any evidence or information that Wackenhut suspended you for your receipt of the fax because you had filed a charge of discrimination with the EEOC?
>
> A.     No.
>
> Q.     Are you aware of any evidence or information that Wackenhut suspended you for receipt of the fax because of your educational attainment?
>
> A.     No.

-15-

S.J. Ex. 3 [Grandison Tr. 272:18 – Tr. 274: 4].

43.    By memorandum to Carroll and a union official, dated February 27, 2006, Grandison

identified instances in which he claimed that management and Foster had mistreated him.  S.J.

Ex. 3 [Grandison Tr. 170:5-16; Grandison Tr. 383:18 – Tr. 384:2; Grandison Tr. Ex. 54].

44.    Carroll responded by memorandum dated March 1, 2006.  S.J. Ex. 3 [Grandison Tr.

535:12 – Tr. 536:21; Grandison Tr. Ex. 76].

45.    He invited Grandison to contact Carroll's chain of command if Grandison felt that Carroll

had treated him unfairly.  But, Grandison never did.  S.J. Ex. 3 [Grandison Tr. 536:2 – Tr.

537:14].

46.    On February 28, 2006, Grandison was due at roll call at 9:45 p.m.  But, he did not report

to the GAO command center until nearly an hour later.  By then, however, the shift supervisor,

Sgt. Avonne Collins, had summoned a replacement officer.  So, Collins told Grandison that he

was not needed.  S.J. Ex. 3 [Grandison Tr. 401:5 – Tr. 403:2; Grandison Tr. 406:18 – Tr. 407:5;

Grandison Tr. Ex. 60 (Disciplinary Report (March 2, 2006))].

47.    Collins issued a disciplinary report, citing Grandison for tardiness or failure to observe

assigned work hours -- third offense.  Thereafter, Wackenhut administered the prescribed

sanction:  a 3-day suspension.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001230]; S.J.

Ex. 3 [Grandison Tr. 415:9-16; Grandison Tr. Ex. 60 (Disciplinary Report (Mar. 2, 2006));

Grandison Tr. Ex. 61 (Letter from K.A. Conry to Grandison (Mar. 17, 2006))].

48.    And, again, Grandison can cite no evidence that supports a conclusion that his race,

gender, or education prompted either document:

> Q.    Are you aware of any evidence or information that supports the conclusion that
> Wackenhut issued Grandison Deposition Exhibit Number 60 [--Disciplinary
> Report (March 2, 2006)) --] or Grandison Deposition Exhibit Number 61 [--Letter
> from K.A. Conry to Grandison (March 17, 2006) -- ] because of your race?
> Here's Number 60.

-16-

A.     I don't know.

Q.     Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Grandison Deposition Exhibit Number 60 or Grandison Exhibit Number 61 because of your gender?

A.     I don't know.

Q.     Are you aware of any evidence or information that supports a conclusion that Grandison (sic) [-- Wackenhut --] issued Grandison Deposition Exhibit Number 60 or 61 because of your educational attainment?

A.     I don't know.

S.J. Ex. 3 [Grandison Tr. 415:17 – Tr. 416:10].

49.     Wackenhut discharged Foster after Grandison reported that Foster had come late to work, smelled of alcohol, and slept on the job.  S.J. Ex. 1 [Conry Decl. ¶ 11]; S.J. Ex. 2 [Carroll Tr. 138:8 – Tr. 139:9]; S.J. Ex. 3 [Grandison Tr. 547:6-11; Grandison Tr. Ex. 82 (Memorandum from Grandison to Carroll, *et al.* (Jan. 31, 2006)]; S.J. Ex. 3 [Grandison Tr. 157:4-13; Grandison Tr. Ex. 23 (Letter from K.A. Conry to Foster (Feb. 28, 2006))].

50.     Foster physically attacked Grandison at the worksite, after the discharge.  Compl. ¶ 14; S.J. Ex. 3 [Grandison Tr. 156:6-12; Grandison Tr. Ex. 24 (Memorandum from Grandison to Carroll, *et al.* (Mar. 2, 2006))].

51.     But, Grandison knows of no evidence that WSI authorized the attack or that Foster launched it on the Company's behalf:

Q.     Are you aware of any evidence that supports a conclusion that Wackenhut authorized Mr. Foster to strike you in the way that you describe in Grandison Deposition Exhibit Number 24 [-- Memorandum from Grandison to Carroll (Feb. 28,2006) --]?

A.     No.

Q.     Are you aware of any evidence that supports the conclusion that Wackenhut -- that -- pardon me -- that Mr. Foster was acting on Wackenhut's behalf when he -- when he acted -- when he did what he did -- pardon me -- when he did what he's described as doing in Grandison Deposition Exhibit Number 24?

-17-

A.      No.

S.J. Ex. 3 [Grandison Tr. 158:20 – Tr. 159:9].

52.     After the confrontation a supervisor, Capt. Kathy Trickey, escorted Grandison from the premises.  S.J. Ex. 3 [Grandison Tr. 482:22 – Tr. 484:1].

53.     On March 13, 2006, Grandison filed a discrimination charge with the EEOC.  S.J. Ex. 3 [Grandison Tr. 218:1 – Tr. 219:9; Grandison Tr. Ex. 36 (Notice of Charge of Discrimination (March 23, 2006), Charge of Discrimination (Mar. 13, 2006))].

54.     WSI learned about the charge over 2 weeks later, on March 28, 2006, when the Company received a copy from the EEOC.  S.J. Ex. 1 [Conry Decl. ¶ 12]; S.J. Ex. 3 [Grandison Tr. 219:11 – Tr. 220:5].

55.     The EEOC dismissed the charge, two days after that, for want of supporting evidence. S.J. Ex. 3 [Grandison Tr.  222:12–18; Grandison Tr. Ex. 37 (Dismissal and Notice of Rights (Mar. 30, 2006)].

56.     Grandison ties his retaliation claim - - Count IIIA. - - to that charge.  S.J. Ex. 3 [Grandison Tr. 368:4 -- Tr. 369:7].

57.     On March 15, 2006, he signed-in for duty without wearing a tie.  Collins told Grandison that he needed to don his tie and be in full uniform before going on post.  But, about 45 minutes later he saw Grandison on post without his tie and with his shirt sleeves unbuttoned and rolled up.  Collins concluded that Grandison's conduct showed "complete disregard for Collins' authority to enforce GAO and Wackenhut policies."  So, Collins issued a disciplinary report, citing Grandison for willful insubordination -- first offense.  S.J. Ex. 3 [Grandison Tr. 416:20 – Tr. 417:15; Grandison Tr. Ex. 62 (Disciplinary Report (March 15, 2006)].

58.     Carroll investigated the matter.  S.J. Ex. 3 [Grandison Tr. Ex. 62 (Disciplinary Report (March 15, 2006)]; S.J. Ex. 4 [Carroll Decl. ¶ 3].

59.    As part of his investigation, Carroll reviewed security tapes showing that Grandison was not in proper uniform.  S.J. Ex. 4 [Carroll Decl. ¶ 4; Carroll Decl. Ex. B (Memorandum from Carroll to Dennis Stephens/Al League (April 5, 2006))].

60.    He also received a statement from another supervisor, Sgt. Douglas Akinmola, who corroborated Collins' description of what had occurred:

> At about 2340 hours [-- 11:40 p.m.-- ], Sgt. Collins informed me that Ofc. Grandison was out of uniform because he did not put on his tie.  He was advised by Sgt. Collins during the roll-call and also when Sgt. Collins went to drop of the NOV list, he told me that Ofc. Grandison was still out of uniform.  As a result, this prompted me to go out to post 11 to confirm Sgt. Collins['] statement.  On getting there, I saw Ofc. Grandison's tie hanging loose on the side of his shirt.  I advised him to dress properly and stop drawing attention to himself.  He wore his tie right and was properly in uniform before I left post 11.

S.J. Ex. 4 [Carroll Decl. ¶ 5; Carroll Decl. Ex. A (Akinmola Statement (Mar. 15, 2006))].

61.    So, Carroll concurred with the report, and recommended that Wackenhut suspend Grandison for 5 days -- the most lenient disciplinary measure prescribed for Grandison's offense. S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001231];  S.J. Ex. 3 [Grandison Tr. Ex. 62 (Disciplinary Report (Mar. 15, 2006))]; S.J. Ex. 4 [Carroll Decl. Ex. B (Memorandum from Carroll to Dennis Stephens/Al League (Apr. 25, 2006))].

62.    Carroll also briefed Grandison, on March 29th, stressing that he must be in full uniform before he goes on post.  Grandison's union shop steward, Daniel McNeil, attended that briefing. S.J. Ex. 4 [Carroll Decl. ¶ 7].

63.    Wackenhut suspended Grandison, as Carroll had recommended.  S.J. Ex. 3 [Grandison Tr. 417:16 – Tr. 418:20; Grandison Tr. Ex. 63 (Letter from K.A. Conry to Grandison (dated May 3, 2006))];

64.    And, Grandison can point to nothing that supports the conclusion that his race, gender, education, or EEOC charge motivated Carroll's report or the Company's suspension decision:

Q.      Are you aware of any evidence or information that supports a conclusion that
        Wackenhut issued Deposition Exhibit Number 62 [-- Disciplinary Report (March
        15, 2006) -- ] or Deposition Exhibit Number 63 [-- Letter from K.A. Conry to
        Grandison (May 3, 2006) -- ] because of your race?

A.      I don't know.

Q.      Are you aware of any evidence or information that supports a conclusion that
        Wackenhut issued Deposition Exhibit Number 62 or Deposition Exhibit Number
        63 because of your gender?

A.      I don't know.

Q.      Are you aware of any evidence or information that supports a conclusion that
        Wackenhut issued Grandison Deposition Exhibit Number 62 or Grandison
        Deposition Exhibit Number 63 because of your educational attainment?

A.      I don't know.

Q.      Are you aware of any evidence or information that supports a conclusion that
        Wackenhut issued Grandison Deposition Exhibit Number 62 or Grandison
        Deposition Exhibit Number 63 in retaliation for anything that you did?

A.      I don't know.

S.J. Ex. 3 [Grandison Tr. 418:21 – Tr. 419:20].

65.     Following an April 2, 2006, on-the-job accident, Grandison was off of work through

early May.  S.J. Ex. 2 [Carroll Tr. 145:19 – Tr. 146:7]; S.J. Ex. 3 [Grandison Tr. 100:8-15].

66.     Wackenhut told him about the suspension when he returned.  S.J. Ex. 3 [Grandison Tr.

Ex. 63 (Letter from K.A. Conry to Grandison (May 3, 2006))].

67.     On or about April 7th, at the GAO's request, Carroll reviewed April 2nd security tapes in

connection with Grandison's alleged injury.  They showed Grandison walking his rounds,

hatless, with his shirt collar open, and with his tie off to one side.  S.J. Ex. 3 [Grandison Tr.

424:1-22; Grandison Tr. 425:5-10; Grandison Tr. Ex. 66]; S.J. Ex. 2 [Carroll Tr. 30:18 - Tr.

31:10; Carroll Tr. 32:2-11].

68.     At Carroll's request, McNeill reviewed the tape and confirmed that it revealed that

Grandison was improperly dressed.  S.J. Ex. 2 [Carroll Tr. 34:17 – Tr. 35:13]; S.J. Ex. 4 [Carroll

Decl. ¶¶ 9, 10; Carroll Decl. Ex. C (Daniel McNeil Statement (Apr. 7, 2006))].

69.     He put the matter this way:

> I, SPO [-- Special Police Officer --] McNeill, was requested to meet with Mr. Carroll (the
> Project Manager), concerning SPO Grandison.  Mr. Carroll showed me the video dated
> 04-02-2006 showing SPO Grandison on his tour of duty in the building hitting
> checkpoint through out the building.  SPO Grandison did not have his hat on and his tie
> was off to the side of his shirt, with his collar open.  This incident was after the
> discussion we had in Mr. Carroll's office on 03-29-2006.

S.J. Ex. 3 [Grandison Tr. 430:11-22; Grandison Tr. 431:21 – Tr. 432:5]; S.J. Ex. 4 [Carroll Decl.

Ex. C (Daniel McNeil Statement (Apr. 7, 2006))].

70.     Carroll concluded that Grandison's continued failure to wear his uniform properly,

coming just days after Carroll had counseled him about his dress, was yet another act of willful

insubordination.  So, Carroll issued a disciplinary report, citing Grandison for his second offense.

S.J. Ex. 2 [S.J. Ex. 2 [Carroll Tr. 62:4–19; Carroll Tr. 77:11 – Tr. 80:20]; S.J. Ex. 3 [Grandison

Tr. 425:5-10; Grandison Tr. Ex. 66 (Disciplinary Notice (Apr. 10, 2006))].

71.     Grandison rejoined that (1) a shift supervisor, Sgt. Douglas Akinmola, had authorized

him to conduct his rounds without his hat, tie, and uniform shoes; and (2) another officer,

Michael Pope, was a witness.  S.J. Ex. 3 [Grandison Tr. 544:22-13; Grandison Tr. Ex. 80

(Grandison Statement (May 4, 2006))].

72.     Carroll conferred with Akinmola, who denied that he had excused Grandison from

wearing his tie or hat.  S.J. Ex. 3 [Grandison Tr. 432:6-20; Grandison Tr. Ex. 69 (Douglas

Akinmola Statement (Apr. 26, 2006))]; S.J. Ex. 4 [Carroll Decl. ¶ 11].

73.     Likewise, Pope, with whom Carroll also conferred, said that he did not hear Akinmola

excuse Grandison from wearing those articles.  S.J. Ex. 3 [Grandison Tr. 546:20 – Tr. 547:1;

Grandison Tr. Ex. 81 (Michael Pope Statement (May 5, 2006))].  S. J. Ex. 4 [Carroll Decl. ¶ 12; Carroll Decl. Ex. E].

74.     Carroll, therefore, recommended that the Company dismiss Grandison -- the prescribed sanction for the second occurrence of willful insubordination.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001231]; S.J. Ex. 2 [Carroll Tr. 62:4-19; Carroll Tr. 77:11 – Tr. 80:20]; S.J. Ex. 3 [Grandison Tr. 550:17-Tr. 551:2; Grandison Tr. Ex. 66 (Disciplinary Report (April 10, 2006)); Grandison Tr. Ex. 85 (Memorandum from Carroll to Dennis Stephens and Al League (May 4, 2006))]; S. J. Ex. 4 [Carroll Decl. ¶ 13; Carroll Decl. Ex. F].

75.     And, the Company did so, effective May 25, 2006.  S.J. Ex. 3 [Grandison Tr. 425:15-22; Grandison Tr. Ex. 67 (Letter from K.A. Conry to Grandison (May 22, 2006))].

76.     Grandison contends that his race, gender, education, and EEOC charge prompted those measures.  But, he can point to no supporting evidence.  Neither can he identify a single similarly situated employee whom Wackenhut treated more favorably.

>     Q     Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Grandison Deposition Exhibit Number 66 [ -- Disciplinary Report (April 10, 2006 --] or Grandison Deposition Exhibit Number 67 [-- Letter from K.A. Conry to Grandson (May 22, 2006) --]because of your race?
>
>     A     I don't know.
>
>     Q     Are you aware that -- of any evidence or information that Grandison issued -- pardon me – that Wackenhut issued Grandison Deposition Exhibit Number 66 or Grandison Deposition Exhibit Number 67 because of your gender?
>
>     A     I'd like to say that -- I'd like to go back to the first question.
>
>     Q     Okay.
>
>     A     I -- I think that's discrimination.  I'm a hundred percent positive that there's been other races, other gender individuals who have been out of uniform that have not been written up for willful insubordination and/or terminated for willful insubordination with regard to uniform issues.  You can go ahead.
>
>     Q     I think we need to start again.

Am I correct that you believe that Grandison -- that the company issued Grandison Deposition Exhibit 66 or 67 because of your race?

A     Yes.

Q     On what do you base that conclusion?

A     From my previous statement.

Q     What employees were out of uniform but were not disciplined for being out of uniform?

A     I don't know.  I have to -- I'll have to look at the tapes and the tapes will show you.

Q     You can't identify any such employee?

A     No.  Not right now, no.

Q     Are you aware of any evidence or information that supports a conclusion that Wackenhut terminated you because of your gender?

A     On numerous occasions, I've seen women without proper uniform on and they haven't been terminated.

Q     Which women?

A     I'll have to look at the tapes, and they'll show you.

Q     You can't identify anyone at the moment?

A     Not at the moment.

Q     Are you aware of any evidence or information that supports a conclusion that Wackenhut terminated you because of your educational attainment?

A     Yeah.  I think this write-up as well as others and me being probably the only individual there with a certain level of education that's different from everybody else's.  I think probably -- I feel like that shows that I got some additional discriminatory, harassing treatment due to my level of education.

Q     Are you aware of any other evidence or information that supports that conclusion?

A     No.

Q     Are you aware of any evidence or information that supports a conclusion that Wackenhut terminated you in retaliation for anything that you did?

A        Yes.

Q        What is that evidence or information?

A        Just the write-up itself.

Q        What about the write-up?

A        The write-up itself --

Q        Well, pardon me.  Before you answer that question, what write-up are you referring to?

A        The last two, 67, 66.

Q        What about Grandison Deposition Exhibit Number 66 and Grandison Deposition Exhibit Number 67 supports a conclusion that Wackenhut terminated you because of your educational attainment?

A        We're back to education now?

Q        I apologize.

A        Retaliation?

Q        Retaliation.  I apologize.  Thank you for the correction.

A        Like I said, once you go to the tapes, I've seen numerous officers out of uniform on a daily basis, supervisors as well, and they haven't been terminated for these offenses.

Q        The people you've seen out of uniform have included men as well as women?

A        Probably.

Q        Black people as well as white people?

A        Probably.

Q        People who have filed charges and people who have not filed charges?

A        I don't know.

S.J. Ex. 3 [Grandison Tr. 426:1 – Tr. 430:3].

77.    Moreover, Wackenhut has disciplined, up to discharge, numerous employees for breaking the rules, including female employees and employees who are not black.  S.J. Ex. 1 [Conry Decl. ¶¶ 14-31 and Conry Decl. Exs. E-V.].

78.    Within about a month after it terminated Grandison, Wackenhut hired two armed security guards for the GAO worksite.  Both are black.  One is a male.  S.J. Ex. 4 [Carroll Decl. ¶ 14].

79.    On May 11, 2006, Grandison filed a second charge with the EEOC.  S.J. Ex. 3 [Grandison Tr. 222:19 – Tr. 223:16; Grandison Tr. Ex. 38 (Notice of Charge of Discrimination (May 25, 2006)); Charge of Discrimination (May 11, 2006))].

80.    Wackenhut learned about the charge on June 1, 2006, when it received a copy from the EEOC.  S.J. Ex. 1 [Conry Decl. ¶ 13]; S.J. Ex. 3 [Grandison Tr. Ex. 38 (Notice of Charge of Discrimination (May 25, 2006))].

81.    The EEOC dismissed the charge because Grandison commenced this action.  S.J. Ex. 3 [Grandison Tr. 437:6 – Tr. 438:14].

82.    Grandison claims that his supervisors contributed to the hostile work environment by falsely accusing him regarding his dress, but overlooking similar acts of female officers which should have resulted in discipline.  Compl. ¶ 10.

83.    He can identify, however, no similarly situated women whom management treated more favorably.  Neither does he know whether management even was aware that women had dressed improperly:

> Q    Do you have any evidence or -- are you aware of any evidence or information that Grandison -- pardon me -- that management did what it did to you with respect to your uniform because of your gender?
>
> A    Yeah.  They ignored the same supposedly infractions that were -- in a case, I guess, that women actually were at fault, and I know that for a fact.
>
> Q     Can you identify the women who were at fault and were ignored?

A      I probably have to do some research on the names, but I know the face.  And I may have it – and I may have it written down in the -- those -- one of those notebooks that I provided.

Q      At this juncture, you can recall no names; is that correct?

A      No.  But I'm sure after talking to a couple of people I can find out who they are.

Q      With whom would you have to speak?

A      A number of the individuals that's in one of those first three exhibits you've shown today.

Q      Please tell me.  With whom would you need to speak?

A      Probably all of them, all of them, and then through that process, they would help me ID who that person was.

And actually, it was -- I know for a fact it was two females, so, you know -- but I can't remember their names, but I assure you that I'll come up with the name.

Q      What infractions did those two females commit?

A      Definitely not wearing their hats 24/7 and also they had cuffs in the bottom of their pants and they had them before I -- before -- they had them before I was issued -- issued -- before I started. They were there before I started.

Q      Are you testifying that you were aware of how they dressed before you began on the job?

A      I just knew they had them.  From the day I started, they had cuffs in their pants.

Q      You're not testifying that you knew how they were dressed before you began work there, are you?

A      Well, the only knowledge I have to that is that -- what I heard from other officers. But I'm sure -- once again, they have CCTV cameras posted, and I'm sure that once we reveal those tapes, we'll see -- we'll see that –

Q      Which management –

A      -- which two.

Q      Had you finished your answer?

A      Right.

Q      I'm sorry.  Did you finish your answer, sir?

A      Uh-huh.

Q      You'll have to say yes or no.

A      Yes.

Q      Which management -- was management aware of the two females whose infractions you've described?

A      I don't know whether they were aware, but I know they were aware of mine.

S.J. Ex. 3 [Grandison Tr. 476:20 – 479:15].

84.    Wackenhut has disciplined several female GSA security guards for appearance

infractions.  S.J. Ex. 1 [Conry Decl. ¶¶ 14, 17, 18, 22, 23; Conry Decl. Ex. E, H, I, M, N].

85.    Grandison alleges, in his Complaint, that Wackenhut made up rules that applied only to

him.  Compl. ¶ 10.

86.    He has decided, however, decided not to press that claim.

Q      Are you contending as part of this lawsuit that Wackenhut made up rules and applied rules that -- pardon me -- made up rules that applied only to you?

A      No.

S.J. Ex. 3 [Grandison Tr. 480:10-13].

87.    Grandison alleges that management intentionally interfered with his right to leave work.

Compl. ¶ 10.

88.    But he can point to no supporting evidence.

Q      My question, then, is are you contending as part of this lawsuit that management intentionally interfered with your right to leave work?

A      I don't know.

Q      Did management ever intentionally interfere with your right to leave work?

A      I don't know.

-27-

S.J. Ex. 3 [Grandison Tr. 482:10 – 16].

89.     Grandison alleges that Wackenhut sent him home for trumped up reasons.  Compl. ¶ 10.

90.     He testified that that contention relates to 6 incidents.  One relates to the occasion on which Wackenhut suspended Grandison in connection with the facsimile, S.J. Ex. 3 [Grandison Tr. 482:22 – 483:4].

91.     But, Grandison can point to no evidence that his race, gender, or education motivated that decision.  *See* ¶¶ 37-42, *supra*.

92.     According to Grandison, another occasion on which WSI sent him home for trumped up reason occurred, on February 26, 2006, on which Wackenhut sent him home for arguing with Foster.  S.J. Ex. 3 [Grandison Tr. 482:22 – Tr. 483:7].

93.     Grandison, however, can point to no evidence that Wackenhut did so due to his race, gender, or education.  S.J. Ex. 3 [Grandison Tr. 503:5 – Tr. 504:22].

94.     According to Grandison, another occasion on which WSI sent him home for trumped up reason occurred on February 28, 2008, when Collins told Grandison that he was not needed after he reported to work over one hour late, S.J. Ex. 3 [Grandison Tr. 482:22 – Tr. 483:14].

95.     But, Grandison can point to no evidence that his gender, race, or education were factors in Collins' decision making.  *See* ¶¶ 46-48, *supra*.

96.     According to Grandison, another occasion on which WSI sent him home for trumped up reason occurred when the Company suspended him for insubordination, S.J. Ex. 3 [Grandison Tr. 482:22 – 483:16; Grandison Tr. 494:3-13].

97.     But, Grandison can point to no evidence that his gender, race or education prompted the Company's disciplinary action.  *See* ¶¶ 57-64, *supra*.

98.     According to Grandison, another occasion on which WSI sent him home for trump up reasons occurred when Trickey escorted Grandison from the premises after his confrontation with Foster.  S.J. Ex. 3 [482:22 – Tr. 483:18].

99.     According to Grandison, another occasion on which Wackenhut sent him home for trumped up reason occurred when the Company purportedly suspended him for wearing unauthorized uniform pants.  S.J. Ex. 3 [482:22 – Tr. 484:2].

100.     Grandison is not pressing the allegation contained in his Complaint that Wackenhut created a hostile work environment by sending him home for sleeping on the job and for not taking authorized breaks.  Compl. ¶ 10; S.J. Ex. 3[Grandison Tr. 482:22 – Tr. 484:2].

101.     Grandison alleges that Wackenhut subjected him to a hostile environment by "attempting to have other officers write disparaging remarks about [him]."  Compl. ¶ 10; S.J. Ex. 3 [Grandison Tr. 505:1-11].

102.     Specifically, according to Grandison, Wackenhut compelled Trickey, Akinmola, and Richardson to lie to justify the Company's decision to discipline Grandison in connection with the February 27th facsimile.  But, he can point to no evidence to support that claim.  S.J. Ex. 3 [Grandison Tr. 505:1 – Tr. 512:20].

103.     Grandison alleges that Wackenhut contributed to the hostile work environment by disciplining him when he took October 15, 2005, off to attend a course.  Compl. ¶ 10; S.J. Ex. 3 [Grandison Tr. 513:4 – Tr. 515:22; Grandison Tr. Ex. 28 (Letter from K.A. Conry to Grandison (Nov. 10, 2005)].

104.     But, he agreed with the contents of the resulting disciplinary report.  And he can cite no evidence that his race, gender, or education prompted it.  *See* ¶¶ 14-16, *supra*.

105.    Grandison alleges that Richardson, Collins, and Foster contributed to the hostile work environment by subjecting him to unfounded threats of discipline.  Compl. ¶ 10; S.J. Ex. 3 [Grandison Tr. 518:18 – Tr. 519:6].

106.    But, he can identify no such threats that Richardson or Collins made.  S.J. Ex. 3 [Grandison Tr. 520:5-10].

107.    Grandison contends that Foster badgered Grandison about his uniform.  S.J. Ex. 3 [Grandison Tr. 106:20 – Tr. 112:4; Grandison Tr. 520:11 – Tr. 521:11].

108.    But, Grandison can point to no evidence that gender played a role in any such alleged conduct.  *See* ¶¶ 82-83, *supra*.

109.    Grandison contends that the Company contributed to a hostile work environment by falsely accused him of arguing with Foster.  Compl. ¶ 10; S. J. Ex. 3 [Grandison Tr. 482:22 – Tr. 483:7; Grandison Tr. 522:12 – Tr. 525:13].

110.    But, he is aware of no evidence that the Company did so due to Grandison's race, gender, or education.

> Q.    Are you aware of any evidence that supports -- or information that supports a conclusion that Wackenhut or its managers accused you of being argumentative with Mr. Foster on or about February 26, 2006 because of your race?
>
> A.    I don't know.
>
> Q.    Are you aware of any evidence or information that Wackenhut or its managers accused you of being argumentative with Mr. Foster on February 26, 2006 because of your gender?
>
> A.    Don't know.
>
> Q.    Are you aware of any evidence or information that supports a conclusion that Wackenhut or its managers accused you of being argumentative with Mr. Foster on February 26 because of your educational attainment?
>
> A.    Don't know.

> Q.     Are you aware of any evidence or information that supports a conclusion that Wackenhut or its managers accused you of being argumentative with Mr. Foster on February 6 -- 26, 2006 in retaliation for anything you had done to that point?
>
> A.     Don't know.

S.J. Ex. 3 [Grandison Tr. 503:22 – Tr. 504:22].

111.    Grandison alleges that Wackenhut tried to provoke him so that he would give the Company an excuse to terminate him.  Compl.  ¶ 10.

112.    But, he can point to no supporting evidence.

> Q.     What evidence or information do you have that supports your conclusion, your testimony, that you were being provoked to say something or do something that might result in your termination?
>
> A.     Well, I don't know what they were attempting to do, but I know what -- when I'm being provoked.  I know that.

S.J. Ex. 3 [Grandison Tr. 527:7-13].

113.    Grandison contends that Wackenhut treated him differently because he graduated from college.  Compl. ¶ 10.

114.    But, again, he can point to no supporting evidence.  *See* ¶ 8-42, 46-48, 57-64, 67-76, 90-110, *supra*.

115.    Grandison grounds his defamation claim upon unflattering remarks about him made to his supervisor and others at Startech.  Compl. ¶¶ 25, 55-58.

116.    But, he attributes those statements to GAO representatives, Mr. Bodel and an individual whose name Grandison cannot recall:  Not to anyone at Wackenhut.  Compl. ¶ 24; S.J Ex. 3 [Grandison Tr. 65:13 – 66:16; Grandison Tr. 71:18 – 72:13].

117.    And, he can identify no occasion on which a Wackenhut employee or agent made such remarks:

Q.    Are you aware of any occasion on which anyone in Wackenhut's employee or anyone serving as an agent of Wackenhut made any disparaging remark about you to Startech or anyone at Startech?

A.    Yeah.  That indicate -- that – those instances where they came into the building and requested information and made the statements that, you know, my -- my coworkers and my supervisor, if they protected me, then they would go down just like I go down.  Those are to me disparaging remarks.  It's got nothing to do with GAO at all.

Q.    Those remarks, as I understand it, Mr. Grandison, were made by Mr. Bodle and this other individual whose name you cannot recall; am I correct –

A.    Right.

Q.    -- in that understanding?

A.    Right.

Q.    My question, then, is different.  Are you you aware of any occasion on which any Wackenhut employee or agent of Wackenhut said anything disparaging about you to anyone at Startech?

MR. SCHIFFRES:  Do you understand the question?

THE WITNESS:  Yeah.  No, I don't -- I don't -- I don't recall.  I don't -- I don't know.  I'll have to go back and check and -- and talk to some of the officers at both locations and find out who said what.

BY MR. MORRIS:

Q.    All right.  At this moment -- I want to make sure I understand.  At this moment, you cannot identify any occasion on which any agent or employee of Wackenhut said anything disparaging about you to anyone at Startech; am I correct?

A.    Yep.

S.J. Ex. 3 [Grandison Tr. 74:4 – Tr. 75:17].

118.    Neither can he cite any evidence that Wackenhut instigated or ratified the offending

remarks.  S.J. Ex. 3 [Grandison Tr. 75:18 – Tr. 76:5].

119.    Grandison contends that Wackenhut "attempted to procure" the breach of his

employment agreement with Startech.  Compl. ¶ 69.

120.    He admits, however, that Wackenhut has done nothing that caused Startech to breach it.

S.J. Ex. 3 [Grandison Tr. 97:7-10].

Respectfully submitted,

ARENT FOX PLLC

By:     /s/ Henry Morris, Jr.
        Henry Morris, Jr., (#375894)
        Kristine J. Dunne (#471348)
        1050 Connecticut Avenue, N.W.
        Washington, D.C. 20036-5339
        (202) 857-6000/Telephone
        (202) 857-6395/Facsimile

        *Counsel for Wackenhut Services, Inc.*

# S.J. EX. 1

# CONRY DECLARATION & EXHIBITS

# PART 1 OF 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TRAVIS GRANDISON,    ) | |
|             ) | |
|      **Plaintiff,**   ) | |
|             ) | |
|       **v.**        ) | **Civil Action No. 1:07-cv-00754 (RMC)** |
|             ) | |
| **WACKENHUT SERVICES, INC.,** ) | |
|             ) | |
|      **Defendant.**   ) | |

## DECLARATION OF KEVIN A. CONRY

I, Kevin A. Conry, do hereby depose and state as follows:

1.     I am a Wackenhut Services, Inc. Vice President, and General Manager of its National Capital Region ("NCR").

2.     Wackenhut supplies high-end armed and unarmed security personnel, paramilitary protective forces, law enforcement officers, fire and rescue services, aviation operations and support, base operations, facility management, entry level training, and cleared personnel to government and select commercial customers.

3.     Through its NCR, the Company provides security services and personnel for the Government Accountability Office headquarters, in Washington, D.C.

4.     The security guards there are members of a collective bargaining unit.

5.     Attached hereto, as Exhibit A, is a true and correct copy of WSI's Sexual Harassment/Workplace Harassment Policy, HR 520 (Sept. 1, 1999) and its Sexual Harassment/Workplace Harassment Statement W-211 (HR 520) (Rev. 9/01/99).

6.     Attached hereto as Exhibit B is a true and correct copy of the G4S Wackenhut Security Officer's Handbook, at 14, 20-21.

7.    Attached hereto as Exhibit C is a true and correct copy of WSI's Human Resources Manual: Equal Employment Opportunity, HR 515 (June 1, 2000).

8.    Attached hereto as Exhibit D is a true and correct copy of the NCR's Standard Operating Procedure: Administration of Discipline, No. 358 (Jan. 1, 2001).

9.    Of the 87 WSI employees who worked at the GAO during Travis Grandison's tenure with the Company, 78 -- nearly 90% -- are black.  Also, 60 -- nearly 70% -- are men.

10.    A true and correct copy of my January 31, 2006, letter to Omer Gilliam is submitted as Grandison Deposition Exhibit No. 44 to WSI's Statement of Material Facts as to which No Genuine Issue Exists.

11.    A true and correct copy of my February 28, 2006, letter to Felton Foster is submitted as Grandison Deposition Exhibit No. 23 to WSI's Statement of Material Facts as to which No Genuine Issue Exists.

12.    WSI learned about Grandison's March 13, 2006, EEOC charge on March 28, 2006, when the Company received a copy from the EEOC.  A true and correct copy of the charge that WSI received is submitted as Grandison Deposition Exhibit No. 36 to WSI's Statement of Material Facts as to which No Genuine Issue Exists.

13.    WSI learned about Grandison's May 11, 2006, EEOC charge on June 1, 2006, when the Company received a copy from the EEOC.  A true and correct copy of the charge that WSI received is submitted as Grandison Deposition Exhibit No. 38 to WSI's Statement of Material Facts as to which No Genuine Issue Exists.

14.    On or about October 19, 2005, WSI issued a memorandum for the record to Nicole Gregory, who is a female, for failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while the performing duties -- first offense.  A

true and correct copy of that memorandum and the disciplinary report on which it is based is attached hereto as Exhibit E.

15.     On or about March 7, 2006, WSI terminated Ms. Gregory for violating the Company's drug and alcohol policy.  A true and correct copy of the Company's termination letter is attached hereto as Exhibit F.

16.     On or about April 8, 2005, WSI terminated Robin Gregory, who is a female, for tardiness or failure to observe assigned work hours -- - fifth offense.  A true and correct copy of the Company's termination letter is attached hereto as Exhibit G.

17.     On or about August 14, 2006, WSI issued a memorandum for the record to Margaret Bowman, who is a female, for failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties -- first offense.  A true and correct copy of that memorandum and the disciplinary report upon which it is based is attached hereto as Exhibit H.

18.     On or about August 14, 2006, WSI issued a memorandum for the record to Marina Kornegay, a female, for failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties -- first offense.  A true and correct copy of that memorandum and the disciplinary report upon which it is based is attached hereto as Exhibit I.

19.     On or about April 7, 2005, WSI terminated Ms. Kornegay for engaging in conduct which by its nature and impact, severely limits the employee's ability to perform essential elements of the job or is injurious to the interest of the Company and/or the client.  A true and correct copy of

WSI's termination letter and the disciplinary report on which it is based is attached hereto as Exhibit J.

20.     On or about July 22, 2005, WSI suspended Amrik Lal, who is an Asian, for leaving his workstation without supervisor's authorization.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit K.

21.     On or about April 13, 2005, WSI suspended Charles Bishop, who is white, for non-willful failure to carry out assigned task while performing duties – second offense.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit L.

22.     On or about April 19, 2007, WSI issued a memorandum for the record to Kimberle Littlepage, who is a female, for failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties -- first offense.  A true and correct copy of that memorandum and the disciplinary report upon which it is based is attached hereto as Exhibit M.

23.     On or about November 29, 2007, WSI issued a memorandum for the record to Shrearon Lewis, who is a female, for failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties -- first offense.  A true and correct copy of WSI's memorandum and the disciplinary report upon which it is based is attached hereto as Exhibit N.

24.     On or about December 1, 2006, WSI suspended Ms. Lewis for leaving her work station without supervisor's authorization – first offense.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit O.

25.     On or about May 19, 2006, WSI suspended Ms. Lewis for disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations – first offense.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit P.

26.     On or about August 11, 2005, WSI suspended Islande Edouard, who is female, for violation of security procedures and regulations – first offense.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit Q.

27.     On or about June 1, 2005, WSI suspended Akeesha Day, who is a female, for disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations – first offense.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit R.

28.     On or about August 11, 2005, WSI suspended Ms. Day for violation of security procedures or regulations – first offense.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit S.

29.     On or about June 1, 2005, WSI suspended Renee Rawlings, who is a female, for disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations – first offense.  A true and correct copy of WSI's suspension letter and the disciplinary report on which it is based is attached hereto as Exhibit T.

30.    On or about March 2, 2005, WSI terminated Mia Mathes for tardiness or failure to observe assigned work hours. A true and correct copy of WSI's termination letter and the disciplinary report on which it is based is attached hereto as Exhibit U.

31.    On or about September 18, 2007, WSI terminated Knox Cockrell for proven theft, dishonesty, fraud, or bribery. A true and correct copy of WSI's termination letter and the disciplinary report on which it is based is attached hereto as Exhibit V.

32.    Attached as Exhibit 55 to WSI's Statement of Material Facts as to which No Genuine Issue Exists is a true and correct copy of a disciplinary report, dated February 27, 2006, issued with respect to Travis Grandison.

33.    I am a custodian of the records attached hereto as exhibits, which were made and are kept in the regular course of WSI's business.

I have read the foregoing Declaration, consisting of 32 numbered paragraphs, and I declare that it is true and correct to the best of my personal knowledge.

Kevin A. Conry

Date: _____June 2008_____

RPP/260714.2

# S.J. EX. 1


# CONRY DECL. EX. A

| | | **NUMBER** |
|---|---|---|
| | | HR 520 |

# Wackenhut

| | | **EFFECTIVE DATE:** |
|---|---|---|
| | | 9/01/99 |

## HUMAN RESOURCES MANUAL

TITLE/SUBJECT:

| | **SUPERSEDES:** |
|---|---|
| | 7/15/90 |

### SEXUAL HARASSMENT/WORKPLACE HARASSMENT POLICY

**PURPOSE**     To establish a Corporate policy on sexual and workplace harassment in the workplace and to develop a procedure to follow in the event an employee feels he/she is a victim of harassment.

**RESPONSIBILITY**     It is the responsibility of all Regional, Area, Branch, Project, Facility, Business Unit (herein referred to as Field Managers/ment) and Corporate Managers to read and comply with this policy. It is the responsibility of those in management/supervisory positions at all levels, who have received sexual harassment and/or workplace harassment complaints, to react immediately and appropriately by following the policies and procedures below. It is the responsibility of all employees to adhere to the Corporate Policy on Sexual Harassment and Workplace Harassment.

**POLICY**     **SEXUAL HARASSMENT**

Sexual harassment, whether it occurs between a supervisor and a subordinate or between co-workers, can not and will not be tolerated by the Company. Sexual harassment is a violation of Title VII of the Civil Rights Act of 1964 and it is against our policy for any employee, male or female, to sexually harass other employees by:

1)     Making unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature a condition of an employee's employment; or

2)     Making submission to or rejection of such conduct the basis for employment decisions affecting the employee; or

3)     Creating an intimidating, hostile or offensive working environment by such conduct.

Sexual harassment may take different forms. Examples of several types of forms are:

<u>Verbal:</u>     Sexual innuendoes, suggestive comments, jokes of a sexual nature, sexual propositions or sexual threats.

<u>Non-verbal:</u>     Sexually suggestive objects or pictures, suggestive or insulting sounds, leering, whistling or obscene gestures.

<u>Physical:</u>     Unwanted physical contact, including touching, pinching, brushing the body, coerced sexual intercourse or assault.

This list is not necessarily exhaustive of what could be construed as sexual harassment.

**Additionally, since many of our employees have frequent contact with client employees, be aware that the Equal Employment Opportunity Commission (EEOC)**



EXHIBIT
Grandison 4
2.5.08 SMB

Page 1 of 6

GRANDISON 00455

| **Wackenhut** | **NUMBER** |
|---|---|
| | HR 520 |
| | **EFFECTIVE DATE:** |
| **HUMAN RESOURCES MANUAL** | 9/01/99 |
| TITLE/SUBJECT: | **SUPERSEDES:** |
| | 7/15/90 |
| SEXUAL HARASSMENT/WORKPLACE HARASSMENT POLICY | |

attaches employer liability for the acts that non-employees (i.e. clients, vendors) make toward employees if the employer is made aware of the situation and fails to take corrective measures.

If an investigation into a sexual harassment complaint concludes that an employee violated this policy by sexually harassing another employee, the violator will be subjected to discipline which may include termination of employment, regardless of his/her level. Management/Supervisors in particular will be held to the highest of standards with respect to their conduct.

Be advised that it is against Company policy for an employee to knowingly bring false accusations of harassment (sexual or otherwise) against another employee. If an employee knowingly and willfully brings forth a false claim, he/she will be subjected to disciplinary action, up to and including termination of employment.

*How to File a Complaint*
Employees who believe they are the victims of sexual harassment are to immediately contact their supervisor, management or Corporate Headquarters Human Resources (800-922-6488) for appropriate action.  For the comfort of the complaining employee, a management representative who is the same gender as the employee may be made available to discuss the issue.

## WORKPLACE HARASSMENT

Consistent with the Company's policy on sexual harassment, it is also strictly against policy for employees to harass other employees on the basis of race, color religion, gender, national origin, age, disability or any other characteristic protected by law.

Harassment under this policy is verbal, non-verbal or physical conduct that denigrates or shows hostility or aversion toward another individual because of his/her race, color, religion, gender, marital status, national origin, age, disability, or any other characteristic protected by law or that of his/her relatives, friends or associates, and that:

1)      Has the purpose or effect of creating an intimidating, hostile, offensive work environment; or

2)      Has the purpose or effect of unreasonably interfering with an individual's work performance; or

3)      Otherwise adversely affects an individual's employment.

Harassing conduct includes, but is not necessarily limited to, epithets, slurs, or negative stereotyping; threatening, intimidating or hostile acts; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group that is placed on walls or elsewhere in the employer's premises or circulated in the workplace.

GRANDISON 00456

# Wackenhut

## HUMAN RESOURCES MANUAL

**TITLE/SUBJECT:**

### SEXUAL HARASSMENT/WORKPLACE HARASSMENT POLICY

**NUMBER**

HR 520

**EFFECTIVE DATE:**

9/01/99

**SUPERSEDES:**

7/15/90

*How to File a Complaint*

As with sexual harassment, any employee who believes he/she is the victim of harassment should contact his or her supervisor, management or Corporate Headquarters Human Resources (800-922-6488) for appropriate action. If it is determined that an employee has violated this policy by harassing another employee, he/she will be subjected to disciplinary action up to and including termination of employment.

Be advised that it is against Company policy for an employee to knowingly bring false accusations of harassment (sexual or otherwise) against another employee. If an employee knowingly and willfully brings forth a false claim, he/she will be subjected to disciplinary action, up to and including termination of employment.

## RETALIATION IS PROHIBITED

**It is strictly against Company policy to retaliate against an employee who either (1) has complained of sexual/workplace harassment and/or (2) has participated in sexual/workplace harassment investigations.**

The Company will not retaliate against an employee who, in good faith, makes a complaint or report of harassment, or who participates in the investigation of such a complaint or report. Retaliation against any individual for good faith reporting of a claim of harassment or for cooperating in the investigation of same will not be tolerated and will itself be cause for appropriate disciplinary action, up to and including termination of employment.

## RELATIONSHIPS / DATING

Corporate Personnel:

- Corporate Headquarters employees are prohibited from establishing/having a sexual/romantic/dating relationship with their direct or indirect subordinates.

- Corporate Headquarters employees are prohibited from establishing/having sexual/romantic/dating relationships with any employee in the field at any level.

Field Personnel:

- All field personnel are prohibited from establishing/having sexual/romantic/dating relationships with any corporate employee.

- All field employees are prohibited from establishing/having a sexual/romantic/ dating relationship with any direct or indirect subordinates or subordinate within the scope of their influence.

GRANDISON 00457

| | **NUMBER** |
|---|---|
| **Wackenhut** | HR 520 |
| | **EFFECTIVE DATE:** |
| **HUMAN RESOURCES MANUAL** | 9/01/99 |
| TITLE/SUBJECT: | **SUPERSEDES:** |
| | 7/15/90 |
| SEXUAL HARASSMENT/WORKPLACE HARASSMENT POLICY | |

PROCEDURE

- Field Management is to ensure that this policy, HR520, is provided to current and newly hired field Managers, Supervisors, and Business Development Representatives and that the attached policy receipt form W-220 is signed by such employees. The form is to be retained in the employee's file. Regional Vice Presidents/Managers, Area/Branch/Project/Facility Managers are to forward their personal signed form W-220 to Corporate Human Resources so that it may be filed in their personnel file.

- Field Management is to ensure that the Sexual Harassment/Workplace Harassment Statement W-211 is given to each newly hired non management employee during the hiring process/initial days of employment and that the attached statement receipt form W-211a is signed by such employees. This form is to be retained in the employee's file.

- Field Management is to ensure that the **Sexual Harassment/Workplace Harassment Statement W-211**, is conspicuously posted and distributed to employees. This statement may be included in the post orders book and periodically included in payroll envelopes.

- Corporate and Field Management (herein referred to as Management) are to support and promote the Company's philosophy and commitment to a workplace free of sexual/workplace harassment. Employees should be assured that an open door policy exists to discuss and report harassment.

- Field Management is to reinforce this policy periodically, for example, during staff meetings, training sessions, one on one discussions, etc. See attached list of training programs and videos available through the Training Department. Such training should be well documented by maintaining a record of the training content and date of training. All persons receiving training should sign and date attendance sheet acknowledging training.

- Pursuing or allowing sexual/romantic/dating relationships to develop or continue as defined and discussed in the Relationships/Dating portion of this policy, is a violation of this policy and may result in disciplinary actions up to and including termination.

- All harassment incidents, alleged or actual, must be treated as potential EEOC litigations. Actions must be handled in a discreet, confidential manner. An accurate reporting of the incidents, alleged or actual, must be given to the Corporate Human Resources or Legal Department.

- If the alleged harassment of a company employee is due to the misconduct of a client or vendor's employee, it is the Manager's responsibility to report this to Corporate Human Resources or Legal.

GRANDISON 00458

# Wackenhut

## HUMAN RESOURCES MANUAL

TITLE/SUBJECT:

### SEXUAL HARASSMENT/WORKPLACE HARASSMENT POLICY

| NUMBER |
| --- |
| HR 520 |
| EFFECTIVE DATE: |
| 9/01/99 |
| SUPERSEDES: |
| 7/15/90 |

- Failure on the part of a Manager/Supervisor to advise Corporate Human Resources/Legal of sexual harassment complaints may be cause for disciplinary action up to and including termination.

- At Corporate, Human Resources will distribute this policy (HR520) and policy receipt form W-220 to Management/Supervisory personnel at Corporate Headquarters. The policy receipt form W-220 is to be signed and filed in the personnel file. All non management Headquarters personnel will receive the **Sexual Harassment/Workplace Harassment Statement W-211** at time of hire. The statement receipt form W-211a is to be signed and retained in the employee's personnel file. Corporate Human Resources will post the appropriate statements.

**INVESTIGATION**

- Employees are expected to cooperate with Company officials who are assigned to investigate a harassment complaint. Refusal to cooperate in an official investigation could subject an employee to disciplinary action, up to and including termination of employment.

- Upon being made aware of a harassment (sexual or otherwise as defined previously in this policy) allegation, whether confirmed, reported or suspected, Management (Field and Corporate) **will immediately advise** the Corporate Human Resources Department or Legal Department. Action directed by Human Resources and/or the Legal Department at Corporate will include, but may not be limited to:

  - Complaints will be investigated in a timely manner and will be kept confidential to the extent practicable recognizing that during an investigation, the alleged harasser and witnesses would need to be contacted.
  - Depending upon the seriousness of a harassment complaint, it may be appropriate to suspend or otherwise transfer the accused away from the Complainant for the duration of the investigation. Under no circumstances should the Complainant be suspended or transferred without the express approval of the Corporate Human Resources and/or Legal Departments.
  - Appropriate corrective disciplinary action, up to and including termination of any employee, regardless of the level of his/her position, will be taken if the stated investigation warrants.

**TRAINING PROGRAMS**

The following training programs relating to equal employment opportunity, affirmative action, sexual harassment and cultural diversity are available from the Wackenhut Training Institute. Please contact the Wackenhut Training Institute at Corporate Headquarters for any questions and/or assistance relating to such training.

GRANDISON 00459



# Wackenhut

## HUMAN RESOURCES MANUAL

TITLE/SUBJECT:

SEXUAL HARASSMENT/WORKPLACE
HARASSMENT POLICY

| NUMBER |
| --- |
| HR 520 |
| EFFECTIVE DATE: |
| 9/01/99 |
| SUPERSEDES: |
| 7/15/90 |

| | | |
| --- | --- | --- |
| AV | - | Audio Visual |
| BK | - | Book |
| FL | - | Focus on Leadership |
| LP | - | Lesson Plans |

| | | |
| --- | --- | --- |
| AV-63 | - | Power Pinch-Sexual Harassment on the Job |
| AV-71 | - | Discrimination and Affirmative Action |
| AV-316 | - | The Americans with Disabilities Act |
| AV-257 | - | Communicating Across Cultures |
| AV-293 | - | March 1992 Security Works (excerpts discuss sexual harassment) |
| AV-370 | - | Counseling and Sexual Harassment |
| AV-371 | - | EEO Compliance for Supervisors & Managers |
| AV-375/ 571 | - | Sexual Harassment:  Prevention, Recognition, and Correction |
| AV-426 | - | Cultural Diversity |
| AV-470 | - | Diversity Awareness |
| AV-532 | - | Sexual Harassment |
| AV-537 | - | Myth vs. Fact:  How to Manage Sexual Harassment Situations |
| AV-538 | - | Myth vs. Fact:  How to Recognize and Confront Subtle Sexual Harassment |
| AV-730 | - | Sexual Harassment (among staff in corrections) |
| AV-1151 | - | Sexual Harassment: You Make the Call |

| | | |
| --- | --- | --- |
| BK-165 | - | The Effective Security Supervision Manual |
| BK-285 | - | America and the New Economy |

| | | |
| --- | --- | --- |
| FL-95-2 | | Focus on Leadership:  Sexual Harassment |
| LP-54 | - | Cultural Diversity |
| LP-59 | - | Sexual Harassment |

GRANDISON 00460



# SEXUAL HARASSMENT / WORKPLACE HARASSMENT STATEMENT

### SEXUAL HARASSMENT

Sexual harassment, whether it occurs between a supervisor and a subordinate or between co-workers, cannot and **will not be tolerated** by The Wackenhut Corporation.

### DEFINITION OF SEXUAL HARASSMENT

Sexual harassment is a violation of Title VII of the Civil Rights Act of 1964 and it is against our policy for any employee, male or female, to sexually harass other employees by:

- making unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature a condition of an employee's employment, or

- making submission to or rejection of such conduct the basis for employment decisions affecting the employee, or

- creating an intimidating,  hostile or offensive working environment by such conduct.

### TYPES OF SEXUAL HARASSMENT

Sexual harassment may take different forms. Examples of several types of forms are:

| | |
|---|---|
| Verbal | Sexual innuendoes, suggestive comments, jokes of a sexual nature, sexual propositions or sexual threats. |
| Non-verbal | Sexual suggestive objects or pictures, graphic commentaries, suggestive or insulting sounds, leering, whistling or obscene gestures. |
| Physical | Unwanted physical contact, including touching, pinching, brushing the body, coerced sexual intercourse or assault. |

### **WORKPLACE HARASSMENT**

Consistent with the Company's policy on sexual harassment, it is also strictly against policy for employees to be harassed by co-workers, supervisors, clients and/or vendors on the basis of race, color, gender, national origin, age, disability or any other characteristic protected by law.

### **DEFINITION OF WORKPLACE HARASSMENT**

Harassment under this policy, is verbal, non-verbal or physical conduct that denigrates or shows hostility or aversion toward another individual because of his/her race, color religion, gender, national origin, age, disability or any other characteristic Protected by law, and that:

Page 1 of 2

GRANDISON 00461

Has the purpose or effect of creating an intimidating, hostile or offensive work environment; or

Has the purpose or effect of unreasonably interfering with an individual's work performance; or

Otherwise adversely affects an individual's employment.

Harassing conduct includes, but is not necessarily limited to, epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group and that is placed on walls or elsewhere on the premises, or is circulated in the workplace.

## HOW TO FILE A COMPLAINT

Employees who believe they are the victims of sexual harassment and/or workplace harassment are to immediately contact their supervisor, a manager, the undersigned, or the Corporate Human Resources Department (800-922-6488) for appropriate action. For the comfort of the employee complaining of sexual harassment, upon request, a management representative who is the same gender as the employee will be made available to receive the complaint. Complaints will be investigated in a timely and thorough manner, and will be kept confidential to the extent practicable within the context of an investigation.

## APPROPRIATE DISCIPLINE

If an investigation into a sexual harassment and/or workplace harassment complaint concludes that an employee violated this policy by harassing another employee, the violator will be subjected to discipline which may include termination of employment, regardless of his/her level.

## RETALIATION IS PROHIBITED

The Company will not retaliate against an employee who, in good faith, makes a complaint or report of sexual harassment or workplace harassment, or who participates in the investigation of such a complaint or report. Retaliation against any individual for good faith reporting of a claim of harassment or for cooperating in the investigation of same will not be tolerated and will itself be cause for appropriate disciplinary action, up to and including termination of employment.

## RELATIONSHIPS / DATING

Corporate Personnel:

Corporate Headquarters employees are prohibited from establishing/having a sexual/romantic/dating relationship with their direct or indirect subordinates.

Corporate Headquarters employees are prohibited from establishing/having sexual/romantic/dating relationships with **any employee in the field at any level.**

Field Personnel:

All field personnel are prohibited from establishing/having sexual/romantic/dating relationships with any corporate employee.

All field employees are prohibited from establishing/having a sexual/romantic/ dating relationship with any direct or indirect subordinates or subordinate within the scope of their influence.

GRANDISON 00462

**WACKENHUT**

## STATEMENT W-211 RECEIPT

## SEXUAL HARASSMENT/WORKPLACE HARASSMENT

I, _____ have received and read and understand The

Wackenhut Corporation's Sexual Harassment/Workplace Harassment Statement W-211. I also

understand that it is my responsibility to adhere to this statement, and that failure to do so will

be cause for disciplinary action up to and including termination.

_____          _____
**Signature**                                              **Date**

_____
**Print Name**

_____
**Department and/or Location**

W-211a (PolicyHR520)    (2/2000) S K U # 7 4 6 7 1

GRANDISON 00463



## POLICY HR520 RECEIPT

## SEXUAL HARASSMENT/WORKPLACE HARASSMENT

I, _____ have received and read and understand The

Wackenhut Corporation's policy on Sexual Harassment/Workplace Harassment (Policy

#HR520). I also understand that it is my responsibility to adhere to this policy, and that

failure to do so will be cause for disciplinary action up to and including termination.


_____        _____
Signature                                 Date


_____
Print Name


_____
Department and/or Location


W-220 (Policy HR 520)    (9/99) SKU# 74672

GRANDISON 00464

# S.J. EX. 1

# CONRY DECLARATION & EXHIBITS

# PART 2 OF 7

# S.J. EX. 1

# CONRY DECL. EX. B



# Wackenhut

## Security Officer Handbook

A World of Security Solutions



EXHIBIT

Grandison 7
2-5-08 AMB

GRANDISON 00349

**EQUAL OPPORTUNITY EMPLOYER** - The Wackenhut Corporation is an Equal Opportunity/ Affirmative Action Employer. All personnel actions are effected without regard to race, sex, age, religion, national origin, disability, medical condition, veteran status, ancestry or marital status. As a responsible organization, we resolutely support the concept and practice of Affirmative Action and Equal Employment Opportunity. Each year we prepare an Affirmative Action Plan which reasserts our continuing commitment to equal treatment for all. We uphold federal and state civil rights laws and ensure that all of our personnel actions and policies are in compliance. Additionally, we recognize and value the importance and diversity of our work force and support its various cultures. The Wackenhut Corporation is dedicated to fostering an environment which respects the dignity, rights and contributions of its employees.

**DUTIES** - You have been selected and placed in your present assignment after having met certain requirements necessary to perform your duties. Your Supervisor will instruct you as to what your work and responsibilities are. You should diligently follow your duties and look to your Supervisor for guidance. He or she will answer any questions concerning your job.

**TRANSFERS** - Due to the nature of the contract security industry, no employee shall have a vested interest in any specific assignment, shift, post, or location and may be removed/transferred for any reason including but not limited to a client-directed request. To effect continuity of employment, it may be necessary for you to transfer from your particular location to another site where the Company is in need of employees. If you wish to be considered for a transfer within your present work unit, discuss the matter with your Supervisor.

**TRAINING** - According to your position with the Company, various training programs will be provided. After basic training, your Supervisor will

14

conduct an on-the-job training program in which procedures and forms applicable to your job will be discussed. It is the policy of Wackenhut to encourage and assist you in broadening your knowledge and to prepare you for increasing responsibility within the Company. To meet this obligation, manuals, monthly training bulletins and other materials for your self-improvement are available. You are urged to learn as much as you can about your present job and to qualify yourself for other important positions with the Company.

**TWC DRUG AND ALCOHOL POLICY** - Except when undergoing prescribed medical treatment as stated below, any use, sale, or possession of narcotics, drugs, controlled substances or alcohol while on duty or on Company property is an offense subject to termination of employment.

Off-the-job use of alcohol which adversely affects an employee's job performance or which jeopardizes the safety of other employees, the public or Company equipment is proper cause for administrative or disciplinary action up to and including termination of employment. Illegal use, sale or possession of narcotics, drugs, or controlled substances, at any time, shall be proper cause for severe disciplinary action up to and including termination of employment.

Employees undergoing prescribed medical treatment with a controlled substance should immediately report this treatment to their Supervisor. Although not grounds for disciplinary action, the use of controlled substances as part of a prescribed medical treatment program requires a medical certificate from the prescribing physician stating that job performance will not be impaired by the treatment. If job performance could be impaired, a medical leave of absence will be required.

15

GRANDISON 00358

An employee does not continue to accrue sick days while on family or medical leave unless the employee is using sick or vacation days. An employee who takes family or medical leave will not lose any employment benefits that accrued before the date leave began.

**Restoration to Employment Following Leave**

An employee eligible for family and medical leave - with the exception of those employees designated as "highly compensated employees" - will be restored to his or her old position or to a position with equivalent pay, benefits, and other terms and conditions of employment. TWC cannot guarantee that an employee will be returned to his or her original job.

All applicable leaves will be applied against FMLA leave.

FMLA does not supersede any state or local law or collective bargaining agreement which provides greater family or medical leave rights.

5. In accordance with the Pregnancy Discrimination Act of 1978, employers are required to treat pregnancy and pregnancy related medical disabilities the same as any other medical disability with respect to all terms and conditions of employment. There are states that have additional laws with respect to maternity leave. Management at each location should ensure compliance with any applicable state laws and FMLA.

For further details regarding leaves of absence, please see your Supervisor.

**SEXUAL HARASSMENT** - Sexual harassment, whether it occurs between a Supervisor and a subordinate or between co-workers, can not and will not be tolerated by The Wackenhut Corporation.

20

Sexual harassment is a violation of Title VII of the Civil Rights Act of 1964 and it is against our policy for any employee, male or female, to sexually harass other employees by: (1) Making unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature a condition of an employee's employment, or (2) Making submission to or rejection of such conduct the basis for employment decisions affecting the employee, or (3) Creating an intimidating, hostile or offensive working environment by such conduct.

Sexual harassment may take different forms. Examples of several types of forms are: **Verbal:** Sexual innuendoes, suggestive comments, jokes of sexual nature, sexual propositions or sexual threats. **Non-verbal:** Sexually suggestive objects or pictures, graphic commentaries, suggestive or insulting sounds, leering, whistling or obscene gestures. **Physical:** Unwanted physical contact, including touching, pinching, brushing the body, coerced sexual intercourse or assault.

If an investigation into a sexual harassment complaint concludes that an employee violated this policy by sexually harassing another employee, the violator will be subjected to discipline which may include termination of employment, regardless of his/her level. Supervisors in particular will be held to the highest of standards with respect to their conduct.

Employees who believe they are the victims of sexual harassment are to immediately contact their Supervisor, or the Corporate Human Resources Department for appropriate action. For the comfort of the complaining employee, upon request, a management representative who is the same gender as the employee may be made available to discuss the issue.

21

GRANDISON 00361

S.J. EX. 1

CONRY DECLARATION &
EXHIBITS

PART 3 OF 7

# S.J. EX. 1


# CONRY DECL. EX. C



| HUMAN RESOURCES MANUAL | NUMBER: |
| --- | --- |
| | HR 515 |
| TITLE/SUBJECT: | EFFECTIVE DATE: |
| | 6/01/2000 |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) and Form W-206, Receipt Page | SUPERSEDES: |
| | 8/1/93 |

**PURPOSE**

To establish a Corporate policy and procedure regarding Equal Employment Opportunity in the workplace.

**RESPONSIBILITY**

It is the responsibility of all field management to include all Regional, Area, Branch, Project, and Facility Managers and Corporate Management to read and comply with the Company's EEO policies as written below. It is the responsibility of those in management/supervisory positions at all levels who have received EEO complaints to react immediately and appropriately by following the procedures and policy below. It is also the responsibility of all field and corporate management to support the philosophy and intent of Equal Employment Opportunity.

**POLICY**

It is the policy of The Wackenhut Corporation to support and further the principles of Equal Employment Opportunity. The Company is committed to creating a work environment free from discrimination, where personnel actions are administered in compliance with Federal and state law prohibiting discrimination on the basis of race, religion, color, gender, age, national origin, disability, veteran status, or any other characteristic protected by law.

The Wackenhut Corporation and all of its subsidiaries support both the spirit and intent of all civil rights legislation. All employees at every level of the Company are expected to follow our Equal Employment Opportunity policies. All supervisory personnel have the additional responsibility of ensuring that their subordinates know about and also comply with such laws and policies.

Any questions regarding this policy should be directed to the Corporate Human Resources department at (800) 922-6488.

**Equal Employment/Affirmative Action Policy Statement**

The Wackenhut Corporation is an Equal Employment Opportunity/Affirmative Action Employer. Each year a revised Affirmative Action Plan reasserts our continuing policy to recruit, employ, promote and ensure that all personnel actions are made without regard to race, religion, color, gender, age, national origin, disability, veteran status, or other protected category.

We are committed to providing equal access and must continue to base decisions regarding employment, promotions, training and other personnel matters so as to further the principle of Equal Employment Opportunity.

Employees who hold supervisory positions will be evaluated with respect to their performance regarding Equal Employment Opportunity and Affirmative Action. Discrimination of any kind (including sexual harassment) will not be tolerated and may subject any employee regardless of his or her level with the Company, to disciplinary action up to and including termination. Similarly, if a supervisory employee is aware of potentially discriminatory practices taking place among his or her subordinates, and that supervisor fails to report it, he or she may be subject to disciplinary action which could include termination.



EXHIBIT
Grandison 10
2-5-08 DMB

PAGE __1__ OF __9__



| HUMAN RESOURCES MANUAL | NUMBER: |
| --- | --- |
| TITLE/SUBJECT: | HR 515 |
| | EFFECTIVE DATE: |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) | 6/01/2000 |
| and | SUPERSEDES: |
| Form W-206, Receipt Page | 8/1/93 |

The Wackenhut Corporation upholds all applicable national, state and local civil rights laws. Additionally, we recognize and value the importance and diversity of each of our employees and support the various cultures within the workplace. The Wackenhut Corporation is dedicated to fostering an environment which respects the dignity, rights and contributions of its employees.

**Diversity Statement**

The Wackenhut Corporation believes that fostering diversity within the workplace contributes to the success of the Company. In an increasingly diverse national and global marketplace, it is essential to be positively attuned to the diversity of our employees and our clients. Understanding diversity within the workplace translates to a more effective and productive workplace.

The inclusion of all employees creates an atmosphere that benefits from the talents and capabilities of a diverse workforce. Inclusion through recruiting, hiring, developing, training and promoting employees of all races, ethnic groups, religions, ages, the qualified able and disabled, and men and women is essential to the success of the Company.

Valuing diversity means acknowledging, respecting, appreciating and utilizing the differences and similarities among people with different cultures and backgrounds to create a productive work environment. It directs the contributions of individuals toward the accomplishment of the Company's goals. Through diversity we gain different points of view as well as a variety of approaches toward business decisions and problem solving.

The Wackenhut Corporation recognizes and values the importance of its employees and supports the diversity of its workforce. It is committed to fostering an environment that promotes inclusion, respect and appreciation for the diversity of its employees.

**Prohibited Discrimination:**

The most common forms of discrimination are based on prejudice and misperception about individuals because of their identification with a group, or any immutable characteristics they may have. Misperceptions regarding workplace abilities and qualifications of the disabled, members of various minority groups, and people of different ages and genders have caused the enactment of the comprehensive rules of law addressed in the following section of this policy. To make employment decisions based in any part on an individual's immutable characteristics (e.g., gender, race, disability, etc.) which are protected is therefore prohibited by law and by Company policy. However, requiring competent performance and sufficient productivity from all of us is not discrimination. Similarly, requiring attendance, respect for instructions, and compliance with Company policies is also not discrimination when applied uniformly.

**Be aware that civil rights laws can also prohibit Retaliation against individuals who complain of discrimination as to themselves or possibly others.**

GRANDISON 00398



| HUMAN RESOURCES MANUAL | NUMBER: |
|---|---|
| TITLE/SUBJECT: | HR 515 |
| | **EFFECTIVE DATE:** |
| **EQUAL EMPLOYMENT OPPORTUNITY (EEO)** and Form W-206, Receipt Page | 6/01/2000 |
| | **SUPERSEDES:** |
| | 8/1/93 |

**Legislative Overview**

Listed below is a brief outline of some of the Federal laws governing Equal Employment Opportunity and Affirmative Action. As stated below, there may be state, regional, or local laws expanding Company obligations.

Title VII of the Civil Rights Act of 1964  Prohibits discrimination on the basis of race, color, religion, sex or national origin, in hiring, firing, promotions, training and all other terms, conditions and privileges of employment. Sexual Harassment is also prohibited under *Title VII*.

Equal Pay Act of 1963   Actually preceding *Title VII*, the *Equal Pay Act* prohibits discrimination in the payment of wages on the basis of sex.

Age Discrimination in Employment Act of 1967 and its 1978 amendments were enacted to promote the employment of older persons, age 40 and older, based on their ability, not their age; and to prohibit arbitrary age discrimination in employment.

Executive Order 11246  In 1965 the President of the United States issued this Order which requires Federal government contractors and subcontractors with contracts over $50,000 and 50 or more employees to prepare and implement a written Affirmative Action Plan. The Wackenhut Corporation is a Federal government contractor and hence subject to this Executive Order.   Please see the Affirmative Action section of the Human Resources Manual for more detail regarding our obligations with respect to this Order.

Rehabilitation Act of 1973         Requires Federal contractors to employ and advance in employment, in a non-discriminatory manner, persons with physical and mental disabilities.

Vietnam Era Veterans Readjustment Assistance Act of 1974  Requires Federal contractors to employ and advance in employment veterans and disabled veterans in accordance with their qualifications. Also addresses the re-employment rights of Veterans.

Uniformed Services Employment and Re-employment Rights Act of 1994   Prohibits employers from discriminating against individuals because of past, present or future membership in a uniformed service and provides employees certain re-employment rights.

Pregnancy Discrimination Act of 1978   Requires employers to treat pregnancy and pregnancy related medical conditions the same as any other medical condition with respect to all terms and conditions of employment.

Americans with Disabilities Act of 1990 (ADA)  *Title I* of ADA prohibits employers from discriminating against qualified applicants and employees on the basis of a disability. **Please review HR 600 for more detail regarding ADA.**

PAGE  3  OF  9

GRANDISON 00399



| HUMAN RESOURCES MANUAL | NUMBER: |
| --- | --- |
| TITLE/SUBJECT: | HR 515 |
| | EFFECTIVE DATE: |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) and Form W-206, Receipt Page | 6/01/2000 SUPERSEDES: 8/1/93 |

<u>Civil Rights Act of 1991</u>  Reversed seven (7) U.S. Supreme Court decisions handed down in 1989 and 1990 which were thought to be detrimental to civil rights.  Added a provision that allows complainants to demand punitive damages and jury trials.

Listed below is additional legislation that can interplay with Equal Employment Opportunity/Affirmative Action laws:

<u>Family Medical Leave Act of 1993 (FMLA)</u>   Requires employers to provide eligible employees with twelve (12) weeks of unpaid, job protected leave per year for:  (1) the birth or placement for adoption or foster care of a child; (2) an employee's serious health condition, or (3) an employee to care for the serious health condition of a spouse, parent or child.  **Please review HR 496 for more detail regarding FMLA.**

<u>Fair Labor Standards Act-FLSA (Federal Wage and Hour Law)</u>   Federal law governing payment of wages and overtime.  **Please review HR 210 for more detail regarding FLSA.**

<u>Various Workers' Compensation Laws and Coverage</u>  Issues surrounding ADA and Workers' Compensation can occasionally be interrelated.  Our ADA Policy (HR 600) addresses this in chapter 13 of that policy.

**Regulatory Agencies**    Agencies have been established by the above noted legislation to ensure employers comply with such laws.  Most issues regarding *Title VII* and related legislation are monitored by the Equal Employment Opportunity Commission (EEOC).  Almost all states have, in addition, their own civil rights agencies which have a work sharing agreement with the EEOC.  Many cities have also established such agencies.  Executive Order 11246 is enforced by the United States Department of Labor, Office of Federal Contract Compliance Programs (OFCCP).  **Any communication from these agencies must be immediately forwarded to Corporate Human Resources.**

**State and Local Laws**

Be aware that the majority of states and many counties and cities have also passed civil rights legislation.  In parts of the country, this legislation may be more comprehensive than Federal laws.  Abide by the applicable law which is more stringent.  In addition to obeying Federal laws, all of our offices are expected to adhere to the applicable civil rights laws in the states and municipalities where they are located.  To address each and every state law within this *document* would create a voluminous policy.  You can find out about your state's particular laws by contacting your local department of equal employment and labor and requesting any poster(s) and publications that they may have available.  (Most states have requirements that their own particular civil rights posters be displayed for viewing by all applicants and employees.)  The Corporate Human Resources Department also maintains publications regarding state laws and can answer questions on a case by case basis.

**Protected Groups**

PAGE_4_OF_9_

GRANDISON 00400



| HUMAN RESOURCES MANUAL | NUMBER: |
|---|---|
| TITLE/SUBJECT: | HR 515 |
| | EFFECTIVE DATE: |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) **and** Form W-206, Receipt Page | 6/01/2000 |
| | SUPERSEDES: |
| | 8/1/93 |

The following groups, characteristics, etc. are considered to be protected by the preceding legislation.

Race/Color  Employers are prohibited from discriminating in any of the terms and conditions of employment on the basis of race.  If race is a motivating factor in an employer's decision regarding the terms and conditions of employment, then the employer can have unlawfully discriminated against the employee.

Gender Discrimination/Sexual Harassment   Discrimination is prohibited on the basis of gender.  If an employee's gender is a motivating factor in an employment decision related to the terms and conditions of employment, then the employer can have engaged in unlawful discriminatory activity.  See the Sexual Harassment Policy (HR 520) in this manual for further details.

National Origin  It is illegal to discriminate against an individual with respect to all terms and conditions of employment on the basis of the individual's ancestry or national origin, such as Hispanic, European or Asian in general and/or specifically if the employee is from a certain country, was born outside the United States, or if the employee's family was born outside the United States.  Also, national origin discrimination can encompass conduct in which employers discriminate against employees based on language skills or other characteristics associated with a national group, that are factors irrelevant to the employee's job.

Religion  It is prohibited to discriminate against an individual on the basis of religion.  This includes a requirement that employers make reasonable accommodation for religious observance so long as it does not cause an undue hardship to the employer.

Age  Federal law prohibits discrimination on the basis of age, specifically for individuals age 40 and older.  Some states have passed laws addressing age discrimination and do not specify which ages are covered to include individuals under age 40.

Marital Status  Be aware that many states prohibit discrimination on the basis of marital status in the terms and conditions of employment.

Disability  The ADA greatly expanded protection for those with disabilities.  Please review HR 600 for more detail regarding those with disabilities.

Retaliation  Most Federal and other anti-discrimination laws described previously have provisions which prohibit an employer from retaliating against an employee who has either complained formally, or informally, about a violation of said laws or who has participated in an investigation of discrimination.

**PROCEDURE**      Each Regional, Area, Branch, Project, and Facility Manager (herein after referred to collectively as "Field Manager") and Corporate Managers will uphold the Company's position on Equal Employment Opportunity.  Further, Managers (Field and Corporate herein

GRANDISON 00401



| HUMAN RESOURCES MANUAL | NUMBER: |
|---|---|
| TITLE/SUBJECT: | HR 515 |
| | EFFECTIVE DATE: |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) | 6/01/2000 |
| and | SUPERSEDES: |
| Form W-206, Receipt Page | 8/1/93 |

referred to as "Managers") will uphold the Company's position that recruiting, hiring, training, transfers, promotions, compensation, benefits, terminations, and all other employment related transactions are to be handled in a non-discriminatory manner.

Each Manager will: (Field and Corporate)

• Thoroughly review HR Policy 515. Each manager will sign Form W-206 which will then be placed in each manager's personnel file. Regional, Area, Branch, Project, Facility and Business Unit Managers will forward their signed form to Corporate Human Resources to be filed in their personnel file.

• Promote the Company's philosophy on the non discriminatory treatment of all individuals and demonstrate through his or her actions, professional behavior that is compliant with this policy.

• Notify Corporate Human Resources immediately upon receiving an EEO/Agency charge, any correspondence alleging discrimination, or any formal, informal or internal complaints of discrimination.

• Ensure that employees are not retaliated against for reporting discrimination.

• If employees are featured in advertising, employee handbooks, publications, or orientation programs, both minority and female and appropriate diversity of employees will be represented.

• Include the EEO statement in all purchase orders. (The EEO Statement is listed on the company's purchase order form.)

• Ensure that all facilities are available to all employees except for obvious areas such as bathrooms and changing areas.

• Ensure that all management/supervisory employees are advised that:

  (1) Equal Employment Opportunity is an integral part of their job responsibilities and part of their performance evaluation;

  (2) Appropriate action and notification is expected to correct any complaints of discrimination and/or harassment.

Each Field Manager will:

• Ensure that all required Equal Employment Opportunity posters as well as state required posters are properly displayed in a conspicuous place for all individuals to see.

PAGE  6  OF  9

GRANDISON 00402



| HUMAN RESOURCES MANUAL | NUMBER: |
|---|---|
| TITLE/SUBJECT: | HR 515 |
| | EFFECTIVE DATE: |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) | 6/01/2000 |
| and | SUPERSEDES: |
| Form W-206, Receipt Page | 8/1/93 |

- Post the Company policies and statement on Equal Employment Opportunity and Reaffirmation of Corporate EEO Policy.

- Ensure that the statement "Equal Opportunity Employer M/F/D/V" is included in all classified advertising.

- Appoint an Area Office or Project Equal Opportunity Officer to coordinate dissemination of the Equal Opportunity Policy to all employees, monitor adherence to the Equal Opportunity Policy, maintain all required reports and information and submit same as required to the Corporate Human Resources/EEO section.

- Ensure all openings are posted with the local job service.

- Conduct and document periodic meetings with the Equal Opportunity Officer and relevant supervisory staff to discuss the progress of the Equal Opportunity/Affirmative Action Program and any problems related to this area.

- Ensure timely submission to Corporate Headquarters, Human Resources, of all requested Equal Employment Opportunity data and reports.

- Check and conform to the particular state and local civil rights legislation. Conform with all Federal laws listed in this policy.

- Ensure that a two-year record is kept of all applicants, showing name, race, sex, date applied, position applied for and disposition (Applicant Flow Log). Ensure that employment applications are kept for the same time period. If state law requires longer retention, abide by state law.

- Ensure that all union collective bargaining agreements are non-discriminatory.

The Corporate Human Resources is responsible for the above as it relates to the Corporate location.

The Human Resources Department at Corporate Headquarters will:

- Develop policy statements and recommend changes in policy and procedures in accordance with Federal, state, or local statutes, executive orders, ordinances, and any revisions and amendments thereof, for compliance with Equal Opportunity.

- Assist Management in the identification and solution of any areas of concern and provide guidance in specific situations regarding Equal Employment Opportunity.

GRANDISON 00403



| HUMAN RESOURCES MANUAL | NUMBER: |
|---|---|
| TITLE/SUBJECT: | HR 515 |
| | EFFECTIVE DATE: |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) | 6/01/2000 |
| and | SUPERSEDES: |
| Form W-206, Receipt Page | 8/1/93 |

- Prepare all position papers, correspondence, Letters of Commitment, etc. for submission to the Federal EEO Commission, Office of Federal Contract Compliance Programs, or state agencies.

- Serve as a liaison between the Company and enforcement agencies.

**Procedure for Handling Complaints of Discrimination**

*Formal Agency Charges*
Should a Company location receive a formal, written complaint of discrimination filed with the Equal Employment Opportunity Commission or any related Federal or state agency, the Corporate Human Resources Department is to be notified *immediately* by phone. Also, a copy of the complaint should be quickly forwarded to the Corporate Human Resources Director, EEO/AA Programs.

The investigation of the complaint will be coordinated by the Corporate Human Resources or Legal Department. All field offices/locations are expected to provide all of the charge documentation, statements, relevant personnel records, etc., as requested by Corporate and forward same in a timely fashion. All said records should be retained and not destroyed without approval from the Human Resources or Legal Departments.

**No position papers or information will be submitted to any government agency, by any location, without approval from the Human Resources or Legal Departments.**

*Internal Discrimination Complaints*
Internal discrimination complaints are to be handled in a similar fashion to formal agency charges. When a complaint of discrimination is received, Corporate Human Resources, the Director, EEO/AA Programs, and/or the Legal Department should **immediately** be notified. An investigation into the complaint will then be coordinated by Human Resources. Again, Human Resources will frequently request supporting documents and statements. Field offices are expected to comply promptly with such requests.

There is no such thing as an unofficial complaint. If an employee verbally complains, or raises a concern about discrimination affecting himself/herself or another employee, it is automatically official. While having the complaint in writing is preferred, a verbal, unwritten complaint is still official and must be acted upon. An investigation, if necessary, should therefore begin promptly.

Always be aware of the possibility of a retaliation charge. Any potentially negative action taken against an employee who has complained can prompt a retaliation charge.

*External Discrimination Complaints*
Correspondence, including demand letters from attorneys, are to be handled the same as formal agency charges. When any correspondence raising an issue of discrimination is received, Corporate Human Resources, the Director, EEO/AA Programs, and/or the Legal

PAGE 8 OF 9

GRANDISON 00404



| HUMAN RESOURCES MANUAL | NUMBER: |
| | HR 515 |
| TITLE/SUBJECT: | EFFECTIVE DATE: |
| EQUAL EMPLOYMENT OPPORTUNITY (EEO) and | 6/01/2000 |
| | SUPERSEDES: |
| Form W-206, Receipt Page | 8/1/93 |

Department should immediately be notified. A copy of the correspondence should be quickly forwarded to the Corporate Human Resources Director, EEO/AA Programs. An investigation into the complaint will be coordinated by Human Resources.

**_Retaliation Prohibited_**

The company will not retaliate against an employee who in good faith makes a complaint. Retaliation against any individual for good faith reporting of a claim/discrimination or for cooperating in such an investigation will not be tolerated and will itself be cause for appropriate disciplinary action, up to and including termination of employment.

**General**

Written notification of Company policies regarding non-discrimination, Equal Employment Opportunity and Affirmative Action will be sent to all subcontractors, vendors and suppliers requesting appropriate action on their part. This will be handled from Corporate Headquarters since no subcontracting or buying is done by the local Area Office or major Project Offices.

**POLICIES FOR POSTING**

The following policies must be posted in a conspicuous place, visible to all employees and applicants. Where employees work off site, place **such policies in with post orders** when possible. To ensure proper dissemination of these policies, they should be included with new hire paperwork, placed with post orders and be attached to paychecks annually thereafter. Samples of these policy statements follow this listing.

1.      EEO Policy Statement by Richard R. Wackenhut
2.      Sexual Harassment/Workplace Harassment Statement
3.      Reaffirmation of Corporate EEO Policy
4.      Policy Statement for individuals with physical and mental disabilities
5.      Policy Statement for disabled veterans and veterans of the Vietnam Era

GRANDISON 00405



## POLICY HR515 RECEIPT

## EQUAL EMPLOYENT OPPORTUNITY (EEO)

I, _____ have received and read and understand The

Wackenhut Corporation's policy on Equal Employment Opportunity (Policy #HR515). I

also understand that it is my responsibility to adhere to this policy, and that failure to do so

will be cause for disciplinary action up to and including termination.


_____          _____

**Signature**                                        **Date**


_____

**Print Name**


_____

**Department and/or Location**


W-206   (Policy HR 515)      (6/01/2000)


GRANDISON 00406

S.J. EX. 1

CONRY DECLARATION &
EXHIBITS

PART 4 OF 7

# S.J. EX. 1

# CONRY DECL. EX. D

| WACKENHUT SERVICES, INC. (NCR) | STANDARD OPERATING PROCEDURES<br>TITLE/SUBJECT:<br><br>ADMINISTRATION OF DISCIPLINE | NUMBER:<br>358<br><br>EFFECTIVE DATE:<br>Jan. 1, 2001 |
| --- | --- | --- |

**PURPOSE**

To establish a standard policy and procedures for the administration of discipline for all Wackenhut Services, Inc. (NCR) employees.

It is the policy of Wackenhut Services, Inc. (NCR) to maintain an effective and consistent disciplinary program to ensure optimum safety and efficiency in meeting all contractual requirements. It is also our policy to supervise and monitor the actions of each employee to assist them in correcting noted shortcomings before these shortcomings reach a level where disciplinary action is required.

Employee discipline is to be accomplished in accordance with the guidance contained herein for offenses or job deficiencies and as listed in the Wackenhut Services, Inc. (NCR) Disciplinary Actions (Attachment 1). However, disciplinary actions are not automatic as each must be considered in light of any mitigating circumstances that may apply. Furthermore, disciplinary actions must not be based on bias and/or personal likes and dislikes.

**RESPONSIBILITY**

The Wackenhut Services, Inc. (NCR) Vice President/General Manager, or his designee, is the approval authority for all terminations and any exceptions to the Administration of Discipline procedure. The Wackenhut Services, Inc. (NCR) Vice President/General Manager, or his designee, is the review authority for all appeals of disciplinary actions.

The Assistant General Manager for Operations is responsible for providing oversight for all disciplinary actions involving operational personnel.

The Field Operations Manager is responsible for insuring that the proposed disciplinary action is appropriate and warranted. The Field Operations Manager will approve or disapprove all disciplinary actions involving operational personnel.

The Project Managers and Site Supervisors are responsible for investigating and providing accurate and complete documentation of all disciplinary actions.

01/01

1

PROD 001226

The Support Specialist is responsible for the processing of disciplinary actions consisting of letters of reprimand, suspensions and terminations.

The Assistant General Manager for Operations is responsible for monitoring the administration of discipline for all Wackenhut Services, Inc. (NCR) personnel.

The Assistant General Manager for Operations is responsible for conducting inquiries/investigations of any offense committed when directed to do so by the Wackenhut Services, Inc. (NCR) Vice President/General Manager.

All Wackenhut Services, Inc. (NCR) employees are responsible for thoroughly reading, understanding and complying with this policy and procedure.

**PROCEDURE**    Discipline will be administered in accordance with the published list of Wackenhut Services, Inc. (NCR) Disciplinary Actions. This will help assure that consistency is maintained and that employees are treated in a fair and equitable manner.

All requests for formal disciplinary action will be submitted on the Wackenhut Services, Inc. (NCR) Disciplinary Report form (Attachment 2). The individual requesting the discipline action is responsible for the proper completion of the Disciplinary Report Form.

The Project Manager or Site Supervisor is responsible for reviewing the request for completeness, either approving or disapproving the request and acknowledge this review by signing in the appropriate space. The request will then be forwarded to the Field Operations Manager.

The Field Operations Manager will review the request and either approve the request and forward the request to Support Specialist for action or disapprove and return the request to the originator with a written explanation for the disapproval. Copies of all disapproved disciplinary actions will be provided to the Assistant General Manager for Operations.

Upon receipt of an approved disciplinary action request, the Support Specialist(s) will prepare the appropriate memorandum or letter as required. Sample formats for a Memorandum For Record (MFR), Letter of Reprimand, Letter of Suspension and Letter of Termination are provided as (Attachment 3). The completed memorandum or letter, with supporting documentation will be routed to the The Assistant General

01/01                                                                                                    2

PROD 001227

Manager for Operations and then forwarded to the appropriate person for signature. The signed memorandum or letter will be returned to the Support Specialist(s) for copying, filing and distribution.

Archiving disciplinary actions after a specified period of time will establish the time period that a particular disciplinary action can be counted against the employee in relation to subsequent occurrences of the same offense. Archived disciplinary actions and related documentation will be maintained in the employee's permanent file; however once archived, the disciplinary actions will no longer be counted against the employee for following occurrences of the same offense.

For all offenses that list a Memorandum For Record (MFR) as the disciplinary action approved for a FIRST OFFENSE, that disciplinary action will be archived after 60 days. For all offenses that list a Letter of Reprimand as the disciplinary action approved for a FIRST OFFENSE, that disciplinary action will be archived after 90 days. For all offenses that list a Suspension as the disciplinary action approved for a FIRST OFFENSE, that disciplinary action will be archived after 180 days. The archiving of one type of offense does not affect another type of offense. Each offense category stands alone. An Offense File Cover Sheet (Attachment 4) will be attached to each disciplinary action. The Administration department is responsible for filling out the Offense File Cover Sheet and ensuring that disciplinary actions are properly archived.

Individuals who believe that they were wrongly disciplined may appeal the action to the Wackenhut Services, Inc. (NCR) Vice President/General Manager. This appeal must be in writing and received at the Wackenhut Services, Inc. (NCR) office within seven (7) calendar days after the disciplinary action is received by the individual being disciplined. The letter of appeal should contain all pertinent information to include witnesses when appropriate, and any mitigating circumstances. The Wackenhut Services, Inc. (NCR) Vice President/General Manager will review the appeal and render a decision.

PROD 001228

# WACKENHUT S⁓ ICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.01 Failure to be properly groomed. (See appropriate SOP's and contract requirements) | Verbal counseling with MFR in personnel file | Written reprimand | Two (2) days suspension to DISMISSAL | DISMISSAL |
| 404.02 Smoking in prohibited areas while on duty. | Verbal counseling with MFR in personnel file | Written reprimand | Five (5) days suspension to DISMISSAL | DISMISSAL |
| 404.03 Improper conduct. | Verbal counseling with MFR in personnel file | Written reprimand | Two (2) days suspension to DISMISSAL | DISMISSAL |
| 404.04 Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties. | Verbal counseling with MFR in personnel file | Written reprimand | One (1) day suspension | DISMISSAL |
| 404.05 Reading unauthorized material and/or using an unauthorized radio, tape payer, CD, television, computer equipment, etc. while on duty. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.06 Failure to take proper action to insure the safety of client or company personnel and/or property. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.7 Failure to properly submit any required report within two (2) work days. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.08 Non-willful failure to carry out assigned task. | Written reprimand | Two (2) days suspension | DISMISSAL | |

01/01

**PROD 001229**

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.09 Losing Property or Equipment in your charge. | Written reprimand and reimbursement | One (1) day suspension and reimbursement | DISMISSAL | |
| 404.10 Tardiness or failure to observe assigned work hours. | Verbal counseling with MFR in personnel file | Written reprimand | Five (5) days suspension* (*Action may be postponed/shortened) | DISMISSAL |
| 404.11 Unauthorized solicitation and/or distribution of written or printed material of any kind for any purpose during working hours. | Written reprimand | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.12 Participating in games of chance, lotteries, sports pools or gambling while on duty. | Written reprimand to Five (5) days suspension | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.13 Two or more unexcused Call-offs from scheduled duty within a two week period. | Written reprimand to Five (5) days suspension | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.14 Unauthorized use of equipment (Client or Company property). | Written reprimand to five (5) days suspension and reimbursement | Five (5) days suspension to DISMISSAL and reimbursement | DISMISSAL and reimbursement | |
| 404.15 Violation of security procedures or regulations. | Written reprimand to DISMISSAL | Five (5) days suspension to DISMISSAL | DISMISSAL | |
| 404.16 Being inattentive to duty but not asleep. | Two (2) days suspension | Five (5) days suspension | DISMISSAL | |

01/01

PROD 001230

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.17 Failure to complete forms 139, 139R and/or 4072. | Written reprimand | Two (2) days suspension | DISMISSAL | |
| 404.18 Permitting or engaging in destruction or damage to customer or company property or equipment through carelessness or inattention to duty. | Five (5) days suspension and reimbursement to termination and reimbursement. | DISMISSAL and reimbursement | | |
| 404.19 Willful insubordination. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.20 Leaving work station without Supervisor's authorization. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.21 Disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.22 Deliberately allowing unauthorized persons on post or client property. | Five (5) days suspension to DISMISSAL | DISMISSAL | | |
| 404.23 Fighting on the job. (Aggressor(s)) | DISMISSAL | | | |
| 404.24 Horseplay or any other activity with potentially serious consequences such as personal injury or property damage. | DISMISSAL | | | |

01/01

**PROD 001231**

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.25  Sleeping on duty. | DISMISSAL | | | |
| 404.26  Harassment (including sexual or racial) of fellow employees, client employees or members of the public. | DISMISSAL | | | |
| 404.27  Unexcused No Call, No Show absence(s). | DISMISSAL | | | |
| 404.28  Unauthorized or careless use, handling or display of firearms or other weapons including pepper spray. | DISMISSAL | | | |
| 404.29  Possession of privately owned weapon(s) on client owned or leased property. | DISMISSAL | | | |
| 404.30  Wearing or bearing a firearm, baton (night stick) or other weapon, or equipment not specifically issued and/or required by the company. | DISMISSAL | | | |
| 404.31  Unauthorized removal of discarded or obsolete client property. | DISMISSAL | | | |
| 404.32  Giving verbal or written reports of any activity or incident to an unauthorized person without company approval. | DISMISSAL | | | |

01/01

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.33 Aiding a competitor without obtaining Company approval by providing Proprietary information and/or confidential data without obtaining Company approval. | DISMISSAL | | | |
| 404.34 Failure to report in writing offers, bribes or gratuities. | DISMISSAL | | | |
| 404.35 Proven theft, dishonesty, fraud or bribery. | DISMISSAL | | | |
| 404.36 Possession of alcoholic beverages or illegal drugs, either on the person, in a company or customer vehicle or on any company or client property. | DISMISSAL | | | |
| 404.37 Under the influence or reporting to work in an impaired state (this applies to alcohol, drugs, and/or narcotics). | DISMISSAL | | | |
| 404.38 Refusing to assist or cooperate in administrative investigations or inquiries. | DISMISSAL | | | |

01/01

PROD 001233

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY ACTIONS

| OFFENSE / JOB DEFICIENCY | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | FOURTH OFFENSE |
|---|---|---|---|---|
| 404.39 Falsification or unlawful concealment, removal, mutilation, or destruction of any official documents or records or concealment of material facts by willful omissions from official documents, records, or statements (written or verbal). | DISMISSAL | | | |
| 404.40 Falsification or fraudulent alteration of any company document or record. | DISMISSAL | | | |
| 404.41 Unethical or improper use of official authority or credentials. | DISMISSAL | | | |
| 404.42 Conviction or pleading guilty to any felony. | DISMISSAL | | | |
| 404.43 Arrest for felony violations or indications of felony violations of Federal, State, or Municipal laws. | Suspension and removal from the contract pending results of an investigation to DISMISSAL | | | |

01/01

PROD 001234

# WACKENHUT S⃝TCES, INC. (NCR)
## DISCIPLINARY ACTIONS

| | DISMISSAL | | | |
|---|---|---|---|---|
| 404.44  Any other act, which by its nature and impact, severely limits the employee's ability to perform the essential elements of the job or is injurious to the interest of the Company and/or the Client. * | | | | |

\* 404.44    These may be acts such as, but not limited to, the following:

- Concealing or failing to report the onset of a serious health condition that severely limits the employee's hearing, vision, motor skills or other potentially disqualifying physical conditions.
- Concealing or failing to report the suspension and/or revocation of job required certifications, licenses or permits.
- Concealing or failing to report the expiration of job required certifications, licenses or permits.

NOTE:    Where applicable, offense/job deficiency definitions or requirements are set forth in the appropriate provision(s) of the SOP's and/or contractual agreements.

01/01

**PROD 001235**

# WACKENHUT SERVICES, INC. (NCR)
## DISCIPLINARY REPORT

TO: _____        DATE OF REPORT:_____

FROM: _____        SITE:_____

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

NAME:_____

DATE OF VIOLATION:_____        TIME DISCOVERED:_____

LOCATION OF VIOLATION:_____

The above named employee was found to be in violation of the Wackenhut Services, Inc. (NCR) Disciplinary Actions:

Article_____        _____

_____

The infraction/offense is described as follows:

_____

_____

_____

use reverse side if more space is needed

(1)    Immediate action taken:_____

(2)    Formal disciplinary action recommended:_____

_____

Requestor:_____        Title:_____
          Printed Name and Signature of Supervisor or Manager

☐ I agree with the contents of the above report        ☐ I do not agree with the contents of the above report

_____        Date:_____        ☐ Statement attached
      Employee Signature

Project Manager:_____        Project Manager: ☐ Approve   ☐ Disapprove
                Signature of Project Manager

Comment:_____

Field Operations Manager:☐ Approve        ☐ Modify        ☐ Disapprove

Comments:_____

Signature:_____        Date:_____

01/01

**PROD 001236**

# WACKENHUT SERVICES, INC. (NCR)
## MEMORANDUM FOR RECORD
### (FORMAT)

Date:

To:          File

From: Individual conducting the counseling session

This is a Memorandum for Record concerning *state the Name of the Individual* committing the violation of the disciplinary actions section of the Wackenhut Services, Inc. (NCR) Administration of Discipline policy and procedures and *state the specific offense committed as stated in the Disciplinary Actions section.*

*Explain the facts and circumstances surrounding the offense. The information provided should answer the questions: Who? What? When? Where? and How?*

*During your counseling session with the individual who committed the offense, inform the individual of the potential consequences of a repeat violation as specified in the Disciplinary Actions section and advise the individual of the actions that must be taken to improve or prevent a recurrence, and, if necessary, where or how assistance can be obtained.*

*Summarize the results of the verbal counseling session and any comments made by the individual who committed the violation.*

Completed Memorandums for Record must be forwarded through the Field Operations Manager to the Contract Support Manager for inclusion in the individual's personnel file. A copy should remain in the Project Manager's file.

01/01

PROD 001237

# WACKENHUT SERVICES, INC. (NCR)
## LETTER OF REPRIMAND
## (FORMAT)

This is an official letter of reprimand concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. (NCR) Administration of Discipline policy and procedures: *State the specific offense committed as stated in the Disciplinary Actions section.*

*Explain the facts and circumstances surrounding the offense.   The information provided should answer the questions: Who?  What?  When?  Where?  and How?*

*Inform the individual of the potential consequences of a repeat violation as specified in the Disciplinary Actions section.*

*Advise the individual of the actions that must be taken to improve or prevent a recurrence, and, if necessary, where or how assistance can be obtained.*

Appropriate signature block

01/01

**PROD 001238**

# WACKENHUT SERVICES, INC. (NCR)
## LETTER OF SUSPENSION and TERMINATION
## (FORMAT)

This is an official letter of suspension concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. (NCR) Administration of Discipline policy and procedures: *State the specific offense committed as stated in the Disciplinary Actions section.*

*Explain the facts and circumstances surrounding the offense. The information provided should answer the questions: Who? What? When? Where? and How?*

*Inform the individual of the inclusive dates of the suspension and the date and time that the individual is scheduled to return to work.*

*Inform the individual of the potential consequences of a repeat violation as specified in the Disciplinary Actions section.*

*Advise the individual of the actions that must be taken to improve or prevent a recurrence, and, if necessary, where or how assistance can be obtained.*

Appropriate signature block

**Note:** A letter of termination contains the same heading and elements of the offense(s) spelled out; It will also give the date termination is effective and instructions for turning in credentials,  and company-provided equipment and uniform items.

01/01

**PROD 001239**

# WACKENHUT SERVICES, INC. (NCR)
## OFFENSE FILE COVER SHEET

Name of Employee:_____

Location:_____

Date of Offense:_____

Category of Offense:_____

Initial (First) offense of this category _____

Second _____ Third_____ offense of this category within _____
of the initial offense.

Type of Disciplinary Action taken for this offense:

_____MOR    _____Letter of Reprimand    _____Suspension

Is the offense still current?    Yes_____    No_____

Remarks:_____

_____

_____

Date of Archiving:_____

Name and Title of Reviewer:_____

Date of Review:_____

01/01

**PROD 001240**

S.J. EX. 1

CONRY DECLARATION &
EXHIBITS

PART 5 OF 7

# S.J. EX. 1

# CONRY DECL. EX. E

# WACKENHUT

## SERVICES INCORPORATED

FILE COPY

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

October 19, 2005

Officer Nicole Gregory
5422 85th Ave., #T1
New Carrollton, MD 20784

Dear Ms. Gregory:

This letter is an official letter of **Memorandum for Record** concerning your violation of disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

|  |  |
|---|---|
| **Violation:** | **Article 404.04 (1st Offense) Failure to wear proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.** |
| **Disciplinary Action:** | **Based on Article 404.04, verbal counseling with MFR in personnel file.** |

**On Oct. 03, 2005 at 0600 hrs, Ofc. Gregory was observed by Craig Trumpett (COTR), without her 8 point hat on while performing duties at post 6.**

Any continued performance of this nature may result in dismissal.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:     Personnel File
        Project Manager/GAO

*Professionalism With Integrity®*

PROD 002455

## WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
## DISCIPLINARY REPORT

_10/19/05_

TO: _Mr. Carroll_          DATE OF REPORT: _OCT 3, 2005_

FROM: _Capt. Trickey_          SITE: _General Accounting Office_

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: _Ofc. N. Gregory_          DATE OF VIOLATION: _Oct. 3, 2005_

LOCATION OF VIOLATION: _GAO_          TIME/DATE DISCOVERED: _0600 hrs. /10/03/05_

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE: _404.04 Failure to wear proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties._

The infraction/offense is described as follows: (Use reverse side if more space is needed.)

_On Oct. 03, 2005 at 0600hrs, Ofc. Gregory was observed by Craig Trumpett (COTR), without her 8 point hat on while performing duties at post 6._

IMMEDIATE ACTION TAKEN: ~~Written reprimand.~~ _NONE. CMC_

OFFENSE: 1st _X_     2nd ___     3rd ___     4th ___     COPIES ATTACHED _____

Formal Disciplinary Action Recommended: _Verbal Counseling with MFR in personnel file. CMC_

Does the recommendation comply with the disciplinary action procedure? Yes _X_ No ____

Requestor: _Capt. Trickey_     Title: _Captain_
          Printed Name and Signature

__ I agree with the contents of this report     ____ I do not agree with the contents of this report

_Nicole Greg_          DATE: _10/03/05_     Statement attached.
Employee's Signature                                          Yes or No

Project Manager: _Chuck Carroll_          Project Manager: __ Approve __ Disapprove

Comments: _____

Field Operations Manager: ✓ Approve __ Modify __ Disapprove

Comment: _MFR USBC w/ MFR_

Signature: _____     Date: _10/19/05_

# S.J. EX. 1

# CONRY DECL. EX. F

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

March 7, 2006

Ms. Nicole Gregory
5422 85th Avenue
Apt. T-1
New Carrolton, MD  20784

Dear Ms. Gregory:

This letter is to inform you that your employment with Wackenhut Services, Inc. was terminated effective March 6, 2006, for violation of Drug and Alcohol Policy.

Your complete uniform as issued to you at the start of your employment must be returned after being professionally laundered or dry-cleaned.  All credentials, to include your Company ID card and Red Cross cards must be relinquished.  These items must be returned within 15 days from the date of this letter to prevent further action.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC/jef

cc:  Personnel File
     Project Manager/GAO

*Professionalism With Integrity®*

**PROD 00001**

# S.J. EX. 1

# CONRY DECL. EX. G

# WACKENHUT
## SERVICES INCORPORATED

April 8, 2005

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

Robin R. Gregory
1926 First Street, N.W.
Washington, DC 20001

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Officer Gregroy:

This letter is to officially inform you that your employment with Wackenhut Services, Inc. is terminated effective April 8, 2005, based on the following disciplinary action:

Violation:

**Article 404.10, Tardiness or failure to observe assigned work hours, as follows:**

*Third (3rd) Offense, 3/21/2005:*

*Scheduled for duty at 1500 hours; Arrived at 1600 hours.*

*Fourth (4th) Offense, 3/27/2005:*

*Scheduled for duty at 1500 hours; Arrived at 1528 hours.*

*Fifth (5th) Offense, 4/01/2005:*

*Scheduled for duty at 1500 hours; Arrived at 1604 hours.*

Disciplinary Action:    **Based on Article 404.10, DISMISSAL**

All equipment and credentials must be returned, to include your Company ID. Your complete uniform, as issued to you at the start of your employment, must be returned after being professionally laundered or dry-cleaned.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC:jef

cc: Personnel File
    Project Manager/GAO



*Professionalism With Integrity®*

GRANDISON 00807

# S.J. EX. 1


# CONRY DECL. EX. H

# WACKENHUT
## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

August 14, 2006

Officer Margaret Bowman
3303 William Johnston Lane
#24
Dumfries, VA 22026

Dear Ms. Bowman:

This letter is an official letter of **Memorandum for Record** concerning your violation of disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

| | |
|---|---|
| **Violation:** | **Article 404.04 (1st Offense) Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.** |
| **Disciplinary Action:** | **Based on Article 404.04, verbal counseling with MFR in personnel file.** |

*On 18 July, 2006 Sgt. James asked Ofc. Bowman if she had on her ballistic vest while on duty. Ofc. Bowman replied "No." Ofc. Bowman has been advised in the past that the wearing of her ballistic vest is a contract requirement. Ofc. Bowman's failure to wear the proper uniform with all required equipment was in direct violation of GAO policies and Wackenhut Article 404.04.*

Any continued performance of this nature may result in dismissal.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:     Personnel File
        Project Manager/GAO

*Professionalism With Integrity®*

**PROD 002459**

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr. Carroll                               DATE OF REPORT: 18 July, 2006

FROM: Sgt James, Laurence                     SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc. Margaret Bowman          DATE OF VIOLATION: 18 July, 2006

LOCATION OF VIOLATION: GAO       TIME/DATE DISCOVERED: 1100 hrs/18 July, 2006

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article 404.04:   Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or
                  failure to wear required equipment while performing duties.

The infraction/offense is described as follows:

On 18 July, 2006 Sgt James asked Ofc Bowman if she had on her ballistic vest while on duty. Ofc Bowman replied "No." Ofc Bowman has been advised in the past that the wearing of her ballistic vest is a contract requirement. Ofc Bowman's failure to wear the proper uniform with all required equipment was in direct violation of GAO policies and Wackenhut Article 404.04.

Immediate action taken:  None

Offense: 1st  X    2nd ____    3rd ____    4th ____

Formal disciplinary action recommended:   Verbal counseling with MFR in personnel file .

Requestor: Sgt James                           Title: Shift Supervisor
           Print Name and Signature
Does the recommendation comply with the disciplinary action procedure? Yes  X    No ____.

___ I agree with the contents of the above report      ___ I do not agree with the contents of the above report

_____ DATE: 8/8/06   Statement attached _____
     Employee's Signature                               Yes or No

Project Manager: Chuck Carroll            Project Manager: ✓ Approve ___ Disapprove

Comments: She wasn't wearing the vest everyone else was in compliance, statement on back.

Field Operations Manager:          X Approve ___ Modify ___ Disapprove

Comment: Recommend Verbal Counseling W/MFR

Signature: _____   Date: 8/10/06

**PROD 002460**

# S.J. EX. 1

# CONRY DECL. EX. I

# WACKENHUT
## SERVICES INCORPORATED

# FILE COPY

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

August 14, 2006

Officer Marina Kornegay
4402 Rena Rd.
Apt. 101
Suitland, MD 20746

Dear Ms. Kornegay:

This letter is an official letter of **Memorandum for Record** concerning your violation of disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

|  |  |
|---|---|
| **Violation:** | **Article 404.04 (1st Offense) Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.** |
| **Disciplinary Action:** | **Based on Article 404.04, verbal counseling with MFR in personnel file.** |

*At approximately 1100 hours on 18 July, 2006 Ofc. Kornegay was observed by Sgt. James, Shift Supervisor, on post without her ballistic vest. Sgt. James asked Ofc. Kornegay is she had on her ballistic vest to confirm and Ofc. Kornegay replied "No." Ofc. Kornegay's actions were in direct violation of GAO policies, GSA policies, and Wackenhut Disciplinary Article 404.04.*

Any continued performance of this nature may result in dismissal.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

**PROD 002462**

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr. Carroll                                DATE OF REPORT: 18 July, 06

FROM: Sgt Laurence James              SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc. Marina Kornegay          DATE OF VIOLATION: 18 July, 06

LOCATION OF VIOLATION: GAO          TIME/DATE DISCOVERED: 1100/18 Jul, 06

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article 404.04: Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.

The infraction/offense is described as follows:

At approximately 1100 hours on 18 July, 2006 Ofc Kornegay was observed by Sgt James, Shift Supervisor, on post without her ballistic vest. Sgt James asked Ofc Kornegay if she had on her ballistic vest to confirm and Ofc Kornegay replied "No." Ofc Kornegay's actions were in direct violation of GAO policies, GSA policies, and Wackenhut Disciplinary Article 404.04.

Immediate action taken:  None

Offense:  1st  X      2nd _____      3rd _____      4th _____

Formal disciplinary action recommended: Verbal counseling with MFR in personnel file.

Does the recommendation comply with the disciplinary action procedure? Yes  X   No _____.

Requestor: Sgt Laurence James _SR James_          Title: Shift Supervisor
           Print Name and Signature of Supervisor or Manager

___ I agree with the contents of the above report      ___ I do not agree with the contents of the above report

_Marina Kornegay_          DATE: 8-8-06          Statement attached _____
Employee's Signature                                                     Yes or No

Project Manager: _Chuck Carroll_          Project Manager: ✓ Approve  ___ Disapprove

Comments: _____

Field Operations Manager: ___ Approve  ___ Modify  ___ Disapprove

Comment: _Recommend Verbal Counseling W/MFR_

Signature _____          Date: 8/10/06

PROD 002464

# S.J. EX. 1

# CONRY DECL. EX. J

# WACKENHUT
## SERVICES INCORPORATED

April 7, 2005

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

Ms. Terry Kornegay
740 Booker Dr.
Capital Heights, MD 20743

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Ms. Kornegay:

This letter is officially informing you that your employment with Wackenhut Services, Inc. is terminated effective April 7, 2005 based on the disciplinary action:

> **To Wit:** *Violation of Section 404.44, Any other act, which by its nature and impact, severely limits the employee's ability to perform the essential elements of the job or is injurious to the interest of the Company and/or the Client.*

*On March 30, 2005, employee Kornegay reported to Buckley's Renewal Center, 637 Indiana Ave., NW, Washington DC for a urinalysis test. The purpose of this test was mandatory random testing. The specimen rendered by Terry Kornegay was tested by Quest Diagnostic, 1901 Sulphur Spring Rd, Baltimore Maryland, and tested "Positive" for "Cocaine Metabolites." This act, by its nature, severely limits the employee's ability to perform the essential elements of the job and is injurious to the interest of both the company and client. This test was conducted after an initial random test, conducted on 3/21/05, was found by the laboratory to have been diluted.*

### *Disciplinary Action: Based on Article 404.44, DISMISSAL*

All equipment and credentials must be returned, to include your Company ID. Your complete uniform as issued to you at the start of your employment must be returned after being professionally laundered or dry-cleaned.

If you have any questions, please feel free to contact us.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC/drl

CC:    Personnel File
Project Manager/GAO

*Professionalism With Integrity®*

**PROD 00003**

**MANAGEMENT**
**DISCIPLINARY REPORT**

TO: <u>K.A. Conry, VP/GM</u>

DATE OF REPORT: <u>04-05-05</u>

FROM: <u>Albert H. League,  DGM</u>

SITE: <u>**GAO**</u>

The following disciplinary report was issued this date to the employee. This report will by placed in the employee's personnel file. Please provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: <u>**Kornegay, Terry**</u>

DATE OF VIOLATION: <u>03-30-05</u>

LOCATION OF VIOLATION: <u>Quest Diagnostic, 1901 Sulphur Springs Rd., Baltimore, Md.</u>

TIME DISCOVERED: <u>04-01-05   4:00 PM</u>

ARTICLE: <u>**404.44**</u>    **Any other act, which by its nature and impact,  severely limits the employee's ability to perform the essential elements of the job or is injurious to the interest of the Company and/or the Client**

THE INFRACTION / OFFENSE ARE DESCRIBED AS FOLLOWS. (Use reverse side if more space is needed.):

<u>On the above listed date, employee Kornegay reported to Buckley's Renewal Center, 637 Indiana Ave., NW, Washington DC for a urinalysis test. The purpose for this test was mandatory random testing. The specimen rendered by Terry Kornegay was tested by Quest Diagnostic, 1901 Sulphur Spring Road, Baltimore Maryland, and tested "Positive" for "Cocaine Metabolites" (attached). This act, by its nature, severely limits the employee's ability to perform the essential elements of the job and is injurious to the interest of both the company and client. This test was conducted after an initial random test, conducted on 03-21-05, was found by the laboratory to have been diluted.</u>

IMMEDIATE ACTION TAKEN BY SUPERVISOR: <u>None.</u>

OFFENSE:    1ST  <u>X</u>    2ND <u>    </u>    3RD <u>    </u>    ☐ COPIES ATTACHED

FORMAL DISCIPLINARY ACTION RECOMMENDED: <u>**Dismissal**</u>

DOES THE RECOMMENDATION COMPLY WITH THE DISCIPLINARY ACTION PROCEDURE?

Yes <u>X</u>    No <u>    </u>    (Justify No responses on a separate page.)

☐ I agree with the contents of this report.    ☐ I do not agree with the contents of this report.

*DID NOT ATTEND DISCIPLINARY REPORT INTERVIEW*    Date:

Employee's Signature ___    Statement Attached: Yes ___    No ___

Operation Manager:    Approve: ☒    Disapprove: ☐    Signature: ___

Comments: *EMPLOYEE FAILED TO ATTEND A SCHEDULED DISCIPLINARY HEARING REGARDING THIS MATTER REC. DISMISSAL*

**PROD 00004**

# S.J. EX. 1

# CONRY DECL. EX. K

# WACKENHUT
## SERVICES INCORPORATED

FILE COPY

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

July 22, 2005

Mr. Amrik Lal
3314 Webley Court
Annandale, VA 22003

Dear Mr. Lal:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

|  |  |
|---|---|
| Violation: | **Article 404.20 – Leaving workstation without Supervisor's Authorization** |
| Disciplinary Action: | **Based on Article 404.20, 5-Day Suspension is warranted from the contract. Days of Suspension: 8/11/05 – 8/15/05; returning on 8/17/05.** |

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/adb

CC:   Personnel File
      Project Manager/GAO

*Professionalism With Integrity®*

**PROD 00007**

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION (NCR)
DISCIPLINARY REPORT

TO: Mr. Carroll                                  DATE OF REPORT: June 9, 2005

FROM: Sgt. Armstrong, Glen                       SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel
file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Officer Lal, A.                 DATE OF VIOLATION: June 9, 2005

LOCATION OF VIOLATION: ___ GAO ___              TIME/DATE DISCOVERED: June 9, 2005

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE: ___ 404.20 ___          Leaving workstation without Supervisor authorization.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Ofc. Lal was observed by the supervisor Sgt. Armstrong entering the G Street Garage in his vehicle at 1625
hours. I asked Ofc. Lal who relieved him from post to move his vehicle? Ofc. Lal stated that Ofc. Worsley
was holding the two personnel Post by himself. Sgt. Armstrong informed Ofc. Lal that this was a violation
of Security Procedures by leaving Post without being properly relieved or without Supervisor
authorization.

IMMEDIATE ACTION TAKEN: ~~Written Reprimand~~  *AL*  NONE.
                                               *CMC*

OFFENSE: 1st _X_      2nd __      3rd __      4th ___      COPIES ATTACHED.

Formal Disciplinary Action Recommended: Five days suspension ~~to Dismissal~~  *AL*
                                                                                *CMC*

Does the recommendation comply with the disciplinary action procedure? Yes _X_  No

Requestor: Sgt. Armstrong, Glen                  Title: Shift Supervisor
           Printed Name and Signature

∟ I agree with the contents of this report      ___ I do not agree with the contents of this report

*Amviu eal*              DATE: 6-10-05  Statement attached _YES_.
Employee's Signature                                          Yes or No

Project Manager: *Charl M Carroll*  Project Manager: ✓Approve __ Disapprove

Comments: *Ofc Lal was unaware of ramifications by matrix recommend Suspension.*

Field Operations Manager: ✓Approve  __Modify  __ Disapprove

Comment: *RFC 5 DAYS SUSP*  →  15/05

Signature: _____  7/22/05   8/11   *Return 8/17*

**PROD 00008**

# S.J. EX. 1

# CONRY DECL. EX. L

**FILE COPY**

# WACKENHUT

## SERVICES INCORPORATED

April 13, 2005

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

Mr. Charles Bishop
67 Columbia Ave.
Newark, NJ 07106

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Mr. Bishop:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation: **Article 404.08 – Non-willful failure to carry out assigned task while performing duties. (2nd Offense)**

Disciplinary Action: **Based on Article 404.08, 2-Day Suspension is warranted from the contract. Days of Suspension: 4/28/05 – 4/29/05; returning on 5/2/05.**

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/drl

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

**PROD 00010**

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Albert League

DATE OF REPORT: 18 ~~Feb~~ 05     *APR CMC*

FROM: Mr. Carroll

SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc Charles Bishop          DATE OF VIOLATION: 8 April, 05

LOCATION OF VIOLATION: GAO          TIME/DATE DISCOVERED: 8 April, 05

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article    404.15          Violation of security procedures or regulations.

The infraction/offense is described as follows:

Ofc Bishop was informed that all personnel were required to report to Buckley's to complete their annual physical, a contract requirement, prior to 7 February, 05. Ofc Bishops was presented a Disciplinary Report from Mr. Conry on 3 March for failure to meet this contract requirement. Since then Ofc Bishop has told Captain Trickey and Mr. Carroll that he went to complete the physical but that he could not pass the requirement at the time because of his blood pressure. He stated that he would bring in or have faxed, documentation that he has been to see a physician and get his physical completed. As of 1630 hours on 8 February, 05 Ofc. Bishop has failed to provide documentation that he has completed the meeting with his doctor and has failed to complete his physical, a contract requirement. Ofc Bishops actions are in violation of contract requirements and Wackenhut Article 404.15 Violation of security procedures and regulations.

Immediate action taken: _____ None. _____

Offense: 1st _____ 2nd _X_ 3rd _____ 4th _____

Formal disciplinary action recommended: Five days suspension.

Requestor: Mr. Carroll          Title: Project Manager
             Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure? Yes _X_ No ___.

✓ I agree with the contents of the above report     ___ I do not agree with the contents of the above report

_Charles H Surly_     DATE: 4/8/05     Statement attached ✓
Employee's Signature                                              Yes or No

Project Manager: _Charl M Carrol_     Project Manager: ✓Approve ___ Disapprove

Comments: Statement, Dis fax, rebuttal attached. Did not request union.

Field Operations Manager: (TWO) ___ Approve ✓ Modify ___ Disapprove

Comment: Rec 2 DAY SUSPENSION    NON WILFUL FAILURE

Signature: _____     Date: 4/12/05     404.08 ✓

PROD 00011

S.J. EX. 1

CONRY DECLARATION &
EXHIBITS

PART 6 OF 7

# S.J. EX. 1

# CONRY DECL. EX. M

# WACKENHUT
## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

April 19, 2007

Officer Kimberle Littlepage
317 Adams St., NE
Washington, DC 20002

Dear Ms. Littlepage:

This letter is an official letter of **Memorandum for Record** concerning your violation of disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

|  |  |
|---|---|
| **Violation:** | **Article 404.04 (1ˢᵗ Offense) Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.** |
| **Disciplinary Action:** | **Based on Article 404.04, verbal counseling with MFR in personnel file.** |

*On Saturday, March 31, 2007 at approximately 1747 hours during guard inspection, Officer Littlepage was not in complete uniform. Officer Littlepage did not have her certification ID with her (first aid, CPR, baton). Also, Littlepage was without her flashlight/case, glove and glove pouch (first aid).*

Any continued performance of this nature may result in dismissal.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:   Personnel File
      Project Manager/GAO

*Professionalism With Integrity®*

**PROD 002473**

# WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
## DISCIPLINARY REPORT

TO:_Mr. Hardy____                    DATE OF REPORT:_April 1, 2007_

FROM:_Sgt. James Johnson_          SITE:_Government Accountability Office_

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME:_Ofc. Kimberly Littlepage___ DATE OF VIOLATION:_March 31, 2007_

LOCATION OF VIOLATION:_GAO___ TIME/DATE DISCOVERED:_1747 hrs./03/31/07_
The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE:_404.04_Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

On Saturday March 31, 2007 at approximately 1747 hours during guard inspection. Officer Littlepage was not in complete uniform. Officer Littlepage did not have her certification ID with her (first aid, CPR, baton). Also Littlepage was with out her flashlight/case, glove and glove pouch (first aid). This is in direct violation of Wackenhut Article 404.04

OFFENSE: 1st _X_   2nd ___   3rd ___   4th ___   COPIES ATTACHED.

Formal Disciplinary Action Recommended:_Verbal counseling with MFR in personnel file._

Does the recommendation comply with the disciplinary action procedure? Yes _X_ No ____

Requestor:_Sgt. James Johnson/_ _James Johnson_          Title:_Shift Supervisor_
             Printed Name and Signature

__ I agree with the contents of this report      ___ I do not agree with the contents of this report

_____          DATE:_4/16/07_     Statement attached _No_
Employee's Signature                                                    Yes or No

Project Manager:_____          Project Manager:_Approve __ Disapprove

Comments: _____

Field Operations Manager: ___ Approve __ Modify ___ Disapprove
Comment:_Recommend Verbal Counseling w/ MFR_
Signature:_____          Date:_4/17/07_

**PROD 002474**

# S.J. EX. 1

# CONRY DECL. EX. N

# WACKENHUT
## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

November 29, 2007

Officer Shrcaron Lewis
116 44th St., NE, # 101
Washington, DC 20019

Dear Ms. Lewis:

This letter is an official letter of **Memorandum for Record** concerning your violation of disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

|  |  |
|---|---|
| **Violation:** | **Article 404.04 (1st Offense) Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.** |
| **Disciplinary Action:** | **Based on Article 404.04, verbal counseling with MFR in personnel file.** |

*On 11/26/07, SPO Lewis was scheduled for Roll Call at 0545 hrs and Post 3 at 0600 hrs. SPO Lewis arrived to Roll Call at 0545 hrs without her weapon. SPO Lewis failed to arrive in a timely manner to receive her weapon prior to Roll Call.*

Any continued performance of this nature may result in dismissal.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

**PROD 002483**

*Professionalism With Integrity®*

# Wackenhut Services Inc. NCR Disciplinary Report

Field Sites will forward this form immediately to NCR Contract Support Manager to be recorded and then immediately presented to NCR Operations for processing. The requesting PM is responsible to contact NCR Operations when a report has been issued.

**Requesting Supervisor Section:**

Name of Requesting Supervisor: Laurence James
                                          (Print)
Rank/Position: Sergeant/Shift Supervisor    Site: GAO
                              (Print)
Signature: _Laurence R._    Date: 11-27-07

*The below named employee is suspected of having been in violation of WSI policy:*

Name: Lewis, Shrearon          Position: SPO
          (Print)                    (Print)
Article Violated: __404.04__    **Failure to wear the proper uniform, wearing a dirty or untidy uniform and/or failure to wear required equipment while performing duties.**

Date/Time of Violation: 11/26/07-0545hrs

The specific offense is described as follows: (Additional sheet may be attached)

on 11/26 SPO Lewis was scheduled for Roll Call at 0545hrs and Post 3 at 0600hrs. SPO Lewis arrived in Roll Call at 0545hrs without her weapon. SPO Lewis has been advised in the past of the importance of arriving on time and prepared for duty. SPO Lewis failed to arrive in a timely manner to receive her weapon for Roll Call is in direct violation of Wackenhut Article 404.04.  prior to

Immediate action taken by supervisor (If applicable): None

Formal disciplinary action recommended: Verbal counseling with MFR in personnel file.

Active number of offenses of the above Article: 1 X   2___   3___   4___

Does the Recommendation Comply with the Disciplinary Matrix: Yes _X_ No____

Justify "No" responses on a separate page.

**Employee Section:**

This report does not constitute discipline in any form. This form is part of an investigation that may result in discipline. If discipline is awarded by the Vice President/General Manager you will receive formal notification. Please review the above portion of this form carefully. You are encouraged to attach a statement giving information that may better explain your involvement in this matter and to include any information that may be favorable to you. Your signature on this report demonstrates only that you chose to read this report and are informed of its contents and supervisor recommendations.

Regarding the contents of this report: I agree_____    I disagree_____ ✓

I wish to attach a statement_____    I do not wish to attach a statement_____ ✓

Employee Signature: _____refused to sign_____ Date Signed: __11/27/07__

**Site Management Section:**

PM/Acting PM:   Approve ____✓____ Disapprove_____

I have reviewed this report, found it to comply with WSI NCR policy and request the recommended discipline be awarded

PM Signature: _____ Date: _11-27-07_

**NCR Operations Section:**

Director of Field Ops: Approve____✗____ Disapprove_____

Director Signature: _____ Date: __11/29/07__

Ops Manager: Disapprove_____    Modify _____

Recommend _Verbal Counsoling w/ MFR_

Ops Manager Signature:_____ Date: _____

04/16/07)

**PROD 002485**

# S.J. EX. 1

# CONRY DECL. EX. O

# WACKENHUT
## SERVICES INCORPORATED

December 1, 2006

Officer Shrcaron Lewis
116 44th St., NE, #101
Washington, DC 20019

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Ms. Lewis:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

| | |
|---|---|
| Violation: | **Article 404.20 – (1st Offense) Leaving work station without Supervisor's authorization.** |
| Disciplinary Action: | **Based on Article 404.20, 5-Day Suspension is warranted from the contract.** **Days of Suspension: 12/10/06 – 12/14/06; returning on 12/17/06.** |

*On 15 November, 2006, Ofc. Lewis was assigned duties on Post 15, exterior 4th Street loading dock. At approximately 1257 hrs. Ofc. Lewis was observed by Sgt. James via CCTV on Post 14, interior 4th Street loading dock, utilizing the phone and talking with Ofc. Alexander. Ofc. Lewis was not in a position to monitor her post or observe the surrounding area. Ofc. Lewis' actions of leaving her post or work station without prior authorization to utilize the phone was in violation of written Post Orders and Wackenhut Article 404.20.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

**PROD 00015**

# WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION(NCR)
### DISCIPLINARY REPORT

TO:_ Mr. Carroll_____          DATE OF REPORT: 15 Nov, 06

FROM:_ Sgt Laurence James___    SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc Lewis, Shrearon__   DATE OF VIOLATION: 15 Nov, 06

LOCATION OF VIOLATION:_ GAO_____    TIME/DATE DISCOVERED: 1257/15 Nov, 06

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article ___404.20___    Leaving work station without Supervisor's authorization.

The infraction/offense is described as follows:

On 15 November, 2006 Ofc Lewis was assigned duties on Post 15, exterior 4th Street loading dock. At approximately 1257 hrs. Ofc Lewis was observed by Sgt James via CCTV on Post 14, interior 4th Street loading dock, utilizing the phone and talking with Ofc Alexander. Ofc Lewis was not in a position to monitor her post or observe the surrounding area. Ofc Lewis's actions of leaving her post or work station without proper authorization to utilize the phone was in violation of written Post Orders and Wackenhut Article 404.20.

Immediate action taken: _____None_____.

Offense: 1st _X_    2nd ____    3rd ____    4th ____

Formal disciplinary action recommended: 5 Days Suspension.

Requestor:_ Sgt Laurence James_____
         Print Name and Signature of Supervisor or Manager

_SMTWT (FS)_

Does the recommendation comply with the disciplin[...]

__ I agree with the contents of the above report   X I d[...]

_____    DATE: _____
     Employee's Signature

_3rd week in DEC_

Project Manager: _Charle M Caull_   Proj[...]

Comments: _Officer refused to sign. Slt[...]

_12/10 - 14th_

Field Operations Manager: ____Approve__

_12/17_

Comment: _RECOMMEND FIVE (5)_

Signature: _____    Date: _12/30/06_

_On_

# S.J. EX. 1

# CONRY DECL. EX. P

# WACKENHUT
## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

May 19, 2006

Officer Shrcaron Lewis
116 44th St., NE, #101
Washington, DC 20019

Dear Ms. Lewis:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation:
**Article 404.21 – (1st Offense) Disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations.**

Disciplinary Action:
**Based on Article 404.21, 5-Day Suspension is warranted from the contract.**
**Days of Suspension: 6/8/06 – 6/12/06; returning on 6/15/06.**

*On May 11, 2006 at approximately 0730 hours a verbal altercation occurred between Officer Shrcaron Lewis and Officer Marina Kornegay in the H Street Lobby. Ofc. Lewis and Ofc. Kornegay were both quarreling in a loud and abusive manner disrupting security operations.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

**PROD 00018**

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr Stephens_____          DATE OF REPORT: 11 May, 2006

FROM: Mr. Carroll_____       SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc Lewis___      DATE OF VIOLATION: 11 May, 2006

LOCATION OF VIOLATION: GAO__       TIME/DATE DISCOVERED: 0730/11 May, 2006

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article ___404.21___   Disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations.

The infraction/offense is described as follows:

On 11 May, 2006 at approximately 0730 hours a verbal altercation occurred between Officer Shrcaron Lewis and Officer Marina Kornegay in the H Street Lobby. Ofc Lewis and Ofc Kornegay were both quarrelling in a loud and abusive manner disrupting security operations. Ofc Lewis's actions were in violation of Wackenhut Article 404.21 Disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations.

Immediate action taken: ___Relieved from post, turned in weapon and sent home.___

Offense: 1ˢᵗ _X___  2ⁿᵈ ___  3ʳᵈ ___  4ᵗʰ ___         FIVE(5) ys

Formal disciplinary action recommended: Four days suspension.

Requestor: Mr. Carroll _Charles M Carroll_          Title: Project Manager
                Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure? Yes_X_ No____.

☑ I agree with the contents of the above report    __ I do not agree with the contents of the above report

_____    DATE: 5-12-06   Statement attached _YES_
    Employee's Signature                                          Yes or No

Project Manager: _Charles Carroll_     Project Manager: ✓Approve __ Disapprove

Comments: _Statement confirms altercation._

Field Operations Manager: __Approve __ Modify __ Disapprove

Comment: RECOMMEND FIVE(5)DAY SUSPENSION

Signature: _____    Date: 5/15/06

# S.J. EX. 1

# CONRY DECL. EX. Q

FILE COPY

# WACKENHUT
## SERVICES INCORPORATED

August 11, 2005

Ms. Islande Edouard
7513 Newburg Drive
Lanham, MD 20706

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Ms. Edouard:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation:    **Article 404.15 – (1st Offense) Violation of security procedures or regulations.**

Disciplinary Action:    **Based on Article 404.15, 2-Day Suspension is warranted from the contract.**
**Days of Suspension: 08/16/05 – 08/17/05; returning on 08/18/05.**

*On 20 July at approximately 1600 hours a contractor assigned to Unicco attempted entry into the Government Accountability Office utilizing his proximity card. The card reader turned red and the individual was denied by the officer. The receptionist (Edouard) and operator Day spoke over the phone verifying that the badge was rejected in the Command Center but neither could verify why the badge was disabled and the individual was allowed to enter the facility. If access cannot be confirmed the individual must be signed in and escorted by a valid badge holder. Receptionist Edouard's failure to follow security procedures is a Violation of Article 404.15.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity*®

*7513 Newburg Dr.*
*Lerham, MD*
*20706*

## WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION(NCR)
## DISCIPLINARY REPORT

TO: Mr. Stephens                                    DATE OF REPORT: 7 Aug. 05

FROM: Mr. Carroll                                    SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Receptionist Islande Edouard    DATE OF VIOLATION: 20 July, 2005

LOCATION OF VIOLATION:   GAO    TIME/DATE DISCOVERED: 1100/22 July, 05

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article   404.15        Violation of security procedures or regulations.

*8/16 -17/05*
*ret on 8/18/05*

The infraction/offense is described as follows:

On 20 July at approximately 1600 hours a contractor assigned to Unicco attempted entry into the Government Accountability Office utilizing his proximity card. The card reader turned red and the individual was denied access by the officer. The receptionist (Edouard) and operator Day spoke over the phone verifying that the badge was rejected in the Command Center but neither could verify why the badge was disabled and the individual was allowed to enter the facility. In accordance with SOP 03-2002 a disabled proximity card requires the badge holder to be detained, the badge confiscated and then attempt to validate his/her current access status through Parking/ID. If they are not available contact SAS, if that fails contact the individuals supervisor or another employee about current access status. If access cannot be confirmed the individual must be signed in and escorted by a valid badge holder. Receptionist Edouard's failure to follow security procedures is a violation of Article 404.15.

Immediate action taken: _____ None. _____

Offense:  1st  X      2nd ____    3rd ____    4th ____

Formal disciplinary action recommended: Two days suspension.          **PROD 00022**

Requestor: Mr. Carroll  *Charles M Carroll*     Title: Project Manager
            Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure? Yes  X    No ____ .

✓ I agree with the contents of the above report        ___ I do not agree with the contents of the above report

*Claude Edouard*          DATE: 8/9/05        Statement attached _____
    Employee's Signature                                         Yes or (No)

Project Manager: *Charles M Carroll*        Project Manager: ✓ Approve   ___ Disapprove        [×]

Project Manager: _____    Project Manager: ___ Approve ___ Disapprove

Comments: _Hard worker, according to statement followed AMDO's guidance._

Field Operations Manager: ___ Approve ___ Modify ___ Disapprove

Comment: _N/A – 2 DAY SUSP._

Signature: _____    Date: _8/13/05_

Received Time Aug. 9.  5:07PM

PROD 00023

# S.J. EX. 1


# CONRY DECL. EX. R

# WACKENHUT
## SERVICES INCORPORATED

FILE COPY

June 1, 2005

Ms. Akeesha Day
817 Irvington Street
#201
Oxon Hill, MD 20745

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Ms. Day:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation:  **Article 404.21 – Disorderly conduct, use of abusive or offensive language, quarreling, intimidation, or disruptive actions that interfere with security operations. (1st Offense)**

*On May 19, 2005, Mr. Mestre/COTR presented a written complaint to Mr. Carroll and requested action. A review of video tapes and other statements supports the complaint that a verbal altercation did occur between Alarm Monitor/Dispatch Operator Day and Officer Rawlings at approximately 7:25 PM. AMDO Day was disorderly and arguing with Ofc Rawlings in a loud and abusive manner disrupting security operations.*

Disciplinary Action:  **Based on Article 404.21, 5-Day Suspension is warranted from the contract.**
**Days of Suspension: 6/13/05 – 6/17/05; returning on 6/20/05.**

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/drl

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

PROD 00024

5/31

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO:  Mr Stephens                          DATE OF REPORT: 23 May 05

FROM:  Mr. Carroll                        SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's
personnel file.  Provide the appropriate letter as required.

EMPLOYEE'S NAME:  AMDO Akeesha Day          DATE OF VIOLATION:  April 26, 2005

LOCATION OF VIOLATION:  GAO               TIME/DATE DISCOVERED: May 19, 05

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article     404.21            Disorderly conduct, use of abusive or offensive language, quarreling,
                             intimidation, or disruptive actions that interfere with security
                             operations.

The infraction/offense is described as follows:

On 19 May, 2005 Mr. Mestre/COTR presented a written complaint to Mr. Carroll and requested
action.  A review of video tapes and other statements supports the complaint that a verbal
altercation did occur between Alarm Monitor/Dispatch Operator Day and Officer Rawlings at
approximately 7:25 PM. AMDO Day was disorderly and arguing with Ofc Rawlings in a loud
and abusive manner disrupting security operations.  AMDO Day's actions were in direct
violation of Wackenhut Article 404.21 Disorderly conduct, use of abusive or offensive language,
quarreling, intimidation, or disruptive actions that interfere with security operations.

Immediate action taken:          None   .

Offense:  1st   X       2nd       3rd       4th   

Formal disciplinary action recommended:  Three days suspension.

Requestor: Mr. Carroll    Chuck Carroll              Title: Project Manager
              Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure?  Yes   X   No_____.

__ I agree with the contents of the above report      ✓ I do not agree with the contents of the above report

_____        DATE: 24 May 2005   Statement attached _____
   Employee's Signature                                            Yes or No

Project Manager:  Chuck Carroll          Project Manager: ✓Approve ___ Disapprove

Comments:  BOTH OFC & AMDO HAD A VERBAL ALTERRATION WITNESSED BY GAO EMPLOYEE

Field Operations Manager:        __ Approve  ✓ Modify    __ Disapprove

Comment: Rec  3 Days Susp.

Signature: _____          Date: 5/31/05

# S.J. EX. 1


# CONRY DECL. EX. S

FILE COPY

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

August 11, 2005

Ms. Akeesha Day
817 Irvington St.
Apt. 201
Oxon Hill, MD 20745

Dear Ms. Day:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

| | |
|---|---|
| Violation: | **Article 404.15 – (1st Offense) Violation of security procedures or regulations.** |
| Disciplinary Action: | **Based on Article 404.15, 2-Day Suspension is warranted from the contract.** **Days of Suspension: 08/18/05 – 08/19/05; returning on 08/22/05.** |

*On July 20, 2005, AMDO Day failed to review newly posted information when coming on duty. Day's failure to follow security procedures resulted in a Unicco employee not being escorted in accordance with e-mail posted in the command center.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*

PROD 00029



WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr. Stephens                            DATE OF REPORT: 7 Aug. 05

FROM: Mr. Carroll                           SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: AMDO Akeesha Day     DATE OF VIOLATION: 20 July, 2005

LOCATION OF VIOLATION: GAO     TIME/DATE DISCOVERED: 1100/22 July, 05

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article ___404.15___          Violation of security procedures or regulations.          *8/18-19/05 Ret u*

The infraction/offense is described as follows:

On 20 July at approximately 1600 hours a contractor assigned to Unicco attempted entry into the Government Accountability Office utilizing his proximity card. The card reader turned red and the individual was denied access by the officer. The receptionist (Edouard) and operator Day spoke over the phone verifying that the badge was rejected in the Command Center but neither could verify why it was rejected. A review of the information (e-mail messages) on the daily clip board identified the fact that a message had been sent out on 19 July requesting the badge to be de-activated and authorizing the Unicco employee escorted access. Alarm Monitor Dispatch Operator (AMDO) Day failed to review this newly posted information when coming on-duty or when the badge was rejected. AMDO Day's failure to follow security procedures resulted with the Unicco employee not being escorted in accordance with the e-mail posted in the Command Center. AMDO Day's actions were a violation of Article 404.15.

Immediate action taken: _____None._____

Offense: 1st _X_     2nd ____     3rd ____     4th ____

Formal disciplinary action recommended: Two days suspension.

Requestor: Mr. Carroll _Charles M Carroll_          Title: Project Manager
                Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure? Yes _X_ No ____.

__ I agree with the contents of the above report          __ I do not agree with the contents of the above report

_____     DATE: _____     Statement attached _____
     Employee's Signature                                                                    Yes or No

Project Manager: _Charles M Carroll_     Project Manager: _/_ Approve __ Disapprove

Comments: _AMDO Day refused to sign, did not want Union representation, disagreed with content._

Field Operations Manager: ___ Approve ___ Modify ___ Disapprove

Comment: _Rec. 2 Days Susp._

Signature: _____     Date: _8/10/05_

# S.J. EX. 1

# CONRY DECLARATION & EXHIBITS

# PART 7 OF 7

# S.J. EX. 1


# CONRY DECL. EX. T

*FILE COPY*

# WACKENHUT
## SERVICES INCORPORATED

June 1, 2005

Ms. Renee Rawlings
2024 Colebrook Dr.
Temple Hills, MD 20748

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Ms. Rawlings:

This is an official letter of **suspension** concerning your violation of the disciplinary
actions section of the Wackenhut Services, Inc. Administration of Discipline policy and
procedures:

Violation:                **Article 404.21 – Disorderly conduct, use of abusive or
                          offensive language, quarreling,
                          intimidation, or disruptive actions that
                          interfere with security operations.
                          (1st Offense)**

*On May 19, 2005, Mr. Mestre/COTR presented a written complaint to Mr. Carroll and
requested action. A review of video tapes and other statements supports the complaint
that a verbal altercation did occur between Alarm Monitor/Dispatch Operator Day and
Officer Rawlings at approximately 7:25 PM. Officer Rawlings was disorderly and
arguing with AMDO Day in a loud and abusive manner disrupting security operations.*

Disciplinary Action:      **Based on Article 404.21, 5-Day Suspension is
                          warranted from the contract.
                          Days of Suspension: 6/20/05 – 6/24/05; returning on
                          6/27/05.**

You are to give your full attention to this action. Any continued performance of this
nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/drl

CC:    Personnel File
       Project Manager/GAO

*Professionalism With Integrity®*                                    **PROD 00032**

5/31

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr Stephens _____                    DATE OF REPORT: 23 May 05

FROM: Mr. Carroll _____               SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's
personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc Rawlings ___     DATE OF VIOLATION: April 26, 2005

LOCATION OF VIOLATION: GAO _____     TIME/DATE DISCOVERED: May 19, 05

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article ___404.21___      Disorderly conduct, use of abusive or offensive language, quarreling,
                          intimidation, or disruptive actions that interfere with security
                          operations.

The infraction/offense is described as follows:

On 19 May, 2005 Mr. Mestre/COTR presented a written complaint to Mr. Carroll and requested
action. A review of video tapes and other statements supports the complaint that a verbal
altercation did occur between Alarm Monitor/Dispatch Operator Day and Officer Rawlings at
approximately 7:25 PM. Ofc Rawlings was disorderly and arguing with AMDO Day in a loud
and abusive manner disrupting security operations. Ofc Rawlings actions were in direct
violation of Wackenhut Article 404.21 Disorderly conduct, use of abusive or offensive language,
quarreling, intimidation, or disruptive actions that interfere with security operations.

Immediate action taken: ___None___.

Offense: 1st _X_   2nd ____   3rd _____   4th _____

Formal disciplinary action recommended: Three days suspension.

Requestor: Mr. Carroll _Chuck Carull_          Title: Project Manager
           Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure? Yes _X_ No_____.

___ I agree with the contents of the above report   ✓ I do not agree with the contents of the above report

_____          DATE: 5/24/05  Statement attached _____
Employee's Signature                                          (Yes) or No

Project Manager: _Chuck Carull_          Project Manager: _✓_Approve ___ Disapprove

Comments: BOTH OFC'S AMDO HAD A VERBAL ALTERCATION WITNESSED BY A GAO EMPLOYEE.

Field Operations Manager: ___Approve  _✓_Modify ___ Disapprove

Comment: _Rec. 5 Days Suspension_

Signature: _____    Date: 5/31/05

**PROD 00033**

# S.J. EX. 1

# CONRY DECL. EX. U

# WACKENHUT
## SERVICES INCORPORATED

March 2, 2005

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Ms. Mia Mathes
3905 Southern Ave.
#202
Suitland, MD 20746

Dear Ms. Mathes:

This letter is officially informing you that your employment with Wackenhut Services, Inc. is terminated effective March 2, 2005 based on the disciplinary action:

*To Wit:  Violation of Section 404.10, Tardiness or failure to observe assigned work hours.*

*Officer Mathes was scheduled to report for Roll Call at 0645 hours and relieved Post 11 at 0700 hours on the 24th, 25th, 26th and 27th of January, 2005.  Officer Mathes was notified by the supervisor that her actions were unacceptable and wrote up multiple Disciplinary Reports. On the 24th she arrived at 0715 and provided no excuse for her tardiness.  On the 25th she arrived at 0815 and stated she had left her credentials at home and had to return to get them. On the 26th and 27th she arrived at 0654 and 0656 failing to notify anyone that she would be late.  Officer Mathes continual resulted with one hour of open time for Roll Call and caused two officers to be held over to provide post coverage.*

*Disciplinary Action: Based on Article 404.10, DISMISSAL*

All equipment and credentials must be returned, to include your Company ID. Your complete uniform as issued to you at the start of your employment must be returned after being professionally laundered or dry-cleaned.

If you have any questions, please feel free to contact us.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC/drl

CC:    Personnel File
Project Manager/GAO

*Professionalism With Integrity®*

**PROD 00038**

## WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
## DISCIPLINARY REPORT

TO:    Mr. Crenshaw                              DATE OF REPORT: 31 Jan 05

FROM: Mr. Carroll                                SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Ofc. Mia Mathes          DATE OF VIOLATION: 24 - 27 Jan, 2005

LOCATION OF VIOLATION: GAO          TIME/DATE DISCOVERED: 0645/24 - 27 Jan, 05

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE:    404.10          Tardiness or failure to observe assigned work hours.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Ofc. Mathes was scheduled to report for Roll Call at 0645 hours and relieve Post 11 at 0700 hours on the 24th, 25th, 26th and 27th of January, 2005. Ofc. Mathes was notified by the supervisor that her actions were unacceptable and wrote up multiple Disciplinary Reports. On the 24th she arrived at 0715 and provided no excuse for her tardiness. On the 25th she arrived at 0815 and stated she had left her credentials at home and had to return to get them. On the 26th and 27th she arrived at 0654 and 0656 failing to notify anyone that she would be late. Ofc. Mathes continual failure to observe assigned work hours all week is in direct violation of Article 404.10 and resulted with one hour of open time for Roll Call and caused two officers to be held over to provide post coverage.

IMMEDIATE ACTION TAKEN:              None

OFFENSE: 1st  X      2nd  XXX 3rd  ___    4th  ___    COPIES ATTACHED _____.

Formal Disciplinary Action Recommended: Written Reprimand.  Verbal Counseling W/MFR in Personnel File Per Matrix give

Does the recommendation comply with the disciplinary action procedure? Yes  X   No ____

Requestor: Mr. Carroll                              Title: Project Manager
              Printed Name and Signature

X   I agree with the contents of this report          ___ I do not agree with the contents of this report

_[signature]_          DATE: 2-8-05          Statement attached
Employee's Signature                                Yes or No

Project Manager: _Chad M Carroll_     Project Manager: ✓ Approve   ___ Disapprove

Comments: All officers briefed on Roll Call requirements and times.

Field Operations Manager:        ___ Approve  ✓ Modify   ___ Disapprove

Comment: BASED ON MULTIPLE TARDIES BEFORE PM COULD REASONABLY RESPOND

Signature: _[signature]_          Date: 2/24/05
          THIS IS A FOURTH OFFENSE: REC. DISMISSAL

**PROD 00039**

# S.J. EX. 1

# CONRY DECL. EX. V

**WACKENHUT**
SERVICES INCORPORATED


FILE

September 18, 2007

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

Knox Cockrell
14909 Croom Airport Rd.
Upper Marlboro, MD 20772

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Mr. Cockrell:

This letter is officially informing you that your employment with Wackenhut Services, Inc. will be terminated effective September 17, 2007, based on the following disciplinary action:

*To Wit:*     *Violation of Section 404.35, Proven theft, dishonesty, fraud or bribery.*

*On September 12, 2007 at approximately 1435 hrs I PM Hardy received notice that evidence indicates proven dishonesty from conversation that took place between Mr. Cockrell and Nick Schnare, the governments Physical Security Specialist inside the Security Operations Center (SOC). Mr. Cockrell told Nick that the G St. playground camera located on the 5th street side of GAO camera was not working. Nick departed the SOC and asked Bearing Point the contractors who are installing the new security system in the building the same question and they stated that the camera is connected. Bearing Point proceeded to show Nick the cable that is connected to the camera. At approximately 1515 hours Nick, Forrest Davenport from Bearing Point and myself entered into Mr. Cockrell's work space/office. Upon investigating the work space/office we found the G St. playground camera connected to a monitor and a video recorder working fine. This camera is an important part of our Physical security posture here at GAO.*

*Disciplinary Action:  Based on Article 404.35, DISMISSAL*

All equipment and credentials must be returned, to include your Company ID.  Your complete uniform as issued to you at the start of your employment must be returned after being professionally laundered or dry-cleaned.

If you have any questions, please contact us.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC:kpp

cc:  Personnel File
     Project Manager/GAO

*Professionalism With Integrity®*

PROD 003612

Received Time Sep. 7. 10:30AM

9/17

# Wackenhut Services Inc. NCR Disciplinary Report

Field Sites will forward this form immediately to NCR Contract Support Manager to be recorded and then immediately presented to NCR Operations for processing. The requesting PM is responsible to contact NCR Operations when a report has been issued.

**Requesting Supervisor Section:**

Name of Requesting Supervisor: _____ Donti Hardy
                                              (Print)
Rank/Position: ___ Project Manager ___  Site: ____ GAO ____
                           (Print)
Signature: _____  Date: 9-17-07

*The below named employee is suspected of having been in violation of WSI policy:*

Name: ___ Knox Cockrell _____  Position: Security Tech _____
              (Print)                                    (Print)

Article Violated: __404.35__    **Proven theft, dishonesty, fraud or bribery.**

Date/Time of Violation: Sept 12, 2007/Approximately 1435 hours

The specific offense is described as follows: (Additional sheet may be attached)

On Sept 12, 2007 at approximately 1435 hrs I PM Hardy received notice that evidence indicates proven dishonesty from conversation that took place between Mr. Cockrell and Nick Schnare the governments Physical Security Specialist inside the Security Operations Center (SOC). Mr. Cockrell told Nick that the G St. playground camera located on the 5th street side of GAO that the camera was not working. Nick departed the SOC and asked Bearing Point the contractors who are installing the new security system in the building the same question and they stated that the camera is connected. Bearing Point proceeded to show Nick the cable that is connected to the camera. At approximately 1515 hours Nick, Forrest Davenport from Bearing Point and myself entered into Mr. Cockrell's work space/office. Upon investigating the work space/office we found the G St. playground camera connected to a monitor and a video recorder working fine. This camera is a important part of our Physical security posture here at GAO. Mr. Cockrell conduct is in direct violation of Wackenhut article 404.35

Immediate action taken by supervisor (If applicable): __None_____

_____

Formal disciplinary action recommended: Dismissal _____

Active number of offenses of the above Article:  1 _X_  2 ___  3 ___  4 ___

**PROD 003613**

1

Does the Recommendation Comply with the Disciplinary Matrix: Yes __X__ No____

Justify "No" responses on a separate page.

**Employee Section:**

**This report does not constitute discipline in any form. This form is part of an investigation that may result in discipline. If discipline is awarded by the Vice President/General Manager you will receive formal notification. Please review the above portion of this form carefully. You are encouraged to attach a statement giving information that may better explain your involvement in this matter and to include any information that may be favorable to you. Your signature on this report demonstrates only that you chose to read this report and are informed of its contents and supervisor recommendations.**

Regarding the contents of this report: I agree ___X___   I disagree _____

I wish to attach a statement___X___  I do not wish to attach a statement_____

Employee Signature: _____ Date Signed: _9-17-07_

**Site Management Section:**

PM/Acting PM:  Approve ___✓___  Disapprove_____

I have reviewed this report, found it to comply with WSI NCR policy and request the recommended discipline be awarded

PM Signature: _____ Date: _9-17-07_

**NCR Operations Section:**

Director of Field Ops: Approve __X__ Disapprove_____

Director Signature: _____ Date: _9/18/07_

Ops Manager: Disapprove_____  Modify _____

    Recommend _DISMISSAL_

Ops Manager Signature: _____ Date: _9/18/07_

(04/16/07)

2

**PROD 003614**

# S.J. EX. 2

# CARROLL TRANSCRIPT

# PART 1 OF 2

Travis Grandison          vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL        Thursday, April 3, 2008

Page 1

IN THE SUPERIOR COURT OF THE

DISTRICT OF COLUMBIA

CIVIL DIVISION


TRAVIS GRANDISON,                )

        Plaintiff,               )

    vs.                          ) Case No.

WACKENHUT SERVICES               ) 0002173-07

INCORPORATED,                    )

        Defendant.               )

        *      *      *      *      *



        The deposition of CHARLES CARROLL was taken

on Thursday, April 3, 2008, commencing at 9:58 a.m.,

at the law offices of Scheuerman & Menist, 700 E

Street, S.E., Washington, D.C., before Timothy R.

Yancey, Notary Public.



        *      *      *      *      *

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                                (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Case 1:07-cv-00754-RMC    Document 29-10    Filed 06/09/2008    Page 3 of 15

Travis Grandison          vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL         Thursday, April 3, 2008

Page 9

1          BY MR. SCHIFFRES:

2      Q.    Majority of the force?

3          MR. MORRIS:  Are you finished with your

4   question?

5          MR. SCHIFFRES:  Yes.

6          MR. MORRIS:  Objection as to form, but you

7   may answer the question.

8          THE WITNESS:  I would say it really is

9   dependent on the site that we're at because some

10  sites are predominately black.  Some sites are

11  predominantly white.  It's more or less in the

12  vicinity where you're at, the personnel that don't

13  want to travel too far.

14          BY MR. SCHIFFRES:

15      Q.    Okay.  Let's just focus in on the GAO when

16   you were there.

17      A.    Okay.

18      Q.    What was the make up there?

19      A.    The majority was black.

20      Q.    Okay.  And do you have a recollection as

21   far as how many women?

22      A.    No, sir.

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters     Toll Free (888) 534-1225
www.mar-reporting.com                                    (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison                    vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL              Thursday, April 3, 2008

Page 13

1    reason or whatever the cause was for them to be late

2    or whatever it is.

3         Q.    So you -- I'm sorry.

4         A.    Whatever the transaction was for the

5    disciplinary report, based on that.

6         Q.    And at the GAO, was it your responsibility

7    to do these investigations?

8         A.    Yes, sir.

9         Q.    And I'm going to sort of backtrack, but if

10   you can just give me a -- at least verbally on your

11   position there when you were working for GAO, what

12   was your position?

13        A.    I came on board as the captain, which is

14   similar to the deputy project manager, the Number 2

15   on site.  On 2 December I became the project

16   manager.

17        Q.    Okay.  And when did you start with them

18   again?  I think you said January of 2003?

19        A.    No, that's when I retired.  It was January.

20   I came on board with Wackenhut in May.

21        Q.    Oh.  And you were made the deputy in

22   December of 2004 or December 2003?

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                                 (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison           vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 14

1      A.    In December of 2003 I was made the project

2   manager.

3      Q.    Made the project manager.  And at that GAO

4   site, who was above you, if anybody?

5      A.    Nobody after I became project manager.

6      Q.    Okay.  And below you, how would the order

7   go?

8          MR. MORRIS:  Objection as to form, but you

9   may answer the question.

10          THE WITNESS:  The chain of command would be

11   myself at the top.  My number two would be the

12   captain.

13          BY MR. SCHIFFRES:

14      Q.    And who would that be when you're at the

15   GAO?

16      A.    I had multiple captains during the time

17   frame I was there.  The first captain was Lieutenant

18   Barr.  After that, I believe it was Tony Smith and

19   then Captain Trickey and there might have been

20   another one very short-term in there.

21      Q.    Okay.  And from captain, what's the next

22   level --

M.A.R. Reporting Group, L.L.C.   Professional Stenotype Reporters      Toll Free (888) 534-1225
www.mar-reporting.com                                       (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison              vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 30

1    specific date and time to bring it up.

2          Otherwise, you could sit there for days

3    trying to review the information.  You would spend

4    days trying to look for the information.

5          The other fact is that they are not owned

6    by Wackenhut.  They are owned by GAO.  To sit there

7    and review them, you would have to go to the client

8    and ask permission to pull the tapes, which are

9    maintained in the control center.

10         Q.    Okay.  And why would you pull the tapes?

11         A.    If you came to me and said we want to

12   investigate this, please investigate this, I would

13   pull that tape for that date and time that they were

14   looking for.

15         Q.    Did you ever request the GAO to look at

16   tapes?

17         A.    No, sir.

18         Q.    Okay.  Did you ever view a tape or

19   Mr. Grandison?

20         A.    Yes, sir.

21         Q.    Okay.  And when was that?

22         A.    That was the incident where he claimed to

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                    (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison          vs.     Wackenhut Services Inc.
Deposition of CHARLES CARROLL        Thursday, April 3, 2008

Page 31

1    have been injured.

2        Q.    Okay.  And when was that?

3        A.    I believe it was April 2nd of '06.

4        Q.    Okay.  And who did you ask at GAO to view

5    it?

6        A.    I didn't ask anybody.  They asked me to

7    view it because it was dealing with their elevator.

8        Q.    They asked you to view it because it was

9    dealing with their elevator?

10       A.    Yes, sir.

11       Q.    Okay.  So did you view it at the GAO

12   Building?

13       A.    Yes, sir.

14       Q.    Okay.  And who was there when you viewed

15   it?

16       A.    At the point where I did my reviews, I had

17   myself and the tech that was helping me break down

18   which monitor would possibly show the incident.

19       Q.    Who at GAO asked you to do this?

20       A.    It would mostly have been the COTR, which

21   at this time would have been Trumpet.

22       Q.    Did you ask him why?

Travis Grandison              vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL              Thursday, April 3, 2008

Page 32

1        A.    No, sir.

2        Q.    Okay.  And what, if anything, did you see

3    on this tape?

4        A.    At the -- what we were looking for was

5    whether there was any specific coverage of the

6    incident during that time frame while I was

7    reviewing tape seeing if there was information that

8    was around that time frame and they -- that's when I

9    came across the tape where Mr. Grandison was walking

10   through the building doing his checks without his

11   hat and tie.

12       Q.    Now, was that the first thing you saw or

13   was that on the tape that -- alleging he didn't have

14   his hat and tie on or did that come after viewing

15   the elevator?

16            MR. MORRIS:  Objection as to form, but if

17   you understand it, you may answer the question.

18            THE WITNESS:  Again, the way time-lapsed

19   VCRs work, the COTR gives me a date and a time and

20   roughly where it occurred based on Grandison's

21   information.  I think he said that it occurred on

22   the fifth, sixth floor.

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                    (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison            vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL            Thursday, April 3, 2008

Page 34

1   what was going on as he went from the fifth floor to

2   the sixth floor to the seventh floor.

3       Q.    Okay.  Did you see the incident?

4       A.    No, sir.  There were no camera coverages

5   specifically of the freight elevators.

6       Q.    Okay.  How long did you view the tape?

7       A.    That probably took me about seven, eight

8   hours.  That was over a few days' period.  I

9   couldn't just sit there and review tapes.

10      Q.    And you mentioned that there was a tech

11  with you.  Was there anybody else with you during

12  this time period?

13      A.    He didn't actually view it.  He helped me

14  set it up and told me which tapes would be the ones

15  to pull.  I viewed it.  After I viewed it, I had

16  others view it to verify the information.

17      Q.    Okay.  And who were the others that you had

18  view it?

19      A.    Sergeant Richardson.

20      Q.    Who is he?

21      A.    Sergeant Richardson?

22      Q.    Yes.

Travis Grandison                 vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL           Thursday, April 3, 2008

Page 35

1      A.    I'm not sure whether or not Al League

2   viewed that one or not.

3      Q.    Who is that?

4      A.    Al League.

5      Q.    Al League?

6      A.    I know he viewed one, but I'm not sure if

7   he viewed that incident.    And Officer McNeill, the

8   union steward.

9      Q.    Why was the union steward viewing the tape?

10      A.    Based on the information that I saw, I

11   wanted to make him aware that I would be doing a

12   disciplinary report on Grandison for failure to

13   comply with the directive he had been given.

14      Q.    Had you done work -- when you were at the

15   GAO were there other workmen's compensation cases?

16      A.    No, sir.

17      Q.    Did you have cause to use the tape to view

18   your employees during the time you were there?

19      MR. MORRIS:    Objection as to from, but you

20   may answer the question.

21      THE WITNESS:    If the client asked me to

22   view something, such as we had a car that struck a

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                                (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison              vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 62

1  knowledgeable of it.  Whereas, non-willful

2  insubordination is -- you didn't really know that

3  you were not in compliance with.

4      Q.    I see.  Why was Mr. Grandison terminated?

5      A.    It was for willful insubordination.

6      Q.    And what was that?

7      A.    He was given specific guidance to ensure

8  that his uniforms were -- that his tie was secured

9  properly during the winter uniform time frame, which

10  means you're supposed to be in a long sleeve shirt.

11  Your tie is to be clasped, your hat is to be on.

12      Q.    And did that come from the tape?

13      MR. MORRIS:  Objection as to form, but you

14  can answer his question.

15      THE WITNESS:  Yes, sir.  During the time I

16  was reviewing the tape as I was investigating his

17  alleged injury, that's where I saw him.  Four days

18  after being told that he needed to have his uniform

19  in compliance, he was out of compliance again.

20      BY MR. SCHIFFRES:

21      Q.    What other people have been terminated for

22  uniform issues such as a tie?

Travis Grandison              vs.      Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 77

1    bosses.  I was not Mr. Bodle's boss.

2            BY MR. SCHIFFRES:

3    Q.   Isn't it true that you could have gone a

4    step further to find out about the alleged incident?

5            MR. MORRIS:  Objection as to form, but you

6    can answer the question.

7            THE WITNESS:  Again, I didn't feel that it

8    was for me to answer his allegations that were

9    occurring at the other workplace.

10           BY MR. SCHIFFRES:

11   Q.   When did you determine that Mr. Grandison

12   should be fired?

13   A.   It would have been after the incident and I

14   didn't make the determination that he should be

15   fired.

16           I made the recommendation for his dismissal

17   based on the facts and that was -- that would have

18   been after 2 April and I would have done a

19   disciplinary report on his return.  We would have

20   discussed it and then the recommendation, along with

21   this information, would have been sent up to

22   headquarters.

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters        Toll Free (888) 534-1225
www.mar-reporting.com                                                     (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison            vs.     Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 78

1     Q.   And what do you mean, On his return?

2     A.   At the point in time where I saw the

3   insubordination where he was not in compliance with

4   the contract, he was on compensation.  So until he

5   returned, I could not address with him the

6   disciplinary report.

7     Q.   Do you recall when that tape was made where

8   his tie wasn't on right?

9     A.   That would have been the same night as the

10  incident with the freight elevator.

11    Q.   Do you recall what night that was?

12    A.   It was 2 April, I believe.

13    Q.   That's when the tape was made?

14    A.   Yes, sir.  The recording was concerning

15  where he got injured that night was when the tape

16  was on.

17    Q.   Okay.  But when did he get fired?

18    A.   That would have been after he had come back

19  from his compensation.

20    Q.   And when did he get fired?

21    A.   I'm not sure off the top of my head.

22    Q.   It is fair to say it would be in May?

Travis Grandison          vs.       Wackenhut Services Inc.
Deposition of CHARLES CARROLL        Thursday, April 3, 2008

Page 79

1      A.    Most likely.  It would have been after he

2    returned back where he and I would have sat down

3    with the disciplinary report with McNeill present,

4    gone over the disciplinary report and sent that up

5    to NCR and then NCR would have processed all of the

6    information and made a final determination.

7      Q.    How come it took that period of time from

8    April 2nd through, possibly, to May to terminate

9    him?

10         MR. GRANDISON:  The 25th.

11         MR. SCHIFFRES:  May 25th.

12         THE WITNESS:  Again, it would have been

13   based on me having the opportunity to sit down with

14   him and the worker's compensation because he wasn't

15   available to come to the site.  I tried to do his

16   compensation forms, get in that portion, trying to

17   complete it and fill out the documentation.

18         BY MR. SCHIFFRES:

19      Q.    While you were doing the compensation

20   forms, is it fair to say that you knew about this

21   particular incident, the taping?

22         MR. MORRIS:  Objection as to form, but you

Travis Grandison            vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 80

1    may answer the question.

2        THE WITNESS:  I'm not sure of the exact

3    sequence of when the disciplinary report was sent up

4    until the point in time where he and I sat down and

5    discussed the discipline and the compensation.

6    Those were all kind of intermingled.

7        Until I sat down with Travis Grandison, the

8    disciplinary action or report wouldn't have been

9    sent up to NCR until I could sit down with him, so

10   no determination had been made at that point.

11       BY MR. SCHIFFRES:

12   Q.    When did you sit down with him?

13   A.    It would be based on the date that he

14   signed on the disciplinary report and it would have

15   been the day I sat down with him.

16   Q.    Was anybody else with you at that time?

17   A.    Most likely the union steward was present

18   as well.

19   Q.    And would that be Mr. McNeill?

20   A.    Yes, sir.

21   Q.    Okay.  Your testimony when we started this

22   deposition was that you weren't aware of any EEOC

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                    (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

S.J. EX. 2

CARROLL TRANSCRIPT

PART 2 OF 2

Travis Grandison              vs.     Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 84

1      A.    If Mr. Conry requested information, I would

2  write it down, yes, sir.

3      Q.    Was there a written procedure?

4      A.    Not that I recall.

5      Q.    Did anybody else inform you that

6  Mr. Grandison had filed a discrimination complaint?

7      A.    No, sir.

8      Q.    So Mr. Conry was the only one?

9      A.    He gave me a call to let me know that there

10  was a pending EEOC complaint.

11      Q.    Is your office at GAO, your particular

12  office?

13      A.    Yes, sir.

14      Q.    Did you have a fax machine there?

15      A.    Yes, sir.

16      Q.    Do you receive faxes there?

17      A.    Yes, sir.

18      Q.    Okay.  Was there a fax machine elsewhere on

19  that floor?

20      A.    Not on that floor that I'm aware of.

21      Q.    Were employees permitted to receive faxes?

22      A.    Yes, sir.  On the Wackenhut fax, yes, sir.

Travis Grandison          vs.     Wackenhut Services Inc.
Deposition of CHARLES CARROLL        Thursday, April 3, 2008

Page 85

1        Q.    Okay.   And what was the category of faxes

2    they could receive?

3        A.    I pretty much authorized all of the

4    officers to receive or send anything that they

5    wanted to on the Wackenhut fax.

6        Q.    Okay.   I assume that you're saying there's

7    a GAO fax?

8             MR. MORRIS:   Objection as to form.

9             Could you repeat the question, please?

10            MR. SCHIFFRES:   You want me to repeat it?

11            MR. MORRIS:   Yes, please.

12            BY MR. SCHIFFRES:

13       Q.    Is there a GAO fax machine?

14       A.    Yes, sir.

15       Q.    And where is that located?

16       A.    There are GAO fax machines throughout the

17   building.

18       Q.    Okay.   Isn't it fair to say that

19   Mr. Grandison was disciplined for using the fax

20   machine?

21       A.    Yes, sir.

22       Q.    Okay.   Could you describe in detail what

M.A.R. Reporting Group, L.L.C.   Professional Stenotype Reporters   Toll Free (888) 534-1225
www.mar-reporting.com                                              (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison              vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL         Thursday, April 3, 2008

Page 86

1    occurred with that incident?

2         A.    At the point in time where he utilized the

3    fax, the government found a fax that had come in on

4    a government fax that was to the attention of

5    Mr. Grandison.  That information was provided to the

6    COTR.

7         Q.    The GAO employees provided that to the

8    COTR?

9         A.    Yes, sir.

10        Q.    Okay.  Which employee, do you recall?

11        A.    He didn't have to provide that to me.  He

12   just let me know that he had a fax that had been

13   sent over a GAO fax machine.

14        Q.    Well, how did you find out about it?

15        A.    Through the COTR.

16        Q.    Okay.  And what did he say?  What was your

17   conversation with him then?

18        A.    He expected disciplinary action to be

19   taken.

20        Q.    Had other people, other employees, received

21   faxes at that particular fax?

22        A.    Not that I'm aware of.

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                      (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison           vs.      Wackenhut Services Inc.
Deposition of CHARLES CARROLL           Thursday, April 3, 2008

Page 87

1    Q.    Was there a specific warning with regard to

2    the fax machine, that it could not be used for

3    non-work purposes?  I'm talking -- let me clarify.

4         The fax machine I'm talking is a GAO fax

5    machine.

6         MR. MORRIS:  Objection as to form, but you

7    may answer the question.

8         THE WITNESS:  We were not authorized to use

9    any government equipment other than for government

10   duties.

11        BY MR. SCHIFFRES:

12   Q.    Well, when could you use the GAO fax

13   machine or receive things on a GAO fax machine?

14   A.    You were not authorized.  You were supposed

15   to use the Wackenhut fax which was downstairs.

16   That's why we had to have a fax.

17   Q.    So just so I've got it in my mind, none of

18   the employees of Wackenhut at the GAO could receive

19   faxes at the GAO fax?

20   A.    They were not authorized to unless it was

21   dealing with duties or information dealing with GAO.

22   It had to be towards a GAO job, such as if an

Case 1:07-cv-00754-RMC    Document 29-11    Filed 06/09/2008    Page 6 of 12

Travis Grandison          vs.     Wackenhut Services Inc.
Deposition of CHARLES CARROLL         Thursday, April 3, 2008

Page 88

1    individual wanted to have an ID and they were in

2    another building or at another state, they would sit

3    there and fax information to the ID clerks so that

4    they could make an ID for that GAO employee.

5        Q.    Would it be fair to say that information

6    concerning a workmen's compensation claim would be

7    allowed under the definition you just gave?

8        A.    No, sir.

9        Q.    Why?

10       A.    Because it wasn't dealing with GAO.  That

11   was dealing with WSI.

12       Q.    Isn't it a fact that your testimony prior

13   was that the GAO was concerned about the workmen's

14   compensation?

15       A.    No, sir.  They were concerned that it was

16   dealing with an elevator.  They had no concern over

17   the worker's comp.  That dealt WSI.  They were

18   concerned with that it was a government elevator

19   that was involved.

20       Q.    So any medical records or things related to

21   the workmen's compensation claim that came over the

22   GAO fax, Mr. Grandison wasn't allowed to receive?

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                                (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison          vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 89

1        A.    He could have sent it to the WSI fax

2    machine.  He was authorized to use that one to

3    receive faxes.

4        Q.    But couldn't --

5        A.    None of the officers were authorized --

6        Q.    The -- okay.

7              MR. MORRIS:  Let him finish.

8              THE WITNESS:  None of the officers were

9    authorized to use GAO equipment for personal.

10             BY MR. SCHIFFRES:

11       Q.    Besides Mr. Grandison, has any other

12   employees of Wackenhut ever used that fax machine in

13   the time you were there?

14       A.    I would say the ID clerks would have used

15   it, but it would have been in support of GAO.  I'm

16   not aware of anybody using it for personal use.

17       Q.    Okay.  I'm not aware where ID clerks are.

18             MR. MORRIS:  I think he's asking you --

19             BY MR. SCHIFFRES:

20       Q.    What is an ID clerk?

21       A.    They were the clerks that handled the ID

22   Section making IDs for GAO employees.

Travis Grandison             vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL        Thursday, April 3, 2008

Page 138

1    Q.    Sergeant Foster was not there.  When did

2    Sergeant Foster get there?

3    A.    I'm not sure, but I was there before he

4    was.

5    Q.    Yes, I understand.  Okay.  Do you know how

6    many times Sergeant Foster was disciplined?

7    A.    No, sir.

8    Q.    Okay.  Did you read the allegations that

9    the plaintiff made about Sergeant Foster's behavior

10   on the job?

11   MR. MORRIS:  Objection as to form.

12   What allegations are you referring to?

13   MR. SCHIFFRES:  The fact that he was drunk;

14   the fact that he was sleeping.  The facts that he

15   was wanting people to have certain uniforms, wear

16   certain uniforms in a certain way where he never did

17   it and the fact that he was harassing the plaintiff.

18   MR. MORRIS:  I think the questions are, did

19   you read those allegations.

20   THE WITNESS:  Yes, sir.  I read the

21   allegations.

22   BY MR. SCHIFFRES:

Travis Grandison              vs.      Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

1    Q.    And did you do anything to follow up on

2    those allegations?

3    A.    Yes, sir.

4    Q.    And that was?

5    A.    Ultimately, it resulted in Foster's

6    termination.

7    Q.    What did you do?  You're saying ultimately.

8    A.    We investigated it and it resulted in

9    Foster's termination.

10    Q.    When did you start the investigation of

11    Foster?

12    A.    We carried Foster a whole slew of different

13    items that you brought up.

14    Q.    When did you start?  Did you start

15    investigating Foster when the plaintiff made these

16    allegations?

17    A.    On which one?

18    Q.    Any of them.

19    A.    Again, you're --

20    Q.    When he made the allegations.  I went

21    through four of them just now.

22    A.    Right.

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                        (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

Travis Grandison          vs.      Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 145

1    to use government equipment.

2        Q.    Would it be clearer that somebody faxed

3    something, if Mr. Grandison faxed something, he's

4    using government equipment, correct?

5        A.    Yes, sir.

6        Q.    But he received something.  He's not using

7    government equipment, is he?

8        A.    Yes, sir, he is.

9        Q.    How so?

10       A.    He had to have provided the number to the

11   individual to use that fax.  So he's telling --

12       Q.    Are you just speculating that, sir?

13       A.    No, sir.

14       Q.    Were you aware of the fact that Gallagher

15   Bassett Insurance Company filed what's known as a

16   Notice of Contravention, Initial Denial of the

17   Plaintiff's Workmen's Compensation Claim?

18       A.    No, sir.

19       Q.    Okay.  After his injury, do you know when

20   he -- at work -- do you know the date that he

21   returned to work?

22            MR. MORRIS:  Objection as to form, but you

Travis Grandison              vs.     Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 146

1    may answer the question.

2              THE WITNESS:  No, sir.

3              BY MR. SCHIFFRES:

4       Q.    No?

5       A.    I don't know the specific date.

6       Q.    Was it in May of 2006?

7       A.    I believe so.

8       Q.    Okay.  Did you hold up his workmen's

9    compensation application because it didn't have

10   what's called a Medical Certification for workmen's

11   compensation?

12             MR. MORRIS:  Objection as to form, but you

13   may answer the question.

14             THE WITNESS:  No, sir, because I actually

15   ended up sending it without all of the information

16   based on what information I still had.  Although I

17   was trying to receive all of the information that I

18   needed to fill it out, I still forwarded it without

19   it.

20             BY MR. SCHIFFRES:

21      Q.    And you forwarded it the same day?

22             MR. MORRIS:  Objection as to form, but you

Travis Grandison          vs.    Wackenhut Services Inc.
Deposition of CHARLES CARROLL          Thursday, April 3, 2008

Page 161

1    DISTRICT OF COLUMBIA, to wit:

2          I, Timothy R. Yancey, before whom the

3    foregoing deposition was taken, do hereby certify

4    that the within-named witness personally appeared

5    before me at the time and place herein set out, and

6    after having been duly sworn by me, according to

7    law, was examined by counsel.

8          I further certify that the examination was

9    recorded stenographically by me and this transcript

10   is a true record of the proceedings.

11         I further certify that I am not of counsel

12   to any party, nor an employee of counsel, nor

13   related to any party, nor in any way interested in

14   the outcome of this action.

15         As witness my hand and notarial seal this

16   _____ day of _____, 2008.

17

18

19         _____

20              TIMOTHY R. YANCEY

21              Notary Public

22   MY COMMISSION EXPIRES:    07/14/08

M.A.R. Reporting Group, L.L.C.    Professional Stenotype Reporters    Toll Free (888) 534-1225
www.mar-reporting.com                                    (703) 534-1225

0f31d0d5-8ddb-4d5d-8b96-b8443eb75074

S.J. EX. 3

GRANDISON
TRANSCRIPT & EXHIBITS

PART 1 OF 11

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3

4    - - - - - - - - - - - - - - -x          COPY
                                  :
5    TRAVIS GRANDISON,            :
                                  :
6              Plaintiff,         :
                                  :
7         vs.                     :  Civil Action No.
                                  :  1:07-cv-00754 (RMC)
8    WACKENHUT SERVICES,          :
     INCORPORATED,                :
9                                 :
               Defendant.         :
10   - - - - - - - - - - - - - -x VOLUME I

11                                Washington, D.C.

12                                Tuesday, February 5, 2008

13   Videotaped Deposition of

14                  TRAVIS GRANDISON

15       Plaintiff, taken on behalf of counsel for the

16   Defendant in the above-entitled matter, before Denise

17   M. Brunet, RPR and Notary Public in and for the

18   District of Columbia, taken at the offices of Arent

19   Fox LLP, 1050 Connecticut Avenue, Northwest,

20   Washington, D.C., commencing at 10:02 a.m., when were

21   present on behalf of the respective parties:

22

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 30

1       Q       Did you leave voluntarily?

2       A       Yes.

3       Q       Why did you leave Coastal International

4    Security?

5       A       I went and worked at Wackenhut and also had

6    another job.

7               (Thereupon, the document was marked as

8               Grandison Deposition Exhibit No. 3 for

9               identification.)

10              BY MR. MORRIS:

11      Q       The court reporter has marked and I'm

12   handing to you a document denominated Grandison

13   Deposition Exhibit Number 3.

14              Is Grandison Deposition Exhibit Number 3 a

15   copy of Wackenhut's job offer to you?

16      A       It looks like it is.

17      Q       Is that your signature that appears at the

18   bottom of Grandison Deposition Exhibit Number 3?

19      A       It appears to be.

20      Q       Who was involved in the decision to hire

21   you at Wackenhut?

22      A       Oh, I can't remember his name.  Oh.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

1    ago.

2        Q    And what is Frontier's full name?

3        A    I think it's Frontier Security Systems

4    Integrators.  Integrators is part of their name.  I

5    know that.

6        Q    Integrate --

7        A    Integrators.

8        Q    Other than Lieutenant or Captain Bullock,

9    have you had any other supervisors during your

10   employment with Frontier -- rather, with

11   Startech/Frontier?

12       A    No.

13       Q    Direct your attention to paragraph 25 of

14   Grandison Deposition Exhibit Number 1.

15       A    Deposition Number 1?

16            MR. SCHIFFRES:  He's talking about the

17   complaint.

18            THE WITNESS:  Okay.  You said page 5?

19            BY MR. MORRIS:

20       Q    No.

21            MR. SCHIFFRES:  Twenty-five.

22

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 66

1          BY MR. MORRIS:

2      Q      Paragraph 25 on page 5.

3      A      Paragraph 25 on page 5.  Okay.

4      Q      Paragraph number 25 recites that your

5  supervisor at Startech reported various information to

6  you.

7          Is the supervisor referenced in

8  paragraph 25 Captain Bullock?

9          THE WITNESS:  Do you want me to answer that

10  question?

11          MR. SCHIFFRES:  Yes, but I want you to

12  understand.  If you need to, read over number 25.

13          THE WITNESS:  Yep, it would be Lieutenant

14  Bullock.  And there were some other officers as well

15  as myself that were present when GAO personnel entered

16  the building and actually harassed my coworkers.

17          BY MR. MORRIS:

18      Q      We'll get to that in a moment.  For now I'd

19  like you to tell me, please, specifically every

20  statement that Lieutenant or Captain Bullock made to

21  you that's contemplated in paragraph 25 of Grandison

22  Deposition Exhibit Number 1.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

1          BY MR. MORRIS:

2     Q     How many conversations did Ms. --

3  Lieutenant or Captain Bullock have with you on that

4  subject?

5     A     I can't give you a specific number.  I can

6  give you an approximate number.

7     Q     Approximately how many?

8     A     Maybe four.

9     Q     When did that first conversation occur?

10    A     I don't remember the exact date.

11    Q     Approximately when?

12    A     I will say probably within one to four

13 weeks after -- I can't remember whether -- I can't

14 recall whether -- one -- I say approximately one to

15 four weeks after I started working at Startech, which,

16 coincidentally, is directly across the street from the

17 GAO building.

18    Q     Who were the gentlemen who harassed,

19 according to Lieutenant Bullock or Captain Bullock,

20 her?

21    A     One of the guy's names -- I can't recall

22 his name.  I may have it written down somewhere.  I

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 72

1    can't recall his name, but I can definitely get his

2    name. But the other gentleman's name was Bodle. His

3    last name was Bodle.

4         Q    B-o-d-l-e?

5         A    Yeah. And there may have been two Os. But

6    I -- there may have been one O. I'm not sure.

7         Q    For whom does Mr. Bodle work or for whom

8    did he work at the time that he did what Lieutenant

9    Bullock described?

10        A    I believe he worked for GAO. I'm not sure

11   if he did or did not work for Wackenhut, but he had a

12   lot of involvement in what the security officers'

13   roles were and what we were -- what role we played in

14   the GAO building. He was some kind of security,

15   physical security specialist of security personnel.

16   That's the best I can tell you.

17        Q    Are you aware of any evidence at all that

18   he worked for Wackenhut?

19        A    No.

20        Q    This other individual whose name you cannot

21   recall, for whom did he work?

22        A    I don't know. I think he worked for GAO as

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 74

1    dialogue between those individuals and Captain

2    Bullock.  They will probably be better served to tell

3    you what they heard specifically.

4        Q    Are you aware of any occasion on which

5    anyone in Wackenhut's employee or anyone serving as an

6    agent of Wackenhut made any disparaging remark about

7    you to Startech or anyone at Startech?

8        A    Yeah.  That indicate -- that -- those

9    instances where they came into the building and

10    requested information and made the statements that,

11    you know, my -- my coworkers and my supervisor, if

12    they protected me, then they would go down just like I

13    go down.  Those are to me disparaging remarks.  It's

14    got nothing to do with GAO at all.

15        Q    Those remarks, as I understand it,

16    Mr. Grandison, were made by Mr. Bodle and this other

17    individual whose name you cannot recall; am I

18    correct --

19        A    Right.

20        Q    -- in that understanding?

21        A    Right.

22        Q    My question, then, is different.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 75

1              Are you you aware of any occasion on which

2     any Wackenhut employee or agent of Wackenhut said

3     anything disparaging about you to anyone at Startech?

4              MR. SCHIFFRES:  Do you understand the

5     question?

6              THE WITNESS:  Yeah.

7              No, I don't -- I don't -- I don't recall.

8     I don't -- I don't know.  I'll have to go back and

9     check and -- and talk to some of the officers at both

10    locations and find out who said what.

11             BY MR. MORRIS:

12       Q    All right.  At this moment -- I want to

13    make sure I understand.  At this moment, you cannot

14    identify any occasion on which any agent or employee

15    of Wackenhut said anything disparaging about you to

16    anyone at Startech; am I correct?

17       A    Yep.

18       Q    Paragraph 25 of Grandison Deposition

19    Exhibit Number 1 recites that the conduct of Mr. Bodle

20    and the other individual whose name you cannot recall,

21    were, quote, approved and instigated by Defendant,

22    which is, of course, Wackenhut.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 76

1          What's the basis for the contention that

2    Wackenhut had anything to do with approving or

3    instigating Mr. Bodle's or this other individual's

4    conduct?

5          A    I don't know.

6          Q    Are you aware of any evidence at all that

7    supports a conclusion that Wackenhut had anything to

8    do with instigating or approving Mr. Bodle or the

9    other individual's conduct?

10         A    Yeah.  The evidence is that if Bodle and

11   this other gentleman work for GAO, they have nothing

12   to do with a Startech employee.  Them asking about my

13   work status at another location is -- it's a huge

14   question as to why they would be threatening coworkers

15   of mine and supervisors of mine as to my work status

16   at another location when they should have absolutely

17   nothing to do with when I started and where I work

18   now.

19         The reason they were there was because

20   Wackenhut was suspending me left and right, left and

21   right, and I just sat back and watched the entire

22   process unfold.  But in the meantime, I looked at it

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 97

 1    correct?

 2        A    I'm still employed with Startech or

 3    Frontier, so no.  But that has more to do with me and

 4    what I had already communicated to Startech and what I

 5    had in writing and what other individuals between

 6    those two locations could verify.  That's all.

 7        Q    Nothing that Wackenhut did caused Startech

 8    to breach its contract with you in any way; is that

 9    correct?

10        A    That's correct.

11        Q    What's the basis for your contention that

12    Wackenhut -- that Wackenhut intended to procure the

13    breach of your contract with Startech?

14        A    I think the connection between Bodle and

15    the other gentleman and their boss and Wackenhut

16    working as a group enforcing Wackenhut's policies,

17    changing policies, recommended discipline, I think

18    their involvement is -- is -- is where the connection

19    comes into play.

20            And that's why I feel like Wackenhut

21    definitely had something to do with it, because if

22    they didn't, GAO employees, if they're GAO employees,

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 100

1  thing with them coming to my job and threatening my

2  coworkers was careless.  It was -- like I said, I

3  wasn't surprised that they would do it.  A lot of

4  things that they did, a lot of things that they said,

5  just the day-to-day harassment, it didn't surprise me,

6  and I just sat back and I watched it and I wrote it

7  down.

8        Q    There was a period of time when you were

9  off during May 2006 because of an injury, is that

10 correct, off of your job at Wackenhut because of an

11 injury; is that correct?

12       A    Right.

13       Q    That was during the month -- virtually the

14 entire month of April 1980 -- rather 2006; is that

15 correct?

16       A    Right.

17       Q    Did you work at Startech during that time?

18       A    No.

19       Q    Did you report for duty at Startech at that

20 time?

21       A    No.

22       Q    What was your relationship with Startech

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 106

1    of everybody on my way out, he'd be like, oh,

2    Grandison, stop, stop, Grandison.  What's wrong with

3    your uniform.  Looks like you didn't take it to the

4    cleaners.  And I don't say nothing.  He says you --

5    the next time you come in here and you haven't taken

6    your uniform to the cleaners, I'm going to send you

7    home.

8           And then he says you don't have any creases

9    in your pants -- now, I don't know if you guys seen

10   security pants, but they all come with basically

11   creases buried in them -- you don't have creases in

12   your pants, and you don't -- and your shirt is not

13   ironed, and on this particular day, I had a jacket on,

14   and I remember.  And I just looked at him and I said

15   are you finished.  And he's like get to post.

16          And that happened on a daily basis for me

17   being asked for my commission, which is my --

18   Q     Sir, stop, stop, stop.

19   A     -- credentials --

20   Q     I'm asking you about dress right now.

21          MR. SCHIFFRES:  Objection.  Please don't

22   tell him to stop.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 107

1          MR. MORRIS:  Wait, he's --

2          MR. SCHIFFRES:  He's responding to your

3    question.  If you have --

4          MR. MORRIS:  He's veering --

5          THE WITNESS:  You know what, Mr. Morris --

6          MR. MORRIS:  He's veering from the

7    question.  Let's focus on --

8          THE WITNESS:  No, let me answer that about

9    dress.  Let me answer that about dress, because he's

10   not aware what goes on in security and what constitute

11   dress and uniform.

12          Your credentials is part of your uniform.

13   Without your credentials, you are not even allowed to

14   be on post.  So your credentials are part of your

15   uniform, as well as your hat and as anything else,

16   your badge, anything else that you're supposed to have

17   on.  It's part of your uniform.

18          BY MR. MORRIS:

19     Q    All right.  Continue answering the question

20   with a focus on the uniform, please.

21     A    That is the -- I'm going to say this one

22   more time.  Your credentials is part of the uniform.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 108

1     Your ID badge, your name tag is a part of the uniform.

2          Q     Continue answering the question, please.

3     And what I'm looking for is each instance on which you

4     were -- on which a Wackenhut officer --

5          A     I know what you're looking for.

6          Q     -- or official made an improper or false

7     allegation regarding your dress while overlooking acts

8     of female officers.

9          A     Well, like I said, the pants --

10               MR. SCHIFFRES:  There's no well --

11               THE WITNESS:  -- the uniform --

12               MR. SCHIFFRES:  There's no while -- excuse

13     me.  Mischaracterizes number 10.  There's no while

14     overlooking acts of females.  It says overlooking

15     acts.

16               THE COURT REPORTER:  It says what?

17               MR. SCHIFFRES:  It says overlooking acts.

18     There's no while before overlooking.

19               Go ahead, I'm sorry.

20               THE WITNESS:  Now, you know, just to get

21     you on this female act thing.  The -- the point of

22     reference for their -- what I believe to be their

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 109

1    point of reference, other than harassing me about the

2    pants issue, was that there were a number of officers

3    there that had cuffs in their pants and they were

4    females, and that's where that comes from.

5            In addition, they had issues about wearing

6    hats underneath your 8-point hat, and typically you do

7    that because of the weather and/or because to absorb

8    the sweat, and they let women wear that every day,

9    every day.  And that was another issue that they had

10   with me.  And as can you see, I'm bald, so there's no

11   hair to absorb any sweat at all.

12           The other issues are uniform.  Uniform

13   issue was a daily thing.  And like I was saying, I was

14   told that my shirt wasn't ironed, and I had a jacket

15   on.  I've come in and I've been told that my shoes

16   weren't spit-shine clean and that I'll be sent home.

17   I've been sent home for not having the proper type of

18   shoe on, and other individuals, including the

19   supervisor, did not have the proper shoes on.

20           I mean, when it comes to the uniform, you

21   name it, and there were comments and issues that I

22   heard on a daily basis.  I mean, it was -- it was

Page 110

1    clear-cut provoking.  I mean, it couldn't be any more

2    provoking.  And probably 5, 10 years ago, I would have

3    lined right up and hook, sink and ladder, you know,

4    but, like I said, it was -- it was daily, the

5    comments.

6         They would come out to my post -- and I was

7    actually written up before -- got to post and my cuffs

8    were cuffed, sometimes you get to post, your wrists

9    sweat, so you pull them up and -- and I had long johns

10   underneath, and I was written up for not being in

11   proper uniform for that.

12        I was written up for not having my 8-point

13   hat on while I was doing a round, I think it's

14   post 18, which takes you about an hour and 45 to

15   2 hours, depending on how fast you move and how well

16   you know the locations of the card readers, and I was

17   told by a supervisor that I didn't have to wear my

18   hat.  And no one -- I'm not going to say no one, but

19   typically, the officers that -- that man that post,

20   when they do their rounds, they don't wear their hat

21   because it's constant walking and you're going to

22   sweat.  And then they tell you that you can put your

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 111

1    hat back on.

2          I got -- I got suspended for that, and when

3    I brought it up to Mr. Carroll that I was told that

4    I -- that I didn't have to wear my hat and that

5    typically the officers don't wear it, of course, he

6    went to the supervisor.  The supervisor's not going to

7    say he told me that, but, you know, I got three days

8    in the street for that.

9          And those are the type of instances that

10   happened on a daily basis, daily.  Everything from

11   harassing me about if I have my jacket on, my jacket

12   needs to be zipped up.  I don't know where that came

13   from, but that's, you know, what -- the type of things

14   that I had to deal with on a daily basis.

15         If you wear boots, you got white socks on,

16   I would get harassment about not having black socks

17   on.  It's rarely that officers that have boots on have

18   black socks.

19         It was just a slew of daily just comments

20   and the daily questioning about, you know, my status

21   in terms of my uniform and my credentials.  I was the

22   only officer asked on a daily basis, can I see your

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

1  credentials.  I was just there yesterday.  You just

2  saw my credentials, they look the same, you know the

3  expiration date, but I would be asked every day.  The

4  only officer asked every day.

5          And not only was I treated differently in

6  terms of that but also in terms of post placement.  I

7  would definitely be placed on the most difficult post

8  to work and the posts that were -- what do you say --

9  more visible and definitely the posts that were under

10  the most scrutiny, the posts where there's a higher

11  degree for error.  Those were the posts that I was

12  placed on.  And I kept track of that to some degree of

13  the post placement.

14          Now, you're supposed to rotate the

15  officers -- and this is where the female thing comes

16  into play again -- but however, I never saw any of the

17  so-called lighter posts or even inside posts or rover

18  posts, which are traditionally not as intense as some

19  of the other posts that I was basically designated to

20  work.

21          In addition, I was criticized for not

22  working overtime.  They always had a shortage of

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 152

1      A    Yes.

2      Q    It's true also that the majority of the

3  workers at the GAO site when you worked there were

4  black; is that correct?

5      A    Yes.

6           MR. MORRIS:  All right.  Why don't we take

7  an hour-long -- if that's -- well, let's take a lunch

8  break now.

9           It's now 1:35, approximately.  Why don't we

10 come back at 2:30.

11          THE VIDEOGRAPHER:  We're off the record at

12 1:33.

13          (Whereupon, at 1:33 p.m., a luncheon recess

14          was taken.)

15

16

17

18

19

20

21

22

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 156

1                    THE VIDEOGRAPHER:  Off the record at 2:34.

2                    (Discussion held off the record.)

3                    THE VIDEOGRAPHER:  We're back on the record

4       at 2:35.

5                    BY MR. MORRIS:

6           Q    Mr. Grandison, you have contended, although

7       you've not made it a count, you have alleged that

8       Mr. Foster assaulted you; is that correct?

9           A    Yes.

10          Q    Did he -- did he assault you on May 2 --

11      pardon me -- March 2nd, 2006?

12          A    I believe that was the date.

13          Q    Mr. Foster was not a Wackenhut employee on

14      the day he assaulted you, was he?

15          A    I'm not sure.  I believe he was terminated

16      that day, earlier during the course of that day, and

17      was allowed to remain in the building for

18      approximately 2 hours.  And that's when the incident

19      occurred.

20                   MR. MORRIS:  Would you mark this as our

21      next exhibit?

22                   (Thereupon, the document was marked as

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 157

1              Grandison Deposition Exhibit No. 23 for

2              identification.)

3              BY MR. MORRIS:

4         Q    Mr. Grandison, the court reporter has

5    marked and I'm handing to you a copy of Grandison

6    Deposition Exhibit Number 23.

7              Is it your understanding that Grandison

8    Deposition Exhibit Number 23 is a copy of Mr. -- of

9    the letter terminating Mr. Foster?

10        A    Uh-huh, yes.

11        Q    And you'll agree with me that it's dated

12   February 26 -- 28, 2006?

13        A    Yes.

14        Q    You prepared a memorandum that describes

15   the alleged assault; is that correct?

16        A    Yeah, I think I did.  Yes.

17             (Thereupon, the document was marked as

18             Grandison Deposition Exhibit No. 24 for

19             identification.)

20             BY MR. MORRIS:

21        Q    Directing your attention to the document

22   that I'm handing you now that's captioned Grandison

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 158

1    Deposition Exhibit Number 24, is Grandison Deposition

2    Exhibit Number 24 a copy of the memorandum that you

3    prepared describing the alleged assault?

4         A    Yes.

5         Q    Is it -- does it fully and accurately

6    describe the incident?

7         A    Yes.  To my knowledge, yes.

8         Q    Does it leave any fact out?

9         A    I don't know.  Let me read.

10        Q    Please don't mark the document.

11        A    Right.  Yeah.

12        Q    Does it leave out any facts, sir?

13        A    No.

14        Q    Do you have a copy of the police report

15   that you filed relative to the alleged assault?

16        A    No.

17        Q    Do you have a copy of any other documents

18   that relate to the alleged assault?

19        A    No.

20        Q    Are you aware of any evidence that supports

21   a conclusion that Wackenhut authorized Mr. Foster to

22   strike you in the way that you describe in Grandison

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 159

```
 1    Deposition Exhibit Number 24?

 2         A    No.

 3         Q    Are you aware of any evidence that supports

 4    the conclusion that Wackenhut -- that -- pardon me --

 5    that Mr. Foster was acting on Wackenhut's behalf when

 6    he -- when he acted -- when he did what he did --

 7    pardon me -- when he did what he's described as doing

 8    in Grandison Deposition Exhibit Number 24?

 9         A    No.

10         Q    So far as you are aware, Mr. -- Mr. Foster

11    was acting on his own; is that correct?

12         A    I wouldn't say that.

13         Q    Do you have any evidence to support a

14    conclusion that he was not acting on his own?

15         A    I'd say the evidence that -- the fact that

16    he was in the meeting, challenging, using foul

17    language, and Mr. Carroll and the captain, project

18    manager and the captain were both less than 10 feet

19    from his location is -- it just seems like they

20    allowed it to continue to happen.

21              And it was almost strange because you walk

22    in and here's this person in the corner yelling and
```

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

# S.J. EX. 3

# GRANDISON
# TRANSCRIPT & EXHIBITS

# PART 2 OF 11

Page 170

1   Ruthie Rouse and nothing was done.  I never had a

2   discussion with Mr. Carroll about the incident, and

3   Ruthie Rouse, I never had a discussion with her about

4   it.  It was as if it never happened.

5       Q     Ruthie Rouse was your union representative;

6   is that correct?

7       A     She -- she was, yeah.  I guess she -- she

8   wasn't somebody who was in day to day on all of the

9   issues.  She's like the president.  I think she was

10  the president.  She's somebody who I began to send

11  documents to in terms of what was going on after a

12  certain point, but she didn't do anything in the way

13  of addressing any of the issues.

14      Q     But she was a union official; is that

15  correct?

16      A     Correct.

17      Q     You received a disciplinary report in

18  June 2005 for failure to work your assigned hours; is

19  that correct?

20      A     Probably.  I'm not sure.

21            (Thereupon, the document was marked as

22            Grandison Deposition Exhibit No. 25 for

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 171

1          identification.)

2          BY MR. MORRIS:

3      Q      The court reporter has marked and I'm

4   handing now to you a copy of a document denominated

5   Grandison Deposition Exhibit Number 25.

6          Is Grandison Deposition Exhibit Number 25 a

7   true and correct copy of a Wackenhut disciplinary

8   report issued on or about June 1, 2005?

9      A      Yes.

10     Q      And does it relate to your being tardy or

11  not observing your work hours on June 1, 2005?

12     A      Yes.

13     Q      Toward the bottom third of the page is an

14  area for the alleged violator to check either that the

15  violator agrees with the content of the report or does

16  not agree with the contents of the report.

17          Do you see those two options?

18     A      Right.

19     Q      Am I correct that you checked I agree with

20  the contents of the report?

21     A      Right.

22     Q      Was Grandison Deposition Exhibit Number 25

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 172

1    changed in any way?

2        A    No.  No, not to my knowledge.

3        Q    Following up on Grandison Deposition

4    Exhibit Number 25, Wackenhut submitted a memorandum to

5    the record -- rather, for the record concerning your

6    failure to observe your assigned work hours; is that

7    correct?

8        A    I've got to see it.

9             (Thereupon, the document was marked as

10            Grandison Deposition Exhibit No. 26 for

11            identification.)

12            BY MR. MORRIS:

13       Q    The court reporter has marked and I'm

14   handing to you a document denominated Grandison

15   Deposition Exhibit Number 26.

16            Is Grandison Deposition Exhibit Number 26 a

17   true and correct copy of the memorandum for the record

18   that Wackenhut issued in connection with your failure

19   to observe your assigned work hours on or about

20   June 1, 2005?

21       A    Yeah.  Yes.

22       Q    You filed no grievance or otherwise

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 173

1    challenged the memorandum for the record; is that

2    correct?

3        A    Yes.

4        Q    And you are not saying in this lawsuit that

5    there was anything inappropriate with respect to the

6    memorandum for the record or the disciplinary report

7    that are Grandison Deposition Exhibit Number 26 and

8    Grandison Deposition Exhibit Number 25?

9        A    Yes.

10       Q    You're not challenging those; is that

11   correct?

12      A    Yes.

13       (Thereupon, the document was marked as

14       Grandison Deposition Exhibit No. 27 for

15       identification.)

16       BY MR. MORRIS:

17      Q    The court reporter has marked and I'm

18    handing to you, Mr. Grandison, a copy of a document

19    denominated Grandison Deposition Exhibit Number 27.

20       Is Grandison Deposition Exhibit Number 27 a

21    copy -- a true and correct copy of the performance

22    appraisal that Wackenhut prepared on or about 29 --

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 174

1    I'm sorry -- September 29, 2005 relative to your

2    performance?

3         A    Yes.

4         Q    And is that your signature that appears at

5    the top of the signatures column in Grandison

6    Deposition Exhibit Number 27?

7         A    Appears to be.

8         Q    In Grandison Exhibit Number 27, the

9    evaluator noted that you need to improve -- needed to

10   improve in several areas; is that correct?

11        A    Focus more on following rules and

12   procedures of the company.  That's what he stated at

13   the bottom.

14        Q    Well, looking first at the numeric ratings,

15   the evaluator said that you needed to improve with

16   respect to your quality of work, correct?

17        A    Quality of work is 4.

18        Q    And 4 indicates needs improvement, correct?

19        A    Right.

20        Q    The evaluator also said that you needed to

21   improve with respect to your attitude, correct?

22        A    Right.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 175

1      Q      Also that you needed to improve with

2    respect to your initiative, correct?

3      A      Correct.

4      Q      Also with respect to dependability,

5    correct?

6      A      Correct.

7      Q      Also with respect to appearance, correct?

8      A      Correct.

9      Q      And also with respect to adherence to

10   regulations, correct?

11     A      Correct.

12     Q      You did not challenge Grandison Deposition

13   Exhibit Number 27 in any way, did you?

14     A      No.

15     Q      And you are not contending in this lawsuit

16   that there was anything inappropriate regarding

17   Grandison Deposition Exhibit Number 27, correct?

18     A      Well, I think at the point that this was

19   recorded was before the situations got out of hand.

20           Typically, a form like this is passed

21   around on post and they give it to you while you're

22   working, and you sign it.  You look over it and you

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 177

1    told that it wasn't, but no DR's on there.

2            And adherence to rules and regulations

3    established by the company, once again, the only

4    information that I really remember is the tardiness

5    and uniform issues.

6        Q    Sir, the question was:  You are not

7    contending in this lawsuit that there was anything

8    inappropriate with respect to Grandison Deposition

9    Exhibit Number 27; is that correct?

10       A    That's correct.

11       Q    You used a term that I want to make sure I

12   understand.  You used the term DR.

13            Does that stand for disciplinary report?

14       A    Yes.

15       Q    In an earlier response, you used the term

16   SPO.

17            Does that stand for special police officer?

18       A    Yes.

19       Q    On October 15, 2005, Sergeant Derrick

20   Richardson issued a disciplinary report against you

21   concerning your tardiness or failure to observe

22   assigned work hours on October 15, 2005; is that

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 178

1    accurate?

2        A      I got to see it.

3               (Thereupon, the document was marked as

4               Grandison Deposition Exhibit No. 28 for

5               identification.)

6               BY MR. MORRIS:

7        Q      Mr. Grandison, I'm handing to you a

8    document that the court reporter has marked Grandison

9    Deposition Exhibit Number 28.

10              Is Grandison Deposition Exhibit Number 28 a

11   copy of a disciplinary report issued against you on or

12   about October 15, 2005?

13       A      Yes.

14       Q      There's a narrative section toward the

15   middle of the document that describes the alleged

16   offense.

17              Do you see that?

18       A      Right.

19       Q      And there's another opportunity for you,

20   the person alleged to have committed the wrong, either

21   to state that you agree or disagree with the report,

22   correct?

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 180

1    attention, and what he told me was he would check on

2    it and he would get back to me.  And what I did was I

3    contacted the office, Wackenhut's office, and got

4    approval from somebody above him and acceptance into

5    the course and called off of work, let them know that

6    I wasn't going to be there because I was going to

7    training.  And he comes back and says I told you not

8    to go to training.  I told you I would handle it.  And

9    this is something that I definitely would not have

10    agreed to.

11        Q    Is it your testimony, sir, that you did not

12    check the box I agree with the contents of this

13    report?

14        A    Right.

15        Q    Who checked the box, then?

16        A    I don't know who checked the box.

17        Q    Is that your signature that appears under

18    the box checked I agree with the contents of this

19    report?

20        A    Right.

21        Q    It is your signature?

22        A    Right.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 181

```
 1        Q       Did you sign Grandison Deposition Exhibit

 2   Number 28 on November 9, 2005?

 3        A       It appears that way.

 4                And one note about these disciplinary

 5   reports, they force you to sign them no matter what.

 6   They force you to sign them.

 7        Q       Did anyone force you to check the box I

 8   agree with the contents of this report?

 9        A       Like I said, I don't think I checked that

10   because we had a big to-do about that.

11        Q       What do you mean by a big to-do?

12        A       It was a -- it was a discussion about it

13   because he did not tell me not to take the course, and

14   he -- he can't even -- he can't tell me not to go and

15   take the course.  He can't tell me that.

16        Q       Mr. --

17        A       He --

18        Q       I'm sorry.

19        A       If I don't come to work for a particular

20   reason, he can say that the reason wasn't valid, but

21   he can't tell me you can't go and keep your

22   credentials up-to-date when he knows that they're
```

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 183

```
 1        Q     Wackenhut issued a memorandum for the

 2   record in connection with this incident; is that

 3   correct?

 4        A     I don't know.

 5              (Thereupon, the document was marked as

 6              Grandison Deposition Exhibit No. 29 for

 7              identification.)

 8              BY MR. MORRIS:

 9        Q     The court reporter has marked and I'm

10   handing to you a copy of a document denominated

11   Grandison Deposition Exhibit Number 29.

12              Is Grandison Deposition Exhibit Number 29 a

13   copy of the memorandum for the record that Wackenhut

14   issued in connection with the incident we've been

15   discussing?

16        A     Yeah.

17        Q     Did you file a grievance with respect to

18   Grandison Deposition Exhibit Number 29?

19        A     Did I do what again?

20        Q     File a grievance in connection with

21   Grandison Deposition Exhibit Number 29.

22        A     I don't -- I don't remember.  I don't
```

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 184

1    remember.

2              And one thing that happened, when he

3    said -- when it says Grandison stated that he called

4    off to attend a CPR/AED training, it wasn't -- I

5    wasn't even asked.  It was in a conversation -- and

6    Richardson was present -- about credentials.  And I

7    mentioned that I had gotten -- did my training on that

8    specific date.

9              And there were no explicit instructions,

10   because there's no explicit instructions in writing as

11   to me not attending that training.

12        Q    Did -- do you have any evidence or

13   information that causes you to believe that Derrick

14   Richardson prepared Grandison Deposition Exhibit

15   Number 28 as he did because of your race?

16        A    No.

17        Q    Do you have any evidence or information

18   that causes you to believe that Derrick Richardson

19   prepared Grandison Deposition Exhibit Number 28 as he

20   did because of your gender?

21        A    No.

22        Q    Do you have any evidence or information

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 185

1   that causes you to believe that Derrick Richardson

2   prepared Grandison Deposition Exhibit Number 28

3   because of your educational attainment?

4        A     Maybe.

5        Q     What is the evidence or information that

6   causes you to believe that?

7        A     Just the information that -- that -- it

8   different.  That, you know, that -- that they're going

9   to single you out for -- for that.

10              You know, I think -- you know, I don't know

11   why he held to this when he knew -- you know, I don't

12   know why he would do that.  I mean, I don't -- you

13   compare this disciplinary report with all the others

14   and it's not even -- it doesn't even compare, you

15   know, to -- to what I'm being disciplined for.

16              You know, I called off to work beforehand.

17   It's -- it's -- you know --

18              MR. SCHIFFRES:  Okay.

19              THE WITNESS:  -- I can call off for

20   whatever reason and -- and -- you know, the question

21   is why --

22

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 186

1          BY MR. MORRIS:

2      Q     Did Sergeant -- did Sergeant Richardson

3   tell you that he disciplined -- pardon me -- that he

4   prepared Grandison Deposition Exhibit Number 28 the

5   way he did because of your educational attainment?

6      A     No.

7      Q     Have you seen anything in writing that

8   supports a conclusion that Sergeant Richardson

9   prepared Grandison Deposition Exhibit Number 28 as he

10  did because of your educational attainment?

11     A     No.

12     Q     Are you speculating, then, that he prepared

13  Grandison Deposition Exhibit Number 28 as he did

14  because of your educational attainment?

15     A     Yes.

16          (Thereupon, the document was marked as

17          Grandison Deposition Exhibit No. 30 for

18          identification.)

19          BY MR. MORRIS:

20     Q     The court reporter has marked and I'm

21  handing to you a document denominated Grandison

22  Deposition Exhibit Number 30.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 187

1              Is Grandison Deposition Exhibit Number 30 a

2      true and correct copy of a disciplinary report that

3      Sergeant Richardson issued against you on or about

4      October 29, 2005?

5          A     Yeah.

6          Q     Is that your signature that appears over

7      the line employee signature toward the bottom third of

8      the page?

9          A     It appears to be.

10         Q     And did you sign Grandison Deposition

11     Exhibit Number 30 on or about November 9, 2005?

12         A     It appears that way.

13         Q     Did you check the box indicating that you

14     agree with the contents of the report?

15         A     I don't know.  I don't know about that.

16              The reason I say I don't know about that is

17     because we were forced to sign, but whether you agreed

18     or did not agree, they never really pushed that, but

19     you -- you definitely were forced to sign.

20         Q     But you don't know whether you signed --

21     whether you checked the I agree box or you didn't

22     check the I agree box?

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 188

1    A    Right.  I don't remember.  But this

2  particular incident, I would have checked it because

3  this happened.

4    Q    So you do agree with the contents of

5  Grandison Deposition Exhibit Number 30?

6    A    Exactly.  Sorry about that.

7        But I think the -- the fact that I live --

8        MR. SCHIFFRES:  You've answered.

9        THE WITNESS:  All right.  That's fine.

10       BY MR. MORRIS:

11   Q    Have you finished your answer, sir?

12   A    I'm finished.

13   Q    Wackenhut issued a letter of reprimand in

14 connection with the infraction described in Grandison

15 Deposition Exhibit Number 30; isn't that correct?

16   A    Say that again.

17   Q    Isn't it correct that Wackenhut issued a

18 letter of reprimand in connection with the infraction

19 described in Grandison Deposition Exhibit Number 30?

20   A    Once again, I got to see that.

21       (Thereupon, the document was marked as

22       Grandison Deposition Exhibit No. 31 for

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 189

1          identification.)

2          BY MR. MORRIS:

3          Q      The court reporter has marked and I'm

4    handing to you a document denominated Grandison

5    Deposition Exhibit Number 31.

6          Is Grandison Deposition Exhibit Number 31 a

7    true and correct copy of a letter -- of the letter of

8    reprimand that Wackenhut issued to you on or about

9    November 10, 2005?

10         A      Yeah.

11         Q      And it relates to the infraction described

12   in Grandison Deposition Exhibit Number 30, correct?

13         A      Uh-huh.

14         Q      You have to say yes or no, sir.

15         A      Yes.

16         Q      You did not file a grievance in connection

17   with Grandison Deposition Exhibit Number 31 or 30,

18   correct?

19         A      Yeah, I would say that's correct.

20         Q      And you are not contending in this

21   litigation that there was anything inappropriate about

22   Grandison Deposition Exhibit Number 30 or 31, correct?

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 190

1        A       Correct.  Except for the check.  I

2    typically -- I typically didn't check whether I agreed

3    or didn't agree.

4        Q       Well, a moment ago, sir, I thought I heard

5    you say you weren't sure whether you checked I agree.

6        A       That's what I'm saying is typically I

7    didn't check whether I agree or didn't agree.  I

8    probably would definitely check whether I didn't

9    agree, but we were forced to sign.  That's what I'm

10   telling you.  And, you know, a lot of the write-ups

11   that they gave in terms tardiness, you know, it was

12   just more or less procedures.

13       Q       I want to make sure I understand.

14               Are you -- is it your testimony that you

15   don't know whether you checked the I agree box?

16       A       Right.

17       Q       Wackenhut issued a diff -- par -- a diff --

18   another disciplinary report on or about November 21,

19   2005 in connection with your being inattentive to duty

20   on November 21, 2005; is that correct?

21       A       I got to see it.

22               (Thereupon, the document was marked as

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 192

1           Is Grandison Deposition Exhibit Number 32 a

2    copy of the disciplinary report that Wackenhut issued

3    on or about November 21, 2005 against you?

4        A    Yeah.

5        Q    And it was requested by Mr. Felton Foster;

6    is that correct?

7        A    It looks that way.

8        Q    And you signed Deposition Exhibit Number 32

9    toward the bottom third of the page?

10       A    Yeah.

11       Q    And did you check the I agree with the

12   contents of this report box?

13       A    I don't recall that.

14       Q    You don't recall one way or the other?

15       A    One way or the other.

16           Well, I would like to make a comment about

17   the disciplinary reports is all of the information at

18   the bottom, this paragraph with the CMC with the

19   parentheses -- that's probably Chuck Carroll's

20   initials -- I don't remember that being there.

21           And all of the recommended 2-day suspension

22   and the signatures at the bottom, they typically don't

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 204

1       A    No.

2       Q    Is it your contention that anything below

3  your signature on Grandison Deposition Exhibit

4  Number 32 was added because of your race?

5       A    No.

6       Q    Because of your gender?

7       A    No.

8       Q    Or because of your educational attainment?

9       A    No.

10      Q    And you didn't file a grievance, by the

11  way, with respect to Grandison Deposition Exhibit

12  Number 32?

13      A    I don't think I did.

14           (Thereupon, the document was marked as

15           Grandison Deposition Exhibit No. 33 for

16           identification.)

17           BY MR. MORRIS:

18      Q    The court reporter has marked and I'm

19  handing to you a document denominated Grandison

20  Deposition Exhibit Number 33.

21           Is Grandison Deposition Exhibit Number 33 a

22  letter of suspension that Wackenhut sent to you in

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 205

1    connection with the infraction described in Grandison

2    Deposition Exhibit Number 32?

3        A    It appears that way.

4        Q    You didn't file a grievance with respect to

5    Grandison Deposition Exhibit Number 33, did you?

6        A    Nope.

7        Q    And am I correct, sir, that you're not

8    contending that Grand -- that Wackenhut issued

9    Grandison Deposition Exhibit Number 33 because of your

10   race?

11       A    No.

12       Q    Let me say that differently.

13            Did Grand -- did Wackenhut issue Grandison

14   Deposition Exhibit Number 33 because of your race?

15       A    I don't -- I don't know.

16       Q    Did Grandison -- pardon me -- did Wackenhut

17   issue Grandison Deposition Exhibit Number 33 because

18   of your gender?

19       A    I don't know.  I really don't know.

20       Q    Did Wackenhut issue Grandison Deposition

21   Exhibit Number 33 because of your educational

22   attainment?

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 206

1       A       No, I doubt it.

2               (Thereupon, the document was marked as

3               Grandison Deposition Exhibit No. 34 for

4               identification.)

5               BY MR. MORRIS:

6       Q       The court reporter has marked and I'm

7       handing to you a document denominated Grandison

8       Deposition Exhibit Number 34.

9               Is Grandison Deposition Exhibit Number 34 a

10      copy of a disciplinary report that Grand -- that

11      Wackenhut issued against you on January 13 -- on or

12      about January 13, 2006?

13      A       Yes.

14      Q       Is that your signature that appears at the

15      bottom third of Grandison Deposition Exhibit

16      Number 34?

17      A       Appears to be.

18      Q       And did you check the box that you agree

19      with the contents of the reports?

20      A       I do not know.

21      Q       You don't know one way or another?

22      A       I do not recall one way or the other.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 207

1       Q       Did you file a grievance with respect to

2  Grandison Deposition Exhibit Number 34?

3       A       I don't think so.

4       Q       Do you contend that Wackenhut issued a

5  disciplinary report -- the disciplinary report which

6  is Grandison Exhibit Number 34 because of your race?

7       A       No.

8       Q       Because of your gender?

9       A       No.

10      Q       Or because of your educational attainment?

11      A       No.

12      Q       Do you agree with the contents of Grandison

13  Exhibit Number 34?

14      A       Just give me one second.

15              Yeah, I do have a -- a -- I guess want to

16  note something that's inaccurate.  And you can correct

17  me if I'm wrong, but it states in the last line, last

18  two lines, it says Grandison resides less than a

19  hundred yards from the GAO building, yet this is the

20  third time in the past quarter that he has been tardy

21  or failed to observe assigned work hours.

22              That statement is not true, and you have

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

S.J. EX. 3

GRANDISON
TRANSCRIPT & EXHIBITS

PART 3 OF 11

1     please.  I'd like you to identify, please, any

2     disciplinary action taken against you within 60 days

3     of January 13, 2006.

4         A     No.

5         Q     You were not -- am I correct, sir, that you

6     were not disciplined at any time within 60 days prior

7     to January 13, 2006?

8         A     It appears that way.

9         (Thereupon, the document was marked as

10         Grandison Deposition Exhibit No. 35 for

11         identification.)

12         BY MR. MORRIS:

13         Q     Directing your attention to Grandison

14     Deposition Exhibit Number 35, am I correct, sir, that

15     Grandison Deposition Exhibit Number 35 is a true and

16     correct copy of a memorandum that -- for the record

17     that was issued as a follow-up to Grandison

18     Deposition -- Deposition Exhibit Number 34?

19         A     Right.  True.  Yes.

20         Q     You filed no grievance in connection with

21     Grandison Deposition Exhibit Number 34 or 35; is that

22     correct?

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 218

1          BY MR. MORRIS:

2     Q    Have you completed your answer, sir?

3     A    Yes.

4     Q    When did you file your charge of

5  discrimination?

6     A    I can't remember.

7          (Thereupon, the document was marked as

8          Grandison Deposition Exhibit No. 36 for

9          identification.)

10         BY MR. MORRIS:

11    Q    The court reporter has marked and I'm

12 handing to you a document denominated Grandison

13 Deposition Exhibit Number 36.

14         Is the second page of Grandison Deposition

15 Exhibit Number 36 the charge of discrimination that

16 prompted the retaliation that you've described?

17    A    Yeah -- yes, to some degree.

18    Q    I don't understand the last comment you

19 made, to some degree.  What does that mean?

20    A    The -- this was the initial claim, and the

21 woman that took the claim, she was hard of hearing and

22 we had a very -- I had a very tough time trying to

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 219

1    explain to her what was going on and her actually

2    being able to understand and follow what I was saying.

3           I came back not long after this and talked

4    to another gentleman, and it was clear, a much

5    different situation.  So -- and these are her words

6    and not mine.  This is what she wrote down.

7       Q    Is that your signature that appears at the

8    bottom left of the second page of Grandison Deposition

9    Exhibit Number 36?

10      A    Yes.

11      Q    Grandison Deposition Exhibit Number 36

12   contains a date stamp on both pages, March 28th, 2006.

13          Is it your understanding that Wackenhut

14   received Grandison Deposition Exhibit Number 36 on

15   March 28th, 2006?

16          MR. SCHIFFRES:  Don't guess.

17          MR. MORRIS:  Sir, it is inappropriate to

18   coach the witness during a deposition.

19          MR. SCHIFFRES:  I'm not coaching.  I'm just

20   telling him not to guess.

21          THE WITNESS:  I don't know.  I really don't

22   know.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 220

1          BY MR. MORRIS:

2      Q     Are you aware of any evidence at all that

3  Wackenhut received Grandison Deposition Exhibit

4  Number 36 before March 28th, 2006?

5      A     I don't -- I don't know.

6      Q     You don't know whether you're aware of any

7  evidence?

8      A     That says what?

9      Q     Are you aware of any evidence that

10  Wackenhut received Grandison Deposition Exhibit

11  Number 36 before March 28th, 2006?

12     A     No.

13     Q     Are you aware of any evidence that

14  Wackenhut knew that you had approached the Equal

15  Employment Opportunity Commission before March 28th,

16  2006?

17     A     No.

18          You know what?  I may need to retract that.

19  Can I do that?

20     Q     What's your answer to the question, sir?

21     A     The -- they may have known because I think

22  I sent something to -- I think I sent something to the

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 222

1    EEOC?

2        A    No.

3        Q    The Equal Employment Opportunity Commission

4    dismissed your charge of discrimination which is

5    Grandison Deposition Exhibit Number 36; isn't that

6    correct?

7        A    Yes.

8            (Thereupon, the document was marked as

9            Grandison Deposition Exhibit No. 37 for

10           identification.)

11           BY MR. MORRIS:

12       Q    Directing your attention to Grandison

13   Deposition Exhibit Number 37, is Grandison Deposition

14   Exhibit Number 37 a copy of the dis -- of the Equal

15   Employment Opportunity Commission's dismissal and

16   notice of rights relative to Grandison Deposition

17   Exhibit Number 36?

18       A    Yes.

19       Q    You have filed a second charge of

20   discrimination with Wackenhut -- pardon me -- against

21   Wackenhut; is that correct?

22       A    Yes.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 223

1              (Thereupon, the document was marked as

2              Grandison Deposition Exhibit No. 38 for

3              identification.)

4         BY MR. MORRIS:

5         Q    The court reporter has marked and I'm

6    handing to you a document denominated Grandison

7    Deposition Exhibit Number 38.

8              Is Grandison Deposition Exhibit Number 38 a

9    copy of the discrimination charge and the notice of

10   discrimination accompanying that second charge of

11   discrimination?

12        A    Yes.

13        Q    Is that your signature that appears on the

14   lower left-hand portion of the second page of

15   Grandison Deposition Exhibit Number 38?

16        A    Yes.

17        Q    What is the status of Grandison Deposition

18   Exhibit Number 38 now?

19        A    I think it's still under investigation.

20        Q    You've received no final conclusion; is

21   that correct?

22        A    No, no final conclusion, but they have

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 238

1    after your car accident?

2        A    Yes.

3        Q    Was there any other time that they

4    offered -- that they gave you permission to use GAO

5    office equipment?

6        A    Every other time they needed some

7    documentation from me.

8             (Thereupon, the document was marked as

9             Grandison Deposition Exhibit No. 40 for

10            identification.)

11            BY MR. MORRIS:

12       Q    The court reporter has marked and I'm

13   handing to you a document denominated Grandison

14   Deposition Exhibit Number 40.

15            Is Grandison Deposition Exhibit Number 40 a

16   copy of a document that you received by fax on a GAO

17   office fax on February 23, 2006?

18       A    Yeah, this is a fax.

19       Q    Is it a copy of a fax that you received on

20   a GAO office fax on January -- on February 23, 2006?

21       A    Appears to be.

22       Q    Would you read the notation in the comment

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 239

1    section, please?

2        A    Yes, Mr. Grandison, I am doing fine.

3    Thanks for asking.  If you are still having trouble

4    with your ear, you should be seen.  And next time you

5    write me a nice letter like this one, please spell my

6    name right.

7        Q    It goes on to say something more.  What

8    does it say?

9        A    Tobie.  It says Tobie in parentheses, and

10    underneath, it says thanks, Sweetie, and you're

11    welcome.

12        Q    What is the reference to ear problems?

13        A    I don't even remember.  I think I may have

14    had an ear infection or something like that and I was

15    out of work.

16        Q    So it does not -- the reference to ear

17    problems does not relate to your -- your elevator

18    accident, correct?

19        A    No, I don't think so.

20        Q    Does it relate to your automobile accident?

21        A    No.

22        Q    Did you send something to Dr. -- is it

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 240

1    Caroe (ph)?

2        A    Canio.

3        Q    Canio.  Did you send something to Dr. Canio

4    that prompted Dr. Canio to send to you Grandison

5    Deposition Exhibit Number 40?

6        A    Yeah.  It was a -- when you -- some -- when

7    you're out of work, if you got a medical issue, they

8    require you to have a doctor's note or something to

9    prove that you were out for whatever medical reason

10   you were out for.

11       Q    What did you send to Dr. Canio that res --

12   to which Dr. Canio responded by sending you Grandison

13   Deposition Exhibit Number 40?

14       A    I don't know what it was.  I don't know

15   what it was.

16       Q    Is Dr. Canio's first name Tobie?

17       A    No.

18       Q    Who is Tobie?

19       A    She's a nurse.

20       Q    Who works in Dr. Canio's office?

21       A    Right.  And this -- and I actually think

22   that this may have been the response to a phone

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 241

1    message that I left her.  I think that's what it was.

2    I'm not sure.  I don't know.

3        Q    In the telephone message, did you indicate

4    that Dr. Canio should communicate with you using a GAO

5    office fax?

6        A    Yes.  Probably more than likely.

7        Q    Do you recall the content of your telephone

8    message?

9        A    No.

10       Q    Do you recall anything that you said in

11   that telephone message?

12       A    No.

13       Q    It's true, isn't it, that a GAO

14   representative informed Wackenhut that the company

15   should discipline you the same way that it had

16   disciplined another employee who had used GAO

17   equipment?

18       A    Well, that statement's not entirely true

19   because the other employee did not use equipment, and

20   it was recommended by a GAO employee after it was

21   brought to his attention by Mr. Carroll to discipline

22   me for receiving a fax that related to my days off of

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 244

1    that yes, we should go with suspending Grandison for

2    five days just as we did Gilliam, Officer Gilliam.

3            He showed me one line and none of the other

4    corresponding e-mails, but it was clear, if you read

5    it, that he was responding to -- I can't remember his

6    name, but he was responding to the recommendation by

7    Carroll to suspend me for five days for a medical fax.

8        Q    Pardon me?

9        A    For a medical fax.

10       Q    F-a-x?

11       A    Fax.

12       Q    I'm showing you now a document that the

13   court reporter has marked Grandison Deposition Exhibit

14   Number 41.

15           Is Grandison Deposition Exhibit Number 41 a

16   copy of the electronic mail that -- exchange that you

17   referred to a moment ago?

18       A    Uh-huh, looks like it.  Trumpet, that's his

19   name.  He's the -- he's the boss of -- I believe he's

20   the boss of Bodle and the other gentleman who came

21   over to the Startech location.

22       Q    As I read Grandison Deposition Exhibit

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 245

1    Number 41, there are two electronic mail messages

2    memorialized on the document; is that correct?

3        A    That's correct, but when I saw the e-mail,

4    there was only one.

5        Q    All right.   The first electronic mail

6    message, the first in time, that is, is a message from

7    Chuck Carroll to Craig A. Trumpet dated March 9, 2006,

8    timed in at 12:45 p.m.

9             Is it your understanding that that is

10   correct?

11       A    Right.

12       Q    And Mr. Carroll says to Craig Trumpet,

13   quote, the initial officer was Master Patrol Officer

14   Boyd with a telephone number.  The next line, James --

15   Sergeant James Crouch, same telephone number.  Next

16   line, not sure if Crouch was the one you spoke with,

17   but those are the two cards that were given to me by

18   the shift supervisor.  Finally, he writes -- he types

19   Chuck.

20            Did I read that correctly?

21       A    Sounded like it.

22       Q    Is there anything in those -- in that

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 249

1   nothing appended to it; is that correct?

2        A    Well, what I saw was a printout.  It was a

3   copy, just one message, that's it.  Just that top

4   message, that's it, printed out.

5        Q    Charles Trumpet is the COTR for the GAO

6   contract; is the right?

7        A    To my knowledge.

8        Q    And COTR stands for contracting officers

9   technical representative?

10       A    Technical -- A stands for something, but

11  that's pretty close.

12       Q    Do you have any evidence or information

13  that supports a belief that Craig A. Trumpet sent his

14  message to Chuck Carroll, Charles Carroll, because of

15  your race?

16       A    No.

17       Q    Do you have any evidence or information

18  that Craig -- that supports a conclusion that

19  Mr. Trumpet sent Mr. Carroll that message because of

20  your gender?

21       A    I don't know.

22       Q    Are you aware of any evidence or

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 250

1    information that supports a conclusion that

2    Mr. Trumpet sent his message to Mr. Carroll because of

3    your educational attainment?

4        A    I don't know.

5        Q    Are you aware of any evidence or

6    information that supports a conclusion that

7    Mr. Trumpet sent his message to Mr. Carroll because

8    you had complained to the EEOC?

9        A    Yeah.  I think that's exactly why it

10   happened the way it happened.  And the reason I think

11   that is because I had sent at this point a number of

12   different faxes and information back and forth, and

13   actually, there's been faxes that were sent to my

14   attention that Chuck Carroll picked up while I was on

15   post and nothing, nothing.

16           And then all of a sudden, out of the blue,

17   one fax, five days' suspension, and -- I want to make

18   this point -- that Gilliam was suspended for reading

19   in an office in a GAO building on his break that

20   stated outside please keep the door open for room use.

21   He's sitting there reading, and they suspended him

22   five days for that.  And that is nowhere near compared

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 255

1    that Mr. Trumpet knew anything at all about your

2    communications with Ms. Rouse?

3         A    No.

4         Q    Mr. Carroll did issue a disciplinary report

5    with respect to the fax machine -- the fax that you

6    received; is that correct?

7         A    Yes, I think he did.

8              (Thereupon, the document was marked as

9              Grandison Deposition Exhibit No. 42 for

10             identification.)

11             BY MR. MORRIS:

12        Q    I'm going to hand to you a document that

13   the court reporter has marked Grandison Deposition

14   Exhibit Number 42.

15             Is Grandison Deposition Exhibit Number 42 a

16   copy of the disciplinary notice that Mr. Carroll

17   issued to you?

18        A    Yes.

19        Q    Is it correct, sir, that all personnel had

20   been briefed and a notice posted that WSI personnel

21   are not authorized to use government equipment and

22   communications devices except in the performance of

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 256

1    their assigned duties?

2        A    That's what it reads.

3        Q    Is that -- is that accurate, sir?

4        A    Yeah, I guess it's accurate.

5             MR. SCHIFFRES:  Objection.

6             THE WITNESS:  Can I make a statement?

7             MR. SCHIFFRES:  Do you understand the

8    question?

9             THE WITNESS:  Can I make a statement about

10   that?

11            BY MR. MORRIS:

12       Q    Is it in response to my question?

13       A    Yeah.  Yeah.

14       Q    Go ahead, please.

15       A    They -- they had you sign those forms, you

16   know, saying that you wouldn't use the fax machine or

17   whatnot, GAO designated fax machine.  But I think once

18   they give you permission to use them multiple times

19   for particular information that's clearly not personal

20   information, that it would be -- that that's -- what's

21   the word I'm looking for -- it really kind of destroys

22   that agreement, puts that agreement in jeopardy, their

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 260

1              identification.)

2              BY MR. MORRIS:

3        Q       The court reporter has marked and I'm

4    handing to you a document denominated Grandison

5    Deposition Exhibit Number 43.

6              Is Grandison Deposition Exhibit Number 43 a

7    copy of your suspension notice with respect to the

8    receipt of the fax?

9        A       It appears to be.

10             (Thereupon, the document was marked as

11             Grandison Deposition Exhibit No. 44 for

12             identification.)

13             THE WITNESS:  I have one thing to say about

14   the -- this whole fax thing.

15             The -- this references a fax on

16   February the 27th, and I don't know whether you're

17   going to produce that fax, but the fax that you're

18   referencing is dated February the 23rd.

19             So I -- you know, this -- this whole fax

20   from Dr. Canio, two pages, in no way references

21   this -- the fax that was supposedly sent on the 27th.

22

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 261

1          BY MR. MORRIS:

2      Q    Do you have a copy of the fax that was sent

3    on the 27th?

4      A    No.  I don't have -- I may have it.  I

5    don't have it here.  But I'm sure -- for five days,

6    I'm sure you guys have it.

7      Q    What makes you so sure?

8      A    I mean, that -- I'm just sure you -- as a

9    matter of fact, I never received a fax.  It was -- it

10   was picked up by somebody and turned over.  I never

11   received that fax.

12     Q    To this moment, have you ever seen the fax

13   that resulted in your suspension?

14     A    I -- I -- I -- I don't think I've ever

15   receive -- I ever seen it.

16     Q    Had you seen Grandison Deposition Exhibit

17   Number --

18     A    Forty?

19     Q    -- 40 before this afternoon?

20     A    I can't say that I have.  I can't say that

21   I received it, you know.

22     Q    I'm showing you a document denominated

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 262

1      Grandison Deposition Exhibit Number 44.

2              Is Grandison Deposition Exhibit Number 44 a

3      copy of the letter of suspension that Wackenhut sent

4      Mr. Omer Gilliam, G-i-l-l-i-a-m?

5      A     Can I make a comment about this?

6      Q     Well, answer the question, please.

7      A     What was the question?

8      Q     Is -- is Grandison Deposition Exhibit

9      Number 44 a copy of the letter of suspension that

10     Wackenhut sent to Omer Gilliam?

11     A     I don't even know because I've never seen

12     it.  I'm not him.  This is not me.  But, I mean, you

13     know, it looks like it's a file copy of a letter of

14     suspension.

15     Q     It's true, isn't it, that Mr. Trickey

16     denies that he gave you permission to use the fax

17     machine?

18     A     No.  No.

19             (Thereupon, the document was marked as

20             Grandison Deposition Exhibit No. 45 for

21             identification.)

22

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 272

1        A    They had a union rep there, but it

2   wasn't much -- you know, I think they were trying to

3   get a union coming around to sign cards to sign up,

4   but I never -- I don't think I ever used the union for

5   anything with SOG.

6        Q    So far as you were aware, had the union won

7   the right to represent the employees at SOG?

8        A    I don't know.  I don't know.

9        Q    Who was your immediate supervisor there?

10       A    I don't even think we had -- when I left,

11   there were a number of supervisors that they were

12   trying to use because they had some turnover.

13            One of the guys that was there, a heavyset

14   guy, I can't remember his name.

15            MR. SCHIFFRES:  Just answer the question.

16            THE WITNESS:  I don't know.

17            BY MR. MORRIS:

18       Q    Do you have any evidence or information --

19   are you aware of any evidence or information that

20   Wackenhut suspended you for use of the fax machine

21   because of your race?

22       A    I don't know.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 273

1      Q      Are you aware of any evidence or

2    information that Wackenhut suspended you because of

3    your -- because of the fax -- use of the fax, receipt

4    of the fax, because of your gender?

5      A      I don't know.

6      Q      Are you aware of any evidence or

7    information that Wackenhut suspended you for a receipt

8    of the fax because you had filed a charge of

9    discrimination with the Equal Employment Opportunity

10   Commission?

11     A      I think it was in response to the

12   documentation that was sent to the union and my

13   persistence to resolve write-ups and disciplinary

14   actions that they've taken against me.  That's what I

15   think it was in retaliation for.

16     Q      All right.  Let's stick to my question,

17   though.

18            Do you have any evidence or information

19   that Wackenhut suspended you for your receipt of the

20   fax because you had filed a charge of discrimination

21   with the EEOC?

22     A      No.

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

Page 274

1   Q  Are you aware of any evidence or

2 information that Wackenhut suspended you for receipt

3 of the fax because of your educational attainment?

4   A  No.

5   Q  What's the basis of your contention that

6 Wackenhut suspended you in connection with the fax

7 because of documents that you had sent to the union?

8   A  Well, like I told you, I was told by one

9 union rep that -- from Kevin Conry, I don't know when

10 they had this -- this conference, but he basically

11 told the union guy that I needed to stop doing what I

12 doing, stop writing, or they're going to basically run

13 me out of there.

14     That was, you know, words that were passed

15 on to me.  But like I said, in the beginning, their

16 actions towards me after those write-ups were

17 indicative of their intentions.  I mean, they

18 definitely weren't trying to be fair about the fax

19 situation at all.  Because like I said before, I sent

20 more than two faxes, more than three faxes, and

21 nothing, and they knew about them.

22   Q  Mr. Conry made the statement to the union

ce2fd84f-7085-48ea-9216-2ef3dd8cc919

1     CERTIFICATE OF NOTARY PUBLIC

2    I, Denise M. Brunet, the officer before

3 whom the foregoing deposition was taken, do hereby

4 certify that the witness whose testimony appears in

5 the foregoing deposition was duly sworn by me; that

6 the testimony of said witness was taken by me

7 stenographically and thereafter reduced to print by

8 means of computer-assisted transcription by me; that

9 said deposition is a true record of the testimony

10 given by said witness; that I am neither counsel for,

11 related to, nor employed by any of the parties to this

12 litigation and have no interest, financial or

13 otherwise, in the outcome of this matter.

14

15 _____

16 Denise M. Brunet
  Notary Public in and for the
  District of Columbia

17

My commission expires:
18 November 30, 2012

19

20

21

22

23

S.J. EX. 3

GRANDISON
TRANSCRIPT & EXHIBITS

PART 4 OF 11

Page 291

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3

4     - - - - - - - - - - - - - - -x
                                    :
5     TRAVIS GRANDISON,             :          COPY
                                    :
6                Plaintiff,         :
                                    :
7          vs.                      : Civil Action No.
                                    : 1:07-cv-00754 (RMC)
8     WACKENHUT SERVICES,           :
      INCORPORATED,                 :
9                                   :
                 Defendant.         :
10    - - - - - - - - - - - - - -x VOLUME II

11                             Washington, D.C.

12                             Thursday, March  13, 2008

13    Continued Videotaped Deposition of

14                    TRAVIS GRANDISON

15         Plaintiff, taken on behalf of counsel for the

16    Defendant in the above-entitled matter, before Denise

17    M. Brunet, RPR and Notary Public in and for the

18    District of Columbia, taken at the offices of Arent

19    Fox LLP, 1050 Connecticut Avenue, Northwest,

20    Washington, D.C., commencing at 10:20 a.m., when were

21    present on behalf of the respective parties:

22

967fafec-4ed9-4c53-885a-dd0e69609123

Page 368

1        Q       Paragraph 43 of Plaintiff's Deposition

2  Exhibit Number 1.

3        A       Uh-huh.

4        Q       Am I correct that paragraph 43 ties the

5  retaliatory conduct to your filing of the Equal

6  Employment Opportunity Commission charge?

7        A       No.

8        Q       Please read it aloud.

9        A       That the actions taken by Defendant

10  subsequent to Plaintiff filing his discrimination

11  complaint constituted legal retaliation which is

12  protected under the District of Columbia Human Rights

13  Act.

14        Q       What's the basis for your statement that

15  paragraph 43 does not tie retaliatory conduct to the

16  charge of discrimination?

17               MR. SCHIFFRES:  This is just the problem I

18  was just suggesting.

19               MR. MORRIS:  And I've heard your

20  suggestion, but my question stands.

21               THE WITNESS:  Say that again now?

22

967fafec-4ed9-4c53-885a-dd0e69609123

Page 369

1          BY MR. MORRIS:

2     Q    What's the basis for your contention that

3   paragraph 43 does not tie the retaliatory conduct to

4   the charge of discrimination?

5     A    I'm not saying that it doesn't tie it

6   together.  I think it's all tied together.  That's

7   what I think.

8          MR. MORRIS:  Would you read the question

9   that I asked before and his answer, please?

10          (The requested portion was read.)

11          BY MR. MORRIS:

12     Q    So does paragraph 43 or does not

13   paragraph 43 tie the alleged retaliation to the Equal

14   Employment Opportunity Commission charge that you

15   filed?

16     A    Yeah, it ties it.

17     Q    And you were begin -- you were asked about

18   your -- to display your commission, as you say,

19   constantly asked to display your commission, prior to

20   the time that you filed --

21          MR. SCHIFFRES:  I'm sorry.  Did you say

22   commission?

967fafec-4ed9-4c53-885a-dd0e69609123

Page 380

1        MR. SCHIFFRES:  Asked and answered.  He

2   just answered it.  He just answered it.  That's my

3   objection.

4        THE WITNESS:  Did they give me any -- did

5   they give me permission to send or receive faxes at

6   any other --

7        BY MR. MORRIS:

8        Q    Machines at any location other than that

9   office that you just described.

10       A    They may have.

11       Q    Do you recall that they did?

12       A    No.

13       Q    Is it correct that you were sent home by

14   Sergeant Foster on February 26, 2006?

15       A    I don't know.

16       Q    Do you recall that after Foster sent you

17   home one day, you were upset and you decided to take

18   the following day off in order to write up the

19   incident?

20       A    Oh, I remember the situation where I did

21   take the day off to address the issues with Foster.

22       Q    And you completed -- as I understand it,

967fafec-4ed9-4c53-885a-dd0e69609123

1    you completed a leave request form; is that correct?

2       A     I may have done that, yeah.  I don't

3    remember.

4       Q     You don't know one way or another?

5       A     I don't remember.

6       Q     Well, what's the protocol for requesting

7    leave at the GAO at the time?

8       A     From what I remember, you just put in the

9    request.  They probably have a form.  You fill out the

10   form and they -- and that's it.

11      Q     What is the protocol for responding to

12   those leave requests?

13      A     I don't know.

14      Q     Are all requests granted?

15      A     I'm sure they're not.

16      Q     Was your leave request granted?

17      A     I think I may have submitted that the day

18   before, and I probably didn't get a response back on

19   it.

20      Q     Did you take that day -- the day off that

21   you requested to take off?

22      A     I may have.  I think so.  I don't know.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 382

1    Q    If you didn't receive a response allowing

2    you to take the day off, why did you take the day off?

3    A    I was going to take the day off anyway, and

4    I put that in to let them know I was taking the day

5    off.  Me not receiving a response from whoever, you

6    know, I was letting them know that I would be off.

7    Q    Regardless of what they said; is that

8    correct?

9    A    Right.  It's -- it's tantamount to calling

10   off work.  You know, you can pick up the phone -- one

11   of the major policies or procedures, if you call off,

12   they have certain times that they like to state that

13   if you call off within a certain amount of hours, then

14   I guess it would be approved.

15        However, like any other job, you know, if

16   you let them know you're not coming to work, you let

17   them know you're not coming to work.  People call off

18   every day.

19   Q    You weren't ill; is that correct?

20   A    No.

21   Q    You weren't taking off because of illness;

22   is that correct?

967fafec-4ed9-4c53-885a-dd0e69609123

Page 383

1       A     No.  And people call off for reasons other

2   than illness.

3       Q     That's not my question.

4             Were you ill --

5       A     I answered that.

6       Q     Were you ill?

7       A     I answered that.

8       Q     Were you ill on February 27th?

9       A     I answered that question.

10      Q     Well, answer it again, please.

11      A     And the answer is no.

12            MR. MORRIS:  Would you make this our next

13  exhibit, please?

14            (Thereupon, the document was marked as

15            Grandison Deposition Exhibit No. 54 for

16            identification.)

17            BY MR. MORRIS:

18      Q     The court reporter has marked and handed to

19  you a document denominated Grandison Deposition

20  Exhibit Number 54.

21            Is Grandison Deposition Exhibit Number 54 a

22  copy of a memorandum from you to Mr. Carroll and

967fafec-4ed9-4c53-885a-dd0e69609123

Page 384

1    Ms. Rouse?

2        A    Appears to be.

3        Q    And is it the case that you describe in

4    Grandison Deposition Exhibit Number 54 the

5    circumstances surrounding your taking February 27th

6    off?

7        A    No.  I don't see that, so I don't know.  I

8    don't see that.  It doesn't say anything about the

9    27th off.

10           Where does it say anything --

11       Q    One moment, please.

12       A    -- about the 27th?

13       Q    One moment, please.

14       A    This is the same as Exhibit 52 that you

15   presented earlier.  That's what it appears to be.

16           MR. SCHIFFRES:  Yes, that's right.  It's a

17   duplicate of the same exhibit.  Fifty-four is the same

18   as 52.

19           MR. MORRIS:  May I have the --

20           MR. SCHIFFRES:  Time out.

21           (Discussion held off the record.)

22           MR. MORRIS:  Are we still on the record?

967fafec-4ed9-4c53-885a-dd0e69609123

Page 386

1    A    It doesn't -- you keep saying the 27th, but

2    what -- what I have written here, what would appear to

3    be written here is that I was in Mr. Carroll's office

4    on the 27th of February, and there's no other dates on

5    here to verify or confirm me taking off on the 27th.

6    Q    Does it describe the circumstances leading

7    to your taking off a day?

8    A    To some degree.

9    Q    Is there anything omitted from that

10   description?

11   A    Probably.

12   Q    What's omitted?

13   A    I don't know.  I'm just saying there may be

14   some information omitted.

15   Q    You were issued a disciplinary report in

16   connection with your failure to work on the 27th; is

17   that correct?

18   A    I don't know.

19        (Thereupon, the document was marked as

20        Grandison Deposition Exhibit No. 55 for

21        identification.)

22

967fafec-4ed9-4c53-885a-dd0e69609123

Page 387

1          BY MR. MORRIS:

2      Q    The court reporter has marked and I've

3  handed -- and has handed to you a document denominated

4  Grandison Deposition Exhibit Number 55.

5          Is Grandison Deposition Exhibit Number 55 a

6  true and correct copy of a disciplinary report issued

7  to you?

8      A    I do not know.  I cannot confirm that.

9          MR. MORRIS:  All right.  I understand we're

10 at the end of the tape, so let's take a brief pause so

11 that we can flip it.

12         THE VIDEOGRAPHER:  Off the record at 12:20.

13         (Whereupon, a short recess was taken.)

14         (Thereupon, the document was marked as

15         Grandison Deposition Exhibit No. 56 for

16         identification.)

17         THE VIDEOGRAPHER:  Okay.  Beginning Tape 2.

18 We're back on the record at 12:24.

19         BY MR. MORRIS:

20     Q    Grandison Deposition Exhibit Number 55

21 recites that the company incurred overtime -- an

22 overtime expense because -- in order to fill in for

967fafec-4ed9-4c53-885a-dd0e69609123

Page 388

1    you during your absence on February 27th.

2              Do you know whether that's accurate?

3        A    I --

4              MR. SCHIFFRES:  I'm sorry.  Did I get a

5    copy of that?

6              THE WITNESS:  No.  Here, you can look at

7    it.

8              I don't know whether that's accurate.

9              BY MR. MORRIS:

10       Q    The court reporter has marked and handed to

11   you a document denominated Grandison Deposition

12   Exhibit Number 6.

13             Is Grandison Deposition Exhibit Number 6 a

14   copy of a letter of reprimand that you received in

15   connection with your not reporting to work on

16   February 27?

17       A    No, we don't have 6.

18       Q    What did I say?

19       A    You said 6.

20       Q    I apologize.  I meant to say 56.

21       A    It appears to be.

22             MR. SCHIFFRES:  Well, wait a second.  Yeah,

967fafec-4ed9-4c53-885a-dd0e69609123

Page 389

1    this is 56.

2         THE WITNESS:  This is 56, yeah.  I think

3    he's --

4         You're relating it to 55; is that what

5    you're doing?

6         BY MR. MORRIS:

7    Q    Are you aware of any evidence or

8    information that causes you to believe that Wackenhut

9    issued the disciplinary report, Number 55, or the

10   letter of reprimand because of your race?

11   A    No.  I don't know.

12   Q    Are you aware --

13   A    I do not know.

14   Q    Are you aware of any evidence or

15   information that supports a belief that Wackenhut

16   issued Grandison Deposition Exhibit Number 55 or

17   Grandison Deposition Exhibit Number 56 because of your

18   gender?

19   A    Nothing specific, no.

20   Q    Are you aware of anything general that

21   supports a conclusion that Grandison Deposition

22   Exhibit Number 55 or 56 were issued because of your

967fafec-4ed9-4c53-885a-dd0e69609123

Page 391

1    receive a letter of reprimand?

2        A    I've heard.  I don't know specifically, but

3    I've heard.  We don't typically know exactly

4    specifically what they're doing in terms of write-ups

5    or documentation when somebody comes late, but it is

6    generally understood that the women are treated

7    differently.

8            They've had a situation where one female

9    couldn't get to work, so her supervisor was going to

10   pick her up every day, you know.

11       Q    My question --

12       A    And, yeah, I've been on post when a number

13   of individuals -- females had been late, you know,

14   more than three times, and, you know, you're supposed

15   to get a suspension or whatever, but they still

16   continued to come to work.

17           Now, you don't know the circumstances

18   surrounding that, but the fact that the females are

19   treated differently would have me to believe that this

20   (indicating) could have been brought -- brought on

21   based on my gender.

22       Q    Are you aware of any female employee at the

967fafec-4ed9-4c53-885a-dd0e69609123

1    GAO who failed to report to work as scheduled,

2    completely failed to report to work as scheduled who

3    was not disciplined for that failure?

4        A    Not specifically, but I'm sure there's

5    proof.

6        Q    Are you aware of any evidence or

7    information that supports a conclusion that Wackenhut

8    issued Grandison Deposition Exhibit Number 55 or

9    Grandison Deposition Exhibit Number 56 because of your

10   educational attainment?

11       A    I think there was some resentment there

12   about my level of education as far as what they

13   thought I thought about myself versus them, and that

14   very well could have played a part in this, in all of

15   the write-ups.

16       Q    Is it your contention that Grandison --

17   that Wackenhut issued Grandison Number 55 or Grandison

18   Number 56 because of your educational attainment?

19       A    Yes.

20       Q    On what do you base that?

21       A    On my last statement.

22       Q    That you think that there was some

967fafec-4ed9-4c53-885a-dd0e69609123

Page 393

1   animosity; is that what you said?

2       A     Right.

3       Q     On what do you base that conclusion, that

4   there was animosity because of your educational

5   attainment?

6       A     My daily treatment and things that I have

7   heard mentioned about, you know, who I think I am,

8   what I think I am and all of this writing and because

9   of, you know, my level of education, I think that I --

10  you know, I'm going to write my way into a certain

11  situation, that that kind of talk and that kind of --

12  that type of dialogue leads me to believe.

13      Q     Who made those comments?

14      A     Officers.  I don't know which ones, but

15  officers.

16      Q     Did Mr. Carroll make the comment?

17      A     I don't recall that.

18      Q     Did Mr. Conry make such a comment?

19      A     No.  Mr. Conry's was -- I can only think

20  that he was referring to the documentation that I

21  wrote when he stated that if I continue to do what I

22  did, he would kick me out of the building or have me

967fafec-4ed9-4c53-885a-dd0e69609123

Page 394

1    rolled out of the building.

2        Q    Have you ever heard Mr. Carroll make any

3    comment at all that supports a conclusion that he had

4    some animus, harbored an animus toward you because of

5    your educational attainment?

6            MR. SCHIFFRES:  Do you understand the

7    question?

8            THE WITNESS:  Yeah.

9            No, I never heard it.

10           BY MR. MORRIS:

11       Q    Are you aware of any evidence or

12   information that causes you to believe that Mr. Conry

13   harbored any animus toward you because of your

14   educational attainment?

15       A    I think the -- I think the actions.  I

16   think the actions.  I don't think it's anything they

17   said.  Of course, they wouldn't say but so much to me.

18   I've never spoken to Conry at all, but I think it's

19   their actions.

20       Q    I don't think I heard an answer to my

21   question, sir.

22           The question is this:  Are you aware of any

967fafec-4ed9-4c53-885a-dd0e69609123

Page 395

1    evidence --

2         A     I said their actions.  That is the

3    evidence.  Their actions that I remember.  And then

4    whether you can prove those actions, you probably will

5    have to get a number of people to come in and say

6    that, you know, they treated Grandison this way and I

7    heard them say that, but -- because you -- you said

8    evidence.  I mean, action would be evidence, right, if

9    something occurred?

10        Q     I said evidence or information.  So my

11   question is:  What did Mr. Conry do that supports a

12   conclusion that he harbored an animus against you

13   because of your educational attainment?

14        A     I don't know.

15             MR. MORRIS:  It's 12:35.  Why don't we take

16   our lunch break now and then resume at 1:30.

17             THE VIDEOGRAPHER:  We're off the record at

18   12:32.

19             (Whereupon, at 12:32 p.m., luncheon recess

20             was taken.)

21

22

967fafec-4ed9-4c53-885a-dd0e69609123

Page 401

1    notation is not standard on the schedule.  So there's

2    a lot of stuff here that needs to be addressed.

3        Q    Have you finished your answer?

4        A    Yes.

5        Q    Did Wackenhut schedule you to work first

6    relief post 11 beginning at 2200 hours and running

7    through 0600 hours for the date in question,

8    March 1st, 2006?

9        A    That's what this shows.

10       Q    The question is:  Did Wackenhut, in fact,

11   do that?

12       A    I don't know.

13       Q    Did you report to work as scheduled on that

14   day?

15       A    I don't know.

16       Q    Isn't it -- isn't the case that all

17   schedules that are posted contains the notation at

18   the -- typed notation at the bottom of

19   Wackenhut Deposition -- pardon me -- Grandison

20   Deposition Exhibit Number 58, namely, quote, note,

21   colon, check schedule on a daily basis, period.

22   Schedule is subject to change due to call-offs and

967fafec-4ed9-4c53-885a-dd0e69609123

Page 402

1    manpower, period, end of quotation?

2         A    Can you repeat that?

3              MR. SCHIFFRES:  He's talking about

4    (indicating).  It's underneath --

5              THE WITNESS:  Yeah, I heard that last part,

6    but, I mean, what was the first part?

7              BY MR. MORRIS:

8         Q    I'll just repeat the question.  It will

9    save some time.

10             Isn't it the case that all of the Wackenhut

11   schedules at GAO contained that notation?

12        A    I don't know.  You would have to produce

13   all of the schedules.

14        Q    Have you ever seen a schedule that was

15   posted without that notation?

16        A    I can't answer that question.

17        Q    Because you don't know?

18        A    Because I do not know.

19        Q    Did you check the first relief schedule on

20   February 27th, 2006?

21        A    I don't know.

22        Q    Did you report to work on February 28th at

967fafec-4ed9-4c53-885a-dd0e69609123

Page 403

1     the designated time?

2          A     I don't know.

3                (Thereupon, the document was marked as

4                Grandison Deposition Exhibit No. 59 for

5                identification.)

6                BY MR. MORRIS:

7          Q     The court reporter has marked and handed to

8     you a document denominated Grandison Deposition

9     Exhibit Number 59.

10               Is Grandison Deposition Exhibit Number 59 a

11    copy of a memorandum from you to Mr. Carroll,

12    Ms. Rouse, Officer McNeill and Sergeant Collins?

13         A     Appears to be.

14         Q     Is it accurate and complete?

15         A     Appears to be.

16         Q     Am I correct that it recites at the bottom

17    of the page that you arrived at the command center at

18    approximately 2240 that day?

19         A     Where does it say that at?

20         Q     Toward the -- toward the end of the second

21    paragraph on the first page of Grandison Deposition

22    Exhibit Number 59.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 406

1    A    I'm not even -- I'm still on this -- this

2 here (indicating).

3         MR. SCHIFFRES:  He was going to rephrase

4 the --

5         THE WITNESS:  I'm not even caught up.  I'm

6 not even here.  I'm still on --

7         MR. SCHIFFRES:  I thought counsel was going

8 to rephrase the question.

9         MR. MORRIS:  And I did.

10        BY MR. MORRIS:

11   Q    So my question is, is Grandison Deposition

12 Exhibit Number 60 a copy of a disciplinary action -- a

13 disciplinary report that Sergeant Collins issued to

14 you in connection with your tardiness on or about

15 March 1, 2006?

16   A    I still haven't completed, you know, I

17 guess my analysis of Exhibit 58 and 59.

18   Q    All right.  Before you offer anything more

19 on 58 and 59, answer my question regarding Exhibit

20 Number 60.

21        Is Grandison Deposition Exhibit

22 Number 60 --

967fafec-4ed9-4c53-885a-dd0e69609123

Page 407

1        A       Appears to be.

2        Q       -- a copy of a disciplinary report that

3   Sergeant Collins issued to you in connection with your

4   tardiness on or about March 1, 2006?

5        A       Appears -- appears to be.

6                Can I go back to 58 and 59?

7        Q       Is it responsive to my question?

8        A       To 58 and 59, yes.

9        Q       Yes, please.

10       A       It goes back to this schedule that says

11  check schedule on daily basis, schedule is subject to

12  change due to call-offs and manpower.

13               I remember this situation because the

14  schedule is supposed to be posted, I think, two weeks

15  or something like that in advance, and Wackenhut was

16  not adhering to that -- to that rule.

17               And what could happen, very well happen is

18  that if they come out with a change on a Monday or a

19  Tuesday and you don't work on that day, you have no

20  way of knowing, especially me when I'm not allowed to

21  enter the building on my days off.

22               So that will give you a little bit more

967fafec-4ed9-4c53-885a-dd0e69609123

S.J. EX. 3

GRANDISON
TRANSCRIPT & EXHIBITS

PART 5 OF 11

Page 415

1    correct?

2        A        Potentially.

3                 MR. MORRIS:  Make this the next exhibit,

4    please.

5                 (Thereupon, the document was marked as

6                 Grandison Deposition Exhibit No. 61 for

7                 identification.)

8                 BY MR. MORRIS:

9        Q        The court reporter has marked and I've

10   handed to you a document denominated Grandison

11   Deposition Exhibit Number 61.

12                Is Grandison Deposition Exhibit

13   Number 60 -- 61 a copy of a letter from Mr. Conry to

14   you suspending you for three days in connection with

15   your tardiness on March 1st, 2006?

16       A        It appears to be.

17       Q        Are you aware of any evidence or

18   information that supports the conclusion that

19   Wackenhut issued Grandison Deposition Exhibit

20   Number 60 or Grandison Deposition Exhibit Number 61

21   because of your race?  Here's Number 60.

22       A        I don't know.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 416

1      Q      Are you aware of any evidence or

2   information that supports a conclusion that Wackenhut

3   issued Grandison Deposition Exhibit Number 60 or

4   Grandison Exhibit Number 61 because of your gender?

5      A      I don't know.

6      Q      Are you aware of any evidence or

7   information that supports a conclusion that Grandison

8   (sic) issued Grandison Deposition Exhibit Number 60 or

9   61 because of your educational attainment?

10     A      I don't know.

11     Q      Are you aware of any evidence or

12  information that supports a conclusion that

13  Grandison -- pardon me -- that Wackenhut issued

14  Grandison Exhibit Number 60 or 61 in retaliation for

15  anything that you did?

16     A      I don't know.

17     Q      Mr. Grandison, I'm returning to you a copy

18  of -- I'm sorry.  I'm returning to you the original

19  card that you showed me a moment ago.

20            Is it the case that on March 15, 2006, you

21  were signing in for duty without wearing your tie?

22     A      I don't know.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 417

1      Q      Do you recall that on that day, Mr. Collins

2  asked you to put your tie on?

3      A      I don't know.

4              (Thereupon, the document was marked as

5              Grandison Deposition Exhibit No. 62 for

6              identification.)

7              BY MR. MORRIS:

8      Q      The court reporter has marked and handed to

9  you a document denominated Grandison Deposition

10  Exhibit Number 62.

11             Is Grandison Deposition Exhibit Number 62 a

12  copy of a disciplinary report that Sergeant Collins

13  issued to you on or about March 15, 2006 in connection

14  with your not wearing a tie?

15     A      Appears to be.

16     Q      Wackenhut suspended you for five days in

17  connection with that infraction, didn't it?

18     A      I don't know.

19     Q      Are you writing on the original exhibit?

20     A      This is the original or is this a copy?

21     Q      The document I handed to you was the

22  original exhibit.  Are you -- did you write on that?

967fafec-4ed9-4c53-885a-dd0e69609123

Page 418

1      A      Yeah.  I put an underline on it.

2      Q      Would you pass the exhibit to me, please?

3      A      (Handing document.)

4      Q      I'm going to erase the underline because

5   that's not part of the exhibit, and please don't mark

6   on the originals.

7             (Thereupon, the document was marked as

8             Grandison Deposition Exhibit No. 63 for

9             identification.)

10            BY MR. MORRIS:

11      Q      The court reporter has marked and I've

12   handed to you a document denominated Grandison

13   Deposition Exhibit Number 63.

14             Does Grandison Deposition Exhibit Number 63

15   refresh your recollection as to whether or not

16   Wackenhut suspended you for five days in connection

17   with your not wearing your tie, having your sleeves

18   unbuttoned -- I'm sorry, having your shirt unbuttoned

19   and your sleeves raised?

20      A      It appears to be.

21      Q      Are you aware of any evidence or

22   information that supports a conclusion that Wackenhut

967fafec-4ed9-4c53-885a-dd0e69609123

Page 419

1    issued Deposition Exhibit Number 62 or Deposition

2    Exhibit Number 63 because of your race?

3        A    I don't know.

4        Q    Are you aware of any evidence or

5    information that supports a conclusion that Wackenhut

6    issued Deposition Exhibit Number 62 or Deposition

7    Exhibit Number 63 because of your gender?

8        A    I don't know.

9        Q    Are you aware of any evidence or

10   information that supports a conclusion that Wackenhut

11   issued Grandison Deposition Exhibit Number 62 or

12   Grandison Deposition Exhibit Number 63 because of your

13   educational attainment?

14       A    I don't know.

15       Q    Are you aware of any evidence or

16   information that supports a conclusion that Wackenhut

17   issued Grandison Deposition Exhibit Number 62 or

18   Grandison Deposition Exhibit Number 63 in retaliation

19   for anything that you did?

20       A    I don't know.

21       Q    Is there an individual at Wackenhut at the

22   General Accounting Office building named Sergeant

967fafec-4ed9-4c53-885a-dd0e69609123

Page 424

1    Q    You injured yourself in a freight elevator

2    accident on April 2, 2006; is that accurate?

3    A    Sounds about right.

4    Q    Is it accurate that there was a tape

5    recording that was -- that captured that injury?

6    A    Not to my knowledge.

7    Q    Was there a tape recording that captured

8    you on that day?

9    A    I'm sure there was.

10    Q    Does it reveal that you were without --

11    that you were doing your tour without your cap and

12    with your shirt unbuttoned?

13    A    I don't know.

14    Q    Did you do your tour that day without your

15    cap and your shirt unbuttoned?

16    A    I know without my hat.

17    Q    What about with the shirt unbuttoned?

18    A    I don't -- I don't know.

19    Q    Is it correct that Mr. Carroll issued a

20    disciplinary report recommending your termination for

21    willful insubordination on April 2, 2006?

22    A    I don't know.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 425

1          (Thereupon, the document was marked as

2          Grandison Deposition Exhibit No. 66 for

3          identification.)

4     BY MR. MORRIS:

5     Q     Is Grandison Deposition Exhibit Number 66,

6  which the court reporter has marked and handed to you,

7  a copy of a disciplinary act -- disciplinary report

8  from Mr. Carroll recommending your dismissal for

9  willful insubordination on April 2nd, 2006?

10    A     It appears to be.

11         (Thereupon, the document was marked as

12         Grandison Deposition Exhibit No. 67 for

13         identification.)

14    BY MR. MORRIS:

15    Q     The court reporter has marked and has

16  handed to you a document denominated Grandison

17  Deposition Exhibit Number 67.

18         Is Grandison Deposition Exhibit Number 67 a

19  copy of a letter from Kevin Conry to you terminating

20  you for willful insubordination on or about April 2,

21  2006?

22    A     It appears to be.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 426

1       Q      Are you aware of any evidence or

2  information that supports a conclusion that Wackenhut

3  issued Grandison Deposition Exhibit Number 66 or

4  Grandison Deposition Exhibit Number 67 because of your

5  race?

6       A      I don't know.

7       Q      Are you aware that -- of any evidence or

8  information that Grandison issued -- pardon me -- that

9  Wackenhut issued Grandison Deposition Exhibit

10  Number 66 or Grandison Deposition Exhibit Number 67

11  because of your gender?

12       A      I'd like to say that -- I'd like to go back

13  to the first question.

14       Q      Okay.

15       A      I -- I think that's discrimination.  I'm a

16  hundred percent positive that there's been other

17  races, other gender individuals who have been out of

18  uniform that have not been written up for willful

19  insubordination and/or terminated for willful

20  insubordination with regard to uniform issues.  You

21  can go ahead.

22       Q      I think we need to start again.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 427

1          Am I correct that you believe that

2    Grandison -- that the company issued Grandison

3    Deposition Exhibit 66 or 67 because of your race?

4          A     Yes.

5          Q     On what do you base that conclusion?

6          A     From my previous statement.

7          Q     What employees were out of uniform but were

8    not disciplined for being out of uniform?

9          A     I don't know.  I have to -- I'll have to

10   look at the tapes and the tapes will show you.

11         Q     You can't identify any such employee?

12         A     No.  Not right now, no.

13         Q     Are you aware of any evidence or

14   information that supports a conclusion that Wackenhut

15   terminated you because of your gender?

16         A     On numerous occasions, I've seen women

17   without proper uniform on and they haven't been

18   terminated.

19         Q     Which women?

20         A     I'll have to look at the tapes, and they'll

21   show you.

22         Q     You can't identify anyone at the moment?

967fafec-4ed9-4c53-885a-dd0e69609123

Page 428

1      A      Not at the moment.

2      Q      Are you aware of any evidence or

3   information that supports a conclusion that Wackenhut

4   terminated you because of your educational attainment?

5      A      Yeah.  I think this write-up as well as

6   others and me being probably the only individual there

7   with a certain level of education that's different

8   from everybody else's.  I think probably -- I feel

9   like that shows that I got some additional

10  discriminatory, harassing treatment due to my level of

11  education.

12     Q      Are you aware of any other evidence or

13  information that supports that conclusion?

14     A      No.

15     Q      Are you aware of any evidence or

16  information that supports a conclusion that Wackenhut

17  terminated you in retaliation for anything that you

18  did?

19     A      Yes.

20     Q      What is that evidence or information?

21     A      Just the write-up itself.

22     Q      What about the write-up?

967fafec-4ed9-4c53-885a-dd0e69609123

Page 429

1      A      The write-up itself --

2      Q      Well, pardon me.  Before you answer that

3  question, what write-up are you referring to?

4      A      The last two, 67, 66.

5      Q      What about Grandison Deposition Exhibit

6  Number 66 and Grandison Deposition Exhibit Number 67

7  supports a conclusion that Wackenhut terminated you

8  because of your educational attainment?

9      A      We're back to education now?

10     Q      I apologize.

11     A      Retaliation?

12     Q      Retaliation.  I apologize.  Thank you for

13  the correction.

14     A      Like I said, once you go to the tapes, I've

15  seen numerous officers out of uniform on a daily

16  basis, supervisors as well, and they haven't been

17  terminated for these offenses.

18     Q      The people you've seen out of uniform have

19  included men as well as women?

20     A      Probably.

21     Q      Black people as well as white people?

22     A      Probably.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 430

1    Q    People who have filed charges and people

2   who have not filed charges?

3    A    I don't know.

4    Q    People who have gone to high school and

5   people who have not?

6    A    Don't know.  As a matter of fact, I think

7   you have to have a high school diploma to work.  I

8   think that was a requirement.  So if somebody was

9   there without a high school diploma, I think that's an

10  entirely different issue.

11   Q    Mr. McNeill was in April 2006 the shop

12  steward for the -- your bargaining unit at Wackenhut;

13  is that correct?

14   A    Yes.  I believe so.

15   Q    It's correct, isn't it, that he submitted a

16  statement to Wackenhut saying that you did not have

17  your hat on on April 2, 2006?

18   A    I don't know.

19   Q    And that your -- and that his statement

20  also states that your collar was open on 2000 -- on

21  April 2nd, 2006?

22   A    I don't know.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 431

1    Q    Was it required that you have your collar

2    closed?

3    A    Not for me.  Not on that day.

4    Q    Is it typically required that a person's

5    collar be closed?

6    A    Typically.

7    Q    Why was it not -- why was it not required

8    of you?

9    A    I was being given -- I was given permission

10    by a supervisor to not wear my hat and I could

11    unbutton the top collar of my shirt while I did my

12    rounds on that particular post.

13    Q    Who gave you that permission?

14    A    Akinmola.

15    Q    The person whose name we discussed before?

16    A    Right.

17          (Thereupon, the document was marked as

18          Grandison Deposition Exhibit No. 68 for

19          identification.)

20          BY MR. MORRIS:

21    Q    The court reporter has marked and I've

22    handed to you a document captioned Grandison

967fafec-4ed9-4c53-885a-dd0e69609123

Page 432

1    Deposition 68 -- Number 68.

2              Is Grandison Deposition Exhibit Number 68 a

3    copy of Mr. McNeill's statement to Wackenhut

4    concerning your appearance on April 2, 2006?

5         A    Appears to be.

6         Q    Isn't it the case that Sergeant Akinmola

7    submitted a statement to Wackenhut saying that he did

8    not authorize you to be on post -- rather, to work

9    without your uni -- without your hat or your tie?

10        A    Yes, he did.

11             (Thereupon, the document was marked as

12             Grandison Deposition Exhibit No. 69 for

13             identification.)

14             BY MR. MORRIS:

15        Q    Directing your attention to Grandison

16   Deposition Exhibit Number 69, is Grandison Deposition

17   Exhibit Number 69, which the court reporter has marked

18   and handed to you, a copy of Sergeant Akinmola's

19   statement?

20        A    It appears to be.

21        Q    Is it your contention that he's being

22   untruthful in Grandison Deposition Exhibit Number 69?

967fafec-4ed9-4c53-885a-dd0e69609123

Page 437

1    Akinmola made that comment?

2        A    I don't know.

3        Q    Do you know whether Wackenhut has hired

4    anyone to replace you after your termination?

5        A    I don't know.

6        Q    You submitted a second charge of

7    discrimination.  The first one was in March.  The

8    second -- of 2006.  The second one was in May 2006.

9             Is that approximately correct?

10       A    Approximately correct.

11       Q    What is the status of the second charge of

12   discrimination?

13       A    I think due to the fact that we're pursuing

14   this case in a court of law, I had to cancel that

15   second claim.

16            MR. SCHIFFRES:  No.  I can speak to that,

17   if you want me to, off the record.

18            MR. MORRIS:  Actually let's stay on the

19   record.  Just tell me what the status is, please.

20            MR. SCHIFFRES:  They sent me -- I spoke to

21   the -- I'm trying to remember the investigator.

22            THE WITNESS:  Gregory Nanney.

967fafec-4ed9-4c53-885a-dd0e69609123

Page 438

1          MR. SCHIFFRES:  Gregory Nanney,

2    N-a-n-n-e-y, and basically he sent me just recently a

3    letter, which I'll be glad to produce for you, saying

4    that since it was his understanding that a reprisal

5    complaint, retaliation complaint is part of the

6    lawsuit, that they were -- the EEOC was going to give

7    up their jurisdiction.

8          And that's what my understanding of his

9    letter to me is.  I'll be glad to send it to you.

10          MR. MORRIS:  I would like to see a copy of

11    the letter, please.

12          BY MR. MORRIS:

13    Q     Is that your understanding, sir?

14    A     Yes.

15    Q     Are you getting tired, Mr. Grandison?

16    A     No.

17    Q     Okay.  Did you ever ask the union about the

18    grievance that you filed?

19    A     Yes.

20    Q     And what response did you get to your

21    inquiry?

22    A     Basically none.  Like I said earlier, they

967fafec-4ed9-4c53-885a-dd0e69609123

1           CERTIFICATE OF NOTARY PUBLIC

2           I, Denise M. Brunet, the officer before

3 whom the foregoing deposition was taken, do hereby

4 certify that the witness whose testimony appears in

5 the foregoing deposition was duly sworn by me; that

6 the testimony of said witness was taken by me

7 stenographically and thereafter reduced to print by

8 means of computer-assisted transcription by me; that

9 said deposition is a true record of the testimony

10 given by said witness; that I am neither counsel for,

11 related to, nor employed by any of the parties to this

12 litigation and have no interest, financial or

13 otherwise, in the outcome of this matter.

14

15 _____

16 Denise M. Brunet
    Notary Public in and for the
    District of Columbia

17

18 My commission expires:
   November 30, 2012

19

20

21

22

23

# S.J. EX. 3

# GRANDISON
# TRANSCRIPT & EXHIBITS

# PART 6 OF 11

Page 467

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2

3

4    - - - - - - - - - - - - - - -x

5    TRAVIS GRANDISON,               :
                                     :
6              Plaintiff,            :
                                     :
7         vs.                        : Civil Action No.
                                     : 1:07-cv-00754 (RMC)
8    WACKENHUT SERVICES,             :
     INCORPORATED,                   :
9                                    :
               Defendant.            :
10   - - - - - - - - - - - - - - -x VOLUME III

11                        Washington, D.C.

12                        Friday, March  21, 2008

13   Continued Videotaped Deposition of

14                   TRAVIS GRANDISON

15        Plaintiff, taken on behalf of counsel for the

16   Defendant in the above-entitled matter, before Denise

17   M. Brunet, RPR and Notary Public in and for the

18   District of Columbia, taken at the offices of Arent

19   Fox LLP, 1050 Connecticut Avenue, Northwest,

20   Washington, D.C., commencing at 10:00 a.m., when were

21   present on behalf of the respective parties:

22

Page 476

1      Q      Have you finished your answer?

2      A      No.  I think you asked this question.  I

3   don't know if you asked me did it have to be in

4   writing or not, but you asked this on the first

5   deposition.

6             I'm finished.

7      Q      You have finished your answer?

8             Have you been asked to provide a written

9   response to Grandison Deposition Exhibit Number 73?

10     A      Not to my recollection.

11     Q      You testified during your first day of the

12  deposition that management officials harassed you

13  concerning your clothing -- your uniform that you wore

14  on the job.

15            Do you have any evidence -- are you aware

16  of any evidence or information that supports a

17  conclusion that management did what it did toward you

18  with respect to your uniform because of your race?

19     A      I don't know.

20     Q      Do you have any evidence or -- are you

21  aware of any evidence or information that Grandison --

22  pardon me -- that management did what it did to you

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 477

1  with respect to your uniform because of your gender?

2      A      Yeah.  They ignored the same supposedly

3  infractions that were -- in a case, I guess, that

4  women actually were at fault, and I know that for a

5  fact.

6      Q      Can you identify the women who were at

7  fault and were ignored?

8      A      I probably have to do some research on the

9  names, but I know the face.  And I may have it -- and

10  I may have it written down in the -- those -- one of

11  those notebooks that I provided.

12      Q      At this juncture, you can recall no names;

13  is that correct?

14      A      No.  But I'm sure after talking to a couple

15  of people I can find out who they are.

16      Q      With whom would you have to speak?

17      A      A number of the individuals that's in one

18  of those first three exhibits you've shown today.

19      Q      Please tell me.  With whom would you need

20  to speak?

21      A      Probably all of them, all of them, and then

22  through that process, they would help me ID who that

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 478

1    person was.

2            And actually, it was -- I know for a fact

3    it was two females, so, you know -- but I can't

4    remember their names, but I assure you that I'll come

5    up with the name.

6        Q    What infractions did those two females

7    commit?

8        A    Definitely not wearing their hats 24/7 and

9    also they had cuffs in the bottom of their pants and

10   they had them before I -- before -- they had them

11   before I was issued -- issued -- before I started.

12   They were there before I started.

13       Q    Are you testifying that you were aware of

14   how they dressed before you began on the job?

15       A    I just knew they had them.  From the day I

16   started, they had cuffs in their pants.

17       Q    You're not testifying that you knew how

18   they were dressed before you began work there, are

19   you?

20       A    Well, the only knowledge I have to that is

21   that -- what I heard from other officers.  But I'm

22   sure -- once again, they have CCTV cameras posted, and

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 479

1    I'm sure that once we reveal those tapes, we'll see --

2    we'll see that --

3         Q    Which management --

4         A    -- which two.

5         Q    Had you finished your answer?

6         A    Right.

7         Q    I'm sorry.  Did you finish your answer,

8    sir?

9         A    Uh-huh.

10        Q    You'll have to say yes or no.

11        A    Yes.

12        Q    Which management -- was management aware of

13   the two females whose infractions you've described?

14        A    I don't know whether they were aware, but I

15   know they were aware of mine.

16        Q    Are you aware of any evidence or

17   information that supports a conclusion that management

18   did what it did to you with respect to your uniform

19   because of your educational attainment?

20        A    Yes.

21        Q    What is that evidence or information?

22        A    I just think that my level of education

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 480

1    distinguished me from others, and I think that their

2    continuing harassment towards me had a lot to do with

3    that as well.

4        Q    Have you answered the question fully?

5            Are you aware of any other evidence or

6    information that supports a conclusion that management

7    did what it did to you with respect to your uniform

8    because of your educational attainment?

9        A    I don't know.

10       Q    Are you contending as part of this lawsuit

11   that Wackenhut made up rules and applied rules that --

12   pardon me -- made up rules that applied only to you?

13       A    No.

14       Q    Are you contending as part of this lawsuit

15   that management intentionally interfered with your

16   right to leave work?

17       A    Right to leave?  What do you mean by right

18   to leave?  Right to leave is, what, go home every day

19   or what?

20       Q    What's your understanding of the term right

21   to leave?

22       A    That's what I'm asking you, to further

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 482

1    paragraph 10.

2            MR. SCHIFFRES:  Do you want him to read it?

3            MR. MORRIS:  Well, he seems to be reading

4    it.

5            MR. SCHIFFRES:  Okay.

6            MR. MORRIS:  I'll ask him a question when

7    he's done.

8            THE WITNESS:  I'm done.

9            BY MR. MORRIS:

10       Q    My question, then, is are you contending as

11   part of this lawsuit that management intentionally

12   interfered with your right to leave work?

13       A    I don't know.

14       Q    Did management ever intentionally interfere

15   with your right to leave work?

16       A    I don't know.

17       Q    Did management ever send you home without

18   pay for trumped-up reasons?

19       A    Yeah.

20            (Discussion held off the record.)

21            BY MR. MORRIS:

22       Q    Would you identify -- tell me, please, on

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 483

1   how many occasions did management send you home for

2   trumped-up reasons?

3         A      I think, for one, the suspension for the

4   fax was one of the occasions, so that's five days.  I

5   was sent home once for supposedly like a verbal

6   altercation with Sergeant Foster that -- where I

7   didn't -- I didn't speak one word to him.

8               I wasn't allowed to work part of a shift.

9   At one point, they had another officer -- they called

10  another officer in to work the shift when I would have

11  been able to work I think the back end of the four

12  hours of the shift.  There was some -- there was some

13  rule that -- where I should have been allowed to work,

14  but I wasn't allowed to work basically.

15              I think the suspension and not having my

16  tie and my hat on, that was another incidence.  After

17  the assault took place, I was escorted out of the

18  building immediately by Captain Trickey.

19              Another time I think I was -- I think I was

20  suspended for -- or not allowed to work for cuffs --

21  having cuffs on my pants.  That was the issue, the

22  same dress code violation that the females were

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 484

1    allowed to work with on a daily basis.

2         That's all I can remember right now.

3    Q    The time when you were assaulted, are you

4    referring to the assault by Mr. Foster?

5    A    Right.

6    Q    Isn't it the case that you went to the

7    hospital immediately after that?

8    A    No, not immediately after.

9    Q    Did you go to the hospital that day?

10   A    I don't think I went to the hospital at

11   all.

12   Q    Did you seek medical attention that day?

13   A    I don't think I went to the hospital at all

14   or sought medical attention.

15   Q    Were you paid for that day?

16   A    I don't think so.

17   Q    Were you told why you were escorted from

18   the premises?

19   A    No.

20   Q    What did you do when you left?

21   A    I went home.

22   Q    And did --

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 494

1    time to see that schedule.  But it was not, according

2    to the rules, posted two weeks in advance.

3         Q    You testified about being suspended for not

4    having your hat and tie on while on duty.

5         A    Correct.  But I was suspended after the

6    fact, maybe like a week or two after.  Of course, the

7    EEOC claim was filed.

8         Q    Directing your attention to Grandison

9    Deposition Exhibit Number 60 and -- 66 and 67, does

10   the suspension to which you refer -- you just referred

11   relate to the incident that is the subject of

12   Grandison Deposition Exhibit Number 66 and 67?

13        A    It appears to be.

14             MR. SCHIFFRES:  Let's go off the record for

15   one second.

16             MR. MORRIS:  No.

17             MR. SCHIFFRES:  Why not?

18             MR. MORRIS:  Because I'm still asking

19   questions.

20             THE WITNESS:  Let him ask his questions.

21             MR. MORRIS:  Do you have to go -- is it a

22   men's room break?

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 503

```
 1        A     I think that's what's in the write-up, but

 2   I'm sure him as well as Mr. Carroll also accused me,

 3   Mr. Richardson and Captain Trickey and the Wackenhut

 4   upper management as well.

 5        Q     Are you aware of any evidence or

 6   information that supports a conclusion that Wackenhut

 7   or its managers accused you of being argumentative

 8   with Mr. Foster on February 26, 2006 because of your

 9   race?

10        A     The only -- yeah, I think that they -- and

11   I think it's just -- it's -- has to be based on some

12   unknown factors, because there wasn't an argument.

13   And for them to support his disciplinary report that

14   there was an argument, then it has to be something.

15              Whether it's race, gender, retaliation,

16   harassment, it's one of them.  It's something.  It's

17   not -- it's not anything --

18        Q     Are you aware --

19        A     -- on a day-to-day basis.  And the support

20   of the upper level management, I mean, it just -- they

21   all-inclusive.

22        Q     Are you aware of any evidence that
```

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 504

1    supports -- or information that supports a conclusion

2    that Wackenhut or its managers accused you of being

3    argumentative with Mr. Foster on or about February 26,

4    2006 because of your race?

5        A    I don't know.

6        Q    Are you aware of any evidence or

7    information that Wackenhut or its managers accused you

8    of being argumentative with Mr. Foster on February 26,

9    2006 because of your gender?

10       A    Don't know.

11       Q    Are you aware of any evidence or

12   information that supports a conclusion that Wackenhut

13   or its managers accused you of being argumentative

14   with Mr. Foster on February 26 because of your

15   educational attainment?

16       A    Don't know.

17       Q    Are you aware of any evidence or

18   information that supports a conclusion that Wackenhut

19   or its managers accused you of being argumentative

20   with Mr. Foster on February 6 -- 26, 2006 in

21   retaliation for anything you had done to that point?

22       A    Don't know.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 505

1      Q      Is it your contention as part of this

2  lawsuit that Wackenhut -- Wackenhut officers or other

3  officials attempted to have other officers write

4  disparaging remarks concerning you?

5      A      Yes.

6      Q      Who were those officers who were the

7  subject of that attempt?  In other words, who was

8  asked or who was otherwise compelled to write a

9  disparaging remark about you?

10     A      What I can remember now is Sergeant

11  Trickey, Sergeant Richardson and Sergeant Akinmola.

12          Sergeant Trickey and Sergeant Richardson

13  both stating that they never gave me permission to use

14  a fax machine, I think that's a disparaging -- or

15  whatever the word you used -- remark because it

16  basically confirmed that I was using the fax machine

17  without permission, which I wasn't, which was untrue,

18  and probably gave, I guess for writing's sake, some

19  documentation to confirm that I was wrong in using the

20  fax machine, but it was completely untrue.

21     Q      All right.  Stop, Mr. Grandison, because

22  you're --

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 506

1        A       I'm not finished.

2        Q       Well, you haven't -- you're not answering

3    my questions.  Let me refocus you.

4        A       I'm not finished.

5        Q       Let me refocus you, sir.  Stop answering

6    the question.

7                Here's the question for you.  Are Trickey,

8    Richardson and Akinmola the only officers whom

9    Wackenhut attempted to have write disparaging remarks

10   about you?

11       A       As far as I can recall right now, yeah.

12   That's what I can recall right now.

13       Q       Okay.  As I understand it from a comment

14   you made a moment ago, Trickey wrote a comment that

15   you had -- that Trickey had not given you permission

16   to write -- to use a fax machine.

17       A       I think --

18       Q       Did I understand you correctly?

19       A       I think you produced some document like

20   that during Deposition I or II.

21       Q       Am I correct, sir, that your testimony is

22   that Trickey submitted a statement that he had not

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 507

1  given you permission to use a fax machine?

2       A     That's what I recall.

3       Q     Is it your contention that he was compelled

4  to submit that statement?

5       A     Either compelled or told to submit it.

6       Q     Who told him to do so?

7       A     I don't know.

8       Q     Who compelled him to do so?

9       A     I would say upper level management, that's

10  what I say, and Mr. Carroll.

11       Q     What's the basis for your contention that

12  Mr. Carroll compelled Mr. Trickey to submit that

13  statement?

14       A     And or Mr. Trumpet as well.  They had

15  recommended a five-day suspension, so they had to have

16  some documentation to support their five-day

17  suspension minus the actual facts.

18       Q     What's the basis for your contention that

19  Mr. Carroll or Mr. Trumpet -- and/or Mr. Trumpet

20  compelled Mr. Trickey to submit that statement?

21       A     Like I said, I think they needed

22  documentation.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 508

1    Q    Are you aware --

2    A    They needed documentation of people on the

3    floor that are more -- probably more than -- more than

4    them -- I guess more so than them would know what's

5    going on with the fax machines because they don't.

6    Q    Are you speculating, sir, that Mr. Trumpet

7    and/or Mr. Carroll compelled Mr. Trickey to submit

8    that statement?

9    A    Well, I don't know.

10   Q    You don't know whether you're

11   speculating or --

12   A    No.  I don't -- I don't know whether they

13   told her to do it or not.  Somebody asked for a

14   statement.

15   Q    Is it your contention that either Carroll

16   or Trump -- and/or Trumpet directed Trickey to lie?

17   A    Yeah.

18   Q    On what do you base that contention?

19   A    I base the contention on the fact that I

20   have submitted, received and sent out a number of

21   faxes with their permission on a number of different

22   days, and I was never suspended, written up or

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 509

1   anything.

2           Like I told you before in Deposition I,

3   they've actually come to -- come to me while on post

4   to tell me that I have a fax waiting for me.  Matter

5   of fact, this fax right here that I got, she came to

6   me like two, three separate days.

7           But by then, I already knew what was going

8   on at the job, so I never -- I never went and got the

9   fax.  And then the next time I saw the fax, it was in

10  Mr. Carroll's office, five-day suspension.

11      Q    You're testifying -- you've testified

12  that -- are you testifying that Ms. Trickey lied?

13      A    Yes.

14      Q    What's the basis for your conclusion that

15  she was compelled to lie by either Mr. Carroll and/or

16  Mr. Trumpet?

17      A    Like I said, they needed documentation.

18      Q    Are you aware of any evidence, sir, that

19  either Mr. Carroll or Mr. Trumpet compelled

20  Ms. Trickey to lie?

21      A    Evidence?  No.  I think it's -- I think

22  that was a collaborative effort, so I think that

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 510

1    whatever needed to be done to enforce that five-day

2    suspension, it was done.

3              I can't wait till you get that fax.

4        Q     What did -- what statement did

5    Mr. Richardson submit?

6        A     I think you showed me that statement,

7    something about him not giving me permission to use a

8    fax.

9        Q     Is that the disparaging statement to which

10   you referred to a moment ago?

11       A     Right.

12       Q     Is it your contention that Mr. Richardson's

13   statement is a lie?

14       A     Yeah.  I know it's a lie.

15       Q     Is it your contention that anyone at

16   Wackenhut compelled him to -- to submit a lie?

17       A     Well, he's -- he works for Wackenhut.

18       Q     Is it your contention, sir, that anyone at

19   Wackenhut compelled him to submit a lie?

20       A     Yeah, that's my contention.

21       Q     What's the basis for your contention?

22       A     Like I just said, it was a collaborative

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 511

1    effort.  They needed documentation, so they went to

2    him to get a documentation and to state that they

3    never gave me permission to use a fax machine.

4        Q    Who asked that of Mr. Trickey --

5        A    I don't know who asked that --

6        Q    -- pardon me -- of Mr. Richardson?

7        A    -- of Mr. Richardson.  I don't know.  I

8    would just have to assume that it's his superior, and,

9    one, his superior is Mr. Carroll, and Carroll's

10   superior was Mr. Trumpet.

11       Q    You have no evidence to support that

12   conclusion, do you?

13       A    No.  But it -- there may be something in

14   e-mails or something along that line that we get ahold

15   of once we get a hard drive tape.

16       Q    What statement did Akinmola submit that was

17   disparaging?

18       A    The statement that you produced in

19   Deposition II referencing that he did not give me

20   permission to take off my hat and my tie.

21       Q    Which you believe is untrue; is that

22   correct?

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 512

1          A     I know it's untrue.

2          Q     Is it your contention that anyone at

3    Wackenhut compelled Akinmola to submit that statement?

4          A     Yeah, that's my contention.

5          Q     Do you have any evidence to support that

6    contention?

7          A     Same evidence I have to support the last

8    contention.

9          Q     Sir, do you have any evidence to support

10   the contention that Akinmola submitted a lie under

11   compulsion from Wackenhut?

12         A     Yeah.  I just said, my last statement.

13         Q     Please identify specifically the evidence

14   that you have that supports the contention that anyone

15   at Wackenhut compelled Mr. Akinmola to submit a lie

16   concerning you.

17         A     I don't have that at this time.

18         Q     Where is that evidence?

19         A     Don't know.  When we go through more

20   discovery, it might show up.

21         Q     Is it your contention in this litigation

22   that anyone at Wackenhut deprived you of an

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 513

1    opportunity to take a course required for

2    certification?

3        A    Say that again?

4        Q    Is it your contention in this lawsuit that

5    anyone at Wackenhut deprived you of the opportunity to

6    take courses necessary for your certification?

7        A    No.

8        Q    Do you have -- are you making any

9    contention in this lawsuit with respect to coursework

10   that you were not allowed to take?

11       A    I'm making -- I'm making some claims about

12   a coursework incident.

13       Q    What is that incident?

14       A    It pertained to credentials and me keeping

15   my credentials current so that I can work.

16            There was a class that was available to be

17   taken and I wasn't signed up for it and I think I

18   informed -- I went on my own to find out about the

19   availability of the course, and the -- Sergeant

20   Richardson, he told me he'll check on it or something

21   like that.  He never got back to me.

22            So I took -- I took off work to take the

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 514

1    course, and I actually called Wackenhut headquarters

2    because you have to sign up, you have to kind of get

3    permission to take the course.

4            So I took the course.  Upon me returning to

5    work, I think I was suspended or written up for -- for

6    going to the course, and Sergeant Richardson stated he

7    told me not to go, which he didn't.  And I think that

8    if it was an issue, I would have been told not to take

9    the course by an individual at Wackenhut's head

10   office.

11           They're supposed to be in contact with

12   Wackenhut with the site and the office in terms of who

13   needs to have their credentials updated.  And

14   according to the CBA, they're supposed to give you, I

15   think, 90 days.  They're supposed to come to you about

16   having your credentials updated.

17           And typically, they schedule you, but it's

18   widely known that you are responsible for your

19   credentials staying current.  And I was well within

20   this 90-day period of my credentials expiring.  And if

21   I don't have it, if my credential expires, I'm not

22   allowed to work.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 515

1      Q      Your credential has not -- never expired;

2  is that correct?

3      A      Yeah, because I made sure it didn't, not

4  Wackenhut.

5      Q      When was your credential scheduled to

6  expire?

7      A      I don't -- I can't remember.

8      Q      Was it within days of the time that you

9  took off?

10     A      I'm sure it was within days.

11     Q      And what course was it that you needed to

12  take?

13     A      I can't even remember.  Might have been a

14  CPR, baton.  I'm not sure.

15     Q      Directing your attention to Grandison

16  Deposition Exhibit Number 28, the question is does

17  Grandison Deposition Exhibit Number 28 relate to the

18  incident concerning the course that you just

19  described?

20     A      Yes.

21     Q      Would you return the binder to me, please?

22     A      I'd like to say something about it, though.

7e246ea0-2933-48c7-a68d-b5e8307785c7

S.J. EX. 3

GRANDISON
TRANSCRIPT & EXHIBITS

PART 7 OF 11

Page 518

1    my expiration date.

2              There's no reason for me to take off to go

3    to a CPR training if you already got me scheduled and

4    it's within the -- I mean, what -- what difference

5    would that make?  It wouldn't make any difference in

6    any sense.  And all of this, this conversation he's

7    talking about, it didn't take place.

8              BY MR. MORRIS:

9    Q      Are you done?

10   A      Oh.  And I'm being instructed that my call

11   off would affect manpower, that's not even the

12   language that they use on the site.  And Officer

13   Grandison choosing not to follow explicit

14   instructions, that's incorrect as well and untrue.

15   Q      Have you ever been subject to unfounded

16   threats of discipline?

17   A      Yes.

18   Q      On how many occasions were you subject --

19   subjected to unfounded threats of discipline?

20   A      Probably on a daily basis.

21   Q      Who made those threats?

22   A      Sergeants, supervisors, all of them.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 519

1    Sergeant Richardson and Foster and Collins.

2         Q    Richardson, Foster and Collins.

3              Are there any others who made unfounded

4    threats of discipline?

5         A    Not that I can remember right now, but it's

6    commonplace there.

7         Q    Did they threaten anyone else with

8    discipline?

9         A    Not to my knowledge.

10        Q    Describe, please, the threats that Sergeant

11   Collins made to you.

12        A    Threats relating to sending you home,

13   threats relating to writing you up.  That's typically

14   the nature of all of their threats.  Just threaten

15   disciplinary action for every little thing that they

16   can think of.

17        Q    Was it in the nature of if you do X, we

18   will do Y to discipline you?  Is that the sort of

19   threat you're talking about?

20        A    No.

21        Q    Please describe the threat you're talking

22   about.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 520

1      A      No, I think the threat is just -- it's

2  just -- it's more direct as far as what they're going

3  to do and what they should do, whether they have proof

4  or whether it's right or wrong.

5      Q      Would you give me one specific example of a

6  threat that Mr. Collins made?

7      A      I can't recall one specific one right now.

8      Q      Would you give me one specific threat that

9  Mr. Richardson made?

10     A      I can't recall.

11     Q      Would you recall -- pardon me -- would you

12  give me one specific threat that Mr. Foster made?

13     A      His threats were daily as far as writing me

14  up or sending me home with respect to uniform and

15  credentials.

16     Q      Would you give me one specific threat that

17  Mr. Foster made?

18     A      He threatened to send me home on the --

19  on -- I think it was -- I don't remember the

20  particular day, but he told me that if I didn't take

21  my uniform to the cleaners that he would send me home.

22             And on one occasion -- I think it was the

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 521

1     same occasion -- I actually had a jacket on, and he

2     told me that -- I was leaving and he called me and he

3     said something to the effect of what's wrong with your

4     uniform or something about my uniform.  And he said

5     that the next time you come in here without your --

6     your shirt ironed and in the cleaners, I'm going to

7     write you up and I'm going to send you home.

8               I had a jacket on.  I just looked at him

9     and I said are you finished, and he said just get out

10    of here.  And that -- and that was basically what you

11    said, but he didn't know what my shirt looked like.

12        Q     Had Mr. Foster seen you that day --

13        A     Did he -- did he --

14        Q     -- prior to that occasion?

15        A     Did he what?

16        Q     Had he seen you that day prior to the

17    occasion?

18        A     No.  I just got there.

19        Q     I thought you said you were leaving.

20        A     No, I just got there.  I was on my way to

21    my post, on my way to leaving the command center.

22              MR. MORRIS:  Would you read the witness's

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 522

1    earlier testimony, please?

2              (The requested portion was read.)

3              BY MR. MORRIS:

4        Q    So when you testified, sir, that you were

5    leaving, you meant you were leaving his presence; is

6    that correct?

7        A    The command center.

8        Q    And he was in the command center, correct?

9        A    Right.

10       Q    And he was Foster, correct?

11       A    Correct.

12       Q    Have you identified every occasion -- who

13   lied about your being argumentative with any

14   supervisor?

15       A    Anybody who signed off on that write-up and

16   approved that write-up or any involvement in it, they

17   lied.

18       Q    Who are you aware of specifically who lied

19   regarding your being argumentative with the

20   supervisor?

21       A    Kevin Conry, Mr. Carroll, Sergeant Trickey,

22   Sergeant Richardson and Sergeant Foster.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 523

1    Q    What was Mr. Conry's lie?

2    A    I think he signed off on the write-up.

3    Q    What was his lie, sir?

4    A    I think his -- whatever that write-up

5    stated, the write-up was a lie.  He signed off on it,

6    so he's confirming that to be true.  So it's a lie.

7    Q    Does he -- did he know it to be untrue when

8    he signed whatever he signed?

9    A    If you don't know it to be true and you --

10   you may not know it to be untrue, then what do you

11   know?

12   Q    Sir, the question is did Mr. Conry know

13   that the write-up was untrue when he signed whatever

14   he signed?

15   A    I don't know, but he signed.

16   Q    Did Mr. -- what did Mr. -- what lie did

17   Mr. Carroll tell?

18   A    The same lie.

19   Q    Did Mr. Carroll know that the write-up was

20   untrue whenever -- when he signed -- when he did

21   whatever he did?

22   A    I don't know, but he signed it.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 524

1    Q    What lie did Mr. Trickey tell?

2    A    The same lie.

3    Q    Did Mr. Trickey know that the write-up was

4    untrue when he did whatever -- is Mr. Trickey a he or

5    her?

6    A    It's a she.

7    Q    Did Ms. Trickey know that the write-up was

8    untrue when she did whatever she did?

9    A    I don't know.

10    Q    What lie did Mr. Foster tell?

11    A    The -- it started with him.

12    Q    Mr. Foster accused you of being

13    argumentative?

14    A    Right.

15    Q    Was Mr. Foster present at the time that the

16    argument allegedly took place?

17    A    There was no argument.

18    Q    Was Mr. Foster present at the -- pardon me.

19    Was Mr. Richardson present at the time when the

20    argument allegedly took place?

21    A    No, not Richardson, no.

22    Q    Mr. Richardson signed a disciplinary

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 525

1    action?

2        A    I don't know if he signed it.

3        Q    What was Mr. Richardson's role in -- with

4    respect to this incident?

5        A    I don't know.  He's just a higher ranking

6    sergeant than Sergeant Foster.

7        Q    Did Mr. Richardson do anything in

8    connection with the incident regarding your alleged

9    argument with Mr. Foster?

10        A    I don't know.

11        Q    What lie did he tell?

12        A    I don't know if he told a lie.  But if he

13    agreed with it, that's the lie.

14        Q    Was there ever an occasion when you were

15    intentionally provoked by supervisors or others in

16    order to terminate you?

17        A    Yeah.  I think even on that occasion, what

18    was supposed to be an argument, that was -- that was a

19    provoking situation, and I would be -- you know,

20    Foster would be just staring at me.  He would come to

21    my post and just stare at me.  You know, I don't know

22    whether he wanted me to say something or what.  But

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 527

1    for it.

2        Q      What's the basis for your contention --

3    what evidence or information do you have --

4        A      Evidence is that --

5        Q      Sir, let me finish.

6        A      Go ahead.

7        Q      What evidence or information do you have

8    that supports your conclusion, your testimony, that

9    you were being provoked to say something or do

10   something that might result in your termination?

11       A      Well, I don't know what they were

12   attempting to do, but I know what -- when I'm being

13   provoked.  I know that.  I'm not -- I'm not lost on

14   that.  And I don't -- you know, I -- all I can say is

15   that they spent a lot of time in my face, more time in

16   my face making statements and giving me write-ups and

17   talking to me about nonsense that they weren't with

18   other officers.

19       Q      Are you aware of any evidence or

20   information that anyone at Wackenhut did anything to

21   you to provoke you to say something or do something

22   that would give Wackenhut a justification to terminate

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 535

1           Is 75 another example of a written

2   complaint to Mr. Carroll?

3       A    Uh-huh, yeah.

4       Q    Directing your attention to Grandison

5   Deposition Exhibit Number 54, is that another example

6   of a written complaint to Mr. Carroll?

7       A    Appears to be.

8           (Thereupon, the document was marked as

9           Grandison Deposition Exhibit No. 76 for

10          identification.)

11          BY MR. MORRIS:

12      Q    The court reporter has marked and handed to

13  you a document denominated Grandison Deposition

14  Exhibit Number 76.

15          Is Grandison Deposition Exhibit Number 7 --

16  I apologize.  Tell you what -- is Grandison Deposition

17  Exhibit Number 76 a copy of Mr. Carroll's response to

18  you that is a response to your memorandum that is

19  Grandison Deposition Exhibit Number 54?

20      A    Uh-huh.

21      Q    You'll have to -- you'll have to say yes

22  or no.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 536

1    A    Yes.

2    Q    On the second page of Grandison Deposition

3    Exhibit Number 54, in the last paragraph, the --

4    Mr. Carroll states that if you feel that you have --

5    that he has mistreated you unfairly at any time that

6    you are free to address it with his chain of command.

7         Did you ever address any issues of

8    unfairness with Mr. Carroll's chain of command?

9    A    Okay.  I didn't get all that.

10   Q    You didn't understand my question, sir?

11   A    I didn't -- yeah, I didn't understand that.

12   Q    Did you ever complain to Mr. Stephens that

13   Mr. Carroll or anyone at Wackenhut was mistreating

14   you?

15   A    Who is Mr. Stephens?

16   Q    You don't know Mr. Stephens?

17   A    Who is that?

18   Q    Do you know Mr. Stephens, sir?

19   A    No.

20   Q    Do you know Mr. Albert League?

21   A    No.

22   Q    Let me direct your attention to the last

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 537

1   paragraph in Grandison Deposition Exhibit Number 76.

2   Just read it to yourself.

3       A    I read it.

4       Q    Did you ever complain to anyone identified

5   in the last paragraph of Grandison Deposition Exhibit

6   Number 76 --

7       A    No.

8       Q    -- about the treatment that you were

9   receiving at Wackenhut?

10      A    No.

11      Q    Did you ever report to Wackenhut's human

12  resources department that you were being mistreated at

13  Wackenhut?

14      A    No.

15      Q    Beyond the documents that I've shown you

16  and that you identified as complaints -- written

17  complaints to Mr. Carroll, are there any other written

18  complaints to Mr. Carroll of which you are aware?

19      A    Not that I'm aware right now of.

20           (Thereupon, the document was marked as

21           Grandison Deposition Exhibit No. 77 for

22           identification.)

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 544

1      Q      Did you see it when you were employed at

2   Wackenhut?

3      A      I don't remember.

4      Q      After Wackenhut submitted -- let me

5   rephrase the question.

6             After March 28, 2006, was -- did the union

7   do anything further in connection with the grievance

8   that you filed against Wackenhut?

9      A      I don't -- I don't know.  I can tell you

10  one thing about this here Exhibit 79.  It says at the

11  last paragraph I spoke to the -- with the PM this

12  morning and had made arrangements to visit the GAO

13  site tomorrow in order to meet with you as requested.

14  That never happened.

15     Q      What never happened, sir?  The meeting

16  never took place?

17     A      Right.

18            (Thereupon, the document was marked as

19            Grandison Deposition Exhibit No. 80 for

20            identification.)

21            BY MR. MORRIS:

22     Q      The court reporter has marked and handed to

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 545

1    you a document denominated Grandison Deposition

2    Exhibit Number 80.

3              Is Grandison Deposition Exhibit Number 80 a

4    document that you submitted to Mr. Carroll?

5        A     Yes.  Typically every write-up that I got,

6    if I -- if I checked that I have a written statement

7    responding to it, I have a written statement.  And

8    there's been a number of write-ups that you presented

9    to me that have been checked that I have a written

10   reply, but you don't have that reply.

11       Q     The question, sir -- and I don't think I

12   heard the answer --

13       A     I think I said yes.

14       Q     Did you submit it also to Mr. Conry?

15       A     I don't know.

16       Q     Did you submit it to Mr. Akinmola?

17       A     I don't know.

18             (Thereupon, the document was marked as

19             Grandison Deposition Exhibit No. 81 for

20             identification.)

21             BY MR. MORRIS:

22       Q     The court reporter has marked and handed to

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 546

1    you a document denominated Grandison Deposition

2    Exhibit Number 81.

3              Is Grandison -- do you recognize Grandison

4    Deposition Exhibit Number 81?

5        A    I haven't finished with Deposition

6    Number 80.

7        Q    Okay.  Well, we've moved -- I have no

8    further questions regarding 80.

9              Would you look at 81, please?

10       A    Uh-huh.

11       Q    Is Grandison Deposition Exhibit Number 81 a

12   document you've seen before today?

13       A    No.

14       Q    Who is Michael Pope?

15       A    I think it's Officer Pope.

16       Q    Do you recognize Mr. Pope's signature?

17       A    No.

18       Q    Do you recognize Mr. Pope's handwriting?

19       A    No.

20       Q    Do you know whether Grandison Deposition

21   Exhibit Number 81 is a true and correct copy of a

22   statement by Michael Pope?

Misty Klapper & Associates
703-780-9559

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 547

1      A      No.

2             (Thereupon, the document was marked as

3             Grandison Deposition Exhibit No. 82 for

4             identification.)

5             BY MR. MORRIS:

6      Q      The court reporter has marked and handed to

7      you a document denominated Grandison Deposition

8      Exhibit Number 82.

9             Is Grandison Deposition Exhibit Number 82 a

10     copy of a document that you submitted to Mr. Carroll?

11     A      Yeah.

12     Q      And following your submission to -- of the

13     document to Mr. Carroll, is it true that Wackenhut

14     issued a disciplinary report against Mr. Fenton

15     Foster?

16     A      I don't know.

17            (Thereupon, the document was marked as

18            Grandison Deposition Exhibit No. 83 for

19            identification.)

20            BY MR. MORRIS:

21     Q      The court reporter has marked and handed to

22     you a document denominated Grandison Deposition

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 548

1    Exhibit Number 83.

2             Is Grandison Deposition Exhibit Number 83 a

3    copy of a disciplinary action report issued against

4    Mr. Foster?

5         A    I don't know.

6             (Thereupon, the document was marked as

7             Grandison Deposition Exhibit No. 84 for

8             identification.)

9             BY MR. MORRIS:

10        Q    The court reporter has marked and handed to

11   you a document denominated Grandison Deposition

12   Exhibit Number 84.

13            Is Grandison Deposition Exhibit Number 84 a

14   copy of a termination letter that Wackenhut sent to

15   Mr. Foster?

16        A    I want to go back to --

17        Q    Well, sir, there's only one --

18        A    -- to --

19        Q    -- question pending.

20        A    Well --

21        Q    Is Grandison Deposition Exhibit --

22        A    You're moving too fast.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 550

1       A       I have something to say.

2       Q       Well, you can say it a later time, not now.

3       A       When will I be able to say it?

4       Q       Your lawyer will explain it to you.

5               THE WITNESS:  When will I be able to say

6       it?

7               MR. SCHIFFRES:  Which exhibit is that?

8               THE WITNESS:  Eighty-three.  You need to

9       write in there Collins -- I need you to write it.  It

10      don't matter.  They can't -- I got to write it in

11      because I got to remember.

12              MR. SCHIFFRES:  Just go.

13              (Thereupon, the document was marked as

14              Grandison Deposition Exhibit No. 85 for

15              identification.)

16              BY MR. MORRIS:

17      Q       The court reporter has marked and handed to

18      you a document denominated Grandison Deposition

19      Exhibit Number 85.

20              Have you seen Grandison Deposition Exhibit

21      Number 85 before today?

22      A       No.

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 551

1    Q    Do you know what it is?

2    A    No.

3    Q    I understand from your earlier testimony,

4  Mr. Grandison, that you're seeking to recover the

5  wages that you lost following your termination.  I

6  also understand, Mr. Grandison, that you're seeking to

7  recover wages that you were not paid on certain days

8  when you were suspended.

9         What days were those?

10   A    I think the days that I want to be paid for

11 for being suspended, I think they're -- all of the

12 suspensions in the disciplinary reports you provided,

13 they -- those days are represented by the disciplinary

14 reports.

15   Q    Am I correct, then, sir, that you're

16 seeking -- you're seeking to be made whole for every

17 day that you were suspended while at Wackenhut; is

18 that correct?

19   A    Every day that I was suspended and I

20 shouldn't have been, that's correct.

21   Q    All right.  Which days were they, in that

22 case?

7e246ea0-2933-48c7-a68d-b5e8307785c7

Page 555

1      A      There's more than one date on these two

2   pages.

3      Q      On how many days, sir, were you asked to --

4   well, your presence in the building as described on

5   the two pages that I gave you?

6             MR. SCHIFFRES:  Do you understand the

7   question?

8             THE WITNESS:  No.  I don't understand the

9   question.

10            BY MR. MORRIS:

11     Q      On how many -- how many days are described

12  on page 264 and 265 of Exhibit Number 49?

13     A      I see one --

14     Q      Have you finished your answer?

15     A      No.

16            Oh, yeah, it looks like one.

17     Q      All right.  So on that day, I understand

18  that based upon the description contained on those two

19  pages, you were asked about your presence in the

20  General Accountability Office; am I correct?

21     A      Right.

22     Q      Were you allowed to remain at the General

7e246ea0-2933-48c7-a68d-b5e8307785c7

1     CERTIFICATE OF NOTARY PUBLIC

2    I, Denise M. Brunet, the officer before

3 whom the foregoing deposition was taken, do hereby

4 certify that the witness whose testimony appears in

5 the foregoing deposition was duly sworn by me; that

6 the testimony of said witness was taken by me

7 stenographically and thereafter reduced to print by

8 means of computer-assisted transcription by me; that

9 said deposition is a true record of the testimony

10 given by said witness; that I am neither counsel for,

11 related to, nor employed by any of the parties to this

12 litigation and have no interest, financial or

13 otherwise, in the outcome of this matter.

14

15          _____

16         Denise M. Brunet
           Notary Public in and for the

17         District of Columbia

18 My commission expires:
 November 30, 2012

19

20

21

22

23

# S.J. EX. 3

# GRANDISON
# TRANSCRIPT & EXHIBITS

# PART 8 OF 11

# S.J. EX. 3


# GRANDISON TR. EX. 3

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

March 30, 2005

Mr. Travis Grandison
1715 Shady River Ct.
#914
Woodbridge, VA 22192

Dear Mr. Grandison:

This letter confirms to you our offer of employment, which has previously been discussed with you. You were offered and accepted a position as a **Special Police Officer (SPO)** on the **Government Accountability Office (GAO)** contract at an hourly rate of $20.00 (Plus Health & Welfare benefits). Your effective date of employment will be April 5, 2005. This offer is contingent upon the successful completion of the following:

a.  Background investigation
b.  Drug testing
c.  Physical
d.  All related employment forms
e.  Obtaining and maintaining a Secret Security Clearance
f.  Maintaining all certifications, qualifications, and licenses for this position and
g.  Enrollment in company direct deposit program within 30 days employment

To confirm these conditions, please sign this letter below. Retain a copy of the letter for your records. This letter is neither intended, nor should it be construed, as a contract of employment. Rather, it is intended to set forth the previously agreed upon conditions of your employment with the company.

We are pleased that you have decided to join our Company and we look forward to a mutually rewarding relationship.

Sincerely,

K.A. Conry
Vice President/General Manager

Acknowledged: _____    Date: 3-30-05
                          Travis Grandison

EXHIBIT
Grandison 3
2-5-08 DMB

*Professionalism With Integrity®*

GRANDISON 00171

# S.J. EX. 3

# GRANDISON TR. EX. 23

SERVICES INCORPORATED

**FILE COPY**

February 28, 2006

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Felton Foster
4008 28th Avenue
Temple Hills, MD 20748

Dear Mr. Foster:

This letter is officially informing you that your employment with Wackenhut Services, Inc. is terminated effective March 1, 2006, based on the following disciplinary action:

>    *To Wit:*        *Violation of Section 404.25, Sleeping on duty.*

*On 21 January, 2006 Sgt. Felton Foster, was scheduled to report at 0645 hours. Between the hours of approximately 0630- 0750 Sgt. Foster was seen by the officers in the break room with his feet up, sleeping and snoring. Sgt. Foster's actions of sleeping while on duty were in violation of Wackenhut article 404.25, Sleeping on duty.*

>    **Disciplinary Action:  Based on Article 404.25, DISMISSAL**

All equipment and credentials must be returned, to include your Company ID. Your complete uniform as issued to you at the start of your employment must be returned after being professionally laundered or dry-cleaned.

If you have any questions, please contact us.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC:kpp

cc:  Personnel File
     Project Manager/GAO

EXHIBIT
Grandison 23
2-5-08 )MB

*Professionalism With Integrity®*

GRANDISON 00511

# S.J. EX. 3

# GRANDISON TR. EX. 24

To: Mr. Carroll, Ruthie Rouse,
From: Grandison, Travis
Re: Assault charge
Date: 3-2-06
Fax: 410-945-7100

On 3-01-06 I was heading to the 2nd relief mandatory meeting. Upon arriving to the location of the meeting in the break-room @ 1415 I could hear Foster yelling obscenities and challenging everyone, and issuing open threats. Shortly after I entered the break-room where the meeting was being held I was greeted by Sgt. Richardson who informed me that I am going to need to attend the mandatory meeting for 1st relief. Shortly after I was informed by Sgt. Richardson that I would need to attend the 1st relief meeting Foster again continues yelling obscenities, continuing to challenge, and issue open threats to everyone in the room. Foster's statements were followed up by encouragement and additional comments coming from Officer James. To my surprise there was no intervention by any member of management to remove Foster or even ask him to refrain from making open threats and using fowl language. It became clear that Foster had begun to direct his comments, challenges, and threats in my direction, and once again his statements were repeated and verbally supported by Officer James. Once again Sgt. Richardson approaching me stated to me that "I will have my meeting with 1st relief". I had the feeling at this point that Sgt. Richardson was simultaneously asking me to leave. As I began to exit the break-room, Foster started to move in my direction. By the time I had gotten to the exit door Foster was on the other side of Sgt. Richardson. However, Foster was not looking at me, but starring at the ground. I walked away heading up the steps, and towards the elevators exiting the building. As I got to the top of the elevators I could hear my fellow co-workers voices beginning to get closer. I looked over my shoulder and Foster was approaching me quickly from behind, coming up the handicap ramp. I turned around and faced Foster. He didn't say anything, just stood there. Then he threw a punch that hit me on the left side of my face. Surprised, I just tried to grab and hold him as he continued to throw punches. I was separated by Officer Robinson and I believe Sgt. Richardson. I was immediately escorted off the property by Captain Trickey. I filed a report with Metro DC Police Department around 7pm on 3-1-06. I was informed by union representatives, fellow officers, and by Mr. Carroll that Foster had been terminated around 1230 on 3-1-06. The assault occurred at 1415. I was not aware of his termination until after the assault took place.

Travis Grandison
571-435-4287



GRANDISON 00033

# S.J. EX. 3


# GRANDISON TR. EX. 25

06/6/05

# WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
### DISCIPLINARY REPORT

TO: Mr. Carroll                          DATE OF REPORT: June 1, 2005

FROM: Sgt. Richardson, Derrick                SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Grandison, Travis        DATE OF VIOLATION: June 1, 2005

LOCATION OF VIOLATION: ___GAO___        TIME/DATE DISCOVERED: 0530 June 1, 2005

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE: ___404.10___        Tardiness or failure to observe assigned work hours.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Officer Grandison was scheduled to open Post 8 at 0530 hours. Ofc. Grandison did not arrive to the Command Center for duty until 0540 hours. Due to Grandison's tardiness, the post was opened late.

IMMEDIATE ACTION TAKEN: _____ NONE

OFFENSE: 1st X    2nd ___    3rd ___    4th ___    COPIES ATTACHED.

Formal Disciplinary Action Recommended: Verbal Counseling with MFR in personnel file

Does the recommendation comply with the disciplinary action procedure? Yes X  No ____

Requestor: Sgt. Richardson, Derrick          Title: Shift Supervisor
          Printed Name and Signature
_____ I agree with the contents of this report    _____ I do not agree with the contents of this report

_____ DATE: 1 June 05    Statement attached  NO
Employee's Signature                                            Yes or No

Project Manager: Chuck Carroll        Project Manager: ✓Approve ___ Disapprove

Comments: _____

Field Operations Manager: _____ ✓Approve ___ Modify ___ Disapprove

Comment: _____ APP VERBAL W/ MFR

Signature: _____

EXHIBIT
Grandison 85
2-5-08 DMB

# S.J. EX. 3

# GRANDISON TR. EX. 26

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

June 6, 2005

Officer Travis Grandison
1715 Shady River Court
#914
Woodbridge, VA 22192

Dear Officer Grandison:

This letter is an official **Memorandum for Record** concerning your violation of the Disciplinary Actions Section of the Wackenhut Services, Inc. Administration of Discipline Policy and Procedure:

**Violation:**    **Article 404.10 Tardiness or failure to observe assigned work hours. (1ˢᵗ Offense)**

*Officer Grandison was scheduled to open Post 8 at 0530 hours. Ofc. Grandison did not arrive to the Command Center for duty until 0540 hours. Due to Grandison's tardiness, the post was opened late.*

**Disciplinary Action:**    **Based on Article 404.10, verbal counseling with MFR in personnel file.**

Any continued performance of this nature may result in dismissal.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC/drl

cc:  Personnel File
     Project Manager/GAO

**EXHIBIT**
Grandison 36
2-5-08 NB

*Professionalism With Integrity®*

GRANDISON 00314

# S.J. EX. 3


# GRANDISON TR. EX. 27

# SECURITY OFFICER/INSPECTOR
# PERFORMANCE APPRAISAL

**WACKENHUT**

| Name of Employee | S.S. Number | Position Title |
|---|---|---|
| GRANDISON, TRAVIS | 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 | SPO |

| Dist./Area/Branch/Project | Facility Name | Date |
|---|---|---|
| WSI/NCR | GAO | 9/29/05 |

**PERFORMANCE RATING**

Appraisals should be made only after reviewing the below listed definitions

**NORMAL PERFORMANCE DISTRIBUTION**

**1.  DISTINGUISHED**
Performance far exceeds normal requirements of the job. Outstanding nature of performance is evident to anyone in a position to observe and evaluate it. Level of performance approaches the maximum possible attainment for the position. Very few are able to reach this level of accomplishment.   **5%**

**2.  COMMENDABLE**
Performance clearly exceeds the requirements of the job. Performance is worthy of special note. Accomplishment indicates extra thought, effort, imagination and results.   **30%**

**3.  COMPETENT**
Performance clearly meets the requirements of the position. Continued performance at this level would be perfectly acceptable. Accomplishment reflects a solid level of performance. Most qualified people are able to attain this level of accomplishment.   **50%**

**4.  NEEDS IMPROVEMENT**
Performance is below the competent level. Employees who are new on this job and develop at less than the expected rate would fit in this category. Continued performance at this level is unacceptable.   **10%**

**5.  UNACCEPTABLE**
Performance is clearly unsatisfactory and below expectations.   **5%**



EXHIBIT
Grandison 27
2-5-08 NYB

| | RATE ON FACTORS BELOW | 1 | 2 | 3 | 4 | 5 | SIGNATURES |
|---|---|---|---|---|---|---|---|
| 1. | **JOB KNOWLEDGE** Overall knowledge of duties and responsibilities | | | ✓ | | | Employee |
| 2. | **QUALITY OF WORK** Correctness, completeness and accuracy | | | | ✓ | | *(signature)* |
| 3. | **QUANTITY OF WORK** Accomplishments of assigned duties and tasks | | | ✓ | | | |
| 4. | **JUDGMENT** Ability to apply sound reasoning when making decisions | | | ✓ | | | Date  10-12-05 |
| 5. | **ATTITUDE** Enthusiasm for job and willingness to accept orders, changes, etc. | | | | ✓ | | Supervisor |
| 6. | **INITIATIVE** Self-motivation, ability to work with minimal supervision. | | | | ✓ | | Sgt. Richard |
| 7. | **ATTENDANCE** Punctual reporting to work | | | ✓ | | | |
| 8. | **COOPERATION** Works with supervisors and fellow employees to get job done | | | ✓ | | | Date  9-29-05 |
| 9. | **DEPENDABILITY** Follows through without constant supervision; reliable | | | | ✓ | | Dist./Area/Branch/Proj. |
| 10. | **COMMUNICATION** Ability to give and receive information by speaking, writing, etc. | | | ✓ | | | |
| 11. | **COURTESY** Attitude displayed to others in performance of duty | | | ✓ | | | Chuck Carroll |
| 12. | **APPEARANCE** Well-groomed, uniform is clean, pressed and complete | | | | ✓ | | Date |
| 13. | **REGULATIONS** Adherence to rules and regulations established by the Company. | | | | ✓ | | 10-14-05 |

COMMENTS:  OFC. GRANDISON HAS THE ABILITY TO BE AN EXCEPTIONAL OFFICER. HE NEEDS TO FOCUS MORE ON FOLLOWING RULES AND PROCEDURES OF THE COMPANY.

W-168 (7-30-88) 74407

GRANDISON 00107

# S.J. EX. 3

# GRANDISON TR. EX. 28

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION (NCR)
DISCIPLINARY REPORT

TO: Mr. Carroll                                    DATE OF REPORT: October 15, 2005

FROM: Sgt. Richardson, Derrick                     SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Grandison, Travis                 DATE OF VIOLATION: October 15, 2005

LOCATION OF VIOLATION: ___GAO___                   TIME/DATE DISCOVERED: 0600 October 15, 2005

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE: ___404.10___        Tardiness or failure to observe assigned work hours.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Officer Grandison was schedule to report and assume duty on Post 12 at 0600 hours. Ofc. Grandison called off and gave no reason for his call off. When questioned by shift supervisor as to his call off on Sunday 10/16/05, Ofc. Grandison stated that he called off to attend CPR/ AED Training at the corporate office. Ofc. Grandison was given explicit instructions by Sgt. Richardson on Wednesday 10/12/05 that the PM had scheduled Grandison for a later training date. He was instructed that his call off would effect manpower. Ofc. Grandison chose not to follow explicit instructions.

IMMEDIATE ACTION TAKEN:         NONE

OFFENSE: 1st X  2nd   3rd   4th       COPIES ATTACHED.

Formal Disciplinary Action Recommended: ~~Written Reprimand~~   VERBAL COUNSELING W/ MEMO FOR RECORD. CMC

Does the recommendation comply with the disciplinary action procedure? Yes X  No ____

Requestor: Sgt. Richardson, Derrick                Title: Shift Supervisor
           Printed Name and Signature

√ I agree with the contents of this report    ____ I do not agree with the contents of this report

_____  DATE: 11-9-05     Statement attached _____
Employee's Signature                                        Yes or No

Project Manager: Charl M Carrll    Project Manager: √ Approve  __ Disapprove

Comments: _____

Field Operations Manager: ____ √ Approve  __ Modify  __ Disapprove

Comment: _____

Signature: _____

EXHIBIT
Grandison 28
2-5-08 MB

# S.J. EX. 3


# GRANDISON TR. EX. 29

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

November 10, 2005

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Officer Travis Grandison
1715 Shady River Ct., #914
Woodbridge, VA 22192

Dear Mr. Grandison:

This letter is an official letter of **Memorandum for Record** concerning your violation of
disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline
policy and procedures:

      **Violation:**             **Article 404.10 (1st Offense) Tardiness or failure
to observe assigned work hours.**

      **Disciplinary Action:**      **Based on Article 404.10, verbal counseling with
MFR in personnel file.**

Officer Grandison was scheduled to report and assume duty on Post 12 at 0600 hours. Ofc.
Grandison called off and gave no reason for his call off. When questioned by shift supervisor as to his
call off on Sunday, October 16, 2005, Ofc. Grandison stated that he called off to attend CPR/AED
Training at the corporate office. Ofc. Grandison was given explicit instructions by Sgt. Richardson
on Wednesday, October 12, 2005, that the PM had scheduled Grandison for a later training date. He
was instructed that his call off would effect manpower. Ofc. Grandison chose not to follow explicit
instructions.

Any continued performance of this nature may result in dismissal.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:     Personnel File
        Project Manager/GAO


EXHIBIT
Grandison 29
(5-08) MB

*Professionalism With Integrity®*

GRANDISON 00318

# S.J. EX. 3

# GRANDISON TR. EX. 30

11/9/05

# WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
### DISCIPLINARY REPORT

TO: Mr. Carroll _____                DATE OF REPORT: October 29, 2005

FROM: Sgt. Richardson, Derrick                    SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Grandison, Travis          DATE OF VIOLATION: October 29, 2005

LOCATION OF VIOLATION: ____ GAO ____      TIME/DATE DISCOVERED: 0545 October 29, 2005

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE: ___ 404.10 ___      Tardiness or failure to observe assigned work hours.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Officer Grandison was scheduled to report for Roll Call at 0545 hours and subsequently assume duty on Post 5. Supervisor made contact with Ofc. Grandison via telephone at 0610 hours to inquire about Ofc. Grandison's tardiness. Ofc. Grandison stated that he overslept and would report to work immediately. Ofc. Grandison resides less than 100 yards from GAO's main entrance. Ofc. Grandison did not arrive to the Command Center for duty until 0800 hours.

IMMEDIATE ACTION TAKEN: _____ NONE

OFFENSE: 1ˢᵗ __     2ⁿᵈ X     3ʳᵈ __     4ᵗʰ __     COPIES ATTACHED.

Formal Disciplinary Action Recommended: Written Reprimand

Does the recommendation comply with the disciplinary action procedure? Yes X   No _____

Requestor: Sgt. Richardson, Derrick               Title: Shift Supervisor
              Printed Name and Signature
                    Sgt. Richard
___ I agree with the contents of this report      ___ I do not agree with the contents of this report

_____     DATE: 11.9.05        Statement attached _____
   Employee's Signature                                  Yes or No

Project Manager: Chas M Carroll      Project Manager: ✓ Approve __ Disapprove

Comments: _____

Field Operations Manager: ____ ✓ Approve ___ Modify ___ Disapprove

Comment: Recomme written reprimand

Signature: _____      11/9/05

EXHIBIT
Grandison 350
2508DYB

# S.J. EX. 3

# GRANDISON TR. EX. 31

FILE COPY

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

November 10, 2005

Officer Travis Grandison
1715 Shady River Ct., # 914
Woodbridge, VA 22192

Dear Mr. Grandison:

This letter is an official **Letter of Reprimand** concerning your violation of the Disciplinary Actions Section of the Wackenhut Services, Inc. Administration of Discipline Policy and Procedure:

| | |
|---|---|
| **Violation:** | **Article 404.10 (2nd Offense) Tardiness or failure to observe assigned work hours.** |
| **Disciplinary Action:** | **Based on Article 404.10, written reprimand in file.** |

*Officer Grandison was scheduled to report for Roll Call at 0545 hours and subsequently assume duty on Post 5. Supervisor made contact with Ofc. Grandison via telephone at 0610 hours to inquire about Ofc. Grandison's tardiness. Ofc. Grandison stated that he overslept and would report to work immediately. Ofc. Grandison resides less than 100 yards from GAO's main entrance. Ofc. Grandison did not arrive to the Command Center for duty until 0800 hours.*

Any continued performance of this nature may result in dismissal.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC/kpp

cc:  Personnel File
     Project Manager/GAO

EXHIBIT
Grandison 31
7-5-06 BMB

*Professionalism With Integrity®*

GRANDISON 00321

# S.J. EX. 3


# GRANDISON TR. EX. 32

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION (NCR)
DISCIPLINARY REPORT

TO: Mr. Carroll

DATE OF REPORT: Nov. 21, 2005

SITE: General Accounting Office

FROM: Sgt. Foster, Felton

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Officer Grandison, Travis

DATE OF VIOLATION: Nov. 21, 2005

LOCATION OF VIOLATION: GAO

TIME/DATE DISCOVERED: 0850 Nov. 21, 2005

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE: 404.16    Being inattentive to duty but not sleep.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Ofc. Grandison was inside of guard booth on 4th street with his feet up on the desk and his head laying on the window.

IMMEDIATE ACTION TAKEN:    NONE

OFFENSE: 1st X    2nd __    3rd __    4th __    COPIES ATTACHED.

*cnc*
*(FIRST OFFENSE SHOULD BE) 2 DAY SUSPENSION.*

Formal Disciplinary Action Recommended: ~~10 days suspension~~

Does the recommendation comply with the disciplinary action procedure? Yes X No ____

Requestor: Sgt. Foster, Felton

Title: Shift Supervisor

Printed Name and Signature
*Sgt. Felton Foster*

____ I agree with the contents of this report    ____ I do not agree with the contents of this report

Employee's Signature    DATE: _____    Statement attached _____
Yes or No

Project Manager: *Chuck Carroll*    Project Manager: ✓ Approve __ Disapprove

Comments: *Actions were in violation of 404.16. Failed to notice Sgt's arrival at the door*

Field Operations Manager:    ✓ Approve    ~~Modify~~    Disapprove

Comment: *RECOMMEND 2 DAY SUSP (TWO)*

Signature: ____    *11/28/07*

*My feet were*

EXHIBIT
Grandison 32
25-08/MB

GRANDISON 00328

# S.J. EX. 3

# GRANDISON TR. EX. 33

FILE COPY

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

November 30, 2005

Officer Travis Grandison
1715 Shady River Ct., #914
Woodbridge, VA 22192

Dear Mr. Grandison:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation:         **Article 404.16 – (1st Offense) Being inattentive to duty but not asleep.**

Disciplinary Action:    **Based on Article 404.16, 2-Day Suspension is warranted from the contract.**
**Days of Suspension: 12/13/05 – 12/14/05; returning on 12/17/05.**

*Ofc. Grandison was inside of the guard booth on 4th street with his feet up on the desk and his head laying on the window.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO



*Professionalism With Integrity®*

GRANDISON 00326

# S.J. EX. 3

# GRANDISON
# TRANSCRIPT & EXHIBITS

# PART 9 OF 11

# S.J. EX. 3

# GRANDISON TR. EX. 34

# WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
### DISCIPLINARY REPORT

TO: Mr. Carroll                                   DATE OF REPORT: Jan. 13, 2006

FROM: Sgt. Richardson, Derrick                    SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Officer Grandison,Travis        DATE OF VIOLATION: Jan. 13, 2006

LOCATION OF VIOLATION:     GAO              TIME/DATE DISCOVERED: 0500 Jan. 13, 2006

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE:     404.10          Tardiness or failure to observe assigned work hours.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Ofc. Grandison was schedule to open Post 13 at 0500 hours. Ofc. Grandison called the Command Center at approximately 0510 hours stating that he was on his way to work after he retrieves an item from his vehicle. Ofc. Grandison did not arrive to the Command Center for duty until 0520 hours. Ofc. Grandison was allowed to switch days of duty with Ofc. Sivoum and signed an action request that he would assume Post 13 at 0500 hours and the schedule was changed by the shift supervisor to reflect the request. Ofc. Grandison resides less than 100 yards from the GAO building yet this is the third time in the past quarter that he has been tardy or failed to observe assigned work hours.

IMMEDIATE ACTION TAKEN:              NONE

OFFENSE: 1st X    2nd ___    3rd X    4th ___    COPIES ATTACHED ___

Formal Disciplinary Action Recommended: Two (2) days Suspension

Does the recommendation comply with the disciplinary action procedure? Yes X  No ___

Requestor: Sgt. Richardson, Derrick              Title: Shift Supervisor
          Printed Name and Signature

____ I agree with the contents of this report    ____ I do not agree with the contents of this report

_____    DATE: 23 Jan 06    Statement attached
Employee's Signature                             Yes or No

Project Manager: Chuck Carroll    Project Manager: ✓Approve ___ Disapprove

Comments: _____

Field Operations Manager: ___ Approve  ✓ Modify ___ Disapprove

Comment: _____

Signature: _____

EXHIBIT
Grandison 34
2-5-08 MB

# S.J. EX. 3

# GRANDISON TR. EX. 35

**WACKENHUT** **FILE COPY**
SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

February 1, 2006

Officer Travis Grandison
1715 Shady River Court
Apt. 914
Woodbridge, VA 22192

Dear Mr. Grandison:

This letter is an official letter of **Memorandum for Record** concerning your violation of disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

| | |
|---|---|
| **Violation:** | **Article 404.10 (1st Offense) Tardiness or failure to observe assigned work hours.** |
| **Disciplinary Action:** | **Based on Article 404.10, verbal counseling with MFR in personnel file.** |

Ofc. Grandison was scheduled to open Post 13 at 0500 hours. Ofc. Grandison called the Command Center at approximately 0510 hours stating that he was on his way to work after he retrieves an item from his vehicle. Ofc. Grandison did not arrive to the Command Center for duty until 0520 hours. Ofc. Grandison was allowed to switch days of duty with Ofc. Siyoum and signed an action request that he would assume Post 13 at 0500 hours and the schedule was changed by the shift supervisor to reflect the request . Ofc. Grandison resides less than 100 yards from the GAO building yet this is the third time in the past quarter that he has been tardy or failed to observe assigned work hours.

Any continued performance of this nature may result in dismissal.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

EXHIBIT
Grandison 35
2-5-08 NNB
PENGAD 800-631-6989

*Professionalism With Integrity®*

GRANDISON 00311

# S.J. EX. 3

# GRANDISON TR. EX. 36

# U.S. Equal Employment Opportunity Commission

PERSON FILING CHARGE

Patricia Marmon
Director EEO Programs
THE WACKENHUT CORP.
4200 Wackenhut Drive
Palm Beach Gardens, FL 33410

**Travis J. Grandison**

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**570-2006-00578**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act          [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act   [ ] The Equal Pay Act

RECEIVED
MAR 28 2006
HUMAN RESOURCES

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ] Please provide by _____ a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

[ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____ to _____

If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Tracy Smalls,**
**Secretary**

EEOC Representative

Telephone   **(202) 419-0734**

Washington Field Office - 570
1801 L Street, N.W.
Suite 100
Washington, DC 20507

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

## See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| Mar 23, 2006 | Dana Hutter, Director | Dana R Hutter |

EXHIBIT
Grandison 56
2-5-08 DMB

GRANDISON 00509

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 570-2006-00578 |

## D.C. Office Of Human Rights
State or local Agency, if any

and EEOC

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Travis J. Grandison | (571) 435-4287 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 705 4th Street, N.W., Apt. 303 | Washington, DC 20001 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| WACKENHUT SERVICES INC./GAO Building | 500 or More | |

| Street Address | City, State and ZIP Code |
|---|---|
| 441 G Street, N.W. | Washington, DC 20001 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 11-01-2005   Latest: 03-10-2006

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began to work for Wackenhut Services in April 2005. On or about October 2005, Sergeant Foster (Black) began to harass me on a daily basis. On November 2005, I made a complaint about the harassment to the Project Manager (Caucasian). However, the harassment by Foster continued. I also sought the help of my direct supervisor, but again it continued and escalated. No one in management attempted to correct the harassment by Foster. On March 1, 2006, I was physically assaulted by Sergeant Foster. I made my complaints because I believed that I was the subject of discrimination, but since making my complaints I have been the one disciplined. For example, on March 10, 2006, I was disciplined again by the Project Manager, in writing, for an infraction for which I had already received written disciplined. I was also threatened with termination. I believe that I have been discriminated against because of my race (Black) and in retaliation for having made a complaint for discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended.

RECEIVED
MAR 28 2006
HUMAN RESOURCES

EEOC WASHINGTON FIELD OFFICE
2006 MAR 13 A
1400 L ST N.W. WASHINGTON D.C.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

I declare under penalty of perjury that the above is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

| Mar 13, 2006 | | |
|---|---|---|
| Date | Charging Party Signature | |

GRANDISON 00510

Received Time Apr. 20.  10:39AM
MAR-28-2006  12:09          5616916591          97%          P.04

# S.J. EX. 3

# GRANDISON TR. EX. 37

EEOC Form 161 (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: Travis J. Grandison<br>705 4th Street, N.W.<br>Apt. 303<br>Washington, DC 20001 | From: Washington Field Office - 570<br>1801 L Street, N.W.<br>Suite 100<br>Washington, DC 20507 |
|---|---|

APR – 4 2006   HUMAN RESOURCES

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 570-2006-00578 | Janet Stump,<br>Enforcement Supervisor | (202) 419-0700 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Dana R. Hutter*

**MAR 30 2006**

Enclosures(s)

**Dana Hutter,
Director**

(Date Mailed)

cc:
**Patricia Marmon
Director EEO Programs
THE WACKENHUT CORP.
4200 Wackenhut Drive
Palm Beach Gardens, FL 33410**

EXHIBIT
Grandison 37
2-5-08 DMB

GRANDISON 00508

Received Time Apr. 20. 10:39AM

TOTAL P.04

S.J. EX. 3


GRANDISON TR. EX. 38

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms Paulette Nunez<br>EEO Analyst<br>WACKENHUT SERVICES, INC.<br>H.R. Department<br>4200 Wackenhut Drive<br>Palm Beach Gardens, FL 33410 | **Travis J. Grandison**<br><br>THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s)<br><br>EEOC CHARGE NO.<br>570-2006-01098 |

### NOTICE OF CHARGE OF DISCRIMINATION
(See the enclosed for additional information)

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act          [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act          [ ] The Equal Pay Act

**RECEIVED**

**JUN - 1 2006**

**HUMAN RESOURCES**

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **26-JUN-06** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **08-JUN-06** to **John Woods, ADR Coordinator, at (202) 419-0727** If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Stanika K. Smith,<br>Investigator Support Asst | Washington Field Office - 570<br>1801 L Street, N.W.<br>Suite 100<br>Washington, DC 20507 |
|---|---|
| EEOC Representative | |
| Telephone (202) 419-0743 | |

Enclosure(s): [X] Copy of Charge

### CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [X] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| May 25, 2006 | Dana Hutter,<br>Director | Dana R Hutter |

**EXHIBIT**
Grandison 38
2.5.08 DMB

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 570-2006-01098 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Travis J. Grandison | (571) 435-4287 | 12-10-1975 |

| Street Address | City, State and ZIP Code |
|---|---|
| 705 4th Street, N.W., #303 | Washington, DC 20001 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| WACKENHUT SERVICES, INC. | 500+ | (202) 512-2282 |

| Street Address | City, State and ZIP Code |
|---|---|
| 441 G Street, N.W. | Washington, DC 20001 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

RECEIVED
DC    JUN    2006
HUMAN RESOURCES

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 03-27-2006 | 05-10-2006 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.   In 4/05, I commenced working for Respondent as a Special Police Officer. On 3/13/06, I filed a charge of discrimination (#570-2006-00578) against Respondent at the EEOC in which I alleged violations under Title VII. Subsequently, in late 3/06, in retaliation for this protected activity, Respondent unreasonably suspended me for five days without pay for receiving a fax that was not work related. In early 4/06, Respondent further retaliated against me by suspending me for three days without pay based upon false accusations that I was tardy on three occasions. On 5/4/06, Respondent further retaliated against me by unjustly recommending me for dismissal for willful insubordination with respect to my failure to wear my uniform hat, shoes and tie on a particular assignment. Finally, on 5/10/06, Respondent retaliated against me by unjustly suspending me for five days without pay based upon a false accusation that I was willfully insubordinate for failing to clip my uniform tie on my shirt collar in the proper spot.

II.  I believe that I have been retaliated against in violation of Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT |
| 5-11-06          _Signature_
Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

GRANDISON 00507

# S.J. EX. 3

# GRANDISON TR. EX. 41

| | |
|---|---|
| **From:** | "Craig A Trumpet" <TrumpetC@gao.gov> |
| **To:** | "Charles Carroll" <CarrollC@GAO.GOV> |
| **Date:** | 3/9/2006 6:59:15 PM |
| **Subject:** | RE: MPD Info |

Thanks chuck. I spoke to kathy and we both agree that grandison should be punished like gilliam was, for unauthorized use of government equipment. If I recall correctly wackenhut suspnded gilliam for 5 days for such an infraction. If that is the case then it is our desire that grandison receive the same punishment.

[Message delivered by NotifyLink]

————Original Message————

From: "Charles Carroll" <CarrollC@GAO.GOV>
Sent: Thu, March 09, 2006 12:45 PM
To: "Craig A Trumpet" <TrumpetC@GAO.GOV>
Subject: MPD Info


Craig,

The initial officer was Master Patrol Officer Boyd (202-698-0555).

Sergeant James Crouch (Same #)

Not sure if Crouch was the one you spoke with but those are the two cards that were given to me by the Shift Supervisor.


Chuck



EXHIBIT
Grandison 41
2-5-08 DMB
PENGAD 800-631-6989

GRANDISON 00291

S.J. EX. 3


GRANDISON TR. EX. 42

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr. Stephens

FROM: Mr. Carroll

DATE OF REPORT: 13 March Jan, 06

SITE: General Accounting Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc Travis Grandison          DATE OF VIOLATION: 27 Feb, 2006

LOCATION OF VIOLATION: GAO      TIME/DATE DISCOVERED: 0800/10 Mar, 06

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article ___404.15___          Violation of security procedures and regulations.

The infraction/offense is described as follows:

On 27 February, 2006 at approximately 1400 hours a personal fax addressed to Ofc Grandison arrived on a Government Fax machine. All personnel have been briefed and a notice posted that WSI personnel are not authorized to use government equipment or communication devices except in the performance of their assigned duties. Mr. Trumpet the Contract Officers Technical Representative has requested disciplinary action for the unauthorized use of government equipment. Ofc Grandison signed a form stating that he was aware that the misuse of government property or service would result in disciplinary action up to and including dismissal. Ofc Grandison's actions violated GAO security procedures and regulations and Wackenhut Article 404.15.

Immediate action taken: _____None._____.

Offense: 1st _X_    2nd ____    3rd ____    4th ____

Formal disciplinary action recommended: Five (5) days suspension.

Requestor: Mr. Carroll  _Charles M Carroll_          Title: Project Manager
                Print Name and Signature of Supervisor or Manager
Does the recommendation comply with the disciplinary action procedure? Yes _X_ No ___.

___ I agree with the contents of the above report      _✓_ I do not agree with the contents of the above report

_____          DATE: _3-15-06_  Statement attached _YES_
  Employee's Signature                                          Yes or No

Project Manager: _Charles M Carroll_          Project Manager: _✓_Approve ___ Disapprove

Comments: _I never authorized use of Gov fax, Captain & Shift Supervisor statements attach_

Field Operations Manager: _____ Approve __ Modify _____ Disapprove

Comment: _RECOMMEND (5) DAY SUSP (FIVE)_

Signature: _____          Date: _3/16/06_

Received Time Mar. 15. 12:51PM

EXHIBIT
Grandison 42
2-5-08 DMB

GRANDISON 00287

# S.J. EX. 3

# GRANDISON TR. EX. 43

# WACKENHUT
## SERVICES INCORPORATED

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

March 16, 2006

Officer Travis Grandison
1715 Shady River Ct., #914
Woodbridge, VA 22192

Dear Mr. Grandison:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation:   **Article 404.15 – (1st Offense) Violation of security procedures and regulations.**

Disciplinary Action:   **Based on Article 404.15, 5-Day Suspension is warranted from the contract.**
**Days of Suspension: 3/22/06 – 3/26/06; returning on 3/29/06.**

*On 27 February, 2006 at approximately 1400 hours a personal fax addressed to Ofc. Grandison arrived on a Government Fax machine. Mr. Trumpet the Contract Officers Technical Representative has requested disciplinary action for the unauthorized use of government equipment. Ofc. Grandison signed a form stating that he was aware that the misuse of government property or service would result in disciplinary action up to and including dismissal. Ofc. Grandison's actions violated GAO security procedures and regulations and Wackenhut Article 404.15.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:   Personnel File
      Project Manager/GAO



*Professionalism With Integrity®*

GRANDISON 00285

# S.J. EX. 3

# GRANDISON TR. EX. 44

# WACKENHUT

## SERVICES INCORPORATED **FILE COPY**

January 31, 2006

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

Officer Omer Gilliam
404 V St., NE
Washington, DC 20002

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Mr.Gilliam:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

|  |  |
|---|---|
| Violation: | **Article 404.15 – (1st Offense) Violation of security procedures and regulations.** |
| Disciplinary Action: | **Based on Article 404.15, 5-Day Suspension is warranted from the contract.**<br>**Days of Suspension: 02/16/06 – 02/20/06; returning on 02/21/06.** |

*On 22 January, 2006 at approximately 0200 hours Ofc. Gilliam (Post 18) requested Ofc. Shipman to get him the 2nd Floor Master Key. Sgt. Akinmola established radio contact with Ofc. Gilliam to ascertain what room Ofc. Gilliam needed to enter. Ofc. Gilliam stated he needed to open 2Y07. Sgt. Akinmola told Ofc. Gilliam to report to the Command Center. Sgt. Akinmola then asked Ofc. Gilliam why do you need the 2nd Floor Master Key. Ofc. Gilliam stated that he needed the key to open 2Y07 to get his book, he was studying for an exam. Sgt. Akinmola escorted Ofc. Gilliam up to room 2Y07 (Physical Structures Conference Room) and allowed him to obtain his personal items. Ofc. Gilliam's actions of conducting personal affairs during official time, use of government property without authorization and violation of security procedures and regulations was in violation of GAO Post Orders, Standards of Conduct and Wackenhut Article 404.15.*

You are to give your full attention to this action.  Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       PM, GAO



EXHIBIT
Grandison 44
2-5-08 DMB

*Professionalism With Integrity®*

GRANDISON 00698

S.J. EX. 3

GRANDISON
TRANSCRIPT & EXHIBITS

PART 10 OF 11

S.J. EX. 3


GRANDISON TR. EX. 54

To: Mr. Carroll, Ruthie Rouse
From: Travis Grandison
Re: Harassment by Management/Foster
Date: 2/27/06
Fax: 410-945-7100

      This is the third notice that I have had to send out about my treatment and
situation at the GAO building. I understand that in response to my first two notices I
would be subject to heavy scrutiny with management. I have been experiencing this
scrutiny and workplace retaliation on the part of management every since. I am also
concerned with the lack of response and lack of change that hasn't occurred. I have
spoken to management on several occasions outside of the notices, and pleaded with
them to step in and correct the inconsistencies and problems. Nothing seems to have
been done. Below are more incidents that have occurred over the past month regarding
me and management and it has become clear that I am a target and being treated fairly
and just left alone maybe impossible at this point. What I want to know is why there
hasn't been anything done? I want to know why I continue to be treated differently,
while at the same time doing everything I am asked. Also I would like to know what are
your policies and procedures when an employee has harassment and workplace
retaliation claims.

On a daily basis I am asked by Foster to show my SPO commission. I have waited to
witness if Foster would ask other officers to show their commission and he hasn't. This
was addressed months ago and nothing has changed.

2-26-06 Foster arrived to work late, approximately 25 minutes late. Foster did not have
      on a gun belt, and he did not have on the proper footwear. In addition Foster had
      a newspaper on his post and was reading it on post. I was sent home without any
      cause or reason at all. I want to know why I was sent home and the justification
      behind me being sent home. If the cause or justification is not valid then I ask to
      be compensated for being sent home. I can only speculate that I was either sent
      home for not having on patent leather shoes (which I put on after I was told that I
      couldn't wear the black leather shoes I had on, and there were plenty of officers
      including Foster who were not in compliance and I made this clear to Foster) or
      that I was sent home because Foster assumed that I and three other officers were
      talking about him concerning proper policy and procedure. I do not understand
      this conclusion because he was not present during the entire discussion and his
      name or title was never mentioned. In any event I was asked to drop my weapon,
      which I did, and then I was asked to leave the building.
        Per my conversation with Mr. Carroll on 2-27-06 I was told that I had
      been sent home for being argumentative and/or verbal with Foster. The only
      words I spoke to Foster were questioning him as to why I had to wear certain
      shoes, while everyone else including himself doesn't have to wear certain shoes.
      I was not sent home during the time I questioned Foster concerning the wearing of
      improper footwear. I was sent home approximately 15 minutes later while I was
      outside of the command center on post 5/6 and I was not talking to Foster, at



EXHIBIT
Grandison 54
3-13-08 JMB
PENGAD 800-831-6989

GRANDISON 00024

Foster, or about Foster. In addition I did put on my patent leather shoes and assumed my post. Also, Foster wanted to write me up for being late to work. I was not late. I came to work and had on black leather shoes. I walk to work everyday. The patent leather shoes are very uncomfortable. I do not understand how I can be written up for being late, and sent home for not having on the proper shoes, which I did put on before I assumed my post and or being argumentative when all I did was question Foster as to the fairness of his decision. If I am not to be paid, then everyone who has ever had on the improper uniform should not be paid. Not just for 2-26-06 but for everyday that an officer or a supervisor did not comply with the policies and procedures. It is common place that officers and supervisors on a daily basis come into the command center without their entire uniform on, not just the incorrect shoes, but without shirt, without hat, and jacket. They sign in and then return to their automobiles and/or the break room and finish getting dressed. Foster of course is one who participates in this activity on a daily basis.

2-4-06  I was informed by Officer Johnson that Foster had told him that "Grandison had better cross all his T's and dot all his I's because I have to something for him." This statement is nothing less than Foster admitting to be involved with workplace retaliation against me.

2-5-06  Foster asked me to give post 11&18 lunch breaks. I was assigned to post 18, which is an outside rover post. I glanced at Officer Johnson and he glances back. I then ask Foster "what post did you say"? He states post 11&12. I say "ok". While I was breaking post 11&12 Foster comes out to the booth and ask me why I was in the booth. I stated to him "you told me to break 11&12. He asked how long has the officer been on break. I stated he has another 30 minutes. Then he states I told you to break 11or12. I stated "no you didn't". He stated "I did". I then asked Officer Johnson "what post did Foster instruct me to break" and Johnson stated "I heard you, meaning Foster say break 11&12". I believe and have reason to believe based on past comments made by Foster that this was an attempt to manipulate a situation so that I would appear to have abandoned post, etc. This case was another example of verbal communication between I and Foster due to Foster not following correct procedures, and he exhibiting incompetence on the job. In addition on two occasions I witnessed Foster on post 11&12 without his gun belt on during the morning of 2-5-06.

2-7-06  Upon returning from break and entering the command center, I stated to Foster that "I need to pick up" referring to picking up my weapon and rounds as I am returning to post. He gets up and asks "can I talk to him and say something else other than "you need to pick up". Upon Foster beginning to work here and on several occasions he made it clear that I needed to say to him that "I needed to pick". This is what I told him, in response to his statement to me. This is an example of Foster trying to provoke or instigate some type of action from me. I feel this is another example of the harassment/workplace retaliation I receive, on a day to day basis. Captain Trickey and Mr. Holly were present in the command center.

GRANDISON 00025

2-14-06 Foster was on post 18. Foster stopped by post 8/9 while I happened to be breaking the post. He came and stated that I couldn't have my bag on post. I use my bag to store shoes, equipment and notepads. There were 2 other bags on the post at the time and Foster mentioned nothing about the other bags. In addition the two officers on post 8/9 were not wearing the exact same uniform. One was wearing a jump suit and the other slacks, white shirt, patent leather shoes and 8 point hat. Foster said nothing about this.

2-15-06 I was assigned to post 8. Foster comes out to post 8 and tells me and officer. T. Robinson that we can't be dressed differently on post, meaning that we both should be dressed a like. The day before he said nothing to the two officers who were or post, with one of the officers being Officer Robinson.

2-20-06 Foster has been continuing to request to see my commission and no one else's on a daily basis.

2-20-06 Foster comes from post 10 up the ramp in an obvious attempt to catch me and officer Addu in violation. He walks in the booth as if the booth is so large he can't see from the door and is looking around. He then leans over on the floor underneath the table and picks up a newspaper as if he is cleaning up the floor. He then stands up and is looking at me as if he is going to say something, but says nothing then leaves the booth walks past a couple sheets of newspaper that are in the bushes and puts the newspaper in the trash. Approximately 10 minutes later I request a 44R. After I use the restroom I go in the command center to sign in. The sign in page was turned to the wrong page when I signed in this morning. In addition there was no date or shift information on this sheet either and Foster stated that was the sheet I needed to sign-in on. I went to the Command Center after Foster radioed my post and stated that I had signed in on the wrong shift and that I "needed to sign-in sometime". While in the Command Center I noticed there was today's Washington Post on the desk not four inches from Foster's left hand. Foster should and I am requesting that he be held to whatever the matrix states for having unauthorized reading material on post.

2-21-06 At approximately 0630 I was in route to the restroom during my 15 minutes break. Upon my route I stopped and spoke to the 2 officers on post ¾. One of the officers who were on post with me or 2/20/06 stated that Foster had stated to him "why did you wake Grandison up yesterday when he was sleep, you know that he was sleep." Foster is obviously referring to him reporting to post 11/12 yesterday and removing a newspaper from post. I was not sleep, and this is another example of workplace retaliation by Foster.

2-21-06 Approximately 0940 for the second time this morning Foster has been by peaking into the booth @ post 13. He is on post 18 which is an outside rover post out in the garage. This is post abandonment, and Foster should be held to whatever the matrix states for post abandonment. This is another example of harassment/workplace retaliation by Foster.

GRANDISON 00026

2-25-06 Foster did not have on patent leather shoes. In addition I was not given a break and didn't have time to take a break until 1:15pm. The shift ends at 2pm and Foster leaves at 1pm. This has occurred at least 3 times before. I have been in at least 3 conversations with Sgt. Armstrong about me taking my break so late during the shift. Sgt. Armstrong has stated to me that it is against policy to take a break during the last hour of your shift. If it is against the policy then why am I not given a break and/or when given a break it comes within the final hour of the shift? Sgt. Richardson saw that Foster had on improper gear.

2-26-06 Foster arrived to work at 0525 late. When I arrived to work I had on black shoes that were not patent leather shoes. I was assigned to post 16 today and 2-25-06. When I arrived Foster stated to me that "I'm not going through this with you." I'm not issuing you a weapon until you put the correct shoes on. I asked Foster "why are you requiring me to change my shoes when you don't have the proper shoes on and never do, and also knowing there will be plenty of officers who come in here that won't have them on either." Then as I'm leaving the Command Center to go and get my patent leather shoes he asked me to clock out. I went and got my shoes, came back and asked him "so you are going to force me to wear these shoes, right?" He stated "right". Then I asked how can you ask me do something and you not do it and don't ask anyone else to do it". Foster said nothing. I picked up my weapon and radio and went out to post 5/6. While at post 5/6 me and 3 officers were talking about the situation and the fact that Foster was late, did not have a gun belt on, unarmed and was not in proper uniform. Foster then comes from out of the Command Center and walks over to me starring at me in an obviously intimidating and belligerent manner and drops the keys on the desk. I happened to be talking and never stopped my conversation. Then Officer Hunter comes over and says Foster just go on; just go on then Foster comes back and says "I'm sending you home, you need to drop your weapon." I drop my weapon and leave the Command Center and come back to the lobby then Foster comes out to the lobby and tells me that I need to leave the building. Then he tells the 3 officers that he needs them to write a statement about what I said about him or something to that effect. Foster doesn't know who we were talking about, as his name was never mentioned and I never even looked at him as he approached post 5/6. This is just another example of harassment/workplace retaliation by Foster and once again I have lost another 8 hours of pay.

In conclusion, this behavior by Foster and management allowing it to continue has been going on for just about 4 months. The fact that I have been the only officer ever sent home for violating uniform policies and the only officer ever harassed on a continual basis in the presence and with the knowledge of management, lets me further know that I will continue to be a target until I succumb to the provoking nature of management, crack under the pressure of the harassment and retaliation, take steps outside of the chain of command to correct the problems, or quit.

Not surprisingly that on the first occasion that I ask management about the inconsistencies, I am stated to be argumentative and in a verbal conflict with management. It is surprising because I have been spoken to on numerous occasions by management in a belligerent, disrespectful, and provoking manner in the presence of other supervisors and officers and nothing was said or done. The only thing that was said was that I need to make sure I am not bringing this on myself. I have not been

GRANDISON 00027

disrespectful, belligerent, or insubordinate to management at all during my time working at the GAO building.

Currently, I feel at this point I am being singled out more strongly due to my willingness to speak about the inconsistencies that take place in the workplace. I am listing the inconsistencies, and events that have occurred that are blatantly provoking, malicious, and guided by an effort to do harm. I hope that the conditions for me will change at the GAO building in the future and I will be allowed to come to work, perform my duties, and go home without the constant harassment.

GRANDISON 00028

# S.J. EX. 3

# GRANDISON TR. EX. 55

# WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
### DISCIPLINARY REPORT

TO:  Mr. Stephens                    DATE OF REPORT: 27 Feb, 06

FROM: Mr. Carroll                    SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Ofc. Travis Grandison          DATE OF VIOLATION: 27 Feb, 06

LOCATION OF VIOLATION: GAO          TIME/DATE DISCOVERED: 0600/27 Feb, 06

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE:    404.10        Tardiness or failure to observe assigned work hours.

The infraction/offense is described as follows: (Use reverse side if more space is needed.):

Ofc. Travis Grandison was scheduled to report for Post 11 at 0600 hours on 27 February 2006. Ofc Grandison entered the GAO Command Center at approximately 2230 hours on 26 February and notified Sgt Collins that he was not coming into work to take care of the situation with Foster. Sgt Collins made Ofc Grandison aware that was not a valid excuse for calling off from his scheduled work hours. Ofc Grandison did not report to work Post 12 on 27 February causing overtime to fill the post requirement. Ofc. Grandison's tardiness and failure to observe assigned work hours was in direct violation of GAO Post orders and Wackenhut Article 404.10.

IMMEDIATE ACTION TAKEN: _____ None _____

OFFENSE: 1st ____    2nd _X_    3rd ____    4th ____    COPIES ATTACHED _____.

Formal Disciplinary Action Recommended:  Written Reprimand .

Does the recommendation comply with the disciplinary action procedure? Yes _X_ No ____

Requestor:  Mr. Carroll  _Charles M Carroll_          Title: Shift Supervisor
                    Printed Name and Signature

____I agree with the contents of this report    ✓ I do not agree with the contents of this report

_____    DATE: 3-2-06    Statement attached _____.
Employee's Signature                                            (Yes) or No

Project Manager: _Charles M Carroll_    Project Manager: ✓ Approve ___ Disapprove

Comments: _The statement has not been provided as of 6 Mar 06._

Field Operations Manager: _____✓ Approve    ___Modify    ___Disapprove

Comment: _SEE WRITTEN REPRIMAND_

Signature: _____    Date: 3/9/06



EXHIBIT
Grandison 35
3-18-08 DMB

Received Time Mar. 6.  1:52PM                    GRANDISON 00296

# S.J. EX. 3


# GRANDISON TR. EX. 56

# WACKENHUT
## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

March 9, 2006

Officer Travis Grandison
1715 Shady River Ct., # 914
Woodbridge, VA 22192

Dear Mr. Grandison:

This letter is an official **Letter of Reprimand** concerning your violation of the Disciplinary Actions Section of the Wackenhut Services, Inc. Administration of Discipline Policy and Procedure:

|  |  |
|---|---|
| **Violation:** | **Article 404.10 (2nd Offense) Tardiness or failure to observe assigned work hours.** |
| **Disciplinary Action:** | **Based on Article 404.10, written reprimand in file.** |

*Ofc. Travis Grandison was scheduled to report for Post 11 at 0600 hours on 27 February 2006. Ofc. Grandison entered the GAO Command Center at approximately 2230 hours on 26 February and notified Sgt. Collins that he was not coming into work to take care of the situation with Foster. Sgt. Collins made Ofc. Grandison aware that was not a valid excuse for calling off from his scheduled work hours. Ofc. Grandison did not report to work, Post 12 on 27 February causing overtime to fill the post requirement.*

Any continued performance of this nature may result in dismissal.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC/kpp

cc: Personnel File
    Project Manager/GAO

EXHIBIT
PENGAD 800-631-6989
Grandison 56
3-13-08 DMB

GRANDISON 00294

# S.J. EX. 3


# GRANDISON TR. EX. 60

# WACKENHUT SERVICES, INC. (WSI)
## NATIONAL CAPITOL REGION (NCR)
### DISCIPLINARY REPORT

DATE OF REPORT: 2 March, 06

TO: Mr. Carroll

FROM: Sgt Collins

SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate disciplinary letter as required.

EMPLOYEE'S NAME: Ofc. Travis Grandison     DATE OF VIOLATION: 28 Feb/1 Mar, 06

LOCATION OF VIOLATION: GAO     TIME/DATE DISCOVERED: 2145/28 Feb/1Mar, 06

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

ARTICLE:    404.10     Tardiness or failure to observe assigned work hours.

The infraction/offense is described as follows:

Ofc. Travis Grandison was scheduled to work Post 11 on 1 March, which required Ofc Grandison to attend Roll Call at 2145 hours and report for Post 11 at 2200 hours on 28 February 2006. Ofc Grandison entered the GAO Command Center at approximately 2240 hours on 28 February. Sgt Collins notified SPO Grandison that he was not needed. Sgt Collins had already called a replacement officer and he was enroute and the relief officer was covering the post pending his arrival. Ofc Grandison stated that Mr. Carroll had told him his hours were from 2300 through 0700. Ofc. Grandison's tardiness and failure to observe assigned work hours was in direct violation of GAO Post orders and Wackenhut Article 404.10.

IMMEDIATE ACTION TAKEN:    None

OFFENSE: 1st ___    2nd ___    3rd  X    4th ___    COPIES ATTACHED _____.

Formal Disciplinary Action Recommended:  Three (3) days suspension.

Does the recommendation comply with the disciplinary action procedure? Yes X  No ____

Requestor: Sgt Collins, A.                    Title: Shift Supervisor
         Printed Name and Signature

___ I agree with the contents of this report     ✓ I do not agree with the contents of this report

_____     DATE: 3-10-06    Statement attached ___ Yes or No
Employee's Signature

Project Manager: Chad M Carroll    Project Manager: ✓ Approve ___ Disapprove

Comments: The schedule was posted. He requested to move from second to first.

Field Operations Manager: ✓ Approve ___ Modify ___ Disapprove

Comment: REC 3 DAY SUSP

Signature: _____    Date: 3/17/06

EXHIBIT
Grandison (a
3-13-08 DMB

Received Time Mar. 10. 11:31AM

GRANDISON 00276

# S.J. EX. 3

# GRANDISON TR. EX. 61

**WACKENHUT**
**SERVICES INCORPORATED**

FILE COPY

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

March 17, 2006

Officer Travis Grandison
1715 Shady River Ct., #914
Woodbridge, VA 22192

Dear Mr. Grandison:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation:     **Article 404.10 – (3rd Offense) Tardiness or failure to observe assigned work hours.**

Disciplinary Action:     **Based on Article 404.10, 3-Day Suspension is warranted from the contract.**
**Days of Suspension: 4/05/06 – 4/07/06; returning on 4/08/06.**

*Ofc. Travis Grandison was scheduled to work Post 11 on 1 March, which required Ofc. Grandison to attend Roll Call at 2145 hours and report for Post 11 at 2200 hours on 28 February 2006. Ofc. Grandison entered the GAO Command Center at approximately 2240 hours on 28 February. Sgt. Collins notified SPO Grandison that he was not needed. Sgt. Collins had already called a replacement officer and he was enroute and the relief officer was covering the post pending his arrival. Ofc. Grandison stated that Mr. Carroll had told him his hours were from 2300 through 0700. Ofc. Grandison's tardiness and failure to observe assigned work hours was in direct violation of GAO Post orders and Wackenhut Article 404.10.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:     Personnel File
        Project Manager/GAO

EXHIBIT
Grandison 61
3/13/08 DHb

*Professionalism With Integrity®*

GRANDISON 00274

S.J. EX. 3


GRANDISON TR. EX. 62

FROM : WSI/CARROLL                    FAX NO. : 202-512-8141                    Apr. 05 2008 ...

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr. Carroll                                 DATE OF REPORT: 15 Mar 06

FROM: Sgt Collins                               SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc Travis Grandison        DATE OF VIOLATION: 15 Mar. 06

LOCATION OF VIOLATION: GAO          TIME/DATE DISCOVERED: 2230/15 Mar, 06

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article    404.19       Willful Insubordination.

The infraction/offense is described as follows:

On 15 March at approximately 2145 Ofc Travis Grandison was signing in for duty without his tie on. Sgt Collins, Shift Supervisor, told Ofc Grandison to put his tie on and in full uniform before assuming Post 11 at 2200 hours. At approximately 2230 hours Sgt Collins delivered paperwork to Post 5, 10 and 11. When Sgt Collins approached Sgt Grandison on Post 11 he observed that Ofc Grandison still did not have his tie on and that Ofc Grandison had also unbuttoned and raised his sleeves. Sgt Collins notified Ofc Grandison about proper uniform requirements and that a disciplinary report would be generated. Ofc Grandison's failure to follow Sgt Collins instructions shows a complete disregard Sgt Collins authority to enforce GAO and Wackenhut policies. Ofc Grandison's willful insubordination is in violation of Wackenhut Article 404.19.

Immediate action taken: _____ None. _____

Offense: 1st  X    2nd ____  3rd ____  4th ____

Formal disciplinary action recommended: Five (5) days suspension to Dismissal.

Requestor: Sgt Avonne Collins _____      Title: Shift Supervisor
           Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure? Yes  X       No ___

___ I agree with the contents of the above report    __ I do not agree with the contents of the above report

_____      DATE: 3-29-06   Statement attached   YES
      Employee's Signature                                          (Yes or No)

Project Manager: Chuck Carroll          Project Manager: ✓ Approve ___ Disapprove

Comments: RECOMMEND 5 days suspension.

Field Operations Manager: X Approve __ Modify ___ Disapprove

Comment: RECOMMEND FIVE (5) Days suspension

Signature: _____      Date: _____

EXHIBIT

GRANDISON 00260

# S.J. EX. 3

# GRANDISON TR. EX. 63

# WACKENHUT
## SERVICES INCORPORATED

**FILE COPY**

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

May 3, 2006

Officer Travis Grandison
705 4th St., NW
Apt. 303
Washington, DC 20001

Dear Mr. Grandison:

This is an official letter of **suspension** concerning your violation of the disciplinary actions section of the Wackenhut Services, Inc. Administration of Discipline policy and procedures:

Violation:                    **Article 404.19 – (1st Offense) Willful Insubordination.**

Disciplinary Action:     **Based on Article 404.19, 5-Day Suspension is warranted from the contract.**
**Days of Suspension: 5/10/06 – 5/14/06; returning on 5/16/06.**

*At approximately 2230 hours Sgt. Collins delivered paperwork to Post 5, 10, and 11. When Sgt. Collins approached Sgt. Grandison on Post 11 he observed that Ofc. Grandison still did not have his tie on and that Ofc. Grandison had also unbuttoned and raised his sleeves. Sgt. Collins notified Ofc. Grandison about proper uniform requirements and that a disciplinary report would be generated. Ofc. Grandison's failure to follow Sgt. Collins instructions shows a complete disregard to Sgt. Collins authority to enforce GAO and Wackenhut policies. Ofc. Grandison's willful insubornation is in violation of Wackenhut Article 404.19.*

You are to give your full attention to this action. Any continued performance of this nature **may result** in dismissal.

If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

K.A. Conry
Vice President/General Manager

KAC/kpp

CC:    Personnel File
       Project Manager/GAO

EXHIBIT
Grandison 63
3-13-08 MB

*Professionalism With Integrity®*

# S.J. EX. 3

# GRANDISON TR. EX. 66

WACKENHUT SERVICES, INC. (WSI)
NATIONAL CAPITOL REGION(NCR)
DISCIPLINARY REPORT

TO: Mr. Stephens                    DATE OF REPORT: 10 Apr 06

FROM: Mr. Carroll                   SITE: Government Accountability Office

The following disciplinary report was issued this date and is to be included in the employee's
personnel file. Provide the appropriate letter as required.

EMPLOYEE'S NAME: Ofc Travis Grandison    DATE OF VIOLATION: 2 Apr. 06

LOCATION OF VIOLATION: GAO          TIME/DATE DISCOVERED: 0900/7 Apr. 06

The above named employee was found to be in violation of the WSI/NCR Disciplinary Actions:

Article    404.19        Willful Insubordination.

The infraction/offense is described as follows:

On 7 April while reviewing security tapes of 2 April, 2006 Mr. Carroll observed Ofc Grandison
on Post 16 conducting his Morse Watchman tour. Ofc Grandison was again not in compliance
with established uniform policies. Specifically his shirt collar was open, his tie was to one side
and he was not wearing his hat. On March 29th both Mr. Carroll and Ofc McNeil were present
when Mr. Carroll presented Ofc Grandison with a disciplinary report for the same offense of not
properly wearing his tie after being told by the supervisor to put his tie on and to be in full
uniform before assuming post. Ofc Grandison's continued failure to follow policies, after being
briefed four days earlier, shows a complete disregard of authority and Wackenhut policies. Ofc
Grandison's willful insubordination is in violation of Wackenhut Article 404.19.

Immediate action taken: _____ None. _____.

Offense: 1st _____ 2nd X 3rd _____ 4th _____

Formal disciplinary action recommended: Dismissal .

Requestor: Chuck Carroll   Chuck Carroll          Title: Project Manager
           Print Name and Signature of Supervisor or Manager

Does the recommendation comply with the disciplinary action procedure? Yes X    No ____ .

__ I agree with the contents of the above report   √ I do not agree with the contents of the above report

_____ DATE 5-4-06    Statement attached   YES
     Employee's Signature                                    Yes or No

Project Manager: Chuck Carroll          Project Manager: √ Approve __ Disapprove

Comments: Find attached rebuttal -three statements, one union statement.

Field Operations Manager:       √ Approve __ Modify __ Disapprove

Comment: RECOMMAND DISMISSAL

Signature: _____ Date: 5/9/06

EXHIBIT
Grandison 66
3-13-08  SMB

Received Time May. 5.  9:08AM

GRANDISON 00247

# S.J. EX. 3

# GRANDISON TR. EX. 67

# WACKENHUT
## SERVICES INCORPORATED

May 22, 2006

Travis Grandison
705 4th St., NW, # 303
Washington, DC 20001

WACKENHUT N.C.R.
A DIVISION OF
WACKENHUT SERVICES INCORPORATED
4710 AUTH PLACE
SUITE 700
CAMP SPRINGS, MD 20746

TELEPHONE: (301) 899-1552
FAX: (301) 899-7153

Dear Mr. Grandison:

This letter is officially informing you that your employment with Wackenhut Services, Inc. is terminated effective May 25, 2006, based on the following disciplinary action:

**To Wit:**    *Violation of Section 404.19 (2nd Offense), Willful Insubordination.*

*On 7 April while reviewing security tapes of 2 April, 2006 Mr. Carroll observed Ofc. Grandison on Post 16 conducting his Morse Watchman tour. Ofc. Grandison was again not in compliance with established uniform policies. Specifically his shirt collar was open, his tie was to one side and he was not wearing his hat. On March 29th both Mr. Carroll and Ofc. McNeil were present when Mr. Carroll presented Ofc.Grandison with a disciplinary report for the same offense of not properly wearing his tie after being told by the supervisor to put his tie on and to be in full uniform before assuming post. Ofc. Grandison's continued failure to follow policies, after being briefed four days earlier, shows a complete disregard of authority and Wackenhut policies. Ofc. Grandison's willful insubordination is in violation of Wackenhut Article 404.19.*

**Disciplinary Action:  Based on Article 404.19, DISMISSAL**

Your termination is based on the above referenced event along with the other behavior previously discussed and documented in your personnel file.

All equipment and credentials must be returned, to include your Company ID.  Your complete uniform as issued to you at the start of your employment must be returned after being professionally laundered or dry-cleaned.

If you have any questions, please contact us.

Sincerely,

K. A. Conry
Vice President/General Manager

KAC:kpp

cc:  Personnel File
      Project Manager/GAO



*Professionalism With Integrity*®

GRANDISON 00246

S.J. EX. 3

GRANDISON TR. EX. 69

This statement is to confirm that I, Sgt. Akinmola, never on any occasion informed or tell Officer Grandison that he did not have to wear or put on his tie or uniform hat.

04-26-06



# S.J. EX. 3

# GRANDISON
# TRANSCRIPT & EXHIBITS

# PART 11 OF 11

# S.J. EX. 3

# GRANDISON TR. EX. 76



**WACKENHUT**
SERVICES INCORPORATED

# MEMORANDUM

Date:   1 March 2006

From:  Chuck Carroll/Project Manager, GAO

To:     Ofc Grandison

In your letter dated 2/27/06 you said that this is the third notice that you were sending out about your treatment and situation at the GAO building.

I do not concur with your statement that you have provided three notifications about your treatment at GAO. In actuality you provided a notification on 28 November. Afterwards I called a meeting with yourself and the Union Steward, addressed your disciplinary problems of tardiness and proper wear of the uniform, which you agreed you were at fault for and the letter about unfair treatment by Sgt Foster. Having identified that you were removed from site because of wearing pants that were cuffed, and no action had been taken against other officers that were also wearing cuffed pants and unauthorized shoes. You were compensated for that day of work. I then addressed your concerns with Sgt Richardson, Captain Trickey and Sgt Foster ensuring that they understood that all disciplinary action was to be fair and equal across the board. All personnel were briefed on the proper uniform requirements and timeliness.

Your second letter dated 31 January had nothing to do with your treatment but allegations about Sgt Foster's behavior (sleeping/out of uniform). Your allegations were investigated, statements gathered and all pertinent information forwarded to WSI/NCR HQ for action. Pending. 

On 26 February Sgt Foster notified me that you had arrived for work out of compliance with uniform standards and when addressed that you became loud and disruptive. He had sent you home across the street to obtain proper footwear in accordance with the contract. Later when he provided you keys to Post 16, you made comments in front of other officers that Sgt Foster felt were disruptive in nature and insubordinate. He decided it was best to remove you from the site rather than the situation escalating further. He notified me of the action and I notified him to gather up statements from those personnel that witnessed the incidents.

You came in at 2230 on 26 February and notified Sgt Collins that you were not coming in to work but would take care of the situation with Sgt Foster, Sgt Collins let you know that your reason for calling off was not a valid excuse. You and I spoke over the phone where you told me of being singled out by Sgt Foster and that you were doing up a letter which you presented to me at approximately 1630 hours, 27 February, 2005. You agreed that you had been showing up to work with the wrong shoes and that you had to get the proper gear before signing on post making you late because you did not have the proper equipment required by contract when you first arrived. Other officers had received write-ups from Sgt Foster as well.

You ask management to take action, but you fail to report the discrepancies as they occur but rather in groups over a long period of time, the last letter goes back a full month making it very difficult to validate the information except the times when personnel entered. I cannot validate if

GRANDISON 00308

# S.J. EX. 3

# GRANDISON TR. EX. 80

To: Carroll, Conway, Akinola
From: Grandison
Re: Willful insubordination
Date: 5-4-06

I was not being willfully insubordinate. I was told by Akinola that I could do my rounds without any hat identifiers and shoes. Akinola stated to me that after the rounds was done then I have to put my gear back on. Akinola stated this to me after he & I and officer Pope were on post side discussing how best to conduct the rounds. Officer Pope initially stated that I should wear my hat and the female I would be escorting hearly from the round. I stated to him, with Akinola present that "no if I did that, they would write me up in a heart beat" ignoring the fact that this is common procedure on 1st relief. Akinola says "nah just do the rounds you can resume your gear just put everything back on when you finish. Every write-up that you pending Mr. Carroll & his asst. to corporate has been of a very petty nature. You are subsequently trying

Received Time May. 5.  9:08AM


EXHIBIT
Grandison 80
5-21-08 DMB

GRANDISON 00248

to terminate me for uniform issues, knowing that
I have been treated unfairly by you and your
supervisors on the midnite. Everyone knows and you
hoped would come and you knew that there are
plenty of others who are not in compliance on a
daily basis and none receive the punishment I
have none. In regards to my tardinesses, there
are others who are sending everyday and none
have the punishment I have received. In our meeting
today you stated that Sgt. Armstrong makes arrangements
with other officers to work for him to arrive
because he is late on often, that is truly an
or failure to direct scheduled hours, work hrs, etc
If I am in violation I have allowed the
same treatment. Never will Mr. Farrell you suggest
or maybe you are absent minded about what
goes on in the CRO building because you only
seem to recognize and not to my actions. You
signaling the above situation to me being treated
and signaling and failing to investigate any wrongs
that I have directly clearly stated to me and
everyone knowledgeable of my situation and that you
are not only signaling issues at will but are

GRANDISON 00249

a catalyst and leader in the objective to have me reward good or eliminated from Wackenhut. I have been written up for not having on the proper shoes before and sent home for not having been in uniform, but these occurrences were never listed as willful insubordination. Don't you think it's a little lade. Don't you see how this is clearly unfair. I know you want to pass yourself off as a good samaritan and middle-man who is only a messenger, but you have been sending the wrong types of messages.

In addition, I am requesting my entire file (personell). I'm sure you have no way of retrieving it, so at your earliest convenience, may I get the info. of the person who can do it.

# S.J. EX. 3

# GRANDISON TR. EX. 81

I Ofc. Pope did not recall and or witness anytime Sgt Akinmola told Ofc. Grandison not to wear his hat or his tie.

Michael B Pope

Michael B Pope        0510 am

5/5/06



EXHIBIT
Grandison 81
3-21-08 DMB

S.J. EX. 3


GRANDISON TR. EX. 82

To: Mr. Carroll, Captain Trickey, Sgt. Richardson, and Sgt. Collins
From: Grandison, Travis
Re: Fosters actions on 1-21-06 and 1-29-06
Date: 1-31-06

On 1-21-06 Foster arrived to work approximately 1 hour late and noticeably hung over as you could smell alcohol when in his presence. After clocking in, Foster proceeded to the break room where he slept for the next 2 hours. This activity was brought to my attention by a number of officers who had witnessed this. Upon receiving this information I proceeded to witness this personally while on my 15 minute break I proceeded to the break room where I found Foster reclined in a chair, with feet up, and visibly sleep and snoring very loudly. Every officer on shift at that time was and is aware of what happened that day. This behavior as well as Foster's behavior since he arrived at GAO has become increasingly unprofessional to say the least and it is becoming increasingly difficult to maintain the integrity of the job when a person given responsibilities to lead by example is doing everything but leading by example. This is not the first occasion that he has been seen sleeping while on post, not to mention abandoning post to leave the premises completely out of uniform as he did on 1-29-06.

On 1-29-06 Foster left the GAO premises without tie, gun belt, hat, or issued jacket. During his exit from the building Sgt. Collins who was off and out of uniform was phoned by command center to issue a weapon to an officer, due to Foster's absence. While Collins was on his way to the command center, Foster returns with a bag of food and a drink in his hand.

These are two incidents of many that occur on a daily basis and me being a well known personal target of Fosters is concerned as to when he will have to answer for his outright deviance of the rules and policies, just as I and everyone else has to answer when we break the rules.

Thank you,

Travis J. Grandison

EXHIBIT
Grandison 87
3-31-08

GRANDISON 00515

# S.J. EX. 3

# GRANDISON TR. EX. 85



# MEMORANDUM

Date: 4 May 2006

From: Chuck Carroll/Project Manager, GAO

To: Dennis Stephens/Al League

Subject: Rebuttal to SPO Grandison's Statement

1. SPO Grandison states in his letter dated 5-4-06 "I was not being willfully insubordinate. I was told by Akinmola that I could do my rounds without my hat and tie, and shoes. Akinmola stated to me that after the round was done then I have to put my gear back on. Akinmola stated this to me after he, I and officer Pope were on post 5 + 6 discussing how best to complete the rounds. Officer Pope initially stated that I should remove my hat and tie because I would be sweating heavily from the round. I stated to him, with Akinmola present that "no if I did that they would write me up in a heart beat, ignoring the fact that this is common procedure on 1st relief." Akinmola says "no, just do the rounds, you can remove your gear, just put everything back on when you finish."

   A. I made contact with both Sgt Akinmola and Ofc Pope and collected their statements. Neither Sgt Akinmola nor Ofc Poe confirms that Sgt Akinmola gave Ofc Grandison approval to conduct his tour out of uniform. Statements are attached.

2. SPO Grandison states "Every write-up that you meaning Mr. Carroll has sent to corporate has been of a very petty nature."

   A. All disciplinary reports presented to Officer Grandison and forwarded to WSI Headquarters are taken from Wackenhut policies were agreed to in the Collective Bargaining Agreement and taken directly from Wackenhut Disciplinary Matrix #358. Mr. Carroll provided Officer Grandison a copy of the matrix in March 2006 to ensure Ofc Grandison was aware of the established policies. Mr. Carroll cannot address why Ofc Grandison feels that they are petty in nature.

3. SPO Grandison states "You are subsequently trying to terminate me for uniform issues, knowing that I have been treated unfairly by you and other supervisors on the issue."

   A. The current disciplinary report being addressed is for willful insubordination, not uniform issues. "Ofc Grandison was told by Mr. Carroll in the presence of the Union Steward, Ofc McNeil, on 29 March that a Disciplinary Report had been generated by Sgt Collins for Willful Insubordination. Mr. Carroll told Ofc Grandison that he needed to be in compliance with Wackenhut and contract policies to avoid future disciplinary reports. Ofc Grandison was told that the client was paying close attention to appearance and expected high standards to be maintained." Less than four days after being told to be in compliance by the Project Manager, Officer Grandison is on duty, walking through the GAO building with his tie to one side, his collar open and his hat off.



EXHIBIT
Grandison SS
3-21-08 DMB

GRANDISON 00251

4. Ofc Grandison states "Everyone knows and your tapes would prove that there are plenty of officers who are not in compliance on a daily basis and none face the punishment I have. None."

A. Ofc Grandsion is not notified of disciplinary actions taken against other officers. Also the majority of officers that do receive disciplinary reports correct their actions after being addressed. The tapes do not belong to Mr. Carroll or Wackenhut; they are the property of the Government. The Government does conduct random reviews of the tapes for officer compliance and also conduct inspections. Identified discrepancies have been addressed.

5. Ofc Grandison states "In regards to my tardiness…"

A. This disciplinary report does not address tardiness.

6. Ofc Grandison states "Mr. Carroll you appear or maybe you are absent minded about what goes on in the GAO building because you only seem to recognize, and act on my actions. Your ignoring the obvious situations at me being targeted and ignoring and failing to investigate any writeups that I have denied clearly states to me and everyone knowledgeable of my time here that you are not only ignoring issues at will, but are a catalyst and leader in the objective to have me removed and or terminated from Wackenhut."

A. Every statement Grandison has submitted has resulted with a review of the information and a rebuttal from me concerning each incident. As far as the comment of Mr. Carroll being a catalyst and leader in the objective to remove Ofc Grandison. Mr. Carroll disagrees. On the first few meetings, Ofc Grandison, Ofc McNeil and Mr. Carroll met for disciplinary reports for tardiness. Mr. Carroll took the time to let Ofc Grandison know the importance of arriving on time and shredded the disciplinary reports giving him another chance. When Ofc Grandison was still coming in late and reports being generated Mr. Carroll again brought in Ofc Grandison and the Union to see if there was another solution. The result, Ofc Grandison submitted for a transfer to First Shift and Mr. Carroll authorized the move. If Mr. Carroll felt the disciplinary report was not justified, as in the case of the wrong shoes being worn and another for the pants being cuffed, the disciplinary reports were shredded. Since his tenure here he has received disciplinary reports from four different supervisors and the client. No one is targeting Ofc Grandison. The two disciplinary reports for willful insubordination in such a short time period are the result of Officer Grandison's actions, nothing else.

7. Ofc Grandison states "I have been written up for not having on the proper shoes before and sent home for not being in uniform, but these occurrences were never (labled?) as willful insubordination."

A. Currently Ofc Grandison has not received any disciplinary action for not having the proper shoes. Currently on file he has disciplinary actions for tardiness, inattentive to duty, willful insubordination and unauthorized use of a fax machine.

8. Ofc Grandison is requesting his personnel file.

A. I will let him know to contact Jane Foxx.

GRANDISON 00252

If there are any questions I can be reached at 202-512-2985.

Chuck Carroll
WSI Project Manager

GRANDISON 00253

# S.J. EX. 4

# CARROLL
# DECLARATION &
# EXHIBITS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS GRANDISON,

    Plaintiff,

    v.

WACKENHUT SERVICES, INC.,

    Defendant.

Civil Action No. 1:07-cv-00754 (RMC)

## DECLARATION OF CHARLES M. CARROLL

I, Charles M. Carroll, do hereby depose and state as follows:

1.   I am a Project Manager for Wackenhut Services, Inc.'s National Capital Region.

2.   During the period referenced herein, I was the senior on-site manager for WSI's security contract with the Government Accountability Office.

3.   I investigated the circumstances underlying the disciplinary report that is submitted as Grandison Deposition Exhibit 62 to WSI's Statement of Material Facts as to which No Genuine Issue Exists.

4.   As part of that investigation, I reviewed security tape showing that Travis Grandison was not in proper uniform on March 15, 2006.

5.   I also received a statement from a shift supervisor, Douglas Akinmola, who confirmed that Grandison was not in proper uniform on that date. Attached as Exhibit A is a true and correct copy of the statement that I received from Akinmola.

6.   So, I concurred with the disciplinary report, and recommended that Wackenhut suspend Grandison for 5 days.

7.    On March 29, 2006, I briefed Grandison, stressing that he must be in full uniform before

he goes on post. Grandison's shop steward, Daniel McNeil, attending that briefing.

8.    Attached hereto as Exhibit B is a true and correct copy of a memorandum, dated April 5,

2006, from me to Dennis Stephens and Al League.

9.    At my request, Ofc. Daniel McNeill, a union shop steward at the GAO site, reviewed

security tape recorded on April 2, 2006, and confirmed that it revealed that Grandison was

improperly dressed.

10.    Attached hereto as Exhibit C is a true and correct copy of a statement, dated April 7,

2006, that McNeil submitted to me.

11.    I conferred with Akinmola as to whether he had authorized Grandison to conduct his

rounds without his complete uniform. Attached hereto as Exhibit D is a true and correct copy of

a statement that Akinmola submitted to me.

12.    I also conferred with an officer, Michael Pope, as to whether he had heard Akinmola

authorize Grandison to conduct his rounds without his complete uniform. Attached hereto as

Exhibit E is a true and correct copy of a statement that Pope submitted to me.

13.    Attached hereto as Exhibit F is a true and correct copy of a memorandum, dated May 4,

2006, from me to Dennis Stephens and Al League.

14.    Within about a month after it terminated Grandison, Wackenhut hired two armed security

guards for the GAO worksite: Vanzell Duncan and Lynn Roddy. Both are black. One is a male.

15.    I saw Grandison place a check mark on the disciplinary reports that are submitted as

Exhibits 25, 28, 30, 32, and 34 to WSI's Statement of Material Facts as to which there is No

Genuine Issue, indicating that he agreed with the content of those documents.

RPP/260741.3

16.    I counseled Grandison with respect to his conduct described in the disciplinary reports that are submitted as Exhibits 25, 28 and 34 to WSI's Statement of Material Facts as to which No Genuine Issue Exists.

I have read the foregoing Declaration, consisting of 16 numbered paragraphs, and declare that it is true and correct to the best of my personal knowledge.


_Charles M. Carroll_ (signature)
Charles M. Carroll

Date: _9 June, 2008_

-3-

# S.J. EX. 4

# CARROLL DECL. EX. A

 **G A O**
Accountability • Integrity • Reliability

# SECURITY REPORT

| Case Number: | Date: 03-15-06 |
|---|---|

NARRATIVE [ ]    SUPPLEMENTAL [ ]    STATEMENT [ ]

At about 2340hrs, Sgt Collins informed me that Ofc. Grandison was out of uniform because he did not put on his tie. He was advised by Sgt Collins during the roll-call and also when the Sgt when to drop off the NOV list, he told me that Ofc Grandison was still out of uniform. As a result, this prompted me to go out to post 11 to confirm Sgt Collins statement. On getting there, I saw Ofc. Grandisons tie hanging loose on the pride of his shirt. I advised him to dress properly and stop at drawing attention to himself. He wore his tie right and was properly in uniform before I left post 11.

EXHIBIT
Grandison 64
3/3-08 DW

| Name: DOUGLAS AKINROLA | Signature: |
|---|---|

GAO, Office of Security and Safety 7/15/2003

# S.J. EX. 4

# CARROLL DECL. EX. B



# MEMORANDUM

Date:  5 April 2006

From:  Chuck Carroll/Project Manager, GAO

To:  Dennis Stephens/Al League

Subject:  Rebuttal to SPO Grandison's Statement

1.  SPO Grandison states in his letter dated 3-29-06 "On 3-15-06 Sgt Collins stated that he told me to put my tie on. I put my tie on and went to post."

A.  Sgt Akinmola also provided a statement. Stating that later during the shift after hearing Sgt Collins saying that Grandison was still not properly wearing a tie he stepped out to post to verify the discrepancy and confirmed that Grandison was not properly wearing the tie.

A.  A review of the tapes conducted by Mr. Carroll confirms that after signing in and departing the Command Center to assume post Ofc Grandison was not wearing a tie. The tapes also confirm that Sgt Collins and Sgt Akinmola did report to Post 11 at different times, making contact with Ofc Grandison.

Chuck Carroll
WSI Project Manager

PROD 00328

# S.J. EX. 4

# CARROLL DECL. EX. C

APRIL 7, 2006

I, SPO McNEILL, WAS REQUEST-
ED TO MEET WITH MR. CARROLL
(THE PROJECT MANAGER)
CONCERNING SPO GRANDISON.
MR. CARROLL SHOWED ME THE
VIDEO DATED 04-02-2006
SHOWING SPO GRANDISON ON
HIS TOUR OF DUTY IN THE BUILD-
ING HITTING CHECK POINTS
THROUGH OUT THE BUILDING. SPO
GRANDISON DID NOT HAVE HIS
HAT ON, AND HIS TIE WAS OFF
TO THE SIDE OF HIS SHIRT,
WITH HIS COLLAR OPEN.
THIS INCIDENT WAS AFTER THE
DISCUSSION WE HAD IN MR. CARROLL'S
OFFICE ON 03-29-2006

**EXHIBIT**
Grandison 68
3/3.08 TX4B

GRANDISON 00256

# S.J. EX. 4

# CARROLL DECL. EX. D

This statement is to confirm that I, Sgt. Akinmola, never on any occasion informed or tell Officer Grandison that he did not have to wear or put on his tie or uniform hat.

04-26-06



GRANDISON 00254

# S.J. EX. 4

# CARROLL DECL. EX. E

I Ofc. Pope did not recall and or witness anytime Sgt Akinmola told Ofc. Grandison not to wear his hat or his tie.

Michael B Pope
Michael B Pope
5/5/06

0510 am

EXHIBIT
Grandison 81
3-21-08 DMB

GRANDISON 00255

S.J. EX. 4


CARROLL DECL. EX. F



# MEMORANDUM

Date: 4 May 2006

From: Chuck Carroll/Project Manager, GAO

To: Dennis Stephens/Al League

Subject: Rebuttal to SPO Grandison's Statement

1. SPO Grandison states in his letter dated 5-4-06 "I was not being willfully insubordinate. I was told by Akinmola that I could do my rounds without my hat and tie, and shoes. Akinmola stated to me that after the round was done then I have to put my gear back on. Akinmola stated this to me after he, I and officer Pope were on post 5 + 6 discussing how best to complete the rounds. Officer Pope initially stated that I should remove my hat and tie because I would be sweating heavily from the round. I stated to him, with Akinmola present that "no if I did that they would write me up in a heart beat, ignoring the fact that this is common procedure on 1st relief." Akinmola says "no, just do the rounds, you can remove your gear, just put everything back on when you finish."

   A. I made contact with both Sgt Akinmola and Ofc Pope and collected their statements. Neither Sgt Akinmola nor Ofc Poe confirms that Sgt Akinmola gave Ofc Grandsion approval to conduct his tour out of uniform. Statements are attached.

2. SPO Grandison states "Every write-up that you meaning Mr. Carroll has sent to corporate has been of a very petty nature."

   A. All disciplinary reports presented to Officer Grandison and forwarded to WSI Headquarters are taken from Wackenhut policies were agreed to in the Collective Bargaining Agreement and taken directly from Wackenhut Disciplinary Matrix #358. Mr. Carroll provided Officer Grandison a copy of the matrix in March 2006 to ensure Ofc Grandison was aware of the established policies. Mr. Carroll cannot address why Ofc Grandison feels that they are petty in nature.

3. SPO Grandison states "You are subsequently trying to terminate me for uniform issues, knowing that I have been treated unfairly by you and other supervisors on the issue."

   A. The current disciplinary report being addressed is for willful insubordination, not uniform issues. "Ofc Grandison was told by Mr. Carroll in the presence of the Union Steward, Ofc McNeil, on 29 March that a Disciplinary Report had been generated by Sgt Collins for Willful Insubordination. Mr. Carroll told Ofc Grandison that he needed to be in compliance with Wackenhut and contract policies to avoid future disciplinary reports. Ofc Grandison was told that the client was paying close attention to appearance and expected high standards to be maintained." Less than four days after being told to be in compliance by the Project Manager, Officer Grandison is on duty, walking through the GAO building with his tie to one side, his collar open and his hat off.



EXHIBIT
Grandison 88
3-21-08 DMB

GRANDISON 00251

4. Ofc Grandison states "Everyone knows and your tapes would prove that there are plenty of officers who are not in compliance on a daily basis and none face the punishment I have. None."

   A. Ofc Grandsion is not notified of disciplinary actions taken against other officers. Also the majority of officers that do receive disciplinary reports correct their actions after being addressed. The tapes do not belong to Mr. Carroll or Wackenhut; they are the property of the Government. The Government does conduct random reviews of the tapes for officer compliance and also conduct inspections. Identified discrepancies have been addressed.

5. Ofc Grandison states "In regards to my tardiness..."

   A. This disciplinary report does not address tardiness.

6. Ofc Grandison states "Mr. Carroll you appear or maybe you are absent minded about what goes on in the GAO building because you only seem to recognize, and act on my actions. Your ignoring the obvious situations at me being targeted and ignoring and failing to investigate any writeups that I have denied clearly states to me and everyone knowledgeable of my time here that you are not only ignoring issues at will, but are a catalyst and leader in the objective to have me removed and or terminated from Wackenhut."

   A. Every statement Grandison has submitted has resulted with a review of the information and a rebuttal from me concerning each incident. As far as the comment of Mr. Carroll being a catalyst and leader in the objective to remove Ofc Grandison. Mr. Carroll disagrees. On the first few meetings, Ofc Grandison, Ofc McNeil and Mr. Carroll met for disciplinary reports for tardiness. Mr. Carroll took the time to let Ofc Grandison know the importance of arriving on time and shredded the disciplinary reports giving him another chance. When Ofc Grandison was still coming in late and reports being generated Mr. Carroll again brought in Ofc Grandison and the Union to see if there was another solution. The result, Ofc Grandison submitted for a transfer to First Shift and Mr. Carroll authorized the move. If Mr. Carroll felt the disciplinary report was not justified, as in the case of the wrong shoes being worn and another for the pants being cuffed, the disciplinary reports were shredded. Since his tenure here he has received disciplinary reports from four different supervisors and the client. No one is targeting Ofc Grandison. The two disciplinary reports for willful insubordination in such a short time period are the result of Officer Grandison's actions, nothing else.

7. Ofc Grandison states "I have been written up for not having on the proper shoes before and sent home for not being in uniform, but these occurrences were never (labled?) as willful insubordination."

   A. Currently Ofc Grandison has not received any disciplinary action for not having the proper shoes. Currently on file he has disciplinary actions for tardiness, inattentive to duty, willful insubordination and unauthorized use of a fax machine.

8. Ofc Grandison is requesting his personnel file.

   A. I will let him know to contact Jane Foxx.

GRANDISON 00252

If there are any questions I can be reached at 202-512-2985.

Chuck Carroll
WSI Project Manager

GRANDISON 00253

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
**TRAVIS GRANDISON,** )
)
**Plaintiff,** )
)
**v.** ) **Civil Action No. 1:07-cv-00754 (RMC)**
)
**WACKENHUT SERVICES, INC.,** )
)
**Defendant.** )
_____)

**WACKENHUT SERVICES, INC.'S MEMORANDUM IN SUPPORT OF
ITS SUMMARY JUDGMENT MOTION**

Henry Morris, Jr., (#375894)
Kristine J. Dunne (#471348)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
(202) 857-6000/Telephone
(202) 857-6395/Facsimile

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................... iv

I.    **Introduction** ...........................................................................1

II.   **Facts** .........................................................................................3

      A.    The Parties ...................................................................3

            1.    Wackenhut .......................................................3

            2.    Grandison .........................................................4

      B.    Grandison's Employment with Wackenhut .......................4

            1.    Grandison's June 5, 2005, Infraction:  Tardiness or Failure
                  to Observe Assigned Work Hours ..........................................4

            2.    Grandison's Performance Appraisal ..................................5

            3.    Grandison's October 5, 2005, Infraction:  Tardiness or Failure
                  to Observe Assigned Work Hours ..........................................6

            4.    Grandison's October 29, 2005, Infraction:  Tardiness or Failure
                  to Observe Assigned Work Hours ..........................................8

            5.    Grandison's November 21, 2005, Infraction:  Inattention to Duty
                  But Not Asleep...........................................................9

            6.    Grandison's January 13, 2006, Infraction:  Tardiness of Failure to
                  Observe Assigned Work Hours ..........................................10

            7.    Grandison's February 27, 2006, Infraction:  Tardiness or Failure
                  to Observe Assigned Work Hours ..........................................12

            8.    Grandison's February 27, 2006, Infraction:  Violation of Security
                  Procedures and Regulations...............................................16

            9.    Grandison's February 27, 2006, Memorandum to Charles Carroll .....18

10.      Grandison's February 28, 2006, Infraction:  Tardiness or Failure to Observe Assigned Work Hours .......................................................19

11.      Grandison's March 1, 2006, Confrontation with Sgt. Foster..............20

12.      Grandison's March 13, 2003, EEOC Charge......................................21

13.      Grandison's March 15, 2006, Infraction:  Willful Insubordination (First Offense)............................................................21

14.      Grandison's April 2, 2006, Infraction:  Willful Insubordination (Second Offense) .......................................................23

15.      Grandison's May 11, 2006, EEOC Charge.........................................28

16.      Grandison's Alleged Hostile Work Environment................................28

        a.      Allegation that Wackenhut Harassed Grandison about his Uniform .................................................................................28

        b.      Allegation that Wackenhut Made Up Rules that Applied only to Grandison........................................................................30

        c.      Allegation that Wackenhut Intentionally Interfered with Grandison's Right to Leave Work ...............................................30

        d.      Allegation that Wackenhut sent Grandison Home for Trumped up Reasons..................................................................31

        e.      Allegation that Wackenhut Attempted to have other Officers Write Disparaging Remarks Concerning Grandison .................32

        f.      Allegation that Wackenhut Deprived Grandison of the Opportunity to take Courses .......................................................32

        g.      Allegation that Grandison was subjected to Unfounded Threats.........................................................................................32

        h.      Allegation that Wackenhut Falsely Accused Grandison of Arguing with his Supervisor.....................................................33

        i.      Alleged Provocation.....................................................................33

        j.      Alleged Mistreatment Due to Grandison's Education................34

        k.      Alleged Defamation .....................................................................34

l.    Grandison's Interference with Contract Claim ...........................35

**III.**    **Argument** ...............................................................................................................35

    A.    The Court Should Enter  Judgment In Wackenhut's Favor .............................35

        1.    The Standard for Granting Summary Judgment ...................................35

        2.    The Court should enter a Judgment in Wackenhut's Favor
            as to Grandison's Interference with Contract Claim ...........................36

        3.    The Court should enter a Judgment in Wackenhut's Favor
            as to Grandison's Defamation Claim ....................................................36

        4.    The Court should enter a Judgment in Wackenhut's Favor
            as to Grandison's DCHRA Claims ......................................................37

            a.    Grandison's Education Discrimination and Harassment
                Claims are Not Justiciable ........................................................37

            b.    Wackenhut Did Not Subject Grandison to a Hostile Work
                Environment ................................................................................38

            c.    Wackenhut Did Not Discriminate Against Grandison ...............41

            d.    Wackenhut Did Not Retaliate Against Grandison .....................43

**IV.**    **Conclusion** ...............................................................................................................44

# TABLE OF AUTHORITIES

<u>Page</u>

**Federal Cases**

*Beeton v. District of Columbia,*
  779 A.2d 918 (D.C. 2001) ........................................................................ 37

*\*Blackman v. Visiting Nurses Ass'n,*
  694 A.2d 865 (D.C. 1997) ........................................................................ 42

*Blodgett v. The Univ. Club,*
  930 A.2d 210 (D.C. 2007) ........................................................................ 37

*Brantley v. Kempthorne,*
  No. Civ. A. 06-1137ESH, 2008 WL 2073913 (May 13, 2008) ......................................... 39, 40

*Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency,*
  834 A.2d 77 (D.C. 2003) ........................................................................ 36

*Catrett v. Johns-Manville Sales Corp.,*
  826 F.2d 33 (D.C. Cir. 1987) ........................................................................ 36

*Celotex Corp. v Catrett,*
  477 U.S. 317 (1986) ........................................................................ 36

*Clawson v. St. Louis Post-Dispatch, L.L.C.,*
  906 A 2d 308 (D.C. 2006) ........................................................................ 37

*Daka, Inc. v. Breiner,*
  711 A.2d 86 (D.C. 1998) ........................................................................ 38, 39

*Faragher v. Boca Raton,*
  524 U.S. 775 (1998) ........................................................................ 38, 39

*Futrell v. Dep't of Labor Fed. Credit Union,*
  816 A.2d 793 (D.C. 2003) ........................................................................ 36

*Glenn v. Williams,*
  No. Civ. A. 98-1278, 2006 WL 401816 (D.D.C. Feb. 21, 2006) ........................................... 38

*\*Howard Univ. v. Best,*
  484 A.2d 958 (D.C. 1984) ........................................................................ 39, 41

*Keely v. Small,*
  391 F. Supp. 2d 30 (D.D.C. 2005) ........................................................................ 39

*Lathram v. Snow.*
  336 F.3d 1085 (D.C. Cir. 2003) ................................................... 42

*Lemmons v. Georgetown Univ. Hosp.,*
  431 F. Supp. 2d 76 (D.D.C. 2006) ............................................... 43

*Lester v. Natsios,*
  290 F. Supp. 2d 11 (D.D.C. 2003) ............................................... 39

*Lively v.. Flexible Packaging Ass'n,*
  830 A.2d 874 (D.C. 2003) .......................................................... 38

*Mason v. DaVita, Inc.,*
  542 F. Supp. 2d 21 (D.D.C. 2008) ............................................... 43

*\*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) ................................................................... 42

*Morgan v. Fed Home Loan Mortgage Corp.,*
  328 F.3d 647 (D.C. Cir. 2003) ..................................................... 42

*Parker v. State Dep't of Pub. Safety,*
  11 F. Supp. 2d 467 (D. Del. 1998) ........................................ 39, 40

*Stewart v. Evans,*
  275 F.3d 1126 (D.C. Cir. 2002) ........................................... 39, 41

**Miscellaneous**

D.C. Code Ann. § 2-1402.11 (a) .................................................... 37

D.C. Code Ann. § 2-1401.02 (18) .................................................. 37

Fed. R. Civ. P. 56(c) .................................................................... 35

*Denotes cases chiefly relied upon

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
**TRAVIS GRANDISON,**           )
                                )
            **Plaintiff,**       )
                                )
        **v.**                   )        **Civil Action No. 1:07-cv-00754 (RMC)**
                                )
**WACKENHUT SERVICES, INC.,**   )
                                )
            **Defendant.**       )
_____)

**WACKENHUT SERVICES, INC.'S MEMORANDUM IN SUPPORT OF
ITS SUMMARY JUDGMENT MOTION**

**I.      Introduction**

Travis Grandison worked for Wackenhut Services, Inc. for about 13 months. But, his performance was problematic.

Often he was late for work. His work quality, attitude, initiative, dependability, appearance, and adherence to regulations fell short. He was inattentive to his duties. He violated security procedures and regulations. And, he was insubordinate, twice.

Wackenhut terminated Grandison for his infractions. This action ensued.

Five counts remain in this case.

- In Count 1, Grandison contends that WSI violated the District of Columbia Human Rights Act by discriminating against him because he is black.

- He contends, in Count II, that the Company violated the Act by discriminating against him because he is a man.

- In Count IIIA, he contends that he is entitled to relief, under the Act, because the Company retaliated against him for filing an EEOC discrimination charge.[1]

- Grandison contends, in Count V, that Wackenhut defamed him to his supervisor at another workplace -- Startech.

- In Count VII, he contends that Wackenhut unlawfully fired him because he is black, because he is a male, because he graduated from college, or because he filed an EEOC charge.

- In Count IX, Grandison contends that WSI interfered with his contract with Startech.

- He also appears to contend, though not in a separate count, that Wackenhut subjected him to a hostile work environment due to his race or gender, or because he graduated from college.  Compl. ¶ 10.[2]

He is wrong.

The undisputed facts make clear that Grandison's race, gender, matriculation, and EEOC charge played no role whatsoever in Wackenhut's decision-making.  Those facts make clear as well that Wackenhut did not subject him to a hostile work environment, defame him, or interfere with his contract with Startech.

In short, Grandison's suit is meritless.  So, as a matter of law, the Court should enter a judgment in Wackenhut's favor.

---

[1]    The Complaint contains 2 counts captioned "Count III."  References herein to the first -- Grandison's retaliation count -- are denominated Count IIIA."  References to the second are denominated Count IIIB.

[2]    On September 25, 2007, this Court issued an order dismissing Count IIIB (intentional infliction of emotional distress), Count IV (breach of contract), Count VI (breach of the covenant of good faith and dealing), and Count VIII (procedural due process).  *Grandison v. Wackenhut Servs., Inc.*, 514 F. Supp. 2d 12, 15, 18 (D.D.C. 2007).

## II.     Facts[3]

### A.     The Parties

#### 1.     Wackenhut

Wackenhut supplies high-end armed and unarmed security personnel, paramilitary protective forces, law enforcement officers, fire and rescue services, aviation operations and support, base operations, facility management, entry level training, and cleared personnel to government and select commercial customers.  S.J. Ex. 1 [Conry Decl. ¶ 2].[4]

Through its National Capital Region (the "NCR"), the Company provides security services and personnel for the Government Accountability Office headquarters, in Washington, D.C.  S.J. Ex. 1 [Conry Decl. ¶ 3.  The security guards there are members of a collective bargaining unit.  S.J. Ex. 1 [Conry Decl. ¶ 4].

Wackenhut is an equal opportunity employer, which strictly prohibits unlawful discrimination, harassment, and retaliation.  S.J. Ex. 1 [Conry Decl. ¶ 5); Conry Decl. Ex. A (Sexual Harassment/Workplace Harassment Policy, HR 520 (Sep. 1, 1999)); Sexual Harassment Workplace Harassment Statement W-211 (HR 520) (Rev. 9/01/99)); Conry Decl. ¶ 6; Conry Decl. Ex. B (G4S Wackenhut Security Officer's Handbook, at 14, 20-21); Conry Decl. ¶ 7, Ex. C (Human Resources Manual: Equal Employment Opportunity, HR 515 (June 1, 2000))].

To promote equal treatment, the NCR has promulgated a standard operating procedure for administration of discipline.  It prescribes the appropriate disciplinary measure for each contemplated offense.  Also, it provides that offenses are archived after 60 days.  S.J. Ex. 1 [Conry Decl. ¶ 8; Conry Decl. Ex. D (Standard Operating Procedure: Administration of Discipline, No. 358 (Jan. 1, 2001) ("SOP 358")) at 3].

---

[3]     To the extent that Wackenhut relies upon Grandison's rendition of the facts, it does so for the purposes of this Motion only.

[4]     Citations to the Declaration of Kevin A. Conry, are denominated "Conry Decl. ¶ ___."

### 2.      Grandison

Grandison was a special police officer at the GAO site.  He lasted for just over a year, from April 5, 2005 until May 25, 2006, when Wackenhut terminated him for willful insubordination.  S.J. Ex. 3 [Grandison Tr. 30:11-13; Grandison Tr. 425:15-22; Grandison Tr. Ex. 3 (Letter from K.A. Conry to Grandison, dated March 30, 2005); Grandison Tr. Ex. 67 (Letter from K.A. Conry to Grandison (May 22, 2006))][5] .

Of the 87 WSI employees who worked at the GAO during Grandison's tenure, 78 -- nearly 90% -- are black, like Grandison.  Also like Grandison, 60 -- nearly 70% -- are men. Compl. ¶ 3; S.J. Ex. 1 [Conry Decl. ¶ 9]; S.J. Ex. 2 [Carroll Tr. 9:15-19];[6] S.J. Ex. 3 [Grandison Tr. 152:2-5].

### B.      Grandison's Employment with Wackenhut

Grandison's performance at Wackenhut was problematic, almost from the start.

### 1.      Grandison's June 5, 2005, Infraction:  Tardiness or Failure to Observe Assigned Work Hours

He committed his first documented infraction on June 5, 2005, when he opened his post late.  The shift supervisor, Sgt. Derrick Richardson, issued a disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- first offense.  S.J. Ex. 3 [Grandison Tr. 171:3 - 172:21; Grandison Tr. Ex. 25 (Disciplinary Report (June 1, 2005)); Grandison Tr. Ex. 26 (Letter from K.A. Conry to Grandison (June 6, 2005)).

Grandison agreed with the report's contents.  And, the Company followed-up by counseling Grandison and issuing a memorandum for the record, the prescribed disciplinary measure under the NCR's standard operating procedure.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358

---

[5]      Citations to Grandison's disposition transcript are denominated "Grandison Tr. ___. " Citations to exhibits to his transcript are denominated "Grandison Tr. Ex. __."

[6]      Citations to Charles Carroll's deposition transcript are denominated "Carroll Tr. __."

at PROD 001230)]; S.J. Ex. 3 [Grandison Tr. 171:3 - 172:21; Grandison Tr. Ex. 25 (Disciplinary

Report (June 1, 2005)); Grandison Tr. Ex. 26 (Letter from K.A. Conry to Grandison (June 6,

2005)); S.J. Ex. 4 [Carroll Decl. ¶¶ 15, 16]. [7]

> Grandison takes no issue with the Company's action:

> Q      And you are not saying in this lawsuit that there was anything inappropriate with
>        respect to the memorandum for the record or the disciplinary report that are
>        Grandison Deposition Exhibit Number 26 [-- Letter from K.A. Conry to
>        Grandison (June 6, 2005) --] and Grandison Deposition Exhibit Number 25 [ --
>        Disciplinary Report (June 1, 2005)]?

> A      Yes.

> Q      You're not challenging those; is that correct?

> A      Yes.

S.J. Ex. 3 [Grandison Tr. 173:4-12].

### 2.    Grandison's Performance Appraisal

Wackenhut evaluated Grandison's performance a few months later, noting that he needed

to improve in several areas:

- Quality of Work: Correctness, completeness and accuracy.
- Attitude: Enthusiasm for the job and willingness to accept orders, changes, *etc*.
- Initiative: Self motivation, ability to work with minimal supervision.
- Dependability: Follows through without constant supervision, reliable.
- Appearance: Well-groomed, uniform is clean, pressed, and complete.
- Regulations: Adherence to regulations established by the Company.

S.J. Ex. 3 [Grandison Tr. 173:17 – Tr. 175:11; Grandison Tr. Ex. 27 (Performance Appraisal

(Sept. 9, 2005))].

The Company observed that Grandison has the ability to be an exceptional officer.   But,

it continued, "[h]e needs to focus more on following rules and procedures of the Company."  S.J.

Ex. 3 [Grandison Tr. Ex. 27 (Performance Appraisal (Sept. 9, 2005))].

---

[7]      Citations to Charles Carroll's Declaration are denominated "Carroll Decl. __.  "Citations to exhibits to his Declaration transcript are denominated "Carroll Decl. Ex. ___."

Grandison does not contend that there is anything inappropriate about the Company's assessment:

> Q    Sir, the question was:  You are not contending in this lawsuit that there was anything inappropriate with respect to Grandison Deposition Exhibit Number 27 [-- (Performance Appraisal (Sept. 9, 2005)) --]; is that correct?
>
> A    That's correct.

S.J. Ex. 3 [Grandison Tr. 177:6-10].

### 3.    Grandison's October 15, 2005, Infraction:  Tardiness or Failure to Observe Assigned Work Hours

On October 15, 2006, Richardson issued another disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- first offense.  Richardson said this about the precipitating incident:

> Officer Grandison was schedule[d] to report to work and assume duty on Post 12 at 0600 hours [-- 6:00 a.m. --].  Ofc. Grandison called off and gave no reason for his call off. When questioned by shift supervisor as to his call off on Sunday 10/16/05, Ofc. Grandison stated that he called off to attend CPR/AED Training at the corporate office. Ofc. Grandison was given explicit instructions by Sgt. Richardson on Wednesday 10/12/05 that the PM [-- Project Manager --] had scheduled Grandison for a later training date.  He was instructed that his call off would effect manpower.  Ofc. Grandison chose not to follow explicit instruction.

S.J. Ex. 3 [Grandison Tr. 178:7-13; Grandison Tr. Ex. 28 (Disciplinary Report (Oct. 15, 2005))].

Grandison agreed with the report's contents.  S.J. Ex. 3 [Grandison Tr. 180:17 – Tr. 181:3]; S.J. Ex. 4 [Carroll Decl. ¶ 15].  And, he can point to no evidence that his race, gender, or education prompted Richardson to issue it:

> Q.    Did -- do you have any evidence or information that causes you to believe that Derrick Richardson prepared Grandison Deposition Exhibit Number 28 [ -- Disciplinary Report (Oct. 15, 2005) -- ] as he did because of your race?
>
> A.    No.

Q.    Do you have any evidence or information that causes you to believe that Derrick Richardson prepared Grandison Deposition Exhibit Number 28 as he did because of your gender?

A.    No.

Q.    Do you have any evidence or information that causes you to believe that Derrick Richardson prepared Grandison Deposition Exhibit Number 28 because of your educational attainment?

A.    Maybe.

Q.    What is the evidence or information that causes you to believe that?

A.    Just the information that -- that -- it different.  That, you know, that -- that they're going to single you out for -- for that.

You know, I think -- you know, I don't know why he held to this when he knew -- you know, I don't know why he would do that.  I mean, I don't -- you compare this disciplinary report with all the others and it's not even -- it doesn't even compare, you know, to -- what I'm being disciplined for.

You know, I called off to work beforehand.  It's -- it's -- you know --

MR. SCHIFFRES:

Okay.

THE WITNESS:

-- I can call off for whatever reason and -- and -- you know, the question is why -

BY MR. MORRIS:

Q.    Did Sergeant -- did Sergeant Richardson tell you that he disciplined -- pardon me -- that he prepared Grandison Deposition Exhibit Number 28 the way he did because of your educational attainment?

A.    No.

Q.    Have you seen anything in writing that supports a conclusion that Sergeant Richardson prepared Grandison Deposition Exhibit Number 28 as he did because of your educational attainment?

A.    No.

Q.    Are you speculating, then, that he prepared Grandison Deposition Exhibit Number
28 as he did because of your educational attainment?

A.    Yes.

S.J. Ex. 3 [Grandison Tr. 184: 12 – Tr. 186: 15].

In keeping with the standard operating procedure, Wackenhut counseled Grandison and
issued a memorandum for the record.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD
001230]; S.J. Ex. 3 [Grandison Tr. 183:9-16; Grandison Tr. Ex. 29 (Letter from K.A. Conry to
Grandison (Nov. 10, 2005))]; S.J. Ex. 4 [Carroll Decl. ¶¶ 15, 16].

**4.    Grandison's October 29, 2005, Infraction:  Tardiness or Failure to
Observe Assigned Work Hours**

Still the infractions continued.

On October 29, 2005, Grandison was due at work at 5:45 a.m.  Nearly 30, minutes later,
however, he neither had arrived nor called.  So, Richardson telephoned Grandison to determine
his whereabouts.   S.J. Ex. 3 [Grandison Tr. 186:20 - Tr. 188:6; Grandison Tr. Ex. 30
(Disciplinary Report (Oct. 29, 2005))].

When reached, Grandison explained that he had overslept and that he would report to
work immediately.  But, although he lived less than 100 yards away, Grandson did not show up
for almost another 2 hours.  S.J. Ex. 3; [Grandison Tr. Ex. 30 (Disciplinary Report (Oct. 29,
2005))].

Richardson issued another disciplinary report, citing Grandison for tardiness or failure to
observe assigned work hours -- second offense.  Grandison agreed with the report's contents.
S.J. Ex. 3 [Grandison Tr. 186:20 – Tr. 188:6; Grandison Tr. Ex. 30 (Disciplinary Report (Oct.
29, 2005))]; S.J. Ex. 4 [Carroll Decl. ¶ 15].  And, WSI issued a letter of reprimand, the
disciplinary measure that the standard operating procedure prescribes.  S.J. Ex. 1 [Conry Decl.

Ex. D (SOP 358) at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 189:3-15; Grandison Tr. Ex. 31

(Letter from K.A. Conry to Grandison (Nov. 10, 2005))].

      Grandison complains about neither document:

Q.     You did not file a grievance in connection with Grandison Deposition Exhibit Number 31 [ -- Letter from K.A. Conry to Grandison  (Nov. 10, 2005) --] or 30 [-- Disciplinary Report (October 29, 2005) --], correct?

A.     Yeah, I would say that's correct.

Q.     And you are not contending in this litigation that there was anything inappropriate about Grandison Deposition Exhibit Number 30 or 31, correct?

A.     Correct.  Except for the check.  I typically -- I typically didn't check whether I agreed or didn't agree.

Q.     Well, a moment ago, sir, I thought I heard you say you weren't sure whether you checked I agree.

A.     That's what I'm saying is typically I didn't check whether I agree or didn't agree.  I probably would definitely check whether I didn't agree, but we were forced to sign.  That's what I'm telling you.  And, you know, a lot of the write-ups that they gave in terms tardiness, you know, it was just more or less procedures.

Q.     I want to make sure I understand.  Are you -- is it your testimony that you don't know whether you checked the I agree box?

A.     Right.

S.J. Ex. 3 [Grandison Tr. 189:16 – 190:16; Grandison Tr. Ex. 31].

### 5.     Grandison's November 21, 2005, Infraction: Inattention to Duty But Not Asleep

Grandison broke the rules again on November 21, 2005.

      Shift Supervisor Sgt. Felton Foster found him in a guard booth with his feet propped up on the desk and his head laying on the window.  Foster issued a disciplinary report, citing Grandison for being inattentive to duty but not asleep -- first offense.  S.J. Ex. 3 [Grandison Tr. 192:1-7; Grandison Tr. Ex. 32 (Disciplinary Report (Nov. 21, 2005))].

Grandison agreed with the report's contents.  S.J. Ex. 3 [Grandison Tr. 192:8-15]; S.J. Ex. 4

[Carroll Decl. ¶ 15]. And, in keeping with the standard operating procedure, Wackenhut suspended him for 2 days. S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 204:18 – 205:3; Grandison Tr. Ext. 33 (Letter from K.A. Conry to Grandison (Nov. 30, 2005))].

Grandison can point to no evidence that his race, gender, or education played a role in the Company's decision-making:

> Q.     You didn't file a grievance with respect to Grandison Deposition Exhibit Number 33 [ -- Letter from K.A. Conry to Grandison (Nov. 30, 2005) --], did you?
>
> A.     Nope.
>
> Q.     And am I correct, sir, that you're not contending that Grand -- that Wackenhut issued Grandison Deposition Exhibit Number 33 because of your race?
>
> A.     No.
>
> Q.     Let me say that differently. Did Grand -- did Wackenhut issue Grandison Deposition Exhibit Number 33 because of your race?
>
> A.     I don't -- I don't know.
>
> Q.     Did Grandison -- pardon me -- did Wackenhut issue Grandison Deposition Exhibit Number 33 because of your gender?
>
> A.     I don't know. I really don't know.
>
> Q.     Did Wackenhut issue Grandison Deposition Exhibit Number 33 because of your educational attainment?
>
> A.     No, I doubt it.

S.J. Ex. 3 [Grandison Tr. 205:4 – 206:1].

### 6.     Grandison's January 13, 2006, Infraction:  Tardiness or Failure to Observe Assigned Work Hours

Grandison committed yet another infraction on January 13, 2006.

He was scheduled to open his post at 5:00 a.m.  But, he did not appear until 20 minutes later.  S.J. Ex. 3 [Grandison Tr. 206:6-17; Grandison Tr. Ex. 34 (Disciplinary Report (Jan. 13, 2006))].

Again, Richardson issued a disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- third offense.  The NCR standard operating procedure allows for up to a 5-day suspension for that infraction.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD 001230].  But, the Project Manager, Charles Carroll, reduced the level to first offense, since Grandison's earlier offenses were archived.  S.J. Ex. 3 [Grandison Tr. 206:6-17; Grandison Tr. Ex. 34 (Disciplinary Report (Jan. 13, 2006))].

Grandison agreed with the report's contents.  S.J. Ex. 3 [Grandison Tr. 206:14-22; Grandison Tr. Ex. 34 (Disciplinary Report (Jan. 13, 2006))]; S.J. Ex. 4 [Carroll Decl. ¶ 15]. And, he does not contend that his race, gender, or education motivated it:

> Q.    Do you contend that Wackenhut issued a disciplinary report -- the disciplinary report which is Grandison Exhibit Number 34 [-- Disciplinary Report (Jan. 13, 2006) --] because of your race?
>
> A.    No.
>
> Q.    Because of your gender?
>
> A.    No.
>
> Q.    Or because of your educational attainment?
>
> A.    No.

S.J. Ex. 3 [Grandison Tr. 207:4-11].

Wackenhut counseled Grandison and issued a memorandum for the record, the prescribed disciplinary measure for his infraction.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358) at PROD

001230]; S.J. Ex. 3 [Grandison Tr. 211:13-19; Grandison Tr. Ex. 35 (Letter from K.A. Conry to

Grandison (Feb. 1, 2006));  S.J. Ex. 4 [Carroll Decl. ¶ 16].

> **7.    Grandison's February 27, 2006, Infraction:  Tardiness or Failure to Observe Assigned Work Hours**

That did not end Grandison's misconduct.

On February 26, 2006, Grandison asked to take the next day off so that he could tend to

issues that he was having with Foster.  Grandison received no response to the request.  But, he

took the day off anyway.  Indeed, he had decided that he would not report to work no matter

what management said:

Q.    Do you recall that after Foster sent you home one day, you were upset and you decided to take the following day off in order to write up the incident?

A.    Oh, I remember the situation where I did take the day off to address the issues with Foster.

Q.    And you completed -- as I understand it, you completed a leave request form; is that correct?

A.    I may have done that, yeah.  I don't remember.

Q.    You don't know one way or another?

A.    I don't remember.

Q.    Well, what's the protocol for requesting leave at the GAO at the time?

A.    From what I remember, you just put in the request.  They probably have a form. You fill out the form and they -- and that's it.

Q.    What is the protocol for responding to those leave requests?

A.    I don't know.

Q.    Are all requests granted?

A.    I'm sure they're not.

Q.    Was your leave request granted?

A.      I think I may have submitted that the day before, and I probably didn't get a response back on it.

Q.      Did you take that day -- the day off that you requested to take off?

A.      I may have.  I think so.  I don't know.

Q.      If you didn't receive a response allowing you to take the day off, why did you take the day off?

A.      I was going to take the day off anyway, and I put that in to let them know I was taking the day off.  Me not receiving a response from whoever, you know, I was letting them know that I would be off.

Q.      Regardless of what they said; is that correct?

A.      Right.  It's -- it's tantamount to calling off work.  You know, you can pick up the phone -- one of the major policies or procedures, if you call off, they have certain times that they like to state that if you call off within a certain amount of hours, then I guess it would be approved.

        However, like any other job, you know, if you let them know you're not coming to work, you let them know you're not coming to work.  People call off every day.

Q.      You weren't ill; is that correct?

A.      No.

Q.      You weren't taking off because of illness; is that correct?

A.      No.  And people call off for reasons other than illness.

Q.      That's not my question.  Were you ill –

A.      I answered that.

Q.      Were you ill?

A.      I answered that.

Q.      Were you ill on February 27th?

A.      I answered that question.

Q.      Well, answer it again, please.

A.      And the answer is no.

S.J. Ex. 3 [Grandison Tr. 380:16 – Tr. 383:11; Grandison Tr. 386:15 – Tr. 387:8; Grandison Tr. 387:20 - Tr. 388:8; Grandison Tr. Ex. 55 (Disciplinary Report, dated Feb. 27, 2006))].

Wackenhut incurred overtime due to Grandison's unscheduled absence.  S.J. Ex. 3 [Grandison Tr. 386:15 – 387:8; Grandison Tr. 387:20 - Tr. 388:8; Grandison Tr. Ex. 55 (Disciplinary Report, dated Feb. 27, 2006))].

The Project Manager -- Charles Carroll -- issued a disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- second offense.  Consistent with the standard operating procedure, Wackenhut issued a letter of reprimand.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001230]; S.J. Ex. PROD 001230 [Carroll Tr. 13:9 – 14:5]; S.J. Ex. 3 [Grandison Tr. 388:10-21; Grandison Tr. Ex. 56 (Letter from K.A. Conry to Grandison, dated Mar. 9, 2006)].  And, Grandison can point to no evidence that his race, gender, or education was a factor, with either document:

> Q.    Are you aware of any evidence or information that causes you to believe that Wackenhut issued the disciplinary report, Number 55, or the letter of reprimand because of your race?
>
> A.    No.  I don't know.
>
> Q.    Are you aware --
>
> A.    I do not know.
>
> Q.    Are you aware of any evidence or information that supports a belief that Wackenhut issued Grandison Deposition Exhibit Number 55 or Grandison Deposition Exhibit Number 56 [ -- Letter from K.A. Conry to Grandison (March 9, 2006) --]  because of your gender?
>
> A.    Nothing specific, no.

S.J. Ex. 3 [Grandison Tr. 389:7-19]

> Q.    Are you aware of any female employee at the GAO who failed to report to work as scheduled, completely failed to report to work as scheduled who was not disciplined for that failure?

-14-

A.     Not specifically, but I'm sure there's proof.

S.J. Ex. 3 [Grandison Tr. 391:22 – Tr. 392:5].

Q.     Is it your contention that Grandison -- that Wackenhut issued Grandison Number 55 or Grandison Number 56 because of your educational attainment?

A.     Yes.

Q.     On what do you base that?

A.     On my last statement.

Q.     That you think that there was some animosity; is that what you said?

A.     Right.

Q.     On what do you base that conclusion, that there was animosity because of your educational attainment?

A.     My daily treatment and things that I have heard mentioned about, you know, who I think I am, what I think I am and all of this writing and because of, you know, my level of education, I think that I -- you know, I'm going to write my way into a certain situation, that that kind of talk and that kind of -- that type of dialogue leads me to believe.

Q.     Who made those comments?

A.     Officers.  I don't know which ones, but officers.

Q.     Did Mr. Carroll make the comment?

A.     I don't recall that.

Q.      Did Mr. Conry make such a comment?

A.     No.  Mr. Conry's was -- I can only think that he was referring to the documentation that I wrote when he stated that if I continue to do what I did, he would kick me out of the building or have me rolled out of the building. . . .

Q.     Have you ever heard Mr. Carroll make any comment at all that supports a conclusion that he had some animus, harbored an animus toward you because of your educational attainment?

MR. SCHIFFRES:

    Do you understand the question?

THE WITNESS:

    Yeah.

    No, I never heard it.

BY MR. MORRIS:

Q.    Are you aware of any evidence or information that causes you to believe that Mr. Conry [- - a Wackenhut Vice President and General Manager of NCR --] harbored any animus toward you because of your educational attainment?

A.    I think the -- I think the actions. I think the actions. I don't think it's anything they said. Of course, they wouldn't say but so much to me. I've never spoken to Conry at all, but I think it's their actions.

Q.    I don't think I heard an answer to my question, sir. The question is this: Are you aware of any evidence –

A.    I said their actions. That is the evidence. Their actions that I remember. And then whether you can prove those actions, you probably will have to get a number of people to come in and say that, you know, they treated Grandison this way and I heard them say that, but -- because you -- you said evidence. I mean, action would be evidence, right, if something occurred?

Q.    I said evidence or information. So my question is: What did Mr. Conry do that supports a conclusion that he harbored an animus against you because of your educational attainment?

A.    I don't know.

S.J. Ex. 3 [Grandison Tr. 392:16 – Tr. 395:14]; S.J. Ex. 1 [Conry Decl. ¶ 1].

### 8.    Grandison's February 27, 2006, Infraction:  Violation of Security Procedures and Regulations

On February 27th, at Grandison's request, someone sent a personal facsimile to him at a

GAO facsimile machine. Receiving it violated WSI's policies and GAO security procedures,

which preclude unauthorized WSI employees from using government equipment. Indeed,

consistent with those policies and procedures, Wackenhut had informed personnel that they

-16-

could not use government equipment except when performing their assigned duties.  S.J. Ex. 2 [Carroll Tr. 84:11 – Tr. 89:17]; S.J. Ex. 3 [Grandison Tr. 238:12 – Tr. 241:6; Grandison Tr. 255:19 – Tr. 256:4].

Craig Trumpet, the GAO contracting officer's technical representative, asked WSI to discipline Grandison appropriately for the same offense for which it had disciplined another employee -- Omer Gilliam -- who had engaged in similar conduct.   S.J. Ex. 1 [Conry Decl. ¶ 10; S.J. Ex. 2 [Carroll Tr. 85:22 – Tr. 86:19]; S.J. Ex. 3 [Grandison Tr. 238:12 – Tr. 241:6; Grandison Tr. 244:12 – Tr. 245:21; Grandison Tr. 249:5-11; Grandison Tr. 261:22 – Tr. 262:14; Grandison Tr. Ex. 41 (Electronic Mail Memorandum from Craig Trumpet to Charles Carroll, dated Mar. 9, 2006)); Grandison Tr. Ex. 44 (Letter from K.A. Conry to Omer Gilliam (Jan. 31, 2006))].

Grandison can point to no evidence that Trumpet requested the discipline due to Grandison's race, gender, or education.  S.J. Ex. 3 [Grandison Tr. 249:12 – Tr. 250:4].

Carroll issued a disciplinary report, citing Grandison for violating security procedures and regulations -- first offense.  S.J. Ex. 3 [Grandison Tr. 255:4-18; Grandison Tr. Ex. 42 (Disciplinary Report, dated Mar.13, 2006)].  And, Wackenhut suspended him for 5 days, the prescribed disciplinary measure. S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001230); S.J. Ex. 3 [Grandison Tr. 260:3-9; Grandison Tr. Ex. 43 (Letter from K.A. Conry to Grandison (March 16, 2006))].

Grandison can point to no evidence that his race, gender, or education played a role in that decision:

> Q.    Do you have any evidence or information -- are you aware of any evidence or information that Wackenhut suspended you for use of the fax machine because of your race?
>
> A.    I don't know.

Q.     Are you aware of any evidence or information that Wackenhut suspended you because of your -- because of the fax -- use of the fax, receipt of the fax, because of your gender?

A.     I don't know.

Q.     Are you aware of any evidence or information that Wackenhut suspended you for a receipt of the fax because you had filed a charge of discrimination with the Equal Employment Opportunity Commission?

A.     I think it was in response to the documentation that was sent to the union and my persistence to resolve write-ups and disciplinary actions that they've taken against me.  That's what I think it was in retaliation for.

Q.     All right.  Let's stick to my question, though.

       Do you have any evidence or information that Wackenhut suspended you for your receipt of the fax because you had filed a charge of discrimination with the EEOC?

A.     No.

Q.     Are you aware of any evidence or information that Wackenhut suspended you for receipt of the fax because of your educational attainment?

A.     No.

S.J. Ex. 3 [Grandison Tr. 272:18 – Tr. 274: 4].

### 9.     Grandison's February 27, 2006, Memorandum to Charles Carroll

By memorandum to Carroll and a union official, dated February 27, 2006, Grandison identified instances in which he claimed that management and Foster had mistreated him.  S.J. Ex. 3 [Grandison Tr. 170:5-16; Grandison Tr. 383:18 – Tr. 384:2; Grandison Tr. Ex. 54].  Carroll responded by memorandum dated March 1, 2006.  S.J. Ex. 3 [Grandison Tr. 535:12 – Tr. 536:21; Grandison Tr. Ex. 76].  He invited Grandison to contact Carroll's chain of command if Grandison felt that Carroll had treated him unfairly.  But, Grandison never did.  S.J. Ex. 3 [Grandison Tr. 536:2 – Tr. 537:14].

    **10.    Grandison's February 28, 2006, Infraction:  Tardiness or Failure to Observe Assigned Work Hours**

On February 28, 2006, Grandison was late, again.

He was due at roll call at 9:45 p.m.  But, he did not report to the GAO command center until nearly an hour later.  By then, however, the shift supervisor, Sgt. Avonne Collins, had summoned a replacement officer.  So, Collins told Grandison that he was not needed.  S.J. Ex. 3 [Grandison Tr. 401:5 – Tr. 403:2; Grandison Tr. 406:18 – Tr. 407:5; Grandison Tr. Ex. 60 (Disciplinary Report (March 2, 2006))].

Collins issued a disciplinary report, citing Grandison for tardiness or failure to observe assigned work hours -- third offense.  Thereafter, Wackenhut administered the prescribed sanction:  a 3-day suspension.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001230]; S.J. Ex. 3 [Grandison Tr. 415:9-16; Grandison Tr. Ex. 60 (Disciplinary Report (Mar. 2, 2006)); Grandison Tr. Ex. 61 (Letter from K.A. Conry to Grandison (Mar. 17, 2006))].  And, again, Grandison can cite no evidence that supports a conclusion that his race, gender, or education prompted either document:

> Q.    Are you aware of any evidence or information that supports the conclusion that Wackenhut issued Grandison Deposition Exhibit Number 60 [--Disciplinary Report (March 2, 2006)) --] or Grandison Deposition Exhibit Number 61 [--Letter from K.A. Conry to Grandison (March 17, 2006) -- ] because of your race? Here's Number 60.
>
> A.    I don't know.
>
> Q.    Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Grandison Deposition Exhibit Number 60 or Grandison Exhibit Number 61 because of your gender?
>
> A.    I don't know.
>
> Q.    Are you aware of any evidence or information that supports a conclusion that Grandison (sic) [-- Wackenhut --] issued Grandison Deposition Exhibit Number 60 or 61 because of your educational attainment?

A.    I don't know.

S.J. Ex. 3 [Grandison Tr. 415:17 – Tr. 416:10].

**11.    Grandison's March 1, 2006, Confrontation with Sgt. Foster**

Wackenhut discharged Foster after Grandison reported that Foster had come late to work, smelled of alcohol, and slept on the job.  S.J. Ex. 1 [Conry Decl. ¶ 11]; S.J. Ex. 2 [Carroll Tr. 138:8 – Tr. 139:9]; S.J. Ex. 3 [Grandison Tr. 547:6-11; Grandison Tr. Ex. 82 (Memorandum from Grandison to Carroll, *et al*. (Jan. 31, 2006))]; S.J. Ex. 3 [Grandison Tr. 157:4-13; Grandison Tr. Ex. 23 (Letter from K.A. Conry to Foster (Feb. 28, 2006))].

Grandison contends that Foster physically attacked him at the worksite, after the discharge.  Compl. ¶ 14; S.J. Ex. 3 [Grandison Tr. 156:6-12; Grandison Tr. Ex. 24 (Memorandum from Grandison to Carroll, *et al*. (Mar. 2, 2006))].  But, Grandison knows of no evidence that WSI authorized the attack or that Foster launched it on the Company's behalf:

Q.    Are you aware of any evidence that supports a conclusion that Wackenhut authorized Mr. Foster to strike you in the way that you describe in Grandison Deposition Exhibit Number 24 [-- Memorandum from Grandison to Carroll (Feb. 28,2006) --]?

A.    No.

Q.    Are you aware of any evidence that supports the conclusion that Wackenhut -- that -- pardon me -- that Mr. Foster was acting on Wackenhut's behalf when he -- when he acted -- when he did what he did -- pardon me -- when he did what he's described as doing in Grandison Deposition Exhibit Number 24?

A.    No.

S.J. Ex. 3 [Grandison Tr. 158:20 – Tr. 159:9].

After the confrontation a supervisor, Capt. Kathy Trickey, escorted Grandison from the premises.  S.J. Ex. 3 [Grandison Tr. 482:22 – Tr. 484:1].

### 12.     Grandison's March 13, 2003, EEOC Charge

On March 13, 2006, Grandison filed a discrimination charge with the EEOC.  S.J. Ex. 3 [Grandison Tr. 218:1 – Tr. 219:9; Grandison Tr. Ex. 36 (Notice of Charge of Discrimination (March 23, 2006), Charge of Discrimination (Mar. 13, 2006))].  WSI learned about the charge over 2 weeks later, on March 28, 2006, when the Company received a copy from the EEOC.  S.J. Ex. 1 [Conry Decl. ¶ 12]; S.J. Ex. 3 [Grandison Tr. 219:11 – Tr. 220:5].  And, the EEOC dismissed the charge, two days after that, for want of supporting evidence.  S.J. Ex. 3 [Grandison Tr.  222:12–18; Grandison Tr. Ex. 37 (Dismissal and Notice of Rights (Mar. 30, 2006))].

Grandison ties his retaliation claim - - Count IIIA. - - to that charge.  S.J. Ex. 3 [Grandison Tr. 368:4 -- Tr. 369:7].

### 13.     Grandison's March 15, 2006, Infraction:  Willful Insubordination (First Offense)

Grandison's infractions continued.

On March 15, 2006, he signed-in for duty without wearing a tie.  Collins told Grandison that he needed to don his tie and be in full uniform before going on post.  But, about 45 minutes later he saw Grandison on post without his tie and with his shirt sleeves unbuttoned and rolled up.  Collins concluded that Grandison's conduct showed "complete disregard for Collins' authority to enforce GAO and Wackenhut policies."  So, Collins issued a disciplinary report, citing Grandison for willful insubordination -- first offense.  S.J. Ex. 3 [Grandison Tr. 416:20 – Tr. 417:15; Grandison Tr. Ex. 62 (Disciplinary Report (March 15, 2006))].

Carroll investigated the matter.  S.J. Ex. 3 [Grandison Tr. Ex. 62 (Disciplinary Report (March 15, 2006))]; S.J. Ex. 4 [Carroll Decl. ¶ 3].  As part of his investigation, Carroll reviewed security tapes showing that Grandison was not in proper uniform.  S.J. Ex. 4 [Carroll Decl. ¶ 4; Carroll Decl. Ex. B (Memorandum from Carroll to Dennis Stephens/Al League (April 5, 2006))].

He also received a statement from another supervisor, Sgt. Douglas Akinmola, who corroborated

Collins' description of what had occurred:

> At about 2340 hours [-- 11:40 p.m.-- ], Sgt. Collins informed me that Ofc. Grandison was out of uniform because he did not put on his tie.  He was advised by Sgt. Collins during the roll-call and also when Sgt. Collins went to drop of the NOV list, he told me that Ofc. Grandison was still out of uniform.  As a result, this prompted me to go out to post 11 to confirm Sgt. Collins['] statement.  On getting there, I saw Ofc. Grandison's tie hanging loose on the side of his shirt.  I advised him to dress properly and stop drawing attention to himself.  He wore his tie right and was properly in uniform before I left post 11.

S.J. Ex. 4 [Carroll Decl. ¶ 5; Carroll Decl. Ex. A (Akinmola Statement (Mar. 15, 2006))].

So, Carroll concurred with the report, and recommended that Wackenhut suspend

Grandison for 5 days -- the most lenient disciplinary measure prescribed for Grandison's offense.

S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001231);  S.J. Ex. 3 [Grandison Tr. Ex. 62

(Disciplinary Report (Mar. 15, 2006))]; S.J. Ex. 4 [Carroll Decl. Ex. B (Memorandum from

Carroll to Dennis Stephens/Al League (Apr. 25, 2006))].

Carroll also briefed Grandison, on March 29th, stressing that he must be in full uniform

before he goes on post.  Grandison's union shop steward, Daniel McNeil, attended that briefing.

S.J. Ex. 4 [Carroll Decl. ¶ 7].

Wackenhut suspended Grandison, as Carroll had recommended.  S.J. Ex. 3 [Grandison

Tr. 417:16 – Tr. 418:20; Grandison Tr. Ex. 63 (Letter from K.A. Conry to Grandison (dated May

3, 2006))];

And, Grandison can point to nothing that supports the conclusion that his race, gender,

education, or EEOC charge motivated Carroll's report or the Company's suspension decision:

> Q.     Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Deposition Exhibit Number 62 [-- Disciplinary Report (March 15, 2006) -- ] or Deposition Exhibit Number 63 [-- Letter from K.A. Conry to Grandison (May 3, 2006) -- ] because of your race?
>
> A.     I don't know.

Q.     Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Deposition Exhibit Number 62 or Deposition Exhibit Number 63 because of your gender?

A.     I don't know.

Q.     Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Grandison Deposition Exhibit Number 62 or Grandison Deposition Exhibit Number 63 because of your educational attainment?

A.     I don't know.

Q.     Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Grandison Deposition Exhibit Number 62 or Grandison Deposition Exhibit Number 63 in retaliation for anything that you did?

A.     I don't know.

S.J. Ex. 3 [Grandison Tr. 418:21 – Tr. 419:20].

Following an April 2, 2006, on-the-job accident, Grandison was off of work through early May.  S.J. Ex. 2 [Carroll Tr. 145:19 – Tr. 146:7]; S.J. Ex. 3 [Grandison Tr. 100:8-15].  Wackenhut told him about the suspension when he returned.  S.J. Ex. 3 [Grandison Tr. Ex. 63 (Letter from K.A. Conry to Grandison (May 3, 2006))].

### 14.     Grandison's April 2, 2006, Infraction:  Willful Insubordination (Second Offense)

That was not the last time that Grandison was insubordinate.

On or about April 7th, at the GAO's request, Carroll reviewed April 2nd security tapes in connection with Grandison's alleged injury.  They showed Grandison walking his rounds, hatless, with his shirt collar open, and with his tie off to one side.  S.J. Ex. 3 [Grandison Tr. 424:1-22; Grandison Tr. 425:5-10; Grandison Tr. Ex. 66]; S.J. Ex. 2 [Carroll Tr. 30:18 - Tr. 31:10; Carroll Tr. 32:2-11].

At Carroll's request, McNeill reviewed the tape and confirmed that it revealed that Grandison was improperly dressed.  S.J. Ex. 2 [Carroll Tr. 34:17 – Tr. 35:13]; S.J. Ex. 4 [Carroll

Decl. ¶¶ 9, 10; Carroll Decl. Ex. C (Daniel McNeil Statement (Apr. 7, 2006))]. He put the matter

this way:

> I, SPO [-- Special Police Officer --] McNeill, was requested to meet with Mr. Carroll (the
> Project Manager), concerning SPO Grandison. Mr. Carroll showed me the video dated
> 04-02-2006 showing SPO Grandison on his tour of duty in the building hitting
> checkpoint through out the building. SPO Grandison did not have his hat on and his tie
> was off to the side of his shirt, with his collar open. This incident was after the
> discussion we had in Mr. Carroll's office on 03-29-2006.

S.J. Ex. 3 [Grandison Tr. 430:11-22; Grandison Tr. 431:21 – Tr. 432:5]; S.J. Ex. 4 [Carroll Decl.

Ex. C (Daniel McNeil Statement (Apr. 7, 2006))].

Carroll concluded that Grandison's continued failure to wear his uniform properly,

coming just days after Carroll had counseled him about his dress, was yet another act of willful

insubordination. So, Carroll issued a disciplinary report, citing Grandison for his second offense.

S.J. Ex. 2 [S.J. Ex. 2 [Carroll Tr. 62:4–19; Carroll Tr. 77:11 – Tr. 80:20]; S.J. Ex. 3 [Grandison

Tr. 425:5-10; Grandison Tr. Ex. 66 (Disciplinary Notice (Apr. 10, 2006))].

Grandison rejoined that (1) a shift supervisor, Sgt. Douglas Akinmola, had authorized

him to conduct his rounds without his hat, tie, and uniform shoes; and (2) another officer,

Michael Pope, was a witness. S.J. Ex. 3 [Grandison Tr. 544:22-13; Grandison Tr. Ex. 80

(Grandison Statement (May 4, 2006))].

Carroll conferred with Akinmola, who denied that he had excused Grandison from

wearing his tie or hat. S.J. Ex. 3 [Grandison Tr. 432:6-20; Grandison Tr. Ex. 69 (Douglas

Akinmola Statement (Apr. 26, 2006))]; S.J. Ex. 4 [Carroll Decl. ¶ 11]. Likewise, Pope, with

whom Carroll also conferred, said that he did not hear Akinmola excuse Grandison from wearing

those articles. S.J. Ex. 3 [Grandison Tr. 546:20 – Tr. 547:1; Grandison Tr. Ex. 81 (Michael Pope

Statement (May 5, 2006))]. S. J. Ex. 4 [Carroll Decl. ¶ 12; Carroll Decl. Ex. E].

Carroll, therefore, recommended that the Company dismiss Grandison -- the prescribed sanction for the second occurrence of willful insubordination.  S.J. Ex. 1 [Conry Decl. Ex. D (SOP 358 at PROD 001231]; S.J. Ex. 2 [Carroll Tr. 62:4-19; Carroll Tr. 77:11 – Tr. 80:20]; S.J. Ex. 3 [Grandison Tr. 550:17-Tr. 551:2; Grandison Tr. Ex. 66 (Disciplinary Report (April 10, 2006)); Grandison Tr. Ex. 85 (Memorandum from Carroll to Dennis Stephens and Al League (May 4, 2006))]; S. J. Ex. 4 [Carroll Decl. ¶ 13; Carroll Decl. Ex. F].  And, the Company did so, effective May 25, 2006.  S.J. Ex. 3 [Grandison Tr. 425:15-22; Grandison Tr. Ex. 67 (Letter from K.A. Conry to Grandison (May 22, 2006))].

Grandison contends that his race, gender, education, and EEOC charge prompted those measures.  But, he can point to no supporting evidence.  Neither can he identify a single similarly situated employee whom Wackenhut treated more favorably.

Q    Are you aware of any evidence or information that supports a conclusion that Wackenhut issued Grandison Deposition Exhibit Number 66 [ -- Disciplinary Report (April 10, 2006 --] or Grandison Deposition Exhibit Number 67 [-- Letter from K.A. Conry to Grandison (May 22, 2006) --]because of your race?

A    I don't know.

Q    Are you aware that -- of any evidence or information that Grandison issued -- pardon me – that Wackenhut issued Grandison Deposition Exhibit Number 66 or Grandison Deposition Exhibit Number 67 because of your gender?

A    I'd like to say that -- I'd like to go back to the first question.

Q    Okay.

A    I -- I think that's discrimination.  I'm a hundred percent positive that there's been other races, other gender individuals who have been out of uniform that have not been written up for willful insubordination and/or terminated for willful insubordination with regard to uniform issues.  You can go ahead.

Q    I think we need to start again.

Am I correct that you believe that Grandison -- that the company issued Grandison Deposition Exhibit 66 or 67 because of your race?

A        Yes.

Q        On what do you base that conclusion?

A        From my previous statement.

Q        What employees were out of uniform but were not disciplined for being out of uniform?

A        I don't know. I have to -- I'll have to look at the tapes and the tapes will show you.

Q        You can't identify any such employee?

A        No. Not right now, no.

Q        Are you aware of any evidence or information that supports a conclusion that Wackenhut terminated you because of your gender?

A        On numerous occasions, I've seen women without proper uniform on and they haven't been terminated.

Q        Which women?

A        I'll have to look at the tapes, and they'll show you.

Q        You can't identify anyone at the moment?

A        Not at the moment.

Q        Are you aware of any evidence or information that supports a conclusion that Wackenhut terminated you because of your educational attainment?

A        Yeah. I think this write-up as well as others and me being probably the only individual there with a certain level of education that's different from everybody else's. I think probably -- I feel like that shows that I got some additional discriminatory, harassing treatment due to my level of education.

Q        Are you aware of any other evidence or information that supports that conclusion?

A        No.

Q        Are you aware of any evidence or information that supports a conclusion that Wackenhut terminated you in retaliation for anything that you did?

A        Yes.

Q        What is that evidence or information?

-26-

A       Just the write-up itself.

Q       What about the write-up?

A       The write-up itself --

Q       Well, pardon me.  Before you answer that question, what write-up are you referring to?

A       The last two, 67, 66.

Q       What about Grandison Deposition Exhibit Number 66 and Grandison Deposition Exhibit Number 67 supports a conclusion that Wackenhut terminated you because of your educational attainment?

A       We're back to education now?

Q       I apologize.

A       Retaliation?

Q       Retaliation.  I apologize.  Thank you for the correction.

A       Like I said, once you go to the tapes, I've seen numerous officers out of uniform on a daily basis, supervisors as well, and they haven't been terminated for these offenses.

Q       The people you've seen out of uniform have included men as well as women?

A       Probably.

Q       Black people as well as white people?

A       Probably.

Q       People who have filed charges and people who have not filed charges?

A       I don't know.

S.J. Ex. 3 [Grandison Tr. 426:1 – Tr. 430:3].

Moreover, Wackenhut has disciplined, up to discharge, numerous employees for breaking the rules, including female employees and employees who are not black.  S.J. Ex. 1 [Conry Decl. ¶¶ 14-31 and Conry Decl. Exs. E-V.].

-27-

Within about a month after it terminated Grandison, Wackenhut hired two armed security guards for the GAO worksite.  Both are black.  One is a male.  S.J. Ex. 4 [Carroll Decl. ¶ 14].

### 15.    Grandison's May 11, 2006, EEOC Charge

On May 11, 2006, Grandison filed a second charge with the EEOC.  S.J. Ex. 3 [Grandison Tr. 222:19 – Tr. 223:16; Grandison Tr. Ex. 38 (Notice of Charge of Discrimination (May 25, 2006)); Charge of Discrimination (May 11, 2006))].  Wackenhut learned about the charge on June 1, 2006, when it received a copy from the EEOC.  S.J. Ex. 1 [Conry Decl. ¶ 13]; S.J. Ex. 3 [Grandison Tr. Ex. 38 (Notice of Charge of Discrimination (May 25, 2006))].

The EEOC dismissed the charge because Grandison commenced this action.  S.J. Ex. 3 [Grandison Tr. 437:6 – Tr. 438:14].

### 16.    Grandison's Alleged Hostile Work Environment

He does not include it as a separate count.  But Grandison appears to seek relief on the ground that WSI subjected him to a hostile work environment.  *See* Compl. ¶ 10.

#### a.    Allegation that Wackenhut Harassed Grandison about his Uniform

Grandison claims that his supervisors contributed to the hostile work environment by falsely accusing him regarding his dress, but overlooking similar acts of female officers which should have resulted in discipline.  Compl. ¶ 10.  He can identify, however, no similarly situated women whom management treated more favorably.  Neither does he know whether management even was aware that women had dressed improperly:

Q    Do you have any evidence or -- are you aware of any evidence or information that Grandison -- pardon me -- that management did what it did to you with respect to your uniform because of your gender?

A    Yeah.  They ignored the same supposedly infractions that were -- in a case, I guess, that women actually were at fault, and I know that for a fact.

-28-

Q       Can you identify the women who were at fault and were ignored?

A       I probably have to do some research on the names, but I know the face.  And I may have it – and I may have it written down in the -- those -- one of those notebooks that I provided.

Q       At this juncture, you can recall no names; is that correct?

A       No.  But I'm sure after talking to a couple of people I can find out who they are.

Q       With whom would you have to speak?

A       A number of the individuals that's in one of those first three exhibits you've shown today.

Q       Please tell me.  With whom would you need to speak?

A       Probably all of them, all of them, and then through that process, they would help me ID who that person was.

        And actually, it was -- I know for a fact it was two females, so, you know -- but I can't remember their names, but I assure you that I'll come up with the name.

Q       What infractions did those two females commit?

A       Definitely not wearing their hats 24/7 and also they had cuffs in the bottom of their pants and they had them before I -- before -- they had them before I was issued -- issued -- before I started. They were there before I started.

Q       Are you testifying that you were aware of how they dressed before you began on the job?

A       I just knew they had them.  From the day I started, they had cuffs in their pants.

Q       You're not testifying that you knew how they were dressed before you began work there, are you?

A       Well, the only knowledge I have to that is that -- what I heard from other officers. But I'm sure -- once again, they have CCTV cameras posted, and I'm sure that once we reveal those tapes, we'll see -- we'll see that –

Q       Which management –

A       -- which two.

Q       Had you finished your answer?

-29-

A     Right.

Q     I'm sorry.  Did you finish your answer, sir?

A     Uh-huh.

Q     You'll have to say yes or no.

A     Yes.

Q     Which management -- was management aware of the two females whose infractions you've described?

A     I don't know whether they were aware, but I know they were aware of mine.

S.J. Ex. 3 [Grandison Tr. 476:20 – 479:15].

Wackenhut has disciplined several female GSA security guards for appearance

infractions.  S.J. Ex. 1 [Conry Decl. ¶¶ 14, 17, 18, 22, 23; Conry Decl. Ex. E, H, I, M, N].

### b.     Allegation that Wackenhut Made Up Rules that Applied only to Grandison

Grandison alleges, in his Complaint, that Wackenhut made up rules that applied only to

him.  Compl. ¶ 10.  Evidently, however, he has decided not to press that claim.

Q     Are you contending as part of this lawsuit that Wackenhut made up rules and applied rules that -- pardon me -- made up rules that applied only to you?

A     No.

S.J. Ex. 3 [Grandison Tr. 480:10-13].

### c.     Allegation that Wackenhut Intentionally Interfered with Grandison's Right to Leave Work

Grandison alleges that management intentionally interfered with his right to leave work.

Compl. ¶ 10.  But he can point to no supporting evidence.

Q     My question, then, is are you contending as part of this lawsuit that management intentionally interfered with your right to leave work?

A     I don't know.

-30-

Q       Did management ever intentionally interfere with your right to leave work?

A       I don't know.

S.J. Ex. 3 [Grandison Tr. 482:10 – 16].

### d.    Allegation that Wackenhut sent Grandison Home for Trumped up Reasons

Grandison alleges that Wackenhut sent him home for trumped up reasons.  Compl. ¶ 10.

He testified that that contention relates to 6 incidents:

- The occasion on which Wackenhut suspended him in connection with the facsimile, S.J. Ex. 3 [Grandison Tr. 482:22 – 483:4].  As discussed, however, he can point to no evidence that his race, gender, or education motivated that decision.  *See* pp. 16-18, *supra*.

- An occasion on February 26, 2006, on which Wackenhut sent him home for arguing with Foster.  S.J. Ex. 3 [Grandison Tr. 482:22 – Tr. 483:7].  Grandison, however, can point to no evidence that Wackenhut did so due to his race, gender, or education.  S.J. Ex. 3 [Grandison Tr. 503:5 – Tr. 504:22].

- The occasion, on February 28, 2008, when Collins told Grandison that he was not needed after he reported to work over one hour late, S.J. Ex. 3 [Grandison Tr. 482:22 – Tr. 483:14].  As discussed, however, Grandison can point to no evidence that his gender, race, or education were factors in Collins' decision making.  *See* pp. 19-20, *supra*.

- The occasion on which Wackenhut suspended him for insubordination, S.J. Ex. 3 [Grandison Tr. 482:22 – 483:16; Grandison Tr. 494:3-13].  Again, however, Grandison can point to no evidence that his gender, race or education prompted the Company's disciplinary action.  *See* pp. 21-23, *supra*.

- The occasion on which Trickey escorted Grandison from the premises after his confrontation with Foster.  S.J. Ex. 3 [482:22 – Tr. 483:18].

- And, an occasion on which Wackenhut  purportedly suspended him for wearing unauthorized uniform pants.  S.J. Ex. 3 [482:22 – Tr. 484:2].

Evidently, Grandison is not pressing the allegation contained in his Complaint that

Wackenhut created a hostile work environment by sending him home for sleeping on the job and

for not taking authorized breaks.  Compl. ¶ 10; S.J. Ex. 3[Grandison Tr. 482:22 – Tr. 484:2].

-31-

   **e.**  **Allegation that Wackenhut Attempted to have other Officers Write Disparaging Remarks Concerning Grandison**

Grandison alleges that Wackenhut subjected him to a hostile environment by "attempting to have other officers write disparaging remarks about [him]."  Compl. ¶ 10; S.J. Ex. 3 [Grandison Tr. 505:1-11].  Specifically, according to Grandison, Wackenhut compelled Trickey, Akinmola, and Richardson to lie to justify the Company's decision to discipline Grandison in connection with the February 27th facsimile.  But, he can point to no evidence to support that claim.  S.J. Ex. 3 [Grandison Tr. 505:1 – Tr. 512:20].

   **f.**  **Allegation that Wackenhut Deprived Grandison of the Opportunity to take Courses**

Grandison alleges that Wackenhut contributed to the hostile work environment by disciplining him when he took October 15, 2005, off to attend a course.  Compl. ¶ 10; S.J. Ex. 3 [Grandison Tr. 513:4 – Tr. 515:22; Grandison Tr. Ex. 28 (Letter from K.A. Conry to Grandison (Nov. 10, 2005)].  But, as discussed, he agreed with the contents of the resulting disciplinary report.  And he can cite no evidence that his race, gender, or education prompted it.  *See* pp. 6-8, *supra*.

   **g.**  **Allegation that Grandison was subjected to Unfounded Threats**

Grandison alleges that Richardson, Collins, and Foster contributed to the hostile work environment by subjecting him to unfounded threats of discipline.  Compl. ¶ 10; S.J. Ex. 3 [Grandison Tr. 518:18 – Tr. 519:6].  But, he can identify no such threats that Richardson or Collins made.  S.J. Ex. 3 [Grandison Tr. 520:5-10].  Grandison contends that Foster badgered Grandison about his uniform.  S.J. Ex. 3 [Grandison Tr. 106:20 – Tr. 112:4; Grandison Tr. 520:11 – Tr. 521:11].  As discussed, however, Grandison can point to no evidence that gender played a role in any such alleged conduct.  *See* pp. 28-30, *supra*.

h.      **Allegation that Wackenhut Falsely Accused Grandison of Arguing with his Supervisor**

Grandison alleges that the Company contributed to a hostile work environment by falsely accused him of arguing with Foster.  Compl. ¶ 10; S. J. Ex. 3 [Grandison Tr. 482:22 – Tr. 483:7; Grandison Tr. 522:12 – Tr. 525:13].  But, he is aware of no evidence that the Company did so due to Grandison's race, gender, or education.

Q.      Are you aware of any evidence that supports -- or information that supports a conclusion that Wackenhut or its managers accused you of being argumentative with Mr. Foster on or about February 26, 2006 because of your race?

A.      I don't know.

Q.      Are you aware of any evidence or information that Wackenhut or its managers accused you of being argumentative with Mr. Foster on February 26, 2006 because of your gender?

A.      Don't know.

Q.      Are you aware of any evidence or information that supports a conclusion that Wackenhut or its managers accused you of being argumentative with Mr. Foster on February 26 because of your educational attainment?

A.      Don't know.

Q.      Are you aware of any evidence or information that supports a conclusion that Wackenhut or its managers accused you of being argumentative with Mr. Foster on February 6 -- 26, 2006 in retaliation for anything you had done to that point?

A.      Don't know.

S.J. Ex. 3 [Grandison Tr. 503:22 – Tr. 504:22].

i.      **Alleged Provocation**

Grandison says that Wackenhut tried to provoke him so that he would give the Company an excuse to terminate him.  Compl.  ¶ 10.  But, he can point to no supporting evidence.

Q.      What evidence or information do you have that supports your conclusion, your testimony, that you were being provoked to say something or do something that might result in your termination?

A.      Well, I don't know what they were attempting to do, but I know what -- when I'm
        being provoked.  I know that.

S.J. Ex. 3 [Grandison Tr. 527:7-13].

### j.      Alleged Mistreatment Due to Grandison's Education

Grandison contends that Wackenhut treated him differently because he graduated from

college.  Compl. ¶ 10.  But, again, he can point to no supporting evidence.  *See* pp. 4–18, 19-20,

21-33, *supra*.

### k.      Alleged Defamation

Grandison grounds his defamation claim upon unflattering remarks about him made to

his supervisor and others at Startech.  Compl. ¶¶ 25, 55-58.  But, he attributes those statements to

GAO representatives, Mr. Bodel and an individual whose name Grandison cannot recall:  Not to

anyone at Wackenhut.  Compl. ¶ 24; S.J Ex. 3 [Grandison Tr. 65:13 – 66:16; Grandison Tr.

71:18 – 72:13].  And, he can identify no occasion on which a Wackenhut employee or agent

made such remarks:

Q.      Are you aware of any occasion on which anyone in Wackenhut's employee or
        anyone serving as an agent of Wackenhut made any disparaging remark about
        you to Startech or anyone at Startech?

A.      Yeah.  That indicate -- that – those instances where they came into the building
        and requested information and made the statements that, you know, my -- my
        coworkers and my supervisor, if they protected me, then they would go down just
        like I go down.  Those are to me disparaging remarks.  It's got nothing to do with
        GAO at all.

Q.      Those remarks, as I understand it, Mr. Grandison, were made by Mr. Bodle and
        this other individual whose name you cannot recall; am I correct –

A.      Right.

Q.      -- in that understanding?

A.      Right.

-34-

Q.      My question, then, is different.  Are you you aware of any occasion on which any Wackenhut employee or agent of Wackenhut said anything disparaging about you to anyone at Startech?

MR. SCHIFFRES:  Do you understand the question?

THE WITNESS:  Yeah.  No, I don't -- I don't -- I don't recall.  I don't -- I don't know.  I'll have to go back and check and -- and talk to some of the officers at both locations and find out who said what.

BY MR. MORRIS:

Q.      All right.  At this moment -- I want to make sure I understand.  At this moment, you cannot identify any occasion on which any agent or employee of Wackenhut said anything disparaging about you to anyone at Startech; am I correct?

A.      Yep.

S.J. Ex. 3 [Grandison Tr. 74:4 – Tr. 75:17].

Neither can he cite any evidence that Wackenhut instigated or ratified the offending remarks.  S.J. Ex. 3 [Grandison Tr. 75:18 – Tr. 76:5].

### l.      Grandison's Interference with Contract Claim

Grandison contends that Wackenhut "attempted to procure" the breach of his employment agreement with Startech.  Compl. ¶ 69.  He admits, however, that Wackenhut has done nothing that caused Startech to breach it.  S.J. Ex. 3 [Grandison Tr. 97:7-10].

## III.    Argument

### A.      The Court Should Enter a Judgment in Wackenhut's Favor

#### 1.      The Standard for Granting Summary Judgment

Federal Rule of Civil Procedure 56 mandates entry of summary judgment if the record shows that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).

Summary judgment is not "a disfavored procedural shortcut." Rather, it is an "integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (citation omitted).

Rule 56 allows courts to "isolate and dispose of factually unsupported claims or defenses, and … it should be interpreted in any way that allows it to accomplish this purpose." *Celotex,* 477 U.S. at 323-24. There is no need for a trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 39 (D.C. Cir. 1987), (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).

No trial in this case is warranted.

> **2.    The Court should enter a Judgment in Wackenhut's Favor as to Grandison's Interference with Contract Claim.**

Interference with contract plaintiffs must prove "'(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.'" *Casco Marina Dev., L.L.C. v. D.C. Redevelpment Land Agency*, 834 A.2d 77, 83 (D.C. 2003), *quoting*, *Paul v. Howard Univ*., 754 A.2d 297, 309 (D.C. 2000); *see Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 807 (D.C. 2003) (same).

Grandison contends that Wackenhut "attempted to induce" another employer -- Startech -- to breach its employment contract with him. But, it is undisputed that Startech has not done so. *See* p. 35, *supra*. That dooms Grandison's interference with contract claim.

> **3.    The Court should enter a Judgment in Wackenhut's Favor as to Grandison's Defamation Claim.**

His defamation claim fares no better.

Plaintiffs suing for defamation must prove:

> (1) that *the defendant* made a false and defamatory statement concerning the plaintiff; (2) [that] *the defendant* published the statement without privilege to a third party; (3) that *the defendant's* fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Blodgett v. The Univ. Club*, 930 A.2d 210, 222 (D.C. 2007), *quoting Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (emphasis added); C*lawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 312 (D.C. 2006) (same); *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (same).

Grandison bases his defamation claim upon disparaging remarks about him made to his supervisor and others at Startech. But he attributes the remarks to GAO personnel, *not* to anyone at Wackenhut. *See* pp. 34-35, *supra*.

Thus, as a matter of law, Grandison's defamation claim cannot survive.

### 4. The Court should enter a Judgment in Wackenhut's Favor as to Grandison's DCHRA Claims.

Grandison's DCHRA claims faces the same fate.

### a. Grandison's Education Discrimination and Harassment Claims are Not Justiciable.

The DCHRA prohibits employment discrimination and harassment based upon an individual's "matriculation." D.C. Code Ann. § 2-1402.11 (a). "[M]aticulation," under the Act, means "the condition of being enrolled in a college, or university; or in a business, nursing, professional, secretarial, technical or vocational school; or an adult education program." *Id*. at § 2-1401.02 (18).

Grandison does not contend, or even remotely suggest, that Wackenhut mistreated him because he is enrolled in an educational program. He asserts, instead, that Wackenhut did so

because he is a college graduate.  Compl. ¶¶ 3, 10, 63.   Accordingly, the DCHRA affords him no comfort.

Moreover, Grandison's claim would fail even if he could overcome that obstacle.  Indeed, there is no dispute that Grandison can identify no evidence that his education influenced any of Wackenhut's challenged conduct.  *See* p. 34, *supra*.

So, as a matter of law, the Court should enter a judgment in its favor as to Grandison's DCHRA claim, to the extent that he premises it upon alleged discrimination and harassment due to his education.

### b.     Wackenhut Did Not Subject Grandison to a Hostile Work Environment.

Grandison's hostile environment claim warrants the same treatment.

A hostile environment plaintiff must prove that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on membership in a protected class; and (4) the harassment was severe and pervasive enough to affect a term, condition, or a privilege of employment.  *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C. 2003); *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998).

The DCHRA is not a general employer civility code.  *See Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998); *Glenn v. Williams,* No. Civ. A. 98-1278, 2006 WL 401816, at *33 (D.D.C. Feb. 21, 2006).[8]  Rather, courts employ a "demanding" standard for judging hostile environment actions.  The goal is to "filter out complaints attacking the ordinary tribulations of the workplace,

---

[8]     Courts construing the DCHRA often seek guidance from cases construing federal anti-discrimination statutes.  *Lively*, 830 A.2d at 887; *Daka, Inc.*, 711 A.2d at 92 n.15.

such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Faragher*, 524 U.S. at 788 (citation omitted).[9]

    To that end, the District of Columbia Court of Appeals has admonished that "[m]ore than

a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish

a prima facie case." *Howard Univ. v. Best*, 484 A.2d 958, 980 (D.C. 1984). Rather, in the words

of this Court:

> [N]ot all abusive behavior, even when it is motivated by
> discriminatory animus, is actionable. Rather a workplace
> environment becomes hostile for the purposes of Title VII *only*
> when offensive conduct permeates the workplace with
> discriminatory intimidation, ridicule, and insult that is sufficiently
> severe or pervasive to alter the conditions of the victim's
> employment.

*Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (emphasis added) (internal quotations

omitted) (District Court opinion reprinted with endorsement from District of Columbia Circuit

panel).

    Also, a hostile work environment plaintiff cannot prevail by relying on the discrete acts

on which he bases his discrimination and retaliation claims. *Brantley v. Kempthorne***,** No. Civ.A.

06-1137ESH, 2008 WL 2073913, at * 8 (May 13, 2008) (hostile work environment plaintiff may

not  "bootstrap" her alleged  discrete acts of discrimination and retaliation into a broader hostile

work environment claim."), *citing, Keeley v. Small,* 391 F. Supp. 2d 30, 51 (D.D  C.2005). That

is because "discrete acts constituting discrimination or retaliation claims ... are different in kind

from a hostile work environment claim that must be based on severe and pervasive

discriminatory intimidation or insult."). *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003);

*see Parker v. State Dep't of Pub. Safety,* 11 F. Supp. 2d 467, 475 (D. Del. 1998) ("[T]he dangers

---

[9]     *Faragher* involves alleged sexual harassment. The District of Columbia Court of Appeals, however, has
applied principles derived from such cases to actions involving other harassment types. *See Daka, Inc.*, 711 A.2d at
92.

of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address.").[10]

> In the words of this Court:
>
> [C]obbling together a number of distinct, disparate acts will not create a hostile work environment. For example, if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate disparate treatment claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult and ridicule.

*Brantley*, 2008 WL 2073913, at * 8.

Grandison falls well short of those standards.

First, he can cite no evidence to support his contention that much of the alleged offending conduct even occurred. Rather, he has testified that (1) he does not know whether Wackenhut interfered with his right to leave work, *see* pp. 30-31, *supra*; (2) he can point to no evidence that WSI attempted to have other officers write disparaging remarks about him, *see* p. 32, *supra*; (3) he can identify no occasions on which Richardson or Collins threatened him, *see* p. 32, *supra*; and (4) he does not know whether Wackenhut tried to provoke him to give the Company an excuse to terminate him, *see* pp. 33-34, *supra*.

Second, Grandison's hostile work environment claim cannot succeed to the extent that he premises it upon discrete acts of purported discrimination and/or harassment, such as (l) his contention that Wackenhut sent him home for trumped-up reasons; and (2) his contention that Wackenhut deprived him of the opportunity to take courses.

Third, there is no dispute that Grandison cannot prove that his race, or gender, or education was a factor in most of the conduct about which he complains. To the contrary, he

---

[10]     This Court cites *Parker* with approval in *Brantley*, 2008 WL 2073913, at *8.

concedes that he can point to no evidence that his gender prompted Wackenhut to mistreat him in connection with his uniform.  s*ee* pp. 28-30, *supra*.  Neither can he cite any evidence that his race or gender played a role in (1) Wackenhut's decision to suspend him for the February 27th facsimile, *see* pp. 16-18, *supra*; (2) Wackenhut's decision to send him home for arguing with Foster, *see* p. 31, *supra*; (3) Collins' decision, on February 28, 2006, to tell Grandison that he was not needed that day, *see* pp. 19-20, *supra*; (4) Wackenhut's decision to discipline him for not reporting to work on October 15, 2005, *see* pp. 6-8, *supra*; and (5) Wackenhut's decision to suspend him for insubordination, *see* pp. 21-23, *supra*.

Fourth, as to the remaining alleged offending conduct -- Trickey's decision to escort Grandison from the premises after his confrontation with Foster and Wackenhut's purported decision to suspend him for wearing unauthorized uniform pants -- the conclusion is ineluctable that, in addition to being distinct disparate acts upon which Grandison cannot rely, those two isolated incidents are insufficient, as a matter of law, to support a hostile environment claim. *Stewart*, 275 F.3d at 1134 ("Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment ….  Even a few isolated incidents of offensive conduct do not amount to actionable harassment.") (internal citations omitted); *Best*, 484 A.2d at 980 ("[m]ore than a few isolated incidents must have occurred and genuinely trivial occurrences will not establish a prima facie case.").

In short, as a matter of law, Grandison's hostile environment claim must fail.

### c.     Wackenhut Did Not Discriminate Against Grandison

So too must his discrimination claim.

Courts analyze DCHRA discrimination claims under the familiar burden-shifting framework that the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); s*ee Blackman v. Visiting Nurses Ass'n,* 694 A.2d 865, 868-69 (D.C. 1997).

The plaintiff first must establish a *prima facie* case by proving that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action creates an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Blackman,* 694 A.2d at 868-69.

If he succeeds, the burden shifts to the defendant to articulate a legitimate non-discriminatory business reason for the challenged decision. *Id*. And, if the defendant carries its burden, the burden returns to the plaintiff to prove, by a preponderance of the evidence, that the defendant's stated reasons are a pretext for discrimination. *Id*.

As the District of Columbia Circuit has admonished, "[a]lthough the *McDonnell Douglas* framework shifts 'intermediate evidentiary burdens between the parties, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (citations omitted). Thus, "to survive summary judgment, the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see Blackman*, 694 A.2d at 869.

That Grandison cannot do.

The gravamen of Grandison's discrimination claim is that Wackenhut disciplined and discharged him due to his gender or race. But, his testimony makes clear that he can identify no supporting evidence.

Rather, the undisputed evidence establishes that (1) Wackenhut disciplined and discharged Grandison due to the infractions that he committed; (2) he agreed with the contents of half of the reports that led to Company's disciplinary measures; (3) he can cite no evidence that an unlawful discriminatory animus motivated any of them, (4) Wackenhut treated him the same as it treated other employees -- including, female employees and employees who are not black -- who broke the rules; (5) at the GAO site during Grandison's tenure with Wackenhut, the Company employed mostly black males; and (6); within about a month after it terminated Grandison the Company hired 2 new guards for the site; one is a male, both are black.

Surely, no reasonable jury could infer discrimination under these circumstances.

### d.    Wackenhut Did Not Retaliate Against Grandison.

Neither could a reasonable jury conclude that Wackenhut retaliated against Grandison.

To establish a *prima facie* retaliation claim, the plaintiff must prove that (1) he engaged in statutorily protected activity; (2) the employer took an adverse personnel decision; and (3) a casual connection exists between the two. *Mason v. DaVita. Inc.,* 542 F. Supp. 2d 21, 30-31 (D.D.C. 2008); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006).

Grandison pins his retaliation claim to his March 13, 2006, EEOC charge.   But, it is undisputed that Wackenhut did not learn about that charge until March 28th, when it received a copy from the EEOC.  Thus Grandison's retaliation claim cannot survive to the extent that he premises it upon conduct that preceded that date.  *See Mason,* 431 F. Supp 2d. at 30 ("In order to show causation, a Plaintiff must show that the official responsible for the alleged retaliatory act had knowledge of the protected activity.")

It fails as well because Wackenhut had a legitimate, good faith, business reason for its subsequent adverse actions: (1) its decision to move forward with suspending Grandison when

he was first insubordinate; and (2) its decision to terminate him for his second offense.  *See* pp. 21-28, *supra*.

Certainly, Grandison points to nothing that suggests the contrary.

**IV.    Conclusion**

Grandison may not be pleased with everything that occurred during his tenure at Wackenhut.  His displeasure, however, does not support his lawsuit.

Rather, this case turns on the evidence.  And the undisputed evidence makes clear that Grandison's claims are meritless.  Accordingly, the Court should issue a judgment in Wackenhut's favor as a matter of law.

Respectfully submitted,

ARENT FOX PLLC

By:      /s/ Henry Morris Jr.
            Henry Morris, Jr., (#375894)
            Kristine J. Dunne (#471348)
            1050 Connecticut Avenue, N.W.
            Washington, D.C. 20036-5339
            (202) 857-6000/Telephone
            (202) 857-6395/Facsimile

*Counsel for Wackenhut Services, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

**TRAVIS GRANDISON,**                  )
                                       )
            **Plaintiff,**             )
                                       )
      **v.**                           )        **Civil Action No. 1:07-cv-00754 (RMC)**
                                       )
**WACKENHUT SERVICES, INC.,**          )
                                       )
            **Defendant.**             )
_____)

**ORDER**

THIS COURT having considered Wackenhut Services, Inc.'s Motion for Summary

Judgment, Travis Grandison's Opposition to the Motion, and the argument of counsel, it is

hereby,

ORDERED that Wackenhut's Motion be and the same hereby IS GRANTED, and

FURTHER ORDERED that judgment is hereby entered in Wackenhut's favor as to each

of Grandison's claims.


_____
Rosemary M. Collyer
United States District Court Judge

Date: _____

**SERVE:**

Jay Schiffres, Esquire.
700 E Street, S.E.
Washington, D.C.  20003

Henry Morris, Jr.
Kristine J. Dunne
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339